IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| Protection and Advocacy for People with Disabilities, Inc., | ) ) ) | Civil Action No. 2:20-cv-02738-DCN |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW** |
| James Alton Cannon, Jr., in his official capacity as Charleston County Sheriff, Mitch Lucas, in his official capacity as Assistant Charleston County Sheriff, Willis Beatty, in his official capacity as Chief Deputy of Charleston County Sheriff's Office, and Charleston County School District, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiff Protection and Advocacy for People with Disabilities, Inc. ("P&A" or "Plaintiff"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, hereby moves this Court to issue a Preliminary Injunction directing Defendants and their agents at the Charleston County Juvenile Detention Center ("CCJDC") to cease and desist immediately from engaging in practices that violate the constitutional and statutory rights of Plaintiff's members (the "Children"). As set out below, the requested injunctive relief is narrowly tailored to prevent further ongoing, irreparable harm to the juvenile pretrial detainees—many of whom suffer from various mental illnesses and other disabilities, making them particularly fragile—during the pendency of this action, in which P&A is likely to prevail. Equity, the public interest, and common decency require implementation of the requested injunction.

1

**<u>INTRODUCTION</u>**

This lawsuit seeks to rectify once and for all the ongoing unconstitutional, cruel, inhumane, and illegal practices and conditions which are pervasive at the CCJDC, a facility that is used to house minors who have not been convicted of any crime and who remain constitutionally protected from being punished for an alleged crime. The conditions and practices to which these Children are being subjected are abominable, posing a very real threat to their physical and mental health. The Defendants have been notified repeatedly and from multiple sources of these conditions and practices and yet have done nothing meaningful to resolve the situation. Meanwhile, a revolving group of our most vulnerable citizens is continually traumatized by the very system which should protect and, where necessary, rehabilitate them. These practices must be stopped.[1]

<u>FACTS</u>

The CCJDC is located at 4350 Headquarters Road in North Charleston, South Carolina and houses children aged 11 to 16 years old charged with criminal or status offenses during the pre-adjudicatory phase of their juvenile case. (Exhibit B, John Rhoads Aff. ¶ 13b).[2] Many of these Children have mental health diagnoses. (*Id.* at ¶ 31). Approximately half of the Children arrive from Charleston County, while the remainder of the Children are brought in by law enforcement primarily from surrounding Berkeley County, Dorchester County, and Colleton County. (*Id.* at ¶ 13e). Other counties may also request detention of their Children. (*Id.*). The CCJDC is operated by the Charleston County Sheriff's Office headed by Sheriff James Alton

---

[1] Pursuant to Local Civil Rule (D.S.C.) 7.02, the undersigned conferred with Defendants' counsel in a good faith attempt to resolve the matter contained in this motion, but no agreement has been reached.
[2] John Rhoads is an expert in prison operations who has interviewed many of the Children and submitted an Affidavit in support of this motion.

2

Cannon, Jr. with Chief Deputy Willis Beatty and Assistant Sheriff Mitch Lucas having direct supervisory authority over the operation of the facility.

## The Facility

Constructed in 1967, the CCJDC has never been remodeled or renovated and is likely far past its useful life. (*Id.* at ¶ 13a and 13h). The facility has a total rated capacity of 26 juveniles, but it routinely houses more than double that number. (*Id.*). The cells are small, approximately eighty square feet, and are designed for single occupancy, but often house as many as four Children at a time. (*Id.* at ¶ 54). The walls are concrete block. (*Id.* at ¶ 23). Children are forced to sleep on a thin mattress placed on a metal or concrete bed. (*Id.* at ¶ 23). None of the Children are provided separate pillows and adequate bedding, and while blankets are provided, they are sometimes removed as punishment. (*Id.* at ¶ 28). The building is kept very cold at all times, and removal of a blanket causes sleep deprivation. (*Id.* at ¶ 25 and 28). Each cell has a toilet and a sink. (*Id.* at ¶ 13k). There is no other furniture of any kind in the cells. (*Id.* at ¶ 13k).

Furthermore, the facility has not been properly maintained and is in deplorable condition that makes it unfit for housing anyone, least of all Children. (*Id.* at ¶ 16). It has repeatedly failed inspections undertaken by the South Carolina Department of Corrections in numerous respects. (*Id.* at ¶ 13). The roof of the CCJDC leaks, and water enters the cells and common areas when it rains. (*Id.*). Mop buckets are used to collect rainwater that pours from the ceiling during storms, sometimes requiring evacuation of the building. (*Id.*). There is visible mold near the air vents, on and around windows, and in sections of the ceiling that often leak. (*Id.* at ¶¶ 16 and 17). The building has a foul, moldy smell. (*Id.* at ¶ 16). Bug bites are common, whether from bed bugs, spiders, or mosquitoes. (*Id.* at ¶ 19). Cockroaches are a common sight, and Children report hearing and seeing rats and mice in the facility. (*Id.* at ¶ 18). Toilets in the facility routinely

3

overflow under normal use causing urine, feces, and contaminated water to flood the cells as well as the hallway and adjacent cells. (*Id.* at ¶ 22). When Children are forced to sleep on the floor as a result of overcrowding, which occurs frequently, they are separated from the filthy floors by only a thin pad. (*Id.* at ¶ 23). Moreover, the availability of hot water from the sinks and the shower facilities is inconsistent, often resulting in Children choosing between a cold shower and no shower at all. (*Id.* at ¶ 55).

## Time Spent in Cells

The Children receive no respite from the medieval conditions of these cells as they typically are confined to them for 22 or more hours a day, even when they are not under disciplinary lockdown. (*Id.* at ¶ 13t and 45). The Children leave their cells only for a short amount of time to shower, make phone calls, and, occasionally, have indoor recreation. (*Id.* at ¶ 26). The indoor recreation is extremely basic, including books, a television, and one ping pong table. (*Id.*) The Children typically have to eat in their cells. (*Id.* at ¶ 13p). Although, as noted below, educational services are administered outside of the cell in a common area, most Children indicate they did not regularly receive this sort of instruction, and at most they met with a teacher only a few days out of the week. (*Id.* at ¶¶ 13n and 72). Showers are timed and brief, not providing adequate opportunity for proper hygiene. (*Id.* at ¶ 55). The Children are not allowed to go outside at all. (*Id.* at ¶¶ 13n and 58). These conditions are the equivalent of solitary confinement or disciplinary lockdown typically reserved for hardened criminals. (*Id.* at ¶ 16).

Reports vary as to how frequently guards check on the Children, although some indicate the guards inspect the cells only on shift changes, and many Children report guards are frequently not responsive to calls for help. (*Id.* at ¶ 63). In short, the average day in the life of a

4

Child in custody at CCJDC is a dark, lonely, unsanitary, and inhumane day of solitary confinement.

**<u>Lockdowns</u>**

For discipline above and beyond the punishment of everyday existence at the facility, Children are regularly placed on lockdown in their cells, in solitary confinement in the "wet cell" (or "cool down room"), or strapped down in a restraint chair. These methods of punishment are inhumane, and their use in the twenty-first century, particularly to punish Children who have mental health issues or disabilities, shocks the conscience. Lockdown means the kids cannot leave their cells at all—no visitation with family, no phone calls, no education sessions, no showers, no recreation time, no books to read. (*Id.* at ¶ 28). Instead of being confined to their cells for 22-23 hours a day, they must stay in their cells 24 hours a day until the lockdown is lifted. (*Id.*). Some children have reported that, during lockdowns, they may also lose their blanket, which is necessary to stay warm in the very cold environment of the facility. (*Id.*). Lockdowns can last 24, 48, or 72 hours, and the length can reportedly be increased at the whim of the guards. (*Id.*). Sometimes individual Children are locked down, and sometimes all of the Children are placed on lockdown at the same time.

Lockdowns have been ordered for offenses such as knocking on a cell door to get a guard's attention, laughing, cursing, spitting, or talking out of turn. (*Id.*) Many Children report that when a toilet overflows in a cell—which is a common occurrence because of the antiquated plumbing in the building—the affected Children are blamed and placed on lockdown. (*Id.* at ¶ 22). No Child has expressed an understanding of any consistent or rational application of lockdowns for particular offenses, but all understood that a lockdown is imposed as a

punishment, not merely as a cool down measure used to de-escalate or to protect the Children from themselves or others. (*Id.* at ¶ 30).

## **The Wet Cell**

Yet another and even more crude method of punishment is confinement to the wet cell. (*Id.* at ¶ 43). The wet cell is a small, locked, windowless room, with concrete walls and floor, about the size of a janitor's closet. (*Id.* at ¶ 45). It has no sink, toilet, bed, or other fixtures aside from a concrete bench built into the back wall and a drain on the floor. The wet cell is a dark place, with some Children indicating it is illuminated by a single overhead, dim light bulb, and others saying there is no light in the room at all. (*Id.*). Because the wet cell has no toilet, a child confined to the room may be forced to "wet" himself or herself or urinate in the floor drain if toilet access is not provided timely. (*Id.*).

The reasons for confinement in the wet cell vary, but Children report being put there for minor infractions and are kept there for hours and sometimes for days. (*Id.*)[3] One Child refused to return to his normal cell after recreation time, so he was put in the wet cell for 6 hours. (*Id.* at ¶ 45). Another Child reported being confined in the wet cell on multiple occasions for failure to comply with instructions. (*Id.* at ¶45). He reported being confined in the cell alone for 2 days and being forced to sleep on the wet floor on a thin mat. (*Id.*). Another indicated he was placed in the wet cell in the restraint chair after the "green team" (SWAT team) came to the facility, presumably as a result of fighting. (*Id.* at ¶ 45). Yet another boy was confined for periods of 2 days and 5 days. The 5-day confinement took place in January 2020. During that confinement, the boy reported he was not given a mattress for the first night and he had to sleep on the hard floor. He further reported that he was required to wear only his underwear, socks, and a tee shirt

---

[3] More detail regarding the horrific treatment of Children in the wet cell is contained in the Rhoads Affidavit at ¶ 46.

while he was in the wet cell. During his 2-day confinement, which was in 2018, he was not given a mattress and was forced to sleep on the floor throughout. At that time he was about 13 years old. He was so upset that he repeatedly kicked the door until he was removed from the room by authorities pointing a taser at his chest and placed in the restraint chair for 10 hours (see below). (*Id.* at ¶45). The longest reported occupancy in the wet cell, thus far, comes from one Child who was confined for 10 days. (*Id.*). Most Children report receiving bathroom breaks while in the wet cell, and one child indicated his hands and feet were shackled while he was escorted to the toilet. (*Id.*).

## **The Restraint Chair**

A restraint chair is also used as a disciplinary measure. The chair resembles an "electric chair" with straps to completely immobilize a Child. (*Id.* at ¶ 47*)*. It has straps that secure the Child's feet and legs, waist, torso, arms, neck, and head. (*Id.*). At times the chair is used in the common area in plain view, and at other times it is used in conjunction with isolation of Children in the wet room. (*Id.*). The chair is often used for minor infractions, and Children are left in the chair for many hours with at least one Child reporting being confined to the restraint chair in the wet cell for two full days. (*Id.* at ¶¶ 45, 47). The restrained Children are routinely held longer than necessary to abate any threat of self-harm or harm to others. (*Id.* at ¶ 48). While in the wet cell and/or the restraint chair, Children report that they were not regularly monitored or checked on by CCJDC personnel, were not evaluated by medical or mental health professionals in connection with their confinement, were not afforded notice or an ability to contest the confinement, and were denied basic necessities such as food, water, and bathroom breaks. (*Id.* at ¶ 47). No witness has described the restraint chair as being used merely as a temporary measure

7

to prevent self-harm, but rather it is understood by the Children at the facility as a device used for disciplinary reasons.

## Education Services

Many of the Children report receiving little or no educational services while at the CCJDC. While some Children have reported leaving their cells for 1-3 hours 2-4 times per week for educational services, these Children generally do not receive grade-level or subject matter specific instruction, their educational services are not tailored to any individual Child's previous coursework, and their educational services do not result in academic credit required for the Children to be promoted to the next grade or to graduate high school. (*Id.* at ¶¶ 72, 75). Some Children report that the classroom instruction included coloring in a coloring book or watching a movie. (*Id.* at ¶ 72). Computers are in the building but are not used for instruction. (*Id.* at ¶ 72). Moreover, many of the Children at CCJDC have been diagnosed with various mental health issues and learning disabilities, but they are not provided with instruction and programs consistent with their Individual Education Plan (IEP) from their base school and are otherwise denied a Free Appropriate Public Education (FAPE) as required under federal law. (*Id.* at ¶ 73).

## The Food

Horrible, often inedible food in small portions is a universal complaint from Children at CCJDC. Children report being served spoiled food. (*Id.* at ¶ 80). The food is always cold, as the facility has no operational kitchen, and the meals are transported from elsewhere without a warmer. (*Id.*). The food is typically served very late, and the Children are hungry most of the time, with some losing weight during their stay in the facility. (*Id.* at ¶ 80). Children from families who can afford it pay for canteen privileges and survive on vending machine diets of chips and soda. (*Id.*).

8

## Female Housing

Female Children report persistent shortages of sanitary napkins and other toiletries. (*Id.* at ¶ 13i). Some report being confined in cells with used sanitary napkins littering the floor. (*Id.*). Female Children report male guards "flirting" with them. (*Id.* at ¶ 77). Although some female guards work at the facility, it is common for men to check on the female Children. (*Id.*). The cells are arranged such that these female Children do not have privacy from male guards, even when using the toilet. (*Id.*).

## Health Screening

The Children are not adequately screened and are not always assessed by medical, dental, or mental health personnel upon admission to CCJDC. (*Id.* at ¶¶ 13q, 70a). At the time many, if not most, of these Children are admitted to CCJDC, they have various medical and mental health issues for which they are undergoing treatment, including prescription medication, to manage their symptoms. (*Id.* at ¶¶ 13q, 65, 66. 69). However, the Children report that they are often denied or do not otherwise receive their prescribed medication on time or at all. (*Id.* at ¶¶ 66, 69). In at least one instance the Defendants' neglect of a child's need for regular medication for severe asthma resulted in worsening of the child's condition and the need for her to be transported to the hospital in an ambulance. (*Id.* at ¶ 67). Nurses are rarely available, and Children report that physician visits are virtually nonexistent. (*Id.* at ¶ 68). Once admitted to CCJDC, the treatment that these kids were previously undergoing seems to stop, resulting in potentially dangerous interruption of treatment and negative side effects from medication withdrawal. (Exhibit A, Louis Kraus Aff. at ¶ 43).[4] While many, if not most, of the Children at CCJDC have diagnosed or diagnosable mental health issues and disabilities, they often are not

---

[4] Dr. Kraus is a child psychiatrist who has extensive experience with the juvenile criminal justice system and its effects on the mental health of those who pass through the system.

offered any mental health treatment at the facility—in some cases even if the treatment is requested by the Child or even ordered by the Family Court. (*Id.* at ¶ 17). By way of example, one Child attempted suicide and was placed in the wet cell in a suicide gown where he was seen only every other day by a mental health professional. (*Id.* at ¶ 41). If a suicidal Child is placed in the conditions of the wet cell and then is only seen every other day by a mental health professional, then almost certainly other Children with mental health issues but who have not attempted suicide are not getting any meaningful mental health treatment—and that is what the Children and their families report. (*Id.* at ¶¶ 8, 12, 17).

### Defendants' Knowledge of Harms

The Defendants have been notified by multiple sources that these conditions and practices do not meet either industry or constitutional minimum standards. Most notably, on August 15, 2018, Charleston County Public Defender Ashley Pennington emailed a list of concerns and complaints by the then Child-residents of CCJDC to Defendant Beatty. Those complaints included:

(a)     confinement to cells for twenty-two (22) hours a day;
(b)     overcrowding;
(c)     no outside recreation;
(d)     not receiving prescribed medications;
(e)     not having access to EpiPen for possible severe allergic reactions;
(f)     not having prescription glasses;
(g)     placement of resident with history of PTSD, anxiety, asthma, and sexual/physical abuse in the wet cell for several hours with ankles shackled and hands handcuffed behind back because resident's toilet overflowed followed by 24-hour lockdown for a week;
(h)     delayed medical treatment;
(i)     placement of Child on 24-hour lockdown because Child was asleep when guard came to collect food tray;
(j)     frequent profanity by personnel;
(k)     plumbing issues resulting in sewage backflow in toilets and showers;
(l)     milky white water from sinks as only drinking water;

10

| (m) | placement in wet cell for eight (8) hours for verbal argument with another resident; |
|---|---|
| (n) | placement of Child on 48-hour lockdown for having a pencil in cell; |
| (o) | ceiling leaks; |
| (p) | failure to follow IEP; and |
| (q) | withholding school as discipline. |

*See* E-mails from Pennington to Beatty, attached as Exhibit C. These and other similar conditions and practices have been the subject of many follow-up inquiries by the Public Defender's Office, with the most recent email exchange occurring in March of 2020. *See id.* Despite these notices and complaints, Defendants have not undertaken sufficient measures to cure the constitutional violations. Consequently, Children entering this facility continue to be traumatized at the hands of the Defendants, who are public servants funded by the taxpayers of Charleston County and charged with protecting the Children.

## ARGUMENT

For preliminary injunctive relief to be granted, the movant must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013). Prohibitory injunctions seek to preserve the status quo while the lawsuit is pending, whereas mandatory injunctions seek to compel, rather than prohibit actions. *Wellin v. Wellin*, No. 2:13-cv-1831-DCN, 2013 U.S. Dist. LEXIS 166139, at *9 (D.S.C. Nov. 22, 2013). "[M]andatory injunctions 'should be granted only in those circumstances where the exigencies of the situation demand such relief.'" *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:20-cv-98, 2020 U.S. Dist. LEXIS 64450, at *28 (E.D. Va. Apr. 10, 2020). Here, the exigencies are stark and compelling.

11

## I.   P&A Is Likely to Succeed on the Merits.

### A.   Constitutional Claims

The constitutional challenges to conditions and practices at the CCJDC are evaluated under the Due Process Clause of the Fourteenth Amendment. *Robles v. Prince George's Cty., Maryland*, 302 F.3d 262, 269 (4th Cir. 2002). Further, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights afforded to convicted prisoners, and consequently, the Eighth Amendment's prohibition on cruel and unusual punishment applies with equal if not greater force to pretrial detainees. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Although the tests applicable to these conditions under the Fourteenth Amendment, on one hand, and the Eighth Amendment on the other, are overlapping and differing in some respects, all of these practices and conditions are plainly unconstitutional under both standards, and therefore, P&A is very likely to prevail on the merits as to each.

First, conditions of confinement that are imposed as "punishment" in the constitutional sense are unconstitutional. "[P]retrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley v. Hendrickson,* 576 U.S. 389, 400 (2015); *see also Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 250 (4th Cir. 2005) ("[W]hile the convicted prisoner is entitled to protection only against punishment that is 'cruel and unusual,' the pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to *any* form of 'punishment.'") (emphasis in original). In determining whether a pretrial detainee has been subjected to a "punishment," the detainee first must show a disability or harm "was (1) imposed [upon the detainee] with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to

12

punish may be inferred." *Id.* Irrespective of whether an expressed intent to punish exists, P&A will show that the conditions and practices at issue here are not reasonably related to a legitimate, nonpunitive purpose, and they also appear excessive in relation to any conceivable alternative purpose assigned. *Id.; see also Kingsley v. Hendrickson,* 576 U.S. 389, 398 (2015) ("[A]s *Bell* itself shows (and as our later precedent affirms), a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.").

Second, as noted, conditions of confinement are also subject to review under the Eighth Amendment.

> The Eighth Amendment, which prohibits infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, applies to claims by prisoners against corrections officials challenging conditions of confinement. *See Scinto v. Stansberry,* 841 F.3d 219, 225 (4th Cir. 2016) ("[T]he Eighth Amendment imposes a duty on prison officials [**8] to 'provide humane conditions of confinement . . . [and] ensure that inmates receive adequate food, clothing, shelter, and medical care." (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994))); *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Whether an inmate's conditions of confinement amount to "cruel and unusual punishment" must be measured against "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958)).

*Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019).

An Eighth Amendment claim has two elements: (1) objectively, the deprivation suffered or injury inflicted was "sufficiently serious," and (2) subjectively, the prison officials acted with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "What must be established with regard to each component 'varies according to the nature of the alleged constitutional violation.'" *Williams*, 77 F.3d at 761. Objectively, the court must assess:

13

whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Helling v. McKinney*, 509 U.S. 25, 36 (1993). To satisfy the subjective prong, the plaintiff must establish the defendant acted with "deliberate indifference." To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019). "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Id.*[5]

Whether courts apply the unconstitutional punishment analysis or the deliberate indifference test is often a fact specific inquiry. In any event, P&A is likely to prevail on the merits of each.

### 1. Routine Use of Solitary Confinement[6] or Lockdown

### a. Solitary Confinement: 14th Amendment Punishment

The routine practice at CCJDC of keeping Children locked in their cells for 22 or more hours every day is unconstitutional under the Fourteenth Amendment because these conditions are not reasonably related to a legitimate nonpunitive governmental objective. Thus, an intent to

---

[5] Plaintiff maintains that it is sensible after *Kingsley v. Hendrickson,* 576 U.S. 389, 398 (2015), to conclude that a different, less stringent standard should be applied to the claims of pretrial detainees than the traditional deliberate indifference test, but for purposes of this motion and to demonstrate a likelihood of success on the merits, Plaintiff will apply the traditional test. *See Gattuso v. C.C.S. Med. Dep.,* 2020 U.S. Dist. LEXIS 17078, *11 (D. Md. January 29, 2020).

[6] Solitary confinement is defined as "the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, . . . [with] limit[ed] contact with others." United States Department of Justice, Letter to the Honorable Tom Corbett, Re: Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation, May 31, 2013, at 5, http://justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf; *see also Peoples v. Annucci*, 180 F. Supp. 3d 294, 298 (S.D.N.Y. 2016) ("Solitary confinement, generally speaking, is the practice of socially isolating a prisoner from the general inmate population and depriving him or her of most environmental stimuli."); (Exhibit A, Kraus Aff. ¶ 25).

4848-1613-3312 v.65 AC9

punish may be inferred. *Slade*, 407 F.3d at 250. As noted by Dr. Kraus in his affidavit, the "degree of deprivation of meaningful social contact in the everyday confinement of children to their cells for 22-24 hours per day and no opportunity to go outside, even where there are 2-4 children confined together" meets the definition of solitary confinement. (Kraus Aff. ¶ 26). Solitary confinement is "a deterrent and a punitive force." *Novak v. Beto*, 453 F.2d 661, 670 (5th Cir. 1971). By definition, as soon as a Child is placed into a cell under the conditions prevailing at CCJDC, that Child is being punished in violation of the Fourteenth Amendment.

Further, there can be no nonpunitive purpose for keeping pretrial detainee Children in such conditions. "An action may be reasonably related to a legitimate governmental purpose if 'an alternative purpose to which [the act] may rationally be connected is assignable for it' and the action does not appear 'excessive in relation to the alternative purpose assigned.'" *Robles v. Prince George's County*, 302 F.3d 262, 269-70 (4th Cir. 2002) (internal citations omitted). Here, the daily confinement of Children to their cells for 22 or more hours per day could serve no benefit because it does not achieve legitimate needs of the operators of the facility. According to Mr. Rhoads in his affidavit:

> [A]cademic research continues to show that placing incarcerated youths in isolation has negative public safety consequences, does not reduce violence and likely increases recidivism. Further, there is no research showing the benefits of using isolation to manage youth behavior. By contrast, facilities that have reduced or eliminated the use of solitary confinement have seen a reduction in violence and infractions.

(*Id.* at ¶ 32). Thus, the only conceivable reason for the daily practice of confining Children to their cells for 22 or more hours is for the convenience of the operators of the facility and/or to save money. Neither is a sufficient justification. *See Petrick v. Maynard*, 11 F.3d 991, 995 (10th Cir. 1993) ("[T]he cost of protecting a constitutional right cannot justify its total denial.") .

15

The practice of imposing lockdowns, which is described in detail above as well as in the interviews summarized in the Rhoads Affidavit, is also punishment in violation of the Fourteenth Amendment. Presumably Defendants will maintain that using lockdowns of 24, 48, and 72 hours is to serve the nonpunitive purpose of maintaining order and discipline at the facility. But it is now well established that use of solitary confinement such as lockdowns as a means of enforcing discipline in juveniles is not effective. (*Id.* at ¶¶ 32, 33). Even if use of lockdowns were effective, using it for more than a mere cool down period and without close supervision by mental health professionals renders the confinement excessive in relation to the nonpunitive purpose. (*Id.* at ¶ 43; Kraus Aff. ¶ 39). The risk of harm posed to the Children placed on lockdown—particularly those who have pre-existing mental illness or a history of trauma or abuse—far outweighs the benefit. (Kraus Aff. ¶ 46); *see J.H. v. Williamson Cty., Tennessee*, 951 F.3d 709, 718 (6th Cir. 2020) (holding that juvenile pretrial detainee was particularly vulnerable to effects of solitary confinement due to his age and documented mental health issues and that his solitary confinement for twenty-one days for verbal threats was excessive in relation to the disciplinary purpose of the confinement).

### b. Solitary Confinement: 8th Amendment Deliberate Indifference

### i. Objective Prong: Serious Risk of Harm

Both the everyday solitary confinement and the use of lockdowns are also unconstitutional under the Eighth Amendment deliberate indifference analysis set forth above. First, as to the objective prong of the Eighth Amendment test, use of solitary confinement on Children on a daily basis and through lockdowns poses a sufficiently serious risk because it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. Further, these forms of confinement pose significant health risks to the Children detained at the CCJDC.

16

(Kraus Aff. ¶ 46). Not only do mental health experts agree on the harms, but courts have recognized that "solitary confinement of juveniles in government custody for punitive or disciplinary reasons, especially for extended periods of time and especially for youth who may suffer from mental illness, violates the Eighth Amendment's prohibitions against the inhuman treatment of detainees." *Doe by & through Frazier v. Hommrich*, No. 3-16-0799, 2017 WL 1091864, at *2 (M.D. Tenn. Mar. 22, 2017). Indeed, the Fourth Circuit has found that, even with respect to adult prisoners on death row, "conditions of confinement . . . under which Plaintiffs spent, for years, between 23 and 24 hours a day 'alone, in a small . . . cell' with 'no access to congregate religious, educational, or social programming'—pose a 'substantial risk' of serious psychological and emotional harm." *Porter*, 923 F.3d at 357. The effects on Children are even more severe and alarming. "[T]here is a broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults." *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 583 (N.D.N.Y. 2017) (citing *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds."); *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (recognizing the "comparative immaturity and irresponsibility of juveniles)). And the Supreme Court has continued to stress that these fundamental differences are consequential in the Eighth Amendment context. *See, e.g.*, *Miller v. Alabama*, 567 U.S. 460, (2012) (observing that youth "is a moment and condition of life when a person may be most susceptible to influence and to psychological damage").

As a result, a "growing chorus of courts have recognized the unique harms that are inflicted on juveniles when they are placed in solitary confinement." *J.H. v. Williamson Cty., Tennessee*, 951 F.3d 709, 718 (6th Cir. 2020); *see, e.g.*, *Hommrich*, 2017 WL 1091864, at *2

(granting a preliminary injunction preventing a detention facility from placing juveniles in solitary confinement as punishment or discipline and describing how "courts around the country have found increased protections for juveniles and persons with diminished capacities from inhumane treatment under the Eighth and Fourteenth Amendments"); *V.W. by and through Williams v. Conway*, 236 F. Supp. 3d 554, 583, 590 (N.D.N.Y. 2017) (issuing a preliminary injunction to enjoin a county and its officials "from imposing 23-hour disciplinary isolation on juveniles" and recognizing "there is a broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults"); *Turner v. Palmer*, 84 F. Supp. 3d 880, 884 (S.D. Iowa 2015) (denying qualified immunity to officials who placed a juvenile with psychiatric issues in solitary confinement and noting that, "[t]raditionally, juvenile detainees are afforded greater constitutional protection").

Moreover, P&A's constituent members—composing a significant portion of CCJDC residents—suffer from various disabilities including mental illnesses. "Placement of a mentally-ill detainee in solitary confinement 'raises a genuine concern that the negative psychological effects of his segregation will drive him to self-harm.'" *J.H. v. Williamson Cty., Tennessee*, 951 F.3d 709, 719 (6th Cir. 2020) (quoting *Wallace v. Baldwin*, 895 F.3d 481, 485 (7th Cir. 2018)). As the Third Circuit has explained, confinement of a detainee should be assessed "in light of his mental illness," recognizing the "growing consensus" that solitary confinement" can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity." *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017). The documented mental health issues of many of the Children at CCJDC make them particularly vulnerable to the effects of solitary confinement. (*See also* Kraus Aff. ¶¶ 26-46).

18

## ii. Subjective Prong: Deliberate Indifference

The second, subjective prong is also likely to be proved on the merits. Defendant officials responsible for the CCJDC are specifically aware of, and have consciously chosen to disregard, the serious risk of harm posed by the CCJDC's solitary confinement practices. First and foremost:

> A plaintiff may satisfy this standard by "prov[ing] by circumstantial evidence that a risk was so obvious that it had to have been known." *Makdessi v. Fields*, 789 F.3d 126, 136 (4th Cir. 2015). Put differently, "[a]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate." *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011).

*Porter*, 923 F.3d at 355. The harm posed to these Children is patently obvious, and hence it is appropriate to infer knowledge of the risk to Defendants. *See H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1089 (11th Cir. 1986) ("We further conclude that no reasonable person could believe that a juvenile [pretrial] detainee may be placed indefinitely in isolation and the key thrown away, i.e.—no notice of charges or hearing provided the detainee."). Further, Defendants have been actually aware of the risks of serious harm to the Child residents of CCJDC and have ignored those risks. (*See* Exhibit C, E-mails from Pennington to Beatty). The conditions have not been addressed notwithstanding written notice from the Charleston County Public Defender. This is the very definition of deliberate indifference.

Further, Defendants are aware of the harms created by solitary confinement as a result of the growing body of law, much of which is set forth above, finding such conditions to be harmful not only to adults, but especially to Children and even more acutely for Children with disabilities. *See A.T. by & through Tillman v. Harder*, 298 F. Supp. 3d 391, 416 (N.D.N.Y. 2018) (granting preliminary injunction prohibiting jail's routine placement of juveniles in solitary

19

confinement under 8th Amendment deliberate indifference test, finding the defendant was subjectively aware of the risks of solitary confinement of juveniles partly because of complaints and partly because of imputed knowledge from pervasive research and cases so finding).

Thus, not only is the Defendants' routine placement of these Children in solitary confinement impermissible punishment under the Fourteenth Amendment, it is also the result of constitutionally prohibited deliberate indifference to the serious risk of mental and emotional harm to these Children. Thus, P&A is likely to succeed on the merits of its claims, and this Court should preliminarily enjoin Defendants' routine practice of housing these Children in solitary confinement lockdown.

### 2. Wet Cell

The use of the wet cell is a disturbing indicator of a culture at the CCJDC that places order and discipline above all else, and which has no regard for the health and safety of the Children entrusted to this facility, much less their education, rehabilitation, and improvement. Isolation of Children for up to 10 days at a time in this cold, dark, vile-smelling, and ill-equipped room, restricting all human interaction, and sometimes depriving Children of other essentials such as a mattress or a blanket, are elements of torture that can only be viewed as punishment under the Fourteenth Amendment. In the case of an adult pretrial detainee facing similar conditions, the Tenth Circuit noted the conditions:

> were partly retributive, partly precautionary, but, in any event, were unreasonably degrading and inhumane—a mere masquerade as essential custodial detention and therefore clearly excessive in relation to the alternative purpose [of essential custodial detention] assigned [to it] in manifest violation of plaintiff's rights of due process as a pretrial detainee.

*Littlefield v. Deland*, 641 F.2d 729, 731 (10th Cir. 1981) (internal citations omitted) (confinement of mentally-ill pretrial detainee to cell with no windows, no interior lights, no

20

bunk, no floor covering, and no toilet except for a hole in the concrete floor was unconstitutional); *see also Abila v. Funk*, 220 F. Supp. 3d 1121, 1184–85 (D.N.M. 2016) (holding similar conditions constituted unconstitutional punishment for pretrial detainee).

In addition, all of the same arguments which support the Eighth Amendment challenge to the other forms of solitary confinement apply even more persuasively when applied to the wet cell. With respect to the objective prong of the test, use of the wet cell poses a significant harm to the health and safety of the Children. (Exhibit B, Rhoads Aff. ¶ 43; Exhibit A, Kraus Aff. ¶ 27). For all the same reasons why solitary confinement alone could serve no legitimate governmental objective, solitary confinement in the wet cell poses an even greater risk of harm. As to the subjective component of the deliberate indifference test, on its face, this dungeon-type confinement is the very type of obvious risk of harm that "justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate." *Porter,* 923 F.3d at 355. It is far worse in every respect than the adult death row conditions deemed unconstitutional in *Porter*, and it is plainly excessive in relation to any conceivable legitimate need to maintain discipline and order at this facility. In fact, use of this type of device is counterproductive to the goals of this facility. (Rhoads Aff. ¶ 32). Thus, P&A is likely to prevail on this claim, and the Court should immediately enjoin use of the wet cell.

### 3.  Use of Restraint Chair

Under the Fourteenth Amendment, any placement of juvenile pretrial detainees in a restraint chair for punishment or without penological purpose is constitutionally forbidden. *See Blackmon v. Sutton*, 734 F.3d 1237, 1242 (10th Cir. 2013). Indeed, courts have held that use of a restraint chair for long durations "against a pretrial detainee, without close monitoring and some provision for short periods during which the inmate is relieved of the restraints and given an

21

opportunity to move around, drink, and use the restroom facilities, amounts to unconstitutional punishment." *Pardue v. Glass*, No. 05-5004, 2008 WL 249173, at *21 (W.D. Ark. Jan. 29, 2008).[7] By contrast, cases which have upheld the use of restraint chairs have done so only when the facts indicated the detainee was confined for the limited penological purpose of safety and security, and when the detainee was carefully and frequently monitored, given frequent breaks, and allowed the opportunity to end the confinement by promising not to cause harm. *See e.g., Fuentes v. Wagner,* 206 F.3d 335 (3d Cir. 2000).

Here, the use of the restraint chair as described by multiple witnesses far exceeds any legitimate penological purpose of maintaining safety and security. Using the restraint chair as punishment is the very practice which has been declared violative of the Fourteenth Amendment by other courts. Thus, P&A is likely to succeed on this claim, and the Court should enjoin Defendants' use of the restraint chair other than when necessary for the very narrow penological purpose of preventing self-harm.

### 4. Failure to Provide Outdoor Recreation and Exercise

P&A is also likely to succeed on the merits of its claim that the lack of outdoor exercise at the CCJDC violates the Eighth Amendment under the two-prong test. Under the first prong, it is well settled that a lack of outdoor exercise constitutes deprivation of a basic human need. *Collins v. McCall*, No. 2:13-CV-02700-RMG, 2014 WL 6809792, at *9 (D.S.C. Dec. 3, 2014). Courts have found that outdoor exercise is required when inmates are confined in small cells almost twenty-four hours per day. *Spain v. Procunier*, 600 F.2d 189, 199-200 (9th Cir. 1979)

---

[7] *See also Undlin v. City of Minneapolis*, No. CIV. 08-1855JNEFLN, 2009 WL 3754208, at *6 (D. Minn. Nov. 4, 2009) (manifest error of law for referee to dismiss plaintiff's claims where plaintiff has alleged confinement to a restraint chair for four hours without any breaks or checks on his physical and mental condition for being "argumentative and irritating").

(noting "substantial agreement" that "some form of regular outdoor exercise is extremely important to the psychological and physical well being" of inmates). This is particularly true for energetic teenagers. While the "totality of the circumstances," including the length of deprivation, number of hours inmates are locked in their cells each day, and the practical opportunities available for exercise are to be considered, those factors here weigh heavily in favor of finding a constitutional violation. *See Collins*, at *10. The average length of stay at the CCJDC is 15 days, according to the most recent information available. (Exhibit B, Rhoads Aff. ¶ 13c). It is not uncommon for Children to be detained for months at a time. (*Id.*) In addition, because the Children are housed in small, individual, and often overcrowded cells for 22 or more hours every day, the need for outdoor access is greater than it would be for juveniles housed in a better facility with more indoor recreation time and space. (*Id.* ¶ 59). Last, it is practical to provide outdoor access because the CCJDC has a recreation yard that is enclosed by a fence and even has two basketball goals (though they are missing their hoops). (*Id.* ¶ 58). Accordingly, Plaintiff is likely to succeed on the merits of this claim under a totality of the circumstances test, particularly in light of the *Porter* decision in which the Fourth Circuit found an Eighth Amendment violation where adult death row inmates were confined in circumstances similar to the CCJDC but with five days of outdoor exercise every week, as compared to no outdoor exercise at the CCJDC. *See Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019).

The second prong—deliberate indifference—is also met. Defendants must be aware that the Children are not permitted to go outside and therefore get no outdoor exercise, and in any event, the Public Defender pointed this problem out as far back as 2018. (*See* Exhibit C, Pennington Emails).

### 5. Failure to Provide Adequate Medical and Mental Health Care

"Among the traditionally recognized liberty interests of [juveniles] that survive confinement is the right to minimally adequate health care." *Alexander S. v. Boyd*, 876 F. Supp. 773, 788 (D.S.C. 1995) (*citing Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). This right includes having "a sufficient number of trained medical staff to provide the basic components of a medical system." *Id*. at 789. A juvenile detention center must "meet the health needs of the population." *Id.* "Nursing staff should be available to adequately provide daily review of sick call requests, to administer reasonably prompt medical care and to train other staff members in identifying and monitoring the juveniles' illnesses." *Id.* A failure to provide such needed medical services is deliberate indifference under the Eighth Amendment. *Estelle*, 429 U.S. at 104-05. These rights are equally applicable to pretrial detainees. *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992) ("Pretrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainee's rights to due process when they are deliberately indifferent to serious medical needs."). Further, "[i]t is generally recognized that prompt medical screening is a medical necessity in pre-trial detention facilities." *Dawson v. Kendrick*, 527 F. Supp. 1252, 1307 (S.D. W. Va. August 10, 1981). The failure to provide such screening, as well as classification, record keeping, sick call procedures, and timely access to care violate the Eighth Amendment rights of pretrial detainees. *Id.* at 1308.

Moreover, the requirement that detention facilities provide minimally adequate health care includes the requirement that they provide minimally adequate mental health care. In a recent decision, a federal court in Iowa determined that a residential school for juveniles adjudicated as delinquent violated substantive due process by failing to:

24

(1) formulate mental health treatment plans; (2) provide adequate crisis services by offering the therapy needed to assess the underlying causes of students' self-harming or suicidal ideations; (3) maintain confidential mental health records; (4) provide adequate discharge planning; and (5) properly oversee the mental health programming at the School, be that through a qualified mental health authority or other structure.

*C.P.X. v. Garcia*, 2020 U.S. Dist. LEXIS 61980, *128 (S.D. Iowa March 30, 2020).

The interviews conducted by Mr. Rhoads with the Children detained at the facility show an absence of consistent medical and mental health screening, a failure to provide any meaningful mental health care, often slow (if any) response to acute medical needs, and a consistent failure to administer prescription medications. (Exhibit B, Rhoads Aff. ¶ 66). Further, as Dr. Kraus explains, data show that most Children placed in juvenile facilities have some form of mental illness. (Exhibit A, Kraus Aff. at ¶ 36). The failure to provide mental health care poses a serious and immediate risk to the Children at the facility. (*Id.* at ¶ 43). By delaying and denying CCJDC detainees much needed medical and mental health treatment, Defendants are acting with deliberate indifference to the Children's serious medical and psychological needs in violation of the Fourteenth Amendment. *See Alexander,* 876 F. Supp. at 778; *C.P.X.*, 2020 U.S. Dist. LEXIS 61980, *128. Thus, P&A is likely to succeed on this claim, and the Court should order Defendants to comply with their obligations to provide appropriate medical and mental health care and treatment.

### 6. Failure to Provide Education

Children at the CCJDC report that they do not always receive educational services and that, when instruction is provided, it is general, not challenging, and not individually tailored to each Child's mental or physical abilities in compliance with that particular student's IEP, or consistent with their pre-detention grade level and class assignments. (Exhibit B, Rhoads Aff. ¶

72). Moreover, none of the Children interviewed were allowed the state-mandated thirty hours per week of classroom instruction. *See* S.C. Code Ann. Regs. 43-232 & 234 (mandating thirty hours per week of classroom instruction). The undersigned represents that the CCSD, in consultations prior to filing this motion, indicated it is not able to provide the services to children brought into the CCJDC from other counties because CCSD has no authority over the other school districts. CCSD also raised concerns about its ability to provide services in the existing facility due to space limitations, given the number of children who are housed at the facility. Both of these concerns can be addressed on a preliminary basis by enjoining the CCJDC from accepting children from counties other than Charleston. Because approximately 50% of the children in the facility are from other counties, this injunction will serve both to alleviate the space needs, and it will alleviate the problem of teaching children from another county school district.

In short, the education provided to Children at CCJDC is far below the minimum standards required by state and federal law and regulations. Courts have held that juvenile pretrial detainees have a constitutional property interest in receiving the minimum level of education required under state regulations. *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 586 (N.D.N.Y. 2017); *A.T. by & through Tillman v. Harder*, 298 F. Supp. 3d 391, 416 (N.D.N.Y. 2018). Thus, P&A is likely to succeed on this claim, and the Court should order Defendants to provide the Children at CCJDC with the education required by state and federal law and regulations and to cease accepting Children from other counties so that the CCSD can perform it duties.

4848-1613-3312 v.65 AC9

### B. Statutory Claims (ADA, Section 504, IDEA, S.C. Juvenile Justice Code)

Under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504), Defendants are required to conduct an "individualized assessment" of a Child's disability prior to imposing solitary confinement or other lockdown conditions. To establish a *prima facie* violation under either the ADA or Section 504, a plaintiff must show (1) he is a qualified individual with a disability; (2) defendant is an entity subject to the statutes; and (3) he was denied an opportunity to participate in or benefit from the defendant's services, programs, or activities, or otherwise discriminated against by reason of his disability. *Wright v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 831 F.3d 64, 72 (2d Cir. 2016) (holding DOCCS' "blanket ban" on use of motorized wheelchair fails to "make an individualized assessment of a disabled inmate's particular needs").

Here, many, if not most, of the Children housed at CCJDC have disabilities. (Exhibit B, Rhoads Aff. ¶ 50). Defendants routinely house these Children in conditions that constitute solitary confinement, and they also use additional restrictions, which include lockdowns, confinement to the wet room, and use of the restraint chair. Defendants impose these conditions and restrictions without consulting a mental health worker and without assessing whether the conditions and restrictions are appropriate. (*Id.* at ¶¶ 29, 38, 40, 47). These additional restrictions are often imposed on Children for behaviors that are simply the manifestations of their respective mental health issues and disabilities—manifestations that are only made more likely to occur because of the failure of the facility to administer medications or to provide mental health counseling. (Exhibit A, Kraus Aff. ¶ 43). While under lockdown, confined to the wet cell, or in the restraint chair, the disabled Children are unable to participate in any programs or activities otherwise available. Under the ADA and Section 504, a correctional facility cannot categorically

27

deny an inmate with a disability access to available programs, services, and benefits without first performing an individualized assessment. *A.T. by & through Tillman v. Harder*, 298 F. Supp. 3d 391, 417 (N.D.N.Y. 2018). Thus, P&A is likely to succeed on this claim.

The Individuals with Disabilities Education Act's (IDEA) purpose is to assure that "all children with disabilities" have a free appropriate public education which emphasizes special education. 20 U.S.C. § 1400(c).[8] The IDEA confers upon disabled students an enforceable right to public education in participating states. *Honig v. Doe,* 484 U.S. 305, 310 (1988). The IDEA applies to local juvenile detention facilities. 34 C.F.R. § 300.2(b)(iv); *Donnell C. v. Illinois State Bd. of Educ.*, 829 F. Supp. 1016, 1020 (N.D. Ill. 1993) (applying IDEA to pretrial detainees). With respect to the IDEA, the Defendants routinely fail to adhere to the substantive and procedural requirements mandated by federal law by: failing to create, implement, and follow an IEP for each student or follow procedural requirements such as a manifestation hearing before changing a qualifying juvenile's current placement. Thus, P&A is likely to succeed on this claim.

Moreover, as noted above, South Carolina state regulations mandate a minimum of thirty hours per week of classroom instruction. S.C. Code Ann. Regs. 43-232 & 234. The regulations also set forth a number of other minimum requirements including with respect to the subject matter of education, credit for high school, and class size. *Id.* Local detention facilities, such as the CCJDC, are required by statute to "provide educational programs and services to all preadjudicatory juveniles in its custody" which meet all regulatory requirements. S.C. Code Ann. § 63-19-360. Further, it is "the responsibility of the school district where a local detention center

---

[8] "Special education" has been defined to include instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings. 20 U.S.C. § 1401(a)(16).

. . . is located to provide adequate teaching staff and to ensure compliance with the educational requirements of this State." *Id.*

Here, as demonstrated above, Defendants, including Defendant School District, have not ensured compliance with state minimum requirements such as the minimum thirty hours of weekly instruction time at CCJDC. Thus, P&A is likely to succeed on this claim, and the Court should enter an injunction requiring Defendants to comply with these statutes and regulations.

**II.      Without an Injunction, P&A's Members Are Likely to Suffer Irreparable Harm.**

In a very similar case, a federal district court in New York succinctly addressed how plaintiffs showed irreparable harm, and the court's reasoning applies equally here:

> "First, as a general matter, there is a presumption of irreparable harm when there is an alleged deprivation of constitutional rights." *Donohue*, 886 F. Supp. 2d at 150. In addition, plaintiffs have submitted substantial, convincing evidence that the Onondaga County defendants' continued use of solitary confinement on juveniles puts them at serious risk of short- and long-term psychological damage, and that the related deprivation of education services by both defendants hinders important aspects of their adolescent development. *See, e.g., New York*, 872 F. Supp. 2d at 214 ("[I]nterruption of a child's schooling causing a hiatus not only in the student's education but also in other social and psychological developmental processes that take place during the child's school, raises a strong possibility of irreparable injury." (citation omitted)); *Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F. Supp. 2d 375, 392 (N.D.N.Y. 2001) (McAvoy, J.) ("It is almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm."). Accordingly, this element weighs in favor of granting a preliminary injunction.

*V.W. v. Conway*, 236 F. Supp. 3d 554, 588-589 (N.D.N.Y. February 22, 2017); *see also A.T. v. Harder*, 298 F. Supp. 3d 391, 417 (N.D.N.Y. April 4, 2018); *Doe v. Hommrich*, 2017 U.S. Dist. LEXIS 42290, *5 (M.D. Tenn. March 22, 2017) ("The harm suffered in solitary confinement is not harm easily undone. Indeed, the loss of constitutional rights is presumed to constitute irreparable harm.").

4848-1613-3312 v.65 AC9

## III.    Balance of the Equities Favors Injunctive Relief.

This factor requires balancing the constitutional rights of children at CCJDC with the Defendants' penological interests in maintaining safety and security for juvenile pretrial detainees as the facility. As indicated above, Defendants have confined Children at the CCJDC under conditions which are both impermissibly punitive under the Constitution and either have no penological purpose or exceed the permissible scope of that purpose. Indeed, the conditions and restrictions imposed at the CCJDC that violate the Children's constitutional rights *undermine* safety and security. (Exhibit B, Rhoads Aff. ¶ 32.). Thus, Defendants' penological interests in maintaining safety and security could not possibly justify these constitutional violations. Moreover, Defendants cannot use financial constraints to excuse their continued constitutional and statutory violations. *Petrick v. Maynard*, 11 F.3d 991, 995 (10th Cir. 1993) ("[T]he cost of protecting a constitutional right cannot justify its total denial.") (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)). Here, the scope of the preliminary injunctive relief sought is narrowly tailored to protect the constitutional rights of the Children at CCJDC without unnecessarily invading the Defendants' orderly administration of the CCJDC facility. The balance of the equities favors this narrowly crafted injunctive relief. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("Furthermore, there was no abuse of discretion in the district court's determination that the equities favor issuance of a narrow, limited preliminary injunction.").

## IV.    Preliminary Injunctive Relief Is in the Public Interest.

Courts have held that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Consequently, this factor favors entry of the requested injunctive relief.

4848-1613-3312 v.65 AC9

## V.        Injunctive Relief Requested

As the evidentiary submissions demonstrate, the CCJDC facility itself is unfit for housing Children, but Defendants' policies and practices exacerbate these conditions terribly by: routinely confining Children to their cells for twenty-two (22) or more hours per day without any disciplinary or safety rationale; denying Children any meaningful outlet for exercise, fresh air, or creative pursuits; denying Children medical and mental health treatment and prescription medication; denying Children even the minimum education mandated under the law; and then locking these same Children in a closet or strapping them to a chair for behaviors which were, in all likelihood, caused by the very lack of mental health treatment and programming perpetrated by the Defendants. These conditions and Defendants' policies and actions are trampling the constitutional and statutory rights of these Children—our most vulnerable of citizens—and are inhumane and unconscionable in a civilized society. Rather than educate and rehabilitate, they cruelly perpetuate and exacerbate the mental and behavioral problems which led these Children to CCJDC in the first place. P&A asks this Court to enter the requested injunctive relief to stop these Defendants from causing any further irreparable harm to these Children while P&A fights to protect and vindicate their rights under the law.

P&A requests a preliminary injunction providing the following relief from Defendants:

1.        Immediately cease and desist from the routine and unconstitutional practice of placing the Children in solitary confinement and/or lockdown as punishment.

2.        Immediately cease and desist from placing residents of CCJDC in the "wet cell" or locking residents either alone or with other residents in any room or cell which does not have natural light, an operable toilet, an operable sink, and a bed.

3.        Immediately cease and desist from confining residents of CCJDC in their cell for more than ten (10) hours per day unless the resident has been temporarily assigned to separation for safety or disciplinary reasons.

31

4.    Immediately cease and desist from placing residents of CCJDC in a restraint chair except by order of the CCJDC manager or designee for the sole purpose of preventing self-harm under the following circumstances:[9]

    (a)    Such an order is issued by the CCJDC manager or designee who has had no involvement in the underlying incident that gave rise to the order.

    (b)    The manager or designee conducts an examination of the resident and makes a determination that the resident poses a material threat of self-harm and immediately documents that finding.

    (c)    After being placed in the restraint chair, the resident shall be monitored continuously and asked about his or her condition at frequent intervals.

    (d)    The resident shall be released from the restraint chair as soon as the resident demonstrates he or she has regained a reasonable degree of control over his or her behavior.

    (e)    Under no circumstances shall the resident be confined in the restraint chair for more than 60 minutes. If, after 60 minutes the resident continues to pose a material threat of self-harm, then an in-person examination by a psychiatrist or a LMHP under the direction of a psychiatrist will be provided and treatment will be provided pursuant to the direction of the psychiatrist or LMHP under his/her direction.

    (f)    Upon release from the restraint chair, the resident shall be examined immediately by an LMHP or medical provider.

    (h)    The restraint chair shall never be used to punish or discipline a resident.

5.    Immediately cease and desist from placing residents of CCJDC in any other form of bodily restraint except as a security precaution during a transfer or temporary emergency. Restraints shall not be used on Children locked in a cell unless on a temporary emergency basis to prevent self-harm or harm to others.  Restraints should never be used as punishment or discipline.

6.    Allow each resident of CCJDC, except those temporarily placed in segregation for safety or disciplinary reasons, a minimum of one (1) hour per day of outdoor recreation and large-muscle exercise (weather permitting) in an area measuring the greater of: (a) at least fifty (50) by thirty (30) feet; (b) 750 square feet of unencumbered space with none of the dimensions less than fifteen (15) feet; (c) or fifteen (15) square feet per juvenile for the maximum number of juveniles who are expected to use the area at one time. If weather conditions do not allow for outdoor recreation or exercise, the residents shall be afforded the same amount of time for indoor recreation and exercise.

7.    Perform medical, dental, and mental health screening of all juveniles, excluding intrasystem transfers, immediately upon admission to the facility with the findings recorded, including inquiry into the resident's current illnesses and health problems, mental health issues,

---

[9] P&A is mindful that both Dr. Kraus and Mr. Rhoads consider the use of a restraint chair to be dangerous and counterproductive. Both experts believe the restraint chair should not be used at all. P&A, however, is also aware that for purposes of this motion, relief must be narrowly construed, and accordingly Plaintiff requests relief that allows limited, careful use of the restraint chair if the Court concludes that enjoining all continued uses of the restraint chair is not warranted at this juncture. With regard to permanent prospective relief, P&A has asked the Court to enjoin CCJDC Defendants from any further use of the restraint chair.

disabilities, prescribed medications, and any ongoing medical or mental health treatment or counseling.

8. Confirm any previously prescribed medical or mental health treatments and prescribed medications for each juvenile within twenty-four (24) hours of admission to the facility.

9. Provide residents of CCJDC with their previously prescribed medical or mental health treatments and prescribed medications promptly and as prescribed commencing within twenty-four (24) hours of admission to the facility. Medications are to be administered by a qualified health care professional.

10. Have each resident of CCJDC requiring medical or mental health treatment and/or prescribed medications evaluated and assessed by an appropriate medical professional and/or licensed mental health professional within forty-eight (48) hours of admission to the facility and at least once per week thereafter to determine any needed modifications to such treatments or medications during the resident's stay at CCJDC.

11. Provide residents of CCJDC with a minimum of thirty (30) hours of grade-level and individually appropriate classroom or individualized instruction time per week in accordance with the minimum education program standards set out by the State Board of Education.

12. CCJDC must provide notice by email to CCSD within 12 hours after a child is placed in detention following his or her initial hearing in family court. CCSD is to commence instruction based on school coursework, assignments, books, and tests from their home school within seventy-two (72) hours of receiving such notice and daily thereafter so that each resident has the opportunity to stay up-to-date with his or her school work to prevent falling behind while at CCJDC. CCJDC must also provide CCSD notice of release of a child from detention.

13. Follow all requirements of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973 (Section 504), and the Individuals with Disabilities Education Act including the provision of a Free Appropriate Public Education (FAPE), conduct "appropriate evaluations" of Children suspected of having a disability, follow established individualized education plans (IEPs) for Children who receive special education, or in the case of a Child detained for months, establish an IEP if appropriate and needed, guarantee placement in the Least Restrictive Environment (LRE) where possible, encourage parental participation in placement decisions, and follow procedurally required safeguards.

14. Adhere to all minimum educational program requirements set forth by state statute and regulations, including S.C. Code Ann. Regs. 43-232 & 234.

15. Establish a clearly defined disciplinary system that ensures residents understand when, why, and how they have been disciplined and ensures that any punishment for a disciplinary violation is documented.

16. Enjoin CCJDC from accepting into the facility any children from counties other than Charleston.

<u>CONCLUSION</u>

The Defendants' practices and the conditions at CCJDC violate the constitutional and statutory rights of P&A's constituent members. These practices must stop to prevent further

33

irreparable harm to these vulnerable members of society. Equity, the public interest, and common human decency demand the requested relief. Accordingly, P&A requests that this Court enter the requested preliminary injunctive relief.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: s/ROBERT H. BRUNSON
Robert H. Brunson
Federal Bar No. 10399
E-Mail: robert.brunson@nelsonmullins.com
Patrick C. Wooten
Federal Bar No. 10399
E-Mail: patrick.wooten@nelsonmullins.com
Andrew Connor
Federal Bar No. 11191
E-Mail: andrew.connor@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC  29401-2239
(843) 853-5200

Stuart Andrews
Federal Bar No. 1099
E-Mail: stuart.andrews@nelsonmullins.com
1320 Main Street / 17th Floor
Post Office Box 11070 (29211-1070)
Columbia, SC 29201
(803) 799-2000

-and-

Annie Elizabeth Andrews
Federal Bar No. 13134
E-Mail: andrewsanniee@gmail.com
Post Office Box 957
Mount Pleasant, SC 29465
(843) 822-5329

*Attorneys for Plaintiff*

Charleston, South Carolina
July 25, 2020