# <u>EXHIBIT B</u>

## Affidavit of John P. Rhoads

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| Protection and Advocacy for People with Disabilities, Inc., | ) ) ) | Civil Action No. |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **AFFIDAVIT OF JOHN P. RHOADS** |
| James Alton Cannon, Jr., in his official capacity as Charleston County Sheriff, Mitch Lucas, in his official capacity as Assistant Charleston County Sheriff, Willis Beatty, in his official capacity as Chief Deputy of Charleston County Sheriff's Office, and Charleston County School District, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

PERSONALLY appeared before me John P. Rhoads, who, being duly sworn, says:

1.    My name is John P. Rhoads, and I am over the age of eighteen, suffer no legal disabilities, and  am competent in all respects to testify regarding the matters set forth herein.

2.    My educational background includes a B.A. in Sociology from Cal. State University at Sacramento and an M.A. in Correctional Counseling from Chapman College.

3.    I have 34 years of direct experience working as a probation officer.  I started in 1968 as an on-call counselor in the Sacramento County Juvenile Hall and retired as a Chief Deputy in charge of Juvenile Court Services in 1997.  More than half of this time was working in institutions at every level.

1

4.     In 1997 I accepted the job of Chief Probation Officer in Santa Cruz County California. I was in charge of Adult Probation, the Juvenile Division, and the Juvenile Detention Center. The detention center was a 42-bed facility. I retired from Santa Cruz County in 2002. I am attaching as **Exhibit A** an article published about the positive reforms we were able to achieve at the Santa Cruz facility.

5.     In 2002 I began work with the Annie E. Casey Foundation as a team leader and consultant for the Juvenile Detention Alternative Initiative (JDAI). The Annie E. Casey Foundation is a private philanthropy based in Baltimore and working across the country to make grants that help federal agencies, states, counties, cities and neighborhoods create more innovative, cost-effective responses to the issues that negatively affect children, including poverty, unnecessary disconnection from family, and communities with limited access to opportunity. This Foundation has contributed immensely to improvements in conditions of juvenile detention centers around the country. I worked with assigned sites to help reform their juvenile justice systems. Importantly this included alleviating overcrowding, developing alternatives to incarceration, and improving conditions in their detention centers.

6.     I worked on reform efforts in the following juvenile detention centers: Washoe Co. Nv. (Reno), Clark Co. Nv. (Las Vegas), Santa Clara Co. Ca. (San Jose), San Francisco City & County Ca., Ventura Co. Ca., (Ventura), Ada Co. Id. (Boise), Pima Co. Az. (Tucson), Dallas County Tx., Harris Co. Tx. (Houston).

7.     I worked in this capacity until 2015. From 2015 forward I have worked as an expert in a number of cases involving conditions of confinement, injury and death of juveniles in custody. These cases are outlined in my resume which is attached as **Exhibit B.**

2

8.     As a part of my background research to formulate opinions in this matter I have reviewed inspection reports conducted by the Jail and Prison Inspection Division of the South Carolina Department of Corrections (SCDC) for years 2014-2018. I have also viewed photographs of the facility.

9.     I have also reviewed a Survey of Charleston County Juvenile Detention Center (CCJDC) conducted by the Protection & Advocacy for People with Disabilities, Inc. (P&A) dated June 6, 2018.

10.     I have also reviewed information on the website for the South Carolina Department of Juvenile Justice (https://djj.sc.gov/), including the interactive reports containing information about the CCJDC and other similar facilities in South Carolina.

11.     Also, since being retained on this matter, I have had conference calls with 17 witnesses pertaining to the experiences of 21 different children who have been formerly incarcerated in the CCJDC.   Due to limitations on my ability to travel to Charleston and interview witnesses in person as a result of the COVID 19 pandemic, I have conducted all interviews by telephone. In some cases when a child was unavailable, I interviewed a parent or guardian. I have personally asked these folks to describe their experiences at the CCJDC and I made contemporaneous notes and drafted summaries of each witness interview.  I have asked for others on the calls to review my notes for completeness and accuracy, and they have done so, in some cases adding information that was relayed but which I had failed to capture in my summary. I was the principal interviewer in each of these calls which were attended by an attorney and a paralegal of Nelson Mullins Riley & Scarborough. I have reviewed the final summaries of the interviews and affirm the summaries are complete and accurate. These summaries are attached as **Exhibit C**.

3

12.     All of the information about conditions at the facility in this affidavit are based on my interviews, unless otherwise indicated. I have not relied exclusively on information provided by counsel unless specifically indicated.

13.     Based upon my review of the SCDC inspection reports, the statistics on the DJJ web site, and the P&A survey from 2018, I an informed and believe the following facts pertaining the operations of the facility, unless I note otherwise:

   a.  The CCJDC was built in 1967 and has a capacity to house 26 children.

   b.  It houses children between the ages of 11 and 16.

   c.  As of FY 2017/18, the average stay of a detainee at the facility was 15 days, although based on my interviews it is not uncommon for children to be detained for months.

   d.  As of the March 16, 2018 SCDC inspection, the average daily population at the facility was 30 males and 5 females in the preceding three months, and "had significantly larger high counts." The report noted that this population size violated applicable minimum standards.

   e.   The CCJDC serves Charleston County and all its municipal governments, as well as Berkeley and Dorchester County agencies. I am further informed by counsel and believe that the facility also serves Colleton County. Approximately half of the children housed at the CCJDC are from Charleston County.

   f.  As of March 16, 2018, the CCJDC was scheduled to be staffed by 5 corrections officers over 4 shifts per day.  There were five vacancies on the

guard staff as of this date, so only 4 guards were available for each shift. There were also 5 vacancies in 2007.

g. The CCJDC violated the SCDC Standard each and every year by neglecting to provide a desk, hooks or closet space, and a chair or stool in children's sleeping rooms.

h. The CCJDC violated the SCDC Standard each and every year by failing to accommodate ADA accessibility requirements without extensive housing and plumbing renovations.

i. Upon check in, each male juvenile is provided with a striped jumpsuit and a "hygiene pack," including a toothbrush, toothpaste, deodorant and a drinking cup. Shampoo and soap bars are also provided. Feminine products are provided to females. Female detainees, however, reported that sufficient supplies of sanitary napkins are not provided. Males are also provided with a white T-shirt, boxer shorts, gym socks and plastic sandals. I am unclear on what personal items are provided to females generally, but some indicate in interviews that they are not provided jumpsuits. Interviews with children and their families indicate that at least on some occasions when the toiletries are used up, children are required to buy additional supplies from the canteen.

j. Until June 5, 2018, the CCJDC required that all jumpsuits be worn only outside of the juveniles' rooms and therefore children wore only underclothes in their cells at that time. This is confirmed by some children who were detained at the facility before June 5, 2018.

5

k.  The cells are equipped only with a bunk bed, mattress inside a heavy plastic cover with a raised end as a pillow, toilet and wash basin. No separate pillow is provided. The juveniles are issued a mattress bag cover and a grey cloth blanket. Nothing else is provided.

l.  The CCJDC has a "cool room" where juveniles may be assigned to cool down or if on restriction. Although the P&A report describes this as a "cool room," I understand this is most likely a reference to the "wet cell," discussed below.

m.  Females are apparently sometimes housed in a separate communal, mobile unit, which has been in place for at least 12 years.  The unit is accessed through a side door of the general activity room and contains a toilet room and two shower stalls. This information is not consistent with at least some females who report being housed in the main building on a separate hall from the boys and where they could be seen by male guards.

n.  The P&A report states that, based upon information provided by officer Brown to the P&A inspector, CCJDC provides education services. The report indicates education is provided at CCJDC by the Charleston County School District (CCSD), with detainees attending either morning or afternoon sessions during the school year, and special sessions during the summer.  The report states those children attending the morning session are allowed to go outdoors and engage in outdoor activity with a "coach."  It further states that children are allowed outside during the afternoon school sessions. This information is contradicted by many of the children I interviewed and who indicated educational services were often not provided and the children were

6

not allowed to go outside at all. The P&A report states that Lt. Platts stated "administration is looking at revising the schedule for going to the outdoor recreation area," but based upon my interviews, this apparently has not happened.

o. CCJDC has a central activity room, furnished with installed square tables, a flat screen tv with basic cable and classroom chairs for school work. The room includes a bank of pay phones for children to make collect calls and a kiosk where commissary items may be ordered. Calls and use of the kiosk are privileges, which may be withheld for 1 to 3 days as determined by staff.

p. CCJDC detainees are served breakfast, lunch, dinner and a snack. Some meals are served to females in the central activity room, while males generally eat in their cells.

q. All CCJDC medical treatment is administered by the adult jail. The P&A report states detainees are screened within one hour of arrival, but this is not consistent with my interviews in which many children denied receiving medical screening. The P&A report states that medications are administered three times a day, but nearly every child and parent/guardian interviewed denied that children receive their medications at all.

r. CCJDC contracts the Department of Mental Health clinic for mental health requests, while the children must request general "sick calls" through a paper request or the same kiosk at which they may order commissary items. In my interviews, children generally denied receiving any meaningful mental health care and medical visits were generally described as hard to get.

7

      s.  CCJDC allows parents, grandparents or legal guardians to visit 4 days per week form 6:30pm-9pm, while ministers or attorneys are permitted to visit at any time.

      t.  CCJDC confines children to their rooms for 23 hours per day during the week, and 22 hours per day on the weekends, when not out for school sessions.

14.    The CCJDC violated multiple SCDCC Standards regarding overcrowding each and every year, housing almost double the maximum occupancy rate at times. For example, according to DJJ data available online, in FY 2016/17, the average daily population was 42. In FY 17/18, the number increased to 57. Although DJJ has not published the average daily numbers for subsequent years, I am informed and believe that the total number of Children housed for some period of time in the facility has increased each year with 343 in 2017/18 (which translated to an average daily population of 57), 358 in 2018/19, and 397 in 2019/20. Interviews relating to the conditions of the facility prior to the COVID 19 pandemic indicate that overcrowding conditions have continued to exist at the facility.

15.    Based upon my interviews, I have grave concerns about the conditions to which children are exposed on a daily basis at the CCJDC and find that the conditions are grossly outside the norm of how other juvenile detention centers are typically operated. In fact, the CCJDC provides the overall worst conditions for children of any similar facility I have ever seen in my entire career of over 34 years. This facility seems more like a concentration camp than a detention center for children, and I urge the Court to act promptly to alleviate these abominable and inhumane conditions before more harm is done to these young lives.

**Unsanitary and Unsafe Conditions**

16. Every witness I have interviewed indicated the physical condition of the detention center is deplorable. The conditions at the CCJDC are the equivalent of solitary confinement or disciplinary lockdown typically reserved for hardened criminals. The facility was generally described as dirty, smelly, and moldy. The roof leaks and old mop buckets are routinely placed around to capture the rain water as it falls. I am informed by counsel that, during storms, the building is sometimes evacuated and this was confirmed by C.J., who described being confined in a small room at the adult facility with three other boys for 2 days as a result of an evacuation. The mold is believed to come from the roof and window leaks throughout the building.

17. Because of visible mold and chronic moisture in the building, it is probable that the air quality is not healthy, particularly for children with asthma, chronic bronchitis, compromised immune systems, and other physical vulnerabilities.

18. Children reported seeing bugs, including ants, lizards, spiders, termites and roaches in their cells. A.C. stated that he had a rat in the cell with him and complained, but was not moved to another cell until the next day. Others describe hearing the sounds of apparent rats in the ceiling. I am unaware at this point of what pest control efforts are undertaken, but obviously whatever work has been done is not adequate to maintain a clean and sanitary environment for these children.

19. Several children report experiencing bug bites, which could be attributable to bed bugs, ants, or spiders.

20. Regularly the children are required to have their meals in these unsanitary cells.

21. The toilets and showers at the CCJDC have drainage problems that cause flooding in the cells. Overflowing toilets is a regular occurrence reported by many of the children,

9

including C.R., L.M., I.J., G.J., J.M. and C.J. This flooding sometimes causes water contaminated with urine and feces to flow onto the same floors where children are sometimes required to sleep in overcrowded conditions. Worse still, these children are frequently blamed for overflowing toilets which are likely caused by poor plumbing systems and, as is explained further below, lockdowns are often used to punish children for these events. While I cannot be certain that all of the overflowing toilets are due to plumbing issues and there is reason to believe that some overflows are caused by intentional acts of children held at the facility, in my experience, it would be highly unusual for toilets to overflow as commonly as is described by the children I interviewed primarily as a result of intentional behavior.

22.    Children report that they are required to sleep in small, locked, and bare cells, with a metal or concrete bed covered with a mat. When the CCJDC becomes overcrowded, Children are forced to sleep on the floor on mats, sometimes in wet conditions caused by roof leaks and overflowing toilets. For example, C.R., L.M. R.S., C.J., D.W., C.A., I.J., G.J. and A.C. all described various circumstances in which they or other Children slept on the floor.

23.    Staffing at the CCJDC is apparently inadequate to allow a timely response to emergencies such as behavioral disturbances, fires, or other situations requiring evacuation. Fights and/or attacks take place in cells without guards making any effort to halt the violence and to restore order, as described by A.M. regarding her son C.A., as well as by A.C. and R.S.

24.    Children, including A.C. and C.B., report that the CCJDC is maintained in a very cold condition, and I am informed by counsel that in the past the HVAC systems have malfunctioned in the midst of summer, requiring days for repairs to take place. These observations cause me to be concerned that the heating and cooling units are not functioning properly.

**Arbitrary and Excessive Use of Solitary Confinement**

25.     There is prolonged solitary confinement—which is also known as room confinement, isolation, separation, or seclusion—as a matter of practice at the CCJDC. Detainees, including G.J., I.J., A.C., J.P., J.M. L.R and C.A., say they are let out of their rooms for 1-2 hours of recreation a day.  The indoor recreation is extremely basic, including books, a television, and one ping pong table. The only other time they would be let out would be to attend school and for brief family visits on certain days.  C.R. said he attended some bible study if he was not on lockdown.

26.     The United States Department of Justice defines solitary confinement as "the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, . . . [with] limit[ed] contact with others." See United States Department of Justice, Letter to the Honorable Tom Corbett, Re: Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation, May 31, 2013, at 5, http://justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf.  As a practical matter, children are placed in solitary confinement for virtually their entire stay at the CCJDC—whether this is for days, weeks, or months—because of the very limited recreation time and opportunities for interactions outside of their cells. As a consequence of the lack of stimulation and sensory deprivation, many Children at the CCJDC sleep or simply lie on their beds for long periods during the day.

27.     In addition, to mete out punishment for various offenses, the CCJDC frequently places children on "lockdown" in their cells. On lockdown, conditions are worse yet. Lockdown means the kids cannot leave their cells at all – no visitation with family, no education sessions, no showers, no recreation time, no books to read, as described by R.S., J.H., C.B., C.R., and C.J..

11

Instead of being confined to their cells for 22-23 hours a day, they must stay in their cells until the lockdown is lifted. A.C. reported that during lockdowns, they may also lose their blanket, which is necessary to stay warm in the very cold environment of the facility. They have to eat in their cells. Lockdowns can last 24, 48 or 72 hours, and the length can reportedly be increased at the whim of the guards. Sometimes individuals are locked down, and sometimes all of the children are placed on lockdown at the same time. Lockdowns have been ordered for offenses such as knocking on a cell door to get a guard's attention, laughing, cursing, spitting, or talking out of turn.

28.    I am unaware of any procedure in place at the CCJDC by which qualified professionals determine whether and to what extent solitary confinement in the form of a lockdown is appropriate.

29.    Children report having no understanding of any consistent or rational application of lockdowns for particular offenses, but they understand that a lockdown is imposed as a punishment, not merely as a cool down measure used to de-escalate or to protect the children from themselves or others.

30.    Based upon my knowledge, skill, training and experience in the field of juvenile detention center operations, I am aware that a number of national organizations have concluded that solitary confinement should never be used for minors. For example, standards published by the National Commission on Correctional Health Care ("NCCHC") require that youth "should be excluded from solitary confinement of any duration." The American Medical Association and the American Academy of Child & Adolescent Psychiatry ("AACAP") similarly oppose the use of solitary confinement for children and adolescents. The JDAI has published comprehensive standards that prohibit the use of solitary confinement as a disciplinary measure or for any reason

12

other than as a temporary response to behavior that threatens immediate harm to a youth or to others. These standards state that facilities should not use room confinement as a substitute for special individualized programming, including educational services and treatment plans developed with mental health staff and the youth's family members. If a young person is placed in isolation, JDAI standards require that the isolation last no longer than four hours and that staff develop individualized programming for the youth or consult with a qualified mental health professional about whether a youth's behavior requires that he or she be transported to a mental health facility. The NCCHC has recognized that children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting. Children experience time differently—a day for a child feels longer than a day to an adult—and have a greater need for social stimulation. AACAP has similarly concluded that, due to their developmental vulnerability, adolescents are at a particular danger of adverse reactions, including depression, anxiety, and psychosis, when exposed to prolonged isolation and solitary confinement. Unfortunately, many of the children detained at the CCJDC *already* suffer from depression, anxiety, and other mental health disorders. Placing these children in solitary confinement, especially for extended periods of time, exacerbates these children's problems and causes irreparable harm.

31.    Solitary confinement is antithetical to the goal of maintaining safety and security in juvenile detention facilities. When a child is experiencing anger as a symptom of mental illness, use of solitary confinement often results in additional anger, and additional time in solitary confinement. According to the CJCA, academic research continues to show that placing incarcerated youths in isolation has negative public safety consequences, does not reduce violence and likely increases recidivism. Further, I am aware of no research showing the benefits

13

of using isolation to manage youth behavior. By contrast, facilities that have reduced or eliminated the use of solitary confinement have seen a reduction in violence and infractions. These facilities have ensured that separation only occurs after multiple attempts to defuse tensions, and not as an alternative for controlling the manifestations of mental illness.

32.    These harms of improper and excessive use of solitary confinement are increasingly recognized around the nation. Federal courts in four states have ordered facilities to cease improper solitary confinement. Seven states have enacted laws in the past three years limiting the use of isolation in juvenile facilities, and several other states are considering similar legislation. In December 2018, Congress passed bipartisan legislation to limit isolation of youth in federal facilities in the First Step Act. The First Step Act only allows brief isolation when there is an immediate risk of physical harm and never as a punishment. (Source: *Not in Isolation: How to Reduce Room Confinement While Increasing Safety in Youth Facilities*, Published by the Center for Children's Law and Policy, Council of Juvenile Correctional Administrators, Center for Juvenile Justice Reform, Georgetown University and Justice Policy Institute (June 2019) (Attached as **Exhibit D.)**

33.    At the CCJDC, children are frequently placed in lockdown or other forms of solitary confinement in situations other than those where the child's behavior threatens immediate harm to the child or to others, and children are not released from solitary confinement when they have demonstrated that they are in control of themselves.

34.    Children report being placed in lockdown or other forms of solitary confinement as punishment at the discretion of the guards – which appears to vary significantly from one guard to the next – without any due process, such as a hearing before any type of judicial authority.  R.S. and C.B. said they filed grievances, but never heard anything about them, while

14

L.M., I.J. and G.J. said they never filed grievances because nothing would be done about them. C.J. didn't even think there was a grievance process at CCJDC.

35.    As with any juvenile detention center, many children at the CCJDC with mental illness have a difficult time complying with the CCJDC's disciplinary rules because of their illness. As a result, children are often placed in lockdown or other forms of solitary confinement essentially as a result of their illnesses. Placing children with mental illness in solitary confinement—especially when doing so for extended periods of time—exacerbates the suffering and difficulties associated with the mental illness.

36.    The CCJDC's failure to provide sufficient mental health services to the children also results in symptomatic behavior giving rise to punishment, instead of the treatment that is needed. Extensive literature in the field indicates these punishments may result in long-lasting and substantial harm to all children and are particularly harmful to children already suffering from significant mental illness.

37.    To the extent solitary confinement is used, the child in solitary confinement should receive constant supervision from qualified mental health clinicians. At the CCJDC, however, children placed in solitary confinement are not under constant supervision and often do not have any form of regular contact with mental health clinicians. This practice creates a dangerous situation for the children.

38.    Defendants also fail to provide children placed in solitary confinement with adequate education, counseling, recreation, or other rehabilitative treatment. These services at the CCJDC are inadequate, as set forth in more detail below, during normal operations when children are not in lockdown. When in lockdown, however, children are denied any semblance of

15

an effort to rehabilitate, educate, counsel or treat, much less such an effort that could be described as respectful and dignified.

39.    Based upon information provided from these children and their families, it appears highly likely that guards administering lockdowns lack proper training and qualifications to administer this punishment within appropriate limits to ensure the health and safety of the children.

40.    Children held in solitary confinement at the CCJDC report from their own experience, as well as observations of other children, that they experience extreme loneliness, anxiety, rage, suicidal thoughts, and depression, among other potentially debilitating emotional and psychological problems. D.W. said he thought about suicide.  D.H. reported that three people tried to commit suicide during his stay.  They were placed in the wet cell in a suicide gown and naked underneath.  One girl tried to cut herself.  The others tried to hang themselves. He said mental health staff came in every other  day to talk to the kids who attempted suicide.

41.    In my opinion, the uses of solitary confinement, both as an everyday event based upon how the facility is designed and operated, and also by the excessive, discretionary haphazard and poorly conceived use of lockdowns, are far out of step with minimally acceptable standards and practices at other, similar facilities, and these practices pose a very substantial threat of physical and mental harm to the children housed at CCJDC.

 **Use of excessive force, the "restraint chair,"  and the "Wet Cell"**

42.    Children, including C.R., B.M., L.M. C.J., A.C. and D.H., described to me the common use of excessive force. Guards and apparently outside police forces called to the facility for fights apparently brandish weapons, including guns that shoot rubber bullets, assault type rifles that shoot bean bags, cannisters of pepper spray, and tasers. In addition to these weapons,

16

excessive force and restraints are carried out by confining children to a "restraint chair," and extreme solitary confinement in the "wet cell" or "cool down room." The CCJDC's practices of using mechanical restraints and other uses of force on children as forms of punishment and behavior management are grossly inconsistent with accepted practices in juvenile detention facilities. Further, these practices cause significant harm to the children and do not appear to be justified by some purpose other than to terrorize and punish the children for misconduct in the facility.

43. It is widely recognized in the field of juvenile detention that physical and mechanical restraint of children, as with improper seclusion, can cause physical, psychological, and emotional damage. Accordingly, physical force or mechanical restraints should be used on children only if less restrictive alternatives would be ineffective and, even then, only to the degree and duration necessary to bring the situation under control. In addition, as a matter of standard procedure, any application of physical force or mechanical restraints should be fully documented.

44. At the CCJDC, as a form of punishment more severe than the everyday confinements to cells for 22-23 hours and also more severe than lockdowns of 24-72 hours, guards place children in what is commonly referred to as the wet cell, which is a small room about the size of a mop closet, lit by a dim single light bulb in the ceiling and containing only an air vent, a bench, and a drain on the floor.[1] Because the wet cell has no toilet, a child confined to the room may be forced to "wet" himself or herself or to use the drain in the floor as a toilet when he or she needs to urinate if toilet access is not provided timely. Children placed in the wet

---

[1] I have received conflicting reports about whether the wet cell has one dim light bulb or no light, but in either event it is described as a very dark room. Not all children report that there is a drain hole in the floor, as well. Most kids report, however, that the room does have one dim light bulb and a drain in the middle of the floor which smells strongly of urine.

cell sometimes have their ankles shackled and their wrists handcuffed while they are in the cell and/or when they are being escorted to the toilet. B.M. reported being confined for two days in the wet cell while also confined to the restraint chair (see below). C.R. was put in the wet cell for six hours. C.B. described being confined to the wet cell for 10 days. C.J. was confined for periods of 2 days and 5 days. D.H. experienced a 5-day confinement in January 2020. During that confinement, D.H. reported he was not given a mattress for the first night and he had to sleep on the hard floor. He did receive a mattress after the first night. He further reported that he was required to wear only his underwear, socks and a tee shirt while he was in the wet cell. During his 2-day confinement, which was in 2018, he was not given a mattress and was forced to sleep on the floor throughout. At that time he was about 13 years old. He was so upset that he repeatedly kicked the door until he was removed from the room by authorities pointing a taser at his chest and placed in the restraint chair for 12 hours (see below).

45.    Children report being put in the wet cell for various offenses including being blamed for overflowing toilets. D.H. also reported that when detainees attempt suicide, they are put into the wet cell in a suicide gown and no other clothing. Reportedly those put in the wet cell after attempting suicide are allowed to see a mental health representative every other day during their isolation.

46.    As another form of punishment, children report being placed in a restraint chair, which is sometimes used in conjunction with the wet cell, as noted above, and is sometimes used in the common area in plain view. The restraint chair looks like an electric chair with straps used to fully immobilize the children by strapping down their feet, legs, torso, arms, neck and head. Children report being placed in the restraint chair for arbitrary and minor offenses and being restrained for excessive lengths of time and without any monitoring by qualified mental health

18

professionals. Again, as with the use of lockdowns, no due process is reported as being offered prior to strapping children into the chair as punishment. B.M. was strapped into the chair in the wet cell for two days. D.H., who was put into the restraint chair after being upset that he was denied a mattress in the wet cell, indicates that he was restrained in the chair for 12 hours. He was allowed to exercise his arms for a brief period every 2 hours. He was not fed, taken to the bathroom or allowed to drink anything while he was in the restraints. He received no mental health care or counseling and he was never informed what behavior would be required for him to be released from the chair.

47.    Restraint chairs are not recommended for use in children's detention.  If it is used, it should be used only where the child is determined to be a threat to himself, and it must be monitored by medical staff and mental health staff.  As soon as the person in the chair has control of themselves, they should be taken out of the chair. Prolonged periods of time in the restraint chair are extremely harmful and unacceptable by any standard. Keeping children in the restraint chair for hours at a time is far longer than necessary to abate any threat of self-harm or harm to others.

48.    It is apparent that CCJDC relies on the wet cell and the restraint chair as disciplinary measures for arbitrary and inconsistent reasons which vary based upon what guards are on duty. Again, children report that the severity and extent of punishment is highly dependent upon what guards are on duty, which reflects a culture of wide discretion rather than carefully administered policies and procedures. Children are not given any form of a hearing or opportunity to tell their side of a story (due process) before being put in the wet cell or restraint chair. They are not told for how long they will be confined or what they must do to earn their release.

49.    These arbitrary practices plainly lead to excessive punishment for the children, which is very concerning for all, but especially for those who are vulnerable due to mental health problems, such as PTSD, anxiety, or depression.  The majority of children I interviewed had some form of disability. Placing a child suffering from mental illness in the wet cell or a restraint chair would almost certainly exacerbate the child's mental illness, and placing a child who did not previously suffer from mental illness in the wet cell or restraint chair could cause the child to begin suffering from mental trauma.

50.    In response to fights and disorder, the CCJDC or an outside SWAT team known as the "Green Team", according to D.H. and C.J., also uses guns loaded with rubber bullets and/or assault type rifles with bean bags to restore order and discipline. Children are shot with projectiles from these weapons for failing to follow orders such as failing to get on the ground when instructed. Being shot with rubber bullets and bean bags causes extreme pain, bruising, humiliation and emotional harm.  I have never heard of any other facility that has police officers fire any form of guns, whether with rubber bullets or bean bags, at unarmed children housed in a detention facility. This is an abhorrent practice that could be justified by no conceivable scenario, and it raises not only serious concerns about training and best practices, but it evidences that the CCJDC is operated in a culture of violence, cruelty, fear and retribution, rather than one of safety and rehabilitation.

51.    The extent to which children are being terrorized at the CCJDC is exemplified by a story one mother, E.F., shared. After her son J.M. was released from the facility, he and his Godfather went to Wal Mart. While there, they saw two guards from the facility shopping. When J.M. saw the guards, he immediately turned and ran away from the store in terror.

20

**Overcrowding and Failure to Provide Beds to Children**

52.    The CCJDC facility is frequently overcrowded, resulting in children being forced to sleep on the floor of the facility. This issue is widely reported and substantiated by published statistics of SCDJJ, which indicate that the population of the facility has grown significantly in recent years from 30 per day in FY 2015/16 to 42 per day in FY 2016/17 to 57 per day in FY 2017/18. SCDJJ statistics are not available on the web site for FY 2018/19 or 2019/20, but as noted above, the total number of children housed at the facility on an annual basis has increased each year.

53.    Even in cells with only two children, the rooms are too small and fail to provide sufficient total floor space per occupant. Most of the cells at the CCJDC facility are designed for single occupancy. The square footage of the cells is, upon information and belief, 80 feet. Nonetheless, these cells frequently house more than one child, and sometimes as many as four children. D.H. described how three boys were placed into a single cell which had only one functioning bed because the top bunk was broken and would collapse. The boys were forced to put two mattresses side by side on the floor and sleep there, while one boy slept in the bottom bunk. He further reports that other cells were not fully occupied and beds were available, but these children were nonetheless forced to sleep in this condition. He said he received no explanation for why they had to share a cell when others were available.

54.    A.C., I.J. and D.W. report not having sufficient time to take an adequate shower, often not having hot water in the showers, and having to purchase soap from the canteen at times.  D.H. reported having to take cold showers in a cold building, so sometimes they decline to take a shower altogether.

55.    Some report having to wear dirty uniforms, although the practice of being forced to wear only underwear and an undershirt at all times in cells was apparently ended in 2018.

56.    Children have been able to call their families only if they had money to pay for the calls. Parents have been required to deposit money in a prepaid account in order for calls to be allowed.

**Failure to provide outdoor access and programming**

57.    The children reported almost unanimously that they were never allowed to go outside, even though information provided to P&A in its June 2018 inspection indicated children are allowed outside during school and that they are even are provided a coach for activities.  I do not know why they are not permitted out of doors, if that is indeed the practice. The facility has a recreation yard with two basketball goals (with the hoops missing).  Further, minimum standards call for children in custody to have one hour of large muscle exercise every day, weather permitting. Generally accepted professional standards require that juvenile justice facilities provide recreation and meaningful activities such as group and individual therapy, social skills training, and other programming.

58.    Forcing children to remain indoors and in small cells for weeks or months at a time without access to sufficient recreation and/or outside activities—particularly in conditions such as those that exist at the CCJDC—places the children at significant risk of suffering physical, psychological, mental, and emotional injuries.

59.    The problems created by the inadequate programming and outdoor access at the CCJDC are exacerbated by the lack of a behavior management program at the CCJDC. The failure to provide outdoor access, adequate programming or behavior management is not only violative of the Children's rights, but predictably results in behavior problems.

22

**Failure to provide separation of individuals with violent propensities**

60.    To ensure Children housed at CCJDC are safe, the facility should have a system for screening and separating aggressive juveniles from more passive ones and determining appropriate levels of institutional classification. This is a minimally adequate standard of care.

61.    The CCJDC appears not to provide such a system for screening and separating aggressive from passive Children, or if such a system exists, it is not being implemented and/or is ineffective.

62.    Younger, smaller and more vulnerable children, such as C.A., have been beaten up by larger and more aggressive children. Guards reportedly are very commonly not responsive to such attacks, even when other children make loud noise by shouting for help and banging on walls and doors. In one instance, a vulnerable youth, A.C., was attacked by his roommate who kicked and punched the smaller child and pushed his head into the toilet. Z.C., a child in the adjoining cell screamed for help and banged on the wall as loudly as he could. No guards responded to protect the child being attacked. Z.C. suffered a hand injury from his efforts, but received no treatment for it. After he was released from the CCDJC, he was diagnosed with a broken wrist, but it could not be set because too much time had passed since the injury.

63.    The apparent lack of a system of separation poses a serious risk of injury to children and falls far below the most fundamental practices required to ensure the safety of children housed in a juvenile detention center.

**Failure to Provide Adequate Health Care**

64.    Certain children incarcerated at the facility have specific medical needs, including physical ailments such as asthma, chronic bronchitis, sleep disorders, and diabetes. Nonetheless, the CCJDC does not provide regular and appropriate medical assessments to the Children upon

23

admittance, and the CCJDC fails to provide timely access to qualified health professionals when the children are in need of health services. Further, when children do receive healthcare services, the services are reported to be inadequate.

65.    The facility frequently fails to provide the children with their prescribed medications at the proper dosages at proper intervals or, in many if not most cases, fails to provide the children with their prescribed medications at all. Often the intake personnel refuse to accept medicines provided by parents of the children, or they will accept the medicines and return them unused at the end of the incarceration period. This was a very familiar refrain among those interviewed. D.H., reported being in the facility for six months off of his medication  for ADHD and Oppositional Defiant Disorder (ODD).

66.    In at least one instance as described by L.A., the Defendants' neglect of a child's need for regular medication for severe asthma resulted in worsening of the child's condition and the need for her to be transported to the hospital in an ambulance.

67.    The CCJDC does not maintain health care workers at the site on a full time basis, but apparently nurses visit twice daily. Reports as to the responsiveness of guards to requests for medical care varied somewhat, with some children claiming they did not receive care and others indicating they did eventually receive a treatment when a nurse came to the facility.

**Failure to Provide Adequate Mental Health Care**

68.    Many, if not most, children detained at the CCJDC suffer from various forms of mental illness, and many are prescribed psychotropic medications. The majority of children interviewed indicated having some form of disability with ADHD appearing most commonly. The CCJDC, however, very often fails to provide children with their prescribed medication, including psychotropic medications, and fails to provide any regular individualized mental health

24

assessment, treatment, counseling, or psychotherapy to the children in need of such services. Children and their families report that even when a family court judge has ordered mental health treatment, the facility does not provide it.

69.     The CCJDC also fails to do the following:

a.     Properly screen the Children for medical conditions, including mental health conditions, upon their arrival at the CCJDC.

b.     Employ a sufficient number of qualified mental health professionals to counsel and treat the children with mental health treatment needs.

c.     Adequately train and supervise staff to respond in appropriate ways to the children with mental health issues.

d.     Provide a continuum of mental health services to meet the needs of the children.

e.     Provide adequate or effective group counseling by trained staff.

f.     Provide a confidential setting for counseling.

70.     As a result of these failures, the children do not receive counseling or other necessary mental health treatment.

**Failure to Provide Access to Adequate Education Services**

71.     Defendants fail to ensure that all children at the CCJDC have access to educational services, including special education services. School at the detention facility is very spotty.  Some children say they never go, whereas some say they go 1 or 2 hours a week.  A.C. told me that he attended 5 days a week for 1-2 hours.  D.H. reported that education is provided in two shifts with 10 children in each shift. If more than 20 children are in the facility, then the excess children get no instruction that day. This is consistent with C.J. who said only some children would be allowed to have education. Education is commonly refused for students on

25

lockdown or facing other forms of isolation. Some reported having teachers come from Daniel Jenkins School to teach some of the kids. Other children, including L.M., complained that the school was not hard enough or was not related to the subjects they had in regular school. J.M.'s mother and C.J. both said the school work consisted of coloring and watching movies. C.J. said the work was below grade level and he never received credit and did not attend much school while there. C.R. reports that Children are also not allowed to have pencils in their cells. Although the facility apparently has computers, no child reported using them in conjunction with their school work.

72.    A substantial number of children interviewed, including R.S., M.H. M.J. and C.A., have been identified as Special Education students with an IEP (individual education plan). They are supposed to have certified special ed teachers who follow the IEP. All the children I talked with who were special ed said they have a diagnosis of ADHD and were supposed to be taking medication. The CCJDC in conjunction with the local school system should:

a.    Adequately identify, assess, or evaluate Children to determine whether they have special needs and how such special needs can be met.

b.    Follow IEPs for children who need special education.

c.    Provide related services, such as speech therapy and psychological therapy, to children with disabilities who need such services to benefit from their education.

d.    Obtain and/or provide adequate information from schools that children attend prior to their detention at the CCJDC to properly ascertain the children's special needs.

e.    Provide adequately trained, certified special education teachers to provide special education services to children who need these services.

26

73.     As a result of Defendants' failures, the children are denied their right to education and do not make progress in school.

74.     Almost universally, the children reported not receiving any credit when they returned to school for the education provided, if any, at the CCJDC.

**Cross gender privacy issues**

75.      CCJDC houses both male and female children.

76.     Although females are generally housed in a different wing of the building, the facility fails to ensure the privacy and safety of female children at all times. Specifically, male guards have ready access to the female wing, and the windows in cell doors allow guards to view females in their cells, including when they are dressing, performing personal hygiene and using the toilet. I.J. and G.J. report being confined in cells with used sanitary napkins littering the floor. I.J. reported male guards flirted with her and she said that, although some female guards work at the facility, it is common for men to check on the female children.

77.     The lack of privacy afforded female children renders them susceptible to trauma and contributes to anxiety and loss of self-esteem, which are counterproductive to the goals of juvenile justice.

**Lack of Due Process for Alleged Disciplinary Violations**

78.     There is no due process offered on major discipline, such as lockdowns, the wet cell or the restraint chair.  Staff decide the punishment and that is the end of it. Minimum standards recommend an official process where there is an independent investigation and interviews with witnesses before giving the punishment.  That does not happen in this facility.

**Lack of Nutritious and Appetizing Food**

79.    Every single detainee said the food at CCJDC was awful.  They described it as being cold, having no taste and soggy, and B.M. reported being served milk that was spoiled.  A typical example of a meal was a piece of bologna with two slices of soggy white bread. Some refused to eat the food and others claimed to get sick after consuming it. Because the facility does not have an operational kitchen, the food comes from the main jail, without a warmer, and is always delivered late and cold. Children who could afford to do so and who were aware of the system could order junk food, such as chips and soda, from the canteen on Sundays, and it would be delivered on Thursdays. The families were required to pay in advance for this food, and if the child was released before consuming the pre-ordered snacks, they forfeit the money. Children reported being hungry most of the time.

80.    There also does not seem to be any special diets for either religious reasons or medical reason or simply because of a vegetarian request.  Children have a need for a higher quality diet that addresses their needs.  Further investigation into the nutritional value, quantity, and cleanliness of the food served is warranted, but significant evidence indicates that the CCJDC does not meet the most minimal requirements for providing adequate food to the children housed at the facility.

## Evaluation

81.    In my opinion, this center is not meeting the minimum acceptable standards for Juvenile Detention Centers in South Carolina, nor would it meet the standards of any civilized society. It is more like a concentration camp than a place to house children who are accused of a

28

crime or status offenses. There are issues of excessive force and isolation that are harmful to children. It is a cruel and punitive rather than a rehabilitative system.

82.     In my opinion the CCJDC has been incredibly lucky that they have not experienced a disaster such as a death of a child in custody. Excessive isolation and restraint can cause children to decompensate and act in ways that harm themselves. This does not seem to be a caring environment and needs to reform and change immediately before more harm can be done to these children and their families.

Signature

Print Name:  John P. Rhoads

Dated:  7-24-2020