# EXHIBIT C

**Emails from Pennington to Beatty**

**Archived:** Friday, July 24, 2020 8:55:58 AM
**From:** Annie E. Andrews
**Sent:** Fri, 19 Jun 2020 17:03:07 +0000ARC
**To:** Patrick Wooten
**Subject:** FW: Continuing Problems at Juvenile Detention
**Sensitivity:** Normal

---

███████████████████████████████████

---

**From:** Ashley Pennington <APennington@charlestoncounty.org>
**Sent:** Thursday, September 06, 2018 5:02 PM
**To:** Annie E. Andrews <AAndrews@charlestoncounty.org>
**Subject:** RE: Continuing Problems at Juvenile Detention

████████████████████████████████████████████████
█████████████████████████

████████
██████████████

---

**From:** Annie E. Andrews
**Sent:** Thursday, September 06, 2018 3:42 PM
**To:** Ashley Pennington <APennington@charlestoncounty.org>
**Subject:** Re: Continuing Problems at Juvenile Detention

██████████████████████████████████

█████████████████

On Sep 3, 2018, at 1:42 PM, Ashley Pennington <APennington@charlestoncounty.org> wrote:

████████████████

**From:** Ashley Pennington
**Sent:** Monday, September 3, 2018 1:41 PM
**To:** Willis Beatty
**Subject:** RE: Continuing Problems at Juvenile Detention

Dear Chief Beatty,
I understand that the juveniles have been moved back to Headquarters Road. My juvenile defender lawyers report that the A/C is working and the interior has been painted, which is good.

However, our child clients are back to being confined every day as if they were in the disciplinary detention section of the main adult

jail. These children are still being confined in their cells (with their roommate(s)) for up to 22 hours per day when school is not in session on weekends and holidays. Sometimes there are three boys assigned to the same cell. Most have not committed a significant
infraction of the detention center rules. They are simply being
detained like that pretrial. And, school only reduces their "lock-down" time to 17-18 hours per day.


It seems to us that lengthy, daily confinement causes significant unwarranted harm. The children are being held under the most restrictive conditions, like they were unmanageable adult detainees who pose a danger to staff or others. This isolation and minimal interaction with others does NOT fit juvenile detention standards for juvenile detainees under SC Code Section 63-19-360(5). The standards
require the detention center to "minimize idleness" and to provide at least 70 square feet of total floor space per occupant. Sometimes there are three boys assigned to the same cell. This all seems to be driven by a structure with too little space.  The males
and females cannot have direct supervision at the same time in the more interactive common area. And, we are taking children from other counties and adding to our space shortage.


I have been told recently that SC Protection and Advocacy has toured the facility and came away concerned. The Civil Rights Division of
the Justice Department has also inquired about the detention center.


The pods in the main jail are far more appropriate for these
children. Please look further into these conditions at Headquarters Road. I ask that you reconsider all these facts and put the juveniles back in the pods until we have time to design and to build a more appropriate juvenile detention facility.
All the best,
Ashley


D. Ashley Pennington
Ninth Circuit Public Defender
101 Meeting Street, 5th Floor
Charleston, SC  29401-2214

(843) 958-1850
(843) 958-1870(direct)
(843) 478-1230(mobile)

(843) 958-5149(facsimile)

apennington@charlestoncounty.org

www.lowcountrydefenders.org

Confidential Notice: This electronic mail transmission and any and all accompanying documents and information contain data and matters belonging
to the sender which may be confidential and legally privileged. This information is intended ONLY for the use of the individual entity to whom it is addressed. If you are not the intended recipient, any disclosure, copying, distribution or action of any
sort taken in reliance on the contents of the information contained in this transmission or any attachments is strictly prohibited and objected to. If you have received this transmission in error, please immediately notify us by telephone at (843) 958-1870
and also delete the message. Thank you.

**From:**
Ashley Pennington
**Sent:** Wednesday, August 15, 2018 4:53 PM
**To:** Willis Beatty <wbeatty@charlestoncounty.org>
**Subject:** Juvenile Detention
**Importance:** High

Dear Chief,
Thanks for moving the juveniles on Sunday. Some of the public defender attorneys have met with their clients recently and then passed on some complaints about the setting and problems that they are encountering at the Headquarters Road facility. See below:

Girl,
DC
·      Did not go outside one time.
·      Not receiving 3 medications she normally receives for the treatment daily. Does not have access to an EpiPen for severe allergic reactions. Does not have her glasses so has trouble seeing.
·      Was placed in the "wet cell" by Officer XX for several hours with her ankles shackled and her hands handcuffed behind her back after an incident in which her toilet overflowed, allegedly on purpose. "I could not find a comfortable position to sit/lay while I was shackled/handcuffed like this and I asked for water on one occasion, but was not given any." Following her time in the "wet cell" for this incident Girl was put on 24hr a day lockdown for nearly a week. For one of the days Girl asked to take a shower and was told she could not.
o   According to DSS/medical records, Girl has a diagnosis of PTSD, anxiety, asthma, and a history of sexual and physical abuse.
·      On Friday August 10th, Girl put in a request to be seen by medical because she had itchy bumps all over her lower back and behind her ears as though she was having an allergic reaction. She showed her

attorney the bumps, which look like patches of tiny pimples. She was not seen until 5 days later, after she had put in two subsequent medical requests. When she was seen she did not receive
a diagnosis or any sort of medication.

· "I was put on 24hr lockdown once because I was sleeping when XX came by my room to collect the food tray." She was told that it
was disrespectful to leave the tray by the door for XX to pick up instead of handing it to her.

· Officer XX regularly cusses at the kids saying things like "sit your ass down." Staff are sometimes on a "power trip."

· Conditions generally:

o A/C vent leaks onto the floor,

o "All of the toilets are connected" so if one is flushed in an adjacent cell, the toilet in her cell may begin to rise and could overflow

o Feces came up through the drains in the showers on one occasion because of a flooding issue

o Guards say to drink the water from the sinks in their rooms, but it is milky white

Jail

· The current conditions are "significantly better," "no comparison"

· "The staff seems resentful of us kids because they don't have the power to just lock us in our rooms all day long."


Girl

DC:

· Did not go outside one time.

· Receives medication to help her sleep, but sometimes doesn't receive them until 12am.

· Was placed in the "wet cell" one day from 6am to 2pm after having a verbal argument with another girl. You cannot go to the bathroom
in there and it smells like urine because kids often cannot hold it and have to go on the floor. You can bang on the doors to attempt to get the staff's attention, but they usually can't hear you because all of the banging coming from the nearby boys' rooms.

· Was placed on 48hr lockdown because she had a pencil within her cell (that she was using to write a list of goals to share with
her attorney and the judge).

· Conditions generally:

o A/C vent leaks water on the floor

o Toilets are all connected so when some people flush their toilets too

many times it causes other toilets to flood. One day girls started flushing a lot and there was feces/urine everywhere. The girls were all taken to the common area while the mess was cleaned, but it wasn't cleaned well and when they returned the smell was so bad it gave her a headache.

o "I had bruises on my legs from sleeping in the bed. I showed them to my mom and she thought that maybe there was metal poking out that was rubbing me the wrong way at night. I looked under my mattress and it is just metal wires. I'm not sure what is wrong with the beds."

· "Being at the detention center is like throwing a new puppy into a small room all day long while you go to work." For a time I didn't have a roommate and I could only have human contact by yelling through the vents.

Jail:

o "This place is 100% better. I go to rec outside at night and enjoy the fresh air. It's really a blessing. I'm not alone in my cell anymore."

Boy
DC:

· Only went outside a handful of times.

· Guards will punish you by taking you out of school

· Has been on 48hr-72hr lockdown for just talking to other kids in adjacent cells who were beating on their doors.

· "Being in detention is just really stressful and lonely. I don't know how to explain it. My family says that I've changed since I've been here."

· Conditions generally:

o There are rats in the vents. You can hear them really late at night when people stop banging on the doors.

o Only the hot water works in my room and I'm told to just drink the water when I'm thirsty, but it's hot.

o The ceiling in my room was leaking for a long time and not just when it rained, but they finally fixed it.

· "Some people have been in the wet cell just for beating on the door, and I know that some people in there are shackled and handcuffed and they put a chain in between the two so that you can't really move."

Jail:

· "Being here makes me happy, excited even. When I left DC my eyes hurt when they moved us. It's so dark in there and they don't let us outside. It's been months since I've been outside. Please tell them not to send me back there."

- People are happier here and probably less likely to fight because they don't have all this energy from being kept in a box all day.
- You have more privacy here because the shower curtains cover you in these showers. Also you can pee without people watching you.

In your cell your roommate just watches you pee from a few feet away and it's embarrassing. The clothes are cleaner here as if the detergent is better or they use bleach because our whites are whiter.

- You have rec all day instead of for just 2hrs a day. I've been outside several times already.

Boy

DC:
- Never been outside
- I have an IEP, but Detention doesn't follow it. They probably don't know what grade most kids are in. They just lump us in groups
and teach us the same stuff.
- I've never been in the "wet cell," but I know lots of kids go there for banging on their doors and kids bang on the doors all the
time.
- Conditions generally:
  o The ceiling leaks brown stuff
  o Toilets always leak and break
  o A/C breaks
  o Nothing seems to work well
- You can't cover yourself in the showers at the DC which makes me uncomfortable

Jail:
- I like that I can talk to my mom every day and you can see your brothers on the video. At Detention you can't see your siblings.
- You eat at tables here, which I really like instead of eating in our rooms. I feel like we have longer to eat.
- I've been outside several times.

Girl
DC:
- Never went outside one time.
- You are not allowed to go to school if you get into trouble, and people get put on lockdown for things like trying to get a guard's attention by banging on the door, but that is the only way to get their attention.

- Conditions generally:
  - A/C leaks
  - The sink water is a milky color and guards say to drink that. That is all you have to brush your teeth with.
  - There were rats in the ceiling in the nurse's bathroom
  - Guards cut the water off in my cell once because they said the toilets didn't work, but I couldn't use the bathroom for hours.
- What is DC like? "It is miserable. No one should be there. These kids are going through a lot of stuff anyway, we're sad and lonely anyway, and it just makes our problems worse."

Jail:
- This place is way better.
- I can watch TV and play cards or games, which you can't do at the DC because the games are too worn and cards are missing.
- You can watch what you want on the TV because the TV faces the kids. At DC the guards tell you that you can only watch what they want and they just watch TV from the back of the room.
- The ceilings are higher and the lighting is better. The sunlight comes in. I feel "chilled out" and just more comfortable.
- I can sit at a table and eat like you would for a real meal. At the DC you only get 5min or so to eat. As soon as the guards finish giving meals to the last kid, they start collecting the trays from the first kids. You barely have time to look at your food.
- The mood with the girls is better at the jail.
- Clothes are cleaner here. The washer must work better or they use different detergent because you can smell it on your clothes like they're clean.
- I think the staff is nicer here because there are more cameras and different crews of people are watching how they treat us.
- I like that you can call your parents more here.
- I go to rec all day long here.

Could you consider leaving the juveniles where they are?
Apparently conditions are much better.

Best,
Ashley

D. Ashley Pennington

Ninth Circuit Public Defender
101 Meeting Street, 5th Floor
Charleston, SC  29401-2214

(843) 958-1850
(843) 958-1870(direct)
(843) 478-1230(mobile)
(843) 958-5149(facsimile)

apennington@charlestoncounty.org

www.lowcountrydefenders.org

Confidential Notice:  This electronic mail transmission and any and all accompanying documents and information contain data and matters belonging
to the sender which may be confidential and legally privileged.  This information is intended ONLY for the use of the individual entity
to whom it is addressed.  If you are not the intended recipient, any disclosure, copying, distribution or action of any
sort taken in reliance on the contents of the information contained in this transmission or any attachments is strictly prohibited and
objected to. If you have received this transmission in error, please immediately notify us by telephone at (843) 958-1870
and also delete the message.  Thank you.

```
@font-face
{font-family:Calibri;
panose-1:2 15 5 2 2 2 4 3 2 4;}
@font-face
{font-family:Tahoma;
panose-1:2 11 6 4 3 5 4 4 2 4;}
@font-face
{font-family:"Comic Sans MS";
panose-1:3 15 7 2 3 3 2 2 2 4;}

p.MsoNormal, li.MsoNormal, div.MsoNormal
{margin:0in;
margin-bottom:.0001pt;
font-size:12.0pt;
font-family:"Times New Roman","serif";}
a:link, span.MsoHyperlink
{mso-style-priority:99;
color:blue;
text-decoration:underline;}
a:visited, span.MsoHyperlinkFollowed
{mso-style-priority:99;
color:purple;
text-decoration:underline;}
p
{mso-style-priority:99;
mso-margin-top-alt:auto;
margin-right:0in;
mso-margin-bottom-alt:auto;
```

```
margin-left:0in;
font-size:12.0pt;
font-family:"Times New Roman","serif";}
p.MsoAcetate, li.MsoAcetate, div.MsoAcetate
{mso-style-priority:99;
mso-style-link:"Balloon Text Char";
margin:0in;
margin-bottom:.0001pt;
font-size:8.0pt;
font-family:"Tahoma","sans-serif";}
span.EmailStyle18
{mso-style-type:personal-reply;
font-family:"Calibri","sans-serif";
color:#1F497D;}
span.BalloonTextChar
{mso-style-name:"Balloon Text Char";
mso-style-priority:99;
mso-style-link:"Balloon Text";
font-family:"Tahoma","sans-serif";}
.MsoChpDefault
{mso-style-type:export-only;
font-size:10.0pt;}
@page WordSection1
{size:8.5in 11.0in;
margin:1.0in 1.0in 1.0in 1.0in;}
div.WordSection1
{page:WordSection1;}
-->
```

**Archived:** Friday, July 24, 2020 8:56:02 AM
**From:** Annie E. Andrews
**Sent:** Fri, 19 Jun 2020 17:02:10 +0000ARC
**To:** Patrick Wooten
**Subject:** FW: Juvenile Detention
**Sensitivity:** Normal

---

██████████████████████████████

---

**From:** Ashley Pennington <APennington@charlestoncounty.org>
**Sent:** Friday, August 17, 2018 11:53 AM
**To:** Annie E. Andrews <AAndrews@charlestoncounty.org>
**Subject:** FW: Juvenile Detention

████████████

---

**From:** Ashley Pennington
**Sent:** Thursday, August 16, 2018 2:55 PM
**To:** Willis Beatty <wbeatty@charlestoncounty.org>
**Subject:** Re: Juvenile Detention

Sounds good. Just thought it might easier and cheaper to manage. The kids are much happier. They don't have to be in lockdown like the detention center.

Ashley Pennington
(843) 478-1230

On Aug 16, 2018, at 2:52 PM, Willis Beatty <wbeatty@charlestoncounty.org> wrote:

> Ashely, I am in Columbia today will look into tomorrow when I return. Appreciate the heads up.
>
>
> Willis
>
> Chief Deputy W. Beatty, CJM, CCE
> Sent from my iPhone
>
> On Aug 15, 2018, at 16:52, Ashley Pennington <APennington@charlestoncounty.org> wrote:
>
>> Dear Chief,
>> Thanks for moving the juveniles on Sunday. Some of the public defender attorneys have met with their clients recently and then passed on some complaints about the setting and problems that they are encountering at the Headquarters Road facility. See below:
>>
>> Girl,

DC

· Did not go outside one time.

· Not receiving 3 medications she normally receives for the treatment daily. Does not have access to an EpiPen for severe allergic reactions. Does not have her glasses so has trouble seeing.

· Was placed in the "wet cell" by Officer XX for several hours with her ankles shackled and her hands handcuffed behind her back after an incident in which her toilet overflowed, allegedly on purpose. "I could not find a comfortable position to sit/lay while I was shackled/handcuffed like this and I asked for water on one occasion, but was not given any." Following her time in the "wet cell" for this incident Girl was put on 24hr a day lockdown for nearly a week. For one of the days Girl asked to take a shower and was told she could not.

o According to DSS/medical records, Girl has a diagnosis of PTSD, anxiety, asthma, and a history of sexual and physical abuse.

· On Friday August 10th, Girl put in a request to be seen by medical because she had itchy bumps all over her lower back and behind her ears as though she was having an allergic reaction. She showed her attorney the bumps, which look like patches of tiny pimples. She was not seen until 5 days later, after she had put in two subsequent medical requests. When she was seen she did not receive a diagnosis or any sort of medication.

· "I was put on 24hr lockdown once because I was sleeping when XX came by my room to collect the food tray." She was told that it was disrespectful to leave the tray by the door for XX to pick up instead of handing it to her.

· Officer XX regularly cusses at the kids saying things like "sit your ass down." Staff are sometimes on a "power trip."

· Conditions generally:

o A/C vent leaks onto the floor,

o "All of the toilets are connected" so if one is flushed in an adjacent cell, the toilet in her cell may begin to rise and could overflow

o Feces came up through the drains in the showers on one occasion because of a flooding issue

o Guards say to drink the water from the sinks in their rooms, but it is milky white

Jail

· The current conditions are "significantly better," "no comparison"

· "The staff seems resentful of us kids because they don't have the power to just lock us in our rooms all day long."


Girl

DC:

· Did not go outside one time.

· Receives medication to help her sleep, but sometimes doesn't receive them

until 12am.

· Was placed in the "wet cell" one day from 6am to 2pm after having a verbal argument with another girl. You cannot go to the bathroom in there and it smells like urine because kids often cannot hold it and have to go on the floor. You can bang on the doors to attempt to get the staff's attention, but they usually can't hear you because all of the banging coming from the nearby boys' rooms.

· Was placed on 48hr lockdown because she had a pencil within her cell (that she was using to write a list of goals to share with her attorney and the judge).

· Conditions generally:

o A/C vent leaks water on the floor

o Toilets are all connected so when some people flush their toilets too many times it causes other toilets to flood. One day girls started flushing a lot and there was feces/urine everywhere. The girls were all taken to the common area while the mess was cleaned, but it wasn't cleaned well and when they returned the smell was so bad it gave her a headache.

o "I had bruises on my legs from sleeping in the bed. I showed them to my mom and she thought that maybe there was metal poking out that was rubbing me the wrong way at night. I looked under my mattress and it is just metal wires. I'm not sure what is wrong with the beds."

· "Being at the detention center is like throwing a new puppy into a small room all day long while you go to work." For a time I didn't have a roommate and I could only have human contact by yelling through the vents.

Jail:

o "This place is 100% better. I go to rec outside at night and enjoy the fresh air. It's really a blessing. I'm not alone in my cell anymore."

Boy

DC:

· Only went outside a handful of times.

· Guards will punish you by taking you out of school

· Has been on 48hr-72hr lockdown for just talking to other kids in adjacent cells who were beating on their doors.

· "Being in detention is just really stressful and lonely. I don't know how to explain it. My family says that I've changed since I've been here."

· Conditions generally:

o There are rats in the vents. You can hear them really late at night when people stop banging on the doors.

o Only the hot water works in my room and I'm told to just drink the water when I'm thirsty, but it's hot.

o The ceiling in my room was leaking for a long time and not just when it rained, but they finally fixed it.

· "Some people have been in the wet cell just for beating on the door, and I

know that some people in there are shackled and handcuffed and they put a chain in between the two so that you can't really move."

Jail:

· "Being here makes me happy, excited even. When I left DC my eyes hurt when they moved us. It's so dark in there and they don't let us outside. It's been months since I've been outside. Please tell them not to send me back there."

· People are happier here and probably less likely to fight because they don't have all this energy from being kept in a box all day.

· You have more privacy here because the shower curtains cover you in these showers. Also you can pee without people watching you. In your cell your roommate just watches you pee from a few feet away and it's embarrassing. The clothes are cleaner here as if the detergent is better or they use bleach because our whites are whiter.

· You have rec all day instead of for just 2hrs a day. I've been outside several times already.

Boy

DC:

· Never been outside

· I have an IEP, but Detention doesn't follow it. They probably don't know what grade most kids are in. They just lump us in groups and teach us the same stuff.

· I've never been in the "wet cell," but I know lots of kids go there for banging on their doors and kids bang on the doors all the time.

· Conditions generally:

o The ceiling leaks brown stuff

o Toilets always leak and break

o A/C breaks

o Nothing seems to work well

· You can't cover yourself in the showers at the DC which makes me uncomfortable

Jail:

· I like that I can talk to my mom every day and you can see your brothers on the video. At Detention you can't see your siblings.

· You eat at tables here, which I really like instead of eating in our rooms. I feel like we have longer to eat.

· I've been outside several times.

Girl

DC:

· Never went outside one time.

· You are not allowed to go to school if you get into trouble, and people get

put on lockdown for things like trying to get a guard's attention by banging on the door, but that is the only way to get their attention.

· Conditions generally:

o A/C leaks

o The sink water is a milky color and guards say to drink that. That is all you have to brush your teeth with.

o There were rats in the ceiling in the nurse's bathroom

o Guards cut the water off in my cell once because they said the toilets didn't work, but I couldn't use the bathroom for hours.

· What is DC like? "It is miserable. No one should be there. These kids are going through a lot of stuff anyway, we're sad and lonely anyway, and it just makes our problems worse."

Jail:

· This place is way better.

· I can watch TV and play cards or games, which you can't do at the DC because the games are too worn and cards are missing.

· You can watch what you want on the TV because the TV faces the kids. At DC the guards tell you that you can only watch what they want and they just watch TV from the back of the room.

· The ceilings are higher and the lighting is better. The sunlight comes in. I feel "chilled out" and just more comfortable.

· I can sit at a table and eat like you would for a real meal. At the DC you only get 5min or so to eat. As soon as the guards finish giving meals to the last kid, they start collecting the trays from the first kids. You barely have time to look at your food.

· The mood with the girls is better at the jail.

· Clothes are cleaner here. The washer must work better or they use different detergent because you can smell it on your clothes like they're clean.

· I think the staff is nicer here because there are more cameras and different crews of people are watching how they treat us.

· I like that you can call your parents more here.

· I go to rec all day long here.


Could you consider leaving the juveniles where they are? Apparently conditions are much better.

Best,

Ashley


D. Ashley Pennington
Ninth Circuit Public Defender
101 Meeting Street, 5th Floor

Charleston, SC  29401-2214

(843) 958-1850
(843) 958-1870(direct)
(843) 478-1230(mobile)
(843) 958-5149(facsimile)

apennington@charlestoncounty.org

www.lowcountrydefenders.org

Confidential Notice:  This electronic mail transmission and any and all accompanying documents and information contain data and matters belonging to the sender which may be confidential and legally privileged.  This information is intended ONLY for the use of the individual entity to whom it is addressed.  If you are not the intended recipient, any disclosure, copying, distribution or action of any sort taken in reliance on the contents of the information contained in this transmission or any attachments is strictly prohibited and objected to. If you have received this transmission in error, please immediately notify us by telephone at (843) 958-1870 and also delete the message.  Thank you.

**Archived:** Friday, July 24, 2020 8:56:06 AM
**From:** Annie E. Andrews
**Sent:** Fri, 19 Jun 2020 16:55:57 +0000ARC
**To:** Patrick Wooten
**Subject:** FW: Juvenile Detention Center
**Sensitivity:** Normal

---

<span style="color:red">◊ ?External Email◊ ?</span> - From: AAndrews@charlestoncounty.org

**From:** Ashley Pennington <APennington@charlestoncounty.org>
**Sent:** Thursday, June 14, 2018 2:37 PM
**To:** Megan S. Ehrlich <MEhrlich@charlestoncounty.org>; Holly J. Bendure <HBendure@charlestoncounty.org>; Annie E. Andrews <AAndrews@charlestoncounty.org>; Maryellen Rankin <MRankin@charlestoncounty.org>; J Tim. Taylor <JTTaylor@charlestoncounty.org>; Tammie J. Coppinger <TCoppinger@charlestoncounty.org>
**Subject:** FW: Juvenile Detention Center



**From:** Willis Beatty
**Sent:** Thursday, June 14, 2018 1:58 PM
**To:** Ashley Pennington <APennington@charlestoncounty.org>; Mitch Lucas <mlucas@charlestoncounty.org>
**Subject:** RE: Juvenile Detention Center

Ashley I am sorry I have looked into all this and was going to send out the info and got side tracked. Please see my answers to your questions and let me know if you have any other ones

Willis

*Willis Beatty, CJM, CCE*
*Chief Deputy*
*Charleston County Sheriff's Office*

*Sheriff Al Cannon Detention Center*
*3841 Leeds Ave*
*North Charleston, SC 29405*
*843-529-7314 Office*
*843-529-7406 Fax*
wbeatty@chalestoncounty.org

---

**From:** Ashley Pennington
**Sent:** Thursday, June 14, 2018 11:58 AM
**To:** Mitch Lucas <mlucas@charlestoncounty.org>
**Cc:** Willis Beatty <wbeatty@charlestoncounty.org>
**Subject:** RE: Juvenile Detention Center

Dear Mitch,
We emailed on this on June 4. I am following up on the juvenile detainees having to strip and be in their underwear in their cells at the Juvenile Detention Center, the SMU 18 + hour lockdown conditions regardless of their behavior and the lack of fresh air or exercise for all the kids in detention.

What can be done about to address these harsh conditions for these juvenile detainees?
Best,
Ashley
(843) 478-1230 (mobile)

---

**From:** Ashley Pennington
**Sent:** Monday, June 04, 2018 3:33 PM
**To:** Mitch Lucas <mlucas@charlestoncounty.org>
**Cc:** Willis Beatty <wbeatty@charlestoncounty.org>
**Subject:** Re: Juvenile Detention Center

Many thanks!

Ashley Pennington
(843) 478-1230

On Jun 4, 2018, at 2:53 PM, Mitch Lucas <mlucas@charlestoncounty.org> wrote:

> I will get with Willis and try to get answers to your questions,
> .
> Mitch
>
> Mitch Lucas
> Assistant Sheriff
> Charleston County Sheriff's Office
> 3691 Leeds Avenue
> North Charleston, S.C. 29405
>
> 843-554-2443 Office

**From:** Ashley Pennington
**Sent:** Monday, June 4, 2018 10:26 AM
**To:** Mitch Lucas <mlucas@charlestoncounty.org>
**Subject:** Juvenile Detention Center

Dear Mitch,

We spoke briefly on Thursday that my juvenile defenders are concerned that their clients are forced to strip to their underwear and leave their jail uniforms in the hall outside their door. The kids complain to us that they are sometimes very cold. I recently visited a juvenile detainee and saw all the kid's uniforms piled outside their cell doors myself.  This was nothing new found it had been done for years and has never been addressed till now. The Juvenile are no longer having there clothed left outside this was done in the days before the security fence new window covers and cameras were added.

Our clients also say that the detention center has increased the lock down/cell time of the kids to 18+ hours per weekday for all the kids and more lockdown on weekends when there is no school. For some reason, they cannot have pen and paper in their cells; only two books. They say that their cell windows facing outside are mostly covered and that they almost never are allowed in the outside rec area.  Ashely, this had nothing to do with the population or holding for other counties.  This was caused by the amount of 17 year old's that were help for family court.   I have been working on this for about a year and your complaint help me get resolution that I can hold all 17 year old's in one area separated from 16 years and younger and 18 years and older.  This caused difficulties at Juvenile since they could not be out with the Juveniles and everything had to be done separately.  So wreck time should have been resolved also found small issue with the way the classroom things were setup as well which gave us limited space.

These clients are not on disciplinary punishment, although their custody seems comparable to the SMU or 1A at the jail. My fear is that these punitive conditions are being caused by overcrowding or staff shortages rather than a response to specific kid conduct. It could be being worsened as we take kids from surrounding counties.

As you know, this is not a punishment center. I am concerned that these conditions will embitter these kids and/or desensitize them to imprisonment. I doubt that these policies meet current juvenile detention standards. It will not help them to behave as responsible young men and women since they are all caged like career criminals. I was surprised to hear and see all this and I thought you would be interested too. Is there something that we can do to address these questions?
Best,
Ashley

D. Ashley Pennington
Ninth Circuit Public Defender
101 Meeting Street, 5th Floor
Charleston, SC  29401-2214

(843) 958-1850
(843) 958-1870(direct)
(843) 478-1230(mobile)
(843) 958-5149(facsimile)

apennington@charlestoncounty.org

www.lowcountrydefenders.org

Confidential Notice:  This electronic mail transmission and any and all accompanying documents and information contain data and matters belonging to the sender which may be confidential and legally privileged.  This information is intended ONLY for the use of the individual entity to whom it is addressed.  If you are not the intended recipient, any disclosure, copying, distribution or action of any sort taken in reliance on the contents of the information contained in this transmission or any attachments is strictly prohibited and objected to.  If you have received this transmission in error, please immediately notify us by telephone at (843) 958-1870 and also delete the message.  Thank you.

**Archived:** Friday, July 24, 2020 8:56:09 AM
**From:** Annie E. Andrews
**Sent:** Fri, 19 Jun 2020 16:54:06 +0000ARC
**To:** Patrick Wooten
**Subject:** FW: Juvenile Detention Center
**Sensitivity:** Normal

████████████████████████████████

**From:** Ashley Pennington <APennington@charlestoncounty.org>
**Sent:** Monday, June 04, 2018 10:52 AM
**To:** Annie E. Andrews <AAndrews@charlestoncounty.org>; J Tim. Taylor <JTTaylor@charlestoncounty.org>; Maryellen Rankin <MRankin@charlestoncounty.org>; Holly J. Bendure <HBendure@charlestoncounty.org>
**Subject:** FW: Juvenile Detention Center

████

**From:** Ashley Pennington
**Sent:** Monday, June 04, 2018 10:26 AM
**To:** Mitch Lucas <mlucas@charlestoncounty.org>
**Subject:** Juvenile Detention Center

Dear Mitch,

We spoke briefly on Thursday that my juvenile defenders are concerned that their clients are forced to strip to their underwear and leave their jail uniforms in the hall outside their door. The kids complain to us that they are sometimes very cold. I recently visited a juvenile detainee and saw all the kid's uniforms piled outside their cell doors myself.

Our clients also say that the detention center has increased the lock down/cell time of the kids to 18+ hours per weekday for all the kids and more lockdown on weekends when there is no school. For some reason, they cannot have pen and paper in their cells; only two books. They say that their cell windows facing outside are mostly covered and that they almost never are allowed in the outside rec area.

These clients are not on disciplinary punishment, although their custody seems comparable to the SMU or 1A at the jail. My fear is that these punitive conditions are being caused by overcrowding or staff shortages rather than a response to specific kid conduct. It could be being worsened as we take kids from surrounding counties.

As you know, this is not a punishment center. I am concerned that these conditions will embitter these kids and/or desensitize them to imprisonment. I doubt that these policies meet current juvenile detention standards. It will not help them to behave as responsible young men and women since

they are all caged like career criminals. I was surprised to hear and see all this and I thought you would be interested too. Is there something that we can do to address these questions?
Best,
Ashley

D. Ashley Pennington
Ninth Circuit Public Defender
101 Meeting Street, 5th Floor
Charleston, SC  29401-2214

(843) 958-1850
(843) 958-1870(direct)
(843) 478-1230(mobile)
(843) 958-5149(facsimile)

apennington@charlestoncounty.org

www.lowcountrydefenders.org

Confidential Notice:  This electronic mail transmission and any and all accompanying documents and information contain data and matters belonging to the sender which may be confidential and legally privileged.  This information is intended ONLY for the use of the individual entity to whom it is addressed.  If you are not the intended recipient, any disclosure, copying, distribution or action of any sort taken in reliance on the contents of the information contained in this transmission or any attachments is strictly prohibited and objected to.  If you have received this transmission in error, please immediately notify us by telephone at (843) 958-1870 and also delete the message.  Thank you.

**Archived:** Friday, July 24, 2020 8:56:12 AM
**From:** Annie E. Andrews
**Sent:** Fri, 19 Jun 2020 17:07:39 +0000ARC
**To:** Patrick Wooten
**Subject:** FW: plans for new juvenile detention center
**Sensitivity:** High
**Attachments:**
Minimum Standards for Local Juvenile Detention SC 2018.pdf

███████████████████████████████████

**From:** Ashley Pennington <APennington@charlestoncounty.org>
**Sent:** Monday, December 03, 2018 3:49 PM
**To:** Maryellen Rankin <MRankin@charlestoncounty.org>; J Tim. Taylor <JTTaylor@charlestoncounty.org>; Annie E. Andrews <AAndrews@charlestoncounty.org>; Holly J. Bendure <HBendure@charlestoncounty.org>; Caroline M. Bickley (cbickley@homesc.com) <cbickley@homesc.com>
**Subject:** FW: plans for new juvenile detention center
**Importance:** High

███

**From:** Ashley Pennington
**Sent:** Monday, December 03, 2018 3:45 PM
**To:** Willis Beatty <wbeatty@charlestoncounty.org>
**Subject:** RE: plans for new juvenile detention center
**Importance:** High

Dear Chief,

I am disappointed to report to you that all three public defender lawyers who represent juveniles still report to me that their kid clients are only out of their cells two hours a day, except for when they are in school. This means 22 hours of lockdown on weekends with nothing to do. This is like the kind of lockdown that occurs in adult disciplinary units. Kids are on the floor in "boats". And, the roof is still leaking in the library.

Here are examples:

Boy (incarcerated for over 30 days):
I have had 2 roommates since October. The child who entered my cell last sleeps on the floor in a boat. There is not much room to walk around inside of the cell because there are 3 people and the room is so small. When asked "What do you do with your time?," he said "I twist my hair, watch the walls, and we all try to sleep as much as we can. I started reading a book called Dear Martin, but you can only read so much." "White stuff" comes out of the sink when you cut it on and our room has flooded more than once after the toilet in someone else's cell overflowed and water entered my room. You only get 2hrs of rec, one hour in the morning and one hour at night. "I don't think this place has been good for my mind." I have not been receiving the school assignments from my school even after you complained to the detention center and my mom complained to the detention center and my school. I'm worried being here will hurt my grades since I am not getting my

assignments.

Boy (incarcerated for 1 week):
On 11/14 I had to wait until nighttime to take a shower because the hot water wasn't working. When you take a shower you have to cut the water on all 4 showers at once (there are 5 shower heads, but only 4 work) because that is the only way to get the hot water out. It gets so cold in detention in November. Last night the toilet in my room overflowed after my roommate went to the bathroom. He didn't use that much toilet paper. He used a normal amount, it's just that the toilets are so bad they overflow all the time. The water had pee and poop in it and it overflowed to the hall and they made us clean it all up. As far as rec—you only receive 2hrs of rec if you go to school. If you do not wake up for school, you only get 1hr of rec at night and you lose the 1hr of rec during the day. Other kids here have had 2 roommates in their room for a good while.

I am increasingly concerned that your senior staff there are not following your directives that we discussed. You know my view that the kids are better off at the main jail. Headquarters Road is seems to be unworkable since the staff continue to leave them locked down. What can we do to alleviate this unacceptable situation as we plan and build the new detention center?

I have attached the SC Standards for Juvenile Detention. I do not think we can wait on this. Please advise.
Thanks!
Ashley
(843) 478-1230 (mobile)

---

**From:** Ashley Pennington
**Sent:** Tuesday, October 09, 2018 1:50 PM
**To:** Willis Beatty <wbeatty@charlestoncounty.org>
**Subject:** FW: plans for new juvenile detention center

Dear Chief,
I am checking again about your schedule to look at the plans for the new juvenile detention center. I have time tomorrow afternoon. Just let me know  what works for you.
Best,
Ashley
(843) 478-1230 (mobile)

---

**From:** Ashley Pennington
**Sent:** Monday, October 01, 2018 4:56 PM
**To:** Willis Beatty <wbeatty@charlestoncounty.org>
**Cc:** Annie E. Andrews <AAndrews@charlestoncounty.org>; Maryellen Rankin <MRankin@charlestoncounty.org>; J Tim. Taylor <JTTaylor@charlestoncounty.org>; Holly J. Bendure <HBendure@charlestoncounty.org>
**Subject:** RE: plans for new juvenile detention center

Dear Chief,
I have polled my people and we are available on Wednesday, Oct 10 if you can fit us into your schedule that day.

*Ashley*
(843) 478-1230 (mobile)

---

Dear Chief,
I would like to set a time to look at the plans for the new detention center. I have three juvenile defense lawyers who are just as curious. When is a convenient time for you for us to come by?
Best,
*Ashley*

D. Ashley Pennington
Ninth Circuit Public Defender
101 Meeting Street, 5th Floor
Charleston, SC  29401-2214

(843) 958-1850
(843) 958-1870(direct)
(843) 478-1230(mobile)
(843) 958-5149(facsimile)

apennington@charlestoncounty.org

www.lowcountrydefenders.org

Confidential Notice:  This electronic mail transmission and any and all accompanying documents and information contain data and matters belonging to the sender which may be confidential and legally privileged.  This information is intended ONLY for the use of the individual entity to whom it is addressed.  If you are not the intended recipient, any disclosure, copying, distribution or action of any sort taken in reliance on the contents of the information contained in this transmission or any attachments is strictly prohibited and objected to. If you have received this transmission in error, please immediately notify us by telephone at (843) 958-1870 and also delete the message.  Thank you.

# Minimum Standards for Local Juvenile Detention Facilities in South Carolina



# Type VII Facility
# Juvenile Detention

# TABLE OF CONTENTS

| Standard Number | Subject Title | Page Number |
|---|---|---|
| 5000 | **GENERAL INSTRUCTIONS** | **1** |
| 5001 | Statutory Authority | 1 |
| 5002 | Introduction | 5 |
| 5003 | Integrity of Independent Sections | 5 |
| 5004 | Other Standards and Requirements | 5 |
| 5005 | Definitions | 5 |
| 5006 | Acronyms | 11 |
| | | |
| 5010 | **APPLICATION OF STANDARDS** | **11** |
| 5011 | Types of Facilities | 11 |
| 5012 | Variances and Waivers | 12 |
| 5013 | Emergency Suspension of Standards | 12 |
| 5014 | Inspections | 12 |
| | | |
| 5100 | **ADMINISTRATION/MANAGEMENT** | **13** |
| 5130 | Manual of Policies and Procedures | 13 |
| 5140 | Emergency Pre-Planning | 14 |
| 5150 | Juvenile Population Report | 14 |
| 5160 | Personnel | 14 |
| 5170 | Number of Personnel | 14 |
| 5180 | Jail Management Training | 14 |
| 5190 | Pre-Service Training | 15 |
| 5200 | Operations Training | 16 |
| 5210 | In-service Training | 16 |
| 5220 | Training Records | 16 |
| 5230 | Employee Regulations | 16 |
| 5240 | Organizational Chart | 16 |
| | | |
| 5260 | **ADMISSIONS** | **16** |
| 5270 | Admission Procedures | 17 |
| 5271 | Guidelines for Detention Documents | 18 |
| 5280 | Booking and Record Information | 18 |
| 5290 | Retention of Juvenile Property | 19 |
| 5300 | Admission of Injured, Ill, or Intoxicated Juveniles | 19 |
| 5310 | Death of a Juvenile | 20 |
| 5320 | Recording and Reporting of Attempted Suicides | 20 |
| 5330 | Log Reports | 20 |
| 5340 | Orientation | 20 |
| 5350 | Discharge, Transfer, or Release of a Juvenile | 21 |
| | | |
| 5355 | **SECURITY** | **21** |
| 5360 | Weapons Control | 21 |
| 5370 | Less Lethal Weapons | 21 |
| 5374 | Use of Physical Force | 22 |
| 5375 | Use of Restraints | 22 |

| 5380 | Key Control | 22 |
| 5390 | Tool Control | 23 |
| 5400 | Facility Security | 23 |
| 5410 | Juvenile Movement | 23 |
| 5430 | Juvenile Governance | 23 |

| 5440 | **CLASSIFICATION PLAN** | 24 |
| 5450 | Classification Categories | 24 |
| 5460 | Classification Review | 24 |

| 5470 | **SEPARATION** | 24 |
| 5480 | Communicable Diseases | 24 |
| 5490 | Mentally Disordered Juveniles | 25 |
| 5495 | Administrative Separation | 25 |
| 5500 | Females | 25 |

| 5520 | **DISCIPLINE** | 25 |
| 5530 | Rules and Disciplinary Penalties | 25 |
| 5535 | Plan for Juvenile Discipline | 25 |
| 5540 | Forms of and Limits on Disciplinary Action | 26 |

| 5545 | **PHYSICAL PLANT** | 27 |
| 5550 | Initial Planning | 27 |
| 5560 | Rated Capacity | 28 |
| 5570 | Facilities Prior to July 1980 | 28 |
| 5590 | Facilities From July 1980 Through June 2007 | 29 |
| 5595 | Facilities Constructed From July 2007, to the Present | 31 |
| 5596 | Staff/Juvenile Interaction | 31 |
| 5597 | Facility Location | 32 |
| 5598 | Juvenile Housing | 32 |

| 5610 | **JUVENILE PROGRAMS AND ACTIVITIES** | 34 |
| 5620 | Visitation | 34 |
| 5630 | Correspondence | 35 |
| 5640 | Telephone | 36 |
| 5650 | Access to Legal Counsel and Courts | 36 |
| 5660 | Grievance Procedure | 36 |

| 5700 | **MEDICAL SERVICES** | 37 |
| 5710 | Responsible Physician | 37 |
| 5720 | Medical Procedures | 37 |
| 5730 | Screening | 37 |
| 5731 | Health Appraisal | 38 |
| 5732 | Pharmacy Standards | 38 |
| 5740 | Emergencies | 38 |
| 5750 | Sick Call | 39 |

| 5760 | **JUVENILE CLOTHING AND PERSONAL HYGIENE** | 39 |
| 5765 | Clothing Issue | 39 |
| 5770 | Personal Care Items | 39 |

8/5/2007

| 5775 | Showering | 39 |
| 5780 | Hair Care Services | 40 |
| 5785 | Bedding and Linen Issue | 40 |
| 5787 | Laundering of Bedding and Linens | 40 |
| 5790 | **FOOD** | **40** |
| 5800 | Frequency of Service | 40 |
| 5830 | Dietary Allowances | 40 |
| 5840 | Menus and Food Preparation | 41 |
| 5850 | Sanitation and Food Storage | 41 |
| 5860 | Kitchen Staff | 41 |
| 5870 | **GENERAL SANITATION AND MAINTENANCE REQUIREMENTS** | **41** |
| 5875 | Housekeeping Requirements | 41 |
| 5890 | Vermin, Insects, and Pests | 42 |
| 5900 | Drinking Fountains | 42 |

## 5000 GENERAL INSTRUCTIONS

### 5001 STATUTORY AUTHORITY

The authority to establish and enforce the standards and requirements herein, unless otherwise noted, is based upon the South Carolina Code of Laws, 1976, as amended, Sections 24-9-10 through 24-9-50, and Section 20-7-6845, which read as follows:

24-9-10. Jail and Prison Inspection Division established in Department of Corrections; personnel.

There is hereby established a Jail and Prison Inspection Division under the jurisdiction of the Department of Corrections. The inspectors and such other personnel as may be provided for the Division shall be selected by the Director of the Department.

24-9-20. Inspection of State and local penal facilities housing prisoners or pretrial detainees ; reports.

The Division shall be responsible for inspecting, in conjunction with a representative of the State Fire Marshal, at least annually every facility in this State housing prisoners or pretrial detainees operated by or for a state agency, county, municipality, or any other political subdivision, and such inspections shall include all phases of operation, fire safety, and health and sanitation conditions at the respective facilities. Food service operations of the facilities must be inspected at least annually by an employee of the Department of Health and Environmental Control. The inspections of local confinement facilities shall be based on standards established by the South Carolina Association of Counties and adopted by the Department of Corrections, and appropriate fire and health codes and regulations. The division, the inspecting fire marshal, and the food service inspector of the Department of Health and Environmental Control shall each prepare a written report on the conditions of the inspected facility. Copies of the reports shall be filed with the chairman of the governing body of the political subdivision having jurisdiction of the facility inspected, the chairman of the governing body of each political subdivision involved in a multi-jurisdictional facility, the administrator, manager, or supervisor for the political subdivision, the responsible sheriff or police chief if he has operational custody of the inspected facility, and the administrator or director of the inspected facility. All reports shall be filed through the Director of the Department of Corrections.

(NOTE: In addition to representatives from those state agencies mentioned in the above referenced statute, officials from the Department of Public Safety are also authorized to inspect jails and prisons for compliance with the federal Juvenile Justice and Delinquency Prevention Act.)

24-9-30. Enforcement of minimum standards.

(a) If an inspection under this chapter discloses that a local confinement facility does not meet the minimum standards established by the South Carolina Association of Counties and adopted by the Department of Corrections, and the appropriate fire and health codes and regulations, the Director of the South Carolina Department of Corrections shall

notify the governing body of the political subdivision responsible for the local confinement facility. A copy of the written reports of the inspections required by this chapter shall also be sent to the resident or presiding judge of the judicial circuit in which the facility is located. The governing body shall promptly meet to consider the inspection reports, and the inspection personnel shall appear, if requested, to advise and consult concerning appropriate corrective action. The governing body shall initiate appropriate corrective action within ninety days or may voluntarily close the local confinement facility or objectionable portion thereof.

(b) If the governing body fails to initiate corrective action within ninety days after receipt of the reports of inspections, or fails to correct the disclosed conditions, the Director of the South Carolina Department of Corrections may order that the local confinement facility, or objectionable portion thereof, be closed at such time as the order may designate. However, if the Director determines that the public interest is served by permitting the facility to remain open, he may stipulate actions to avoid or delay closing the facility. The governing body and the resident or presiding judge of the judicial circuit shall be notified by registered mail of the Director's order closing a local confinement facility.

(c) The governing body shall have the right to appeal the Director's order to the resident or presiding judge of the circuit in which the facility is located. Notice of the intention to appeal shall be given by registered mail to the Director of the South Carolina Department of Corrections and to the resident or presiding judge within fifteen days after receipt of the Director's order. The right of appeal shall be deemed waived if notice is not given as herein provided.

(d) The appeal shall be heard before the resident or presiding judge of the circuit who shall give reasonable notice of the date, time, and place of the hearing to the Director of the South Carolina Department of Corrections and the governing body concerned. The hearing shall be conducted without a jury in accordance with the rules and procedures of the Circuit Court. The Department of Corrections, the governing body concerned, other responsible local officials, and fire and health inspection personnel shall have a right to be present at the hearing and present evidence which the court deems appropriate to determine whether the local confinement facility met the required minimum standards on the date of the last inspection. The court may affirm, reverse, or modify the Director's order.

24-9-35. Reports of deaths of incarcerated persons; penalty.

If any person dies while being incarcerated in any municipal or county overnight-lockup, or jail, county prison, or state correctional facility, the jailer or any other person physically in charge of the facility at the time death occurs shall immediately notify the coroner of the county in which the institution is located. The jailer or other person in charge shall also report the death and circumstances surrounding it within seventy-two hours to the Jail and Prison Inspection Division of the Department of Corrections. The division shall retain a permanent record of such reports. Reports shall be made on forms prescribed by the division.

Any person knowingly and willfully violating the provisions of this section shall be deemed guilty of a misdemeanor and upon conviction shall be fined not more than one

hundred dollars.

24-9-40. Certification of compliance with design standards; notification of opening or closing of state or local prison facility.

In order to certify compliance with minimum design standards, the Jail and Prison Inspection Division of the Department of Corrections shall be provided with architectural plans before construction of any state or local confinement facility. Further, the Jail and Prison Inspection Division shall be notified not less than fifteen days prior to the opening of any state or local prison facility so that inspections and reports may be made. Ninety days prior to the closing of any state or local prison facility, the Division shall be notified by the officials concerned.

24-9-50. Reports on detention facilities to the Department of Corrections; electronic reporting preferred.

(A) Each local governmental entity responsible for a municipal, county, regional, or multi-jurisdictional detention facility shall report to the Department of Corrections, at the times and in the form required by the department, data and information prescribed by the department:
(1) for the classification and management of prisoners who receive sentences greater than three months; and
(2) on the classification and management of prisoners who are in pretrial status and prisoners who receive sentences to be served locally.
(B) Data and information authorized in the Minimum Standards for Local Detention Facilities in South Carolina for the operation and management of a statewide jail information system shall be reported to the department by each local governmental entity.
(C) To the greatest extent possible, reports should be submitted through a means of electronic data transfer approved by the department. If it is not possible for a local governmental entity to submit reports through the approved means of electronic data transfer, it shall certify such to the department. The department and the respective local governmental entity shall determine a suitable alternative means for submission of reports until such time as the local governmental entity is able to electronically transfer data in the manner approved by the department.

20-7-6845. Institutional services.    The Department of Juvenile Justice shall provide institutional services which include, but are not limited to:

(4) providing juvenile detention services for juveniles charged with having committed a criminal offense who are found, after a detention screening or detention hearing, to require detention or placement outside the home pending an adjudication of delinquency or dispositional hearing. Detention services provided by the department for the benefit of the counties and municipalities of this State must include secure juvenile detention centers. The size and capacity of the juvenile detention facilities needed must be determined by the department after its consideration and review of minimum standards for local detention facilities in South Carolina for the design, construction, and operation of juvenile detention centers. These recognized state standards must be met or exceeded by the department in determining the size and capacity of the juvenile detention centers and in planning for the construction and operation of the facilities. The department shall determine and announce the anticipated maximum operational capacity of each facility

and shall contact each county and municipal governmental body in this State for the purpose of determining which counties or municipalities anticipate utilizing these facilities upon each facility becoming operational. The department shall inform each county and municipal governmental body of the existing state and federal laws regarding the confinement of juveniles charged with committing criminal offenses, of each county's and municipality's ability to develop its own facility or to contract with other counties or municipalities for the development of a regional facility, and of the availability of the department's facilities. This notice must be provided to each county and municipality for the purpose of determining which county governmental bodies desire to enter into an intergovernmental agreement with the department for the detention of juveniles from their particular community who are charged with committing a criminal offense for which pretrial detention is both authorized and appropriate. No later than September 1, 1993, the department shall report to the Budget and Control Board on the strategy of each county to comply with requirements of counties under this article. The department must include with its report a plan for the construction and the operation of those facilities which are projected to be necessary for the preadjudicatory detention of juveniles in this State. No later than September first of each subsequent year, the department shall report to the board on the status of all preadjudicatory juvenile detention facilities known to be operational or planned, regardless of ownership or management. Beginning with the report to the board which is due no later than September 1, 1996, the department must include an annual status report on the numbers of juveniles in pretrial detention who are awaiting disposition in general sessions court, whether they have been waived by the family court or whether they qualify due to the offense with which they are charged. The board then will coordinate with all responsible and affected agencies and entities to ensure that adequate funding is identified to prevent the detention or incarceration of juveniles who are awaiting disposition by, or who are under the jurisdiction of, the family court in adult jails anywhere within the State of South Carolina and to prevent the detention of juveniles who are awaiting disposition by general sessions court in facilities which do not provide actual sight and sound separation from adults who are in detention or custody. Upon completion of each facility and upon the determination by the Jail and Prison Inspection Division of the Department of Corrections that each facility is staffed in accordance with relevant standards and can be operated in accordance with these standards, the division shall determine and announce the rated capacity of each facility. A facility operated by the Department of Juvenile Justice for the preadjudicatory detention of juveniles must be maintained and continued in operation for that purpose until approved for conversion or closure by the Budget and Control Board. However, a county or municipality which decides to maintain its own approved facilities or which has entered into a regional intergovernmental agreement, which has provided secure facilities for preadjudicatory juveniles, and which meets the standards set forth above, may continue to operate these facilities. County and regionally operated facilities are subject to inspection by the Jail and Prison Inspection Division of the Department of Corrections for compliance with the standards set forth above and those created pursuant to Section 24-9-20. The division has the same enforcement authority over county, municipal, and regionally operated secure juvenile detention facilities as that which is provided in Section 24-9-30. In Department of Juvenile Justice operated facilities, the department shall determine an amount of per diem for each child detained in a center, which must be paid by the governing body of the law enforcement agency having original jurisdiction where the offense occurred. The per diem paid by the governing body of the law enforcement agency having original jurisdiction where the offense occurred must be based on the average operating cost among all preadjudicatory state facilities. The

Department of Juvenile Justice must assume one-third of the per diem cost and the governing body of the law enforcement agency having original jurisdiction where the offense occurred must assume two-thirds of the cost. Per diem funds received by the department must be placed in a separate account by the department for operation of all preadjudicatory state facilities. Transportation of the juvenile to and from a facility is the responsibility of the law enforcement agency having jurisdiction where the offense was committed. Transportation of juveniles between department facilities, if necessary, is the responsibility of the department.

## 5002   INTRODUCTION

These regulations have been prepared and adopted for the purpose of establishing minimum standards for the operation, administration, and design of local juvenile detention facilities. These regulations shall be known as "Minimum Standards." The development of these Standards has not been an arbitrary or discretionary procedure. Various agencies and organizations involved in local corrections in South Carolina were solicited and asked for comments on these Standards. Various national standards developed by professional organizations such as the American Correctional Association, the Council of Juvenile Correctional Administrators, the American Bar Association, and the American Medical Association, as well as sound management principles, were the fundamental guides for the development of the Standards.

The recommendations that are also contained herein are policies and/or procedures which may be implemented with a view toward improving local juvenile detention operations, and every effort should be made to follow them.

## 5003   INTEGRITY OF INDEPENDENT SECTIONS

If any section, subsection, sentence, clause, or phrase of these standards is, for any reason, subsequently held to be unconstitutional; contrary to federal or state law; or otherwise inoperative, such decisions shall not affect the validity of the remaining portion of the standards.

## 5004   OTHER STANDARDS AND REQUIREMENTS

These are considered minimum standards and nothing that is contained in these standards shall be construed to prohibit a city, county, or multi-jurisdictional agency operating a local juvenile detention facility from adopting other standards and requirements governing its own employees and facilities, provided such standards exceed and do not conflict with these standards. Nor shall these standards be construed as an authority to violate any national or state fire, building, health, or safety code, regulation, or standard.

## 5005   DEFINITIONS

The following definitions shall apply:

(a)     "Agency Director" means the governing authority for the South Carolina Department of Corrections, who and which act by and through the Director of the Jail and Prison Inspection Division and his/her designated employees.

(b)     "Facility Administrator" herein means the County Administrator/Manager/ Supervisor, Sheriff, Mayor, City Administrator/Manager, or other official charged by law with the administration of a local juvenile detention facility.

(c)     "Facility Manager" means the detention director, chief jailer, warden, superintendent, jail administrator, or other comparable employee who has been delegated the responsibility for operating a local juvenile detention facility by a Facility Administrator.

(d)     "Shall" and "will" are mandatory; "should" is expected practice; and "may" is permissive.

(e)     "Security personnel" means those officers with the rank of deputy, correctional officer, detention officer, or other equivalent sworn or civilian rank whose primary duties include the supervision of juveniles.

(f)     "Emergency" means any significant disruption of normal policies, procedures, or activities caused by riot, fire, attack, or other similar disturbance.

(g)     "Facility" is, for the purposes of these standards, any holding cell (if not part of another facility as defined in this paragraph); overnight lockup; juvenile holdover facility; city, county, or multi-jurisdictional jail; county prison camp or work camp; work/punishment center; juvenile detention center; or juvenile community residential facility.

(h)     "Holding Cell" is a facility (City/County/Multi-Jurisdictional Lockup) for the temporary holding of persons for detoxification or who are awaiting bond, other judicial action, or transportation. If a person is to be detained longer than six (6) hours, he/she shall be transferred to a Type I or Type II facility.

(i)     "Type I Facility" is a facility (overnight lockup) for the temporary detention of persons who are being held while awaiting a judicial hearing. If a person is going to be detained longer than forty-eight (48) hours, he/she shall be transferred to a Type II facility unless there is some documented compelling reason for not doing so.

(j)     "Type II Facility" is a facility (City, County, or Multi-Jurisdictional Jail) which houses persons awaiting court action, inmates sentenced to three (3) months or less, and civil contemptors.

(k)     "Type III Facility" is a separate facility (County or Multi-Jurisdictional Prison Camp) which houses only sentenced adult inmates.

(l)     "Type IV Facility" is a facility (combined County or Multi-Jurisdictional Jail/Prison Camp) which houses persons awaiting court action, civil contemptors, and inmates sentenced to three (3) months or less, and which may also house inmates with longer sentences under a designated facilities agreement with the Department of Corrections.

(m)    "Type V Facility" is a work/punishment center, stand alone or otherwise, which houses sentenced inmates and civil contemptors who are participating in community programs such as work release or education release.

(n)    "Type VI Facility" is a Juvenile Holdover Facility for the temporary custody of juveniles who are awaiting an initial detention hearing. If a juvenile is not released after the hearing, he/she must be transferred to a Type VII or VIII facility. An approved secure Local Juvenile Holdover Facility may detain juveniles who are alleged to have perpetrated acts that would constitute a violation of criminal law if done by an adult and juveniles who have been committed for violation of a valid court order. An approved non-secure Juvenile Holdover Facility may detain all other categories of status offenders who are legally eligible for detention.

(o)    "Type VII Facility" is an approved Local Juvenile Detention Center for the lawful custody and treatment of juveniles who are alleged to have perpetrated acts that would constitute a violation of criminal law if done by an adult and juveniles who have been committed for violation of a valid court order.

(p)    "Type VIII Facility" is a Juvenile Community Residential Facility which is a structure, or is within a structure, that lacks security hardware and other more traditional confinement accessories and which serves as an alternative for the provision of non-secure housing and/or programming for pre- and/or post-adjudicatory juveniles.

(q)    "Type IX Facility" is Home Detention, which means confinement of a person to his/her place of residence and/or other location(s) as an alternative to incarceration when there are both legal authority and administrative provisions to do so.

(r)    "Standards" are the paragraphs, sections, or lines preceded by a four (4) digit number, which are considered minimum standards for the operation of a local juvenile detention facility. "Discussion" following a standard is for guidance and clarity, but it is not part of the official standard nor is it mandatory. "Recommendations" should not be considered standards. They are principally suggestions for the efficient operation of a facility, but they are not requirements.

*(s)   "Juvenile" is an individual who is under the age of seventeen years.

*(t)   "Delinquency" means the perpetration of an act by a juvenile which, if done by an adult, would constitute a violation of the law.

*(u)   "Status Offenders" are juveniles who are charged with, or who have perpetrated, offenses that would not be criminal if done by an adult.

*(v)   "Juvenile Detention" means the temporary care of juveniles in physically restrictive facilities. This does not constitute "arrest" but "custody." Custody is not punitive. When juveniles are charged as adults, the taking into "custody" may actually be considered to be "arrest"; however, juveniles in preadjudicatory and/or

pretrial detention status are managed under the least restrictive circumstances appropriate based upon classification and other available information.

(w) "Direct Supervision" means management of juveniles in which security personnel are not separated by a barrier that prohibits visual and audio interactions with the juveniles. Officers work directly in housing units and provide frequent, non-scheduled observation of and personal interaction with juveniles. Each housing unit has at least one (1) Security Officer posted to supervise the unit twenty-four (24) hours a day, seven (7) days a week. Security Personnel/Supervisors are assigned at a ratio of no less than one (1) per every twelve (12) juveniles during the day (1:12), and when the entire juvenile population in a living unit is in a secured mode (e.g., cells/rooms are locked for sleeping, etc.), the ratio may be altered to a ratio of one staff member to no more than twenty-four (24) juveniles during the night (1:24), provided that adequate supervision is maintained in each living unit.

(x) "Housing Unit" means a group or cluster of single and/or multiple occupancy cells or detention rooms that houses juveniles and is immediately adjacent and directly accessible to a day room or activity room.

(y) "Local Detention Committee" refers to the permanent, formal group established by the South Carolina Association of Counties for the purpose of considering requests for waivers, proposed classification plans, and other appropriate matters as determined by the Association's Board of Directors.

(z) "Variance" is a temporary deviation from a standard(s) in extenuating circumstances which can be overcome in a reasonable period of time; "waiver" is a long term deviation from a standard(s) in extenuating circumstances which are not likely to be overcome in a reasonable period of time.

(aa) "Essential Support Functions" are the duties and activities identified by the Facility Manager and the Jail and Prison Inspection Division for the safe, secure, and efficient operation of the facility.

*(ab) "Juvenile Charged as Adult" is a person under the age of criminal majority, who may be housed in an approved adult facility which meets sight/sound separation requirements because his/her case is being handled in General Sessions Court.

(ac) "Average Daily Population (ADP)" is the official count taken at midnight for an aggregate time period and divided by the number of days in the specified time period.

(ad) "Average Length of Stay (ALOS)" is the period of time spent in a facility by pre-adjudicatory/pre-trial juveniles as calculated using the following formula: ALOS = (365 x Pre-adjudicatory/Pre-trial ADP ÷ Total Pre-adjudicatory/Pre-trial Bookings for One Year).

(ae) "Operational Capacity" is the optimum number of juveniles that a facility can efficiently and effectively manage and classify. Operational capacity is usually expressed as a percentage of design or rated capacity (e.g., 80% of rated

capacity). This percentage will vary from one facility to another, based on factors such as the types of juveniles held, housing unit design, and proximity of staff. *Note: Authoritative Reference: "Resource Guide for Jail Administrators", Mark D. Martin & Thomas A. Rozazza, NIC, December 2004, Page 52.*

(af)     "Design Capacity" is the total number of beds in a facility as envisioned by the architect and initially built.

(ag)     "Rated Capacity" is the total number of recognized beds in a facility as approved by the Jail and Inspection Division based upon criteria in the Minimum Standards.

(ah)     "Intercom" refers to equipment or a system that enables initiating and receiving sound at each station within a facility without dependence upon staff assistance.

*(ai)    "Youthful Offender" refers here to an inmate who is:

(1) under seventeen years of age and has been bound over for proper criminal proceedings to the court of general sessions pursuant to Section 20-7-7605 for allegedly committing an offense that is not a violent crime, as defined in Section 16-1-60, and that is a misdemeanor, a Class D, Class E, or Class F felony, as defined in Section 16-1-20, or a felony which provides for a maximum term of imprisonment of fifteen years or less; or

(2) seventeen but less than twenty-five years of age at the time of conviction for an offense that is not a violent crime, as defined in Section 16-1-60, and that is a misdemeanor, a Class D, Class E, or Class F felony, or a felony which provides for a maximum term of imprisonment of fifteen years or less.

(aj)     "Juvenile Specifics Training Course" is a forty (40) hour training course that shall include but not be limited to:

(a)     Juvenile rights;
(b)     Officer leadership;
(c)     Interpersonal sensitivity;
(d)     Safety and security;
(e)     Adolescent development;
(f)     Behavioral management;
(g)     Behavioral observation and recording;
(h)     Basic health care and communicable disease issues;
(i)     Dynamics of managing mentally disordered youth;
(j)     Suicide prevention issues;
(k)     Conflict resolution; and
(l)     Effective communication.

(ak)     "Class 2 LCO" means a local facility detention officer who shall successfully complete a training program as approved by the Criminal Justice Academy. Officers possessing a current Class 2-LCO Certification shall be required to complete the number of hours of in-service instruction per year as specified by the Jail Standards Committee and approved by the Criminal Justice Academy.

(al)     "Class 2 JCO" means a juvenile correctional officer with the Department of Juvenile Justice who shall successfully complete a training program as approved by the Criminal Justice Academy. Officers possessing a current Class 2-JCO certification shall be required to complete an agency in-service program approved by the Criminal Justice Academy of at least forty hours every three years. At least one course each year shall be a legal update course.

(am)    "Nutraloaf" is a loaf style form of nourishment prepared using ingredients and processes that meet mandated dietary and nutritional requirements. It is designed to be consumed without the need for utensils and is served as an alternative to regular juvenile meals because of behavior problems such as misuse of food or throwing of bodily waste.

(an)     "Juvenile Justice and Delinquency Prevention Act" refers to federal legislation that was passed by the United States Congress in 1974. It has changed the way states and communities deal with troubled youth. The original goals of the Act and of the Office of Juvenile Justice and Delinquency Prevention (OJJDP) were simple: to help state and local governments prevent and control juvenile delinquency and to improve the juvenile justice system. These goals were reaffirmed in the reauthorization of the Act several times, most recently in 2002. A second important element in the 1974 Act was to protect juveniles in the juvenile justice system from inappropriate placements and from the harm, both physical and psychological, that can occur as a result of exposure to adult inmates. Yet another important element of the JJDP Act emphasized the need for community-based treatment for juvenile offenders. In passing the JJDP Act, Congress recognized that keeping children in the community is critical to their successful treatment.

The JJDP Act, in its current form through the 2002 reauthorization, establishes four core protections with which participating states and territories must comply to receive grants under the JJDP Act:

Deinstitutionalization of status offenders (DSO);
Separation of juveniles from adults in institutions (separation);
Removal of juveniles from adult jails and lockups (jail removal); and
Reduction of disproportionate minority contact (DMC), where it exists.

Meeting the core protections is essential to creating a fair, consistent, and effective juvenile justice system that advances the important goals of the JJDP Act.

Each participating state must develop and implement a strategy for achieving and maintaining compliance with the four core protections as part of its annual Formula Grants State Plan. A state's level of compliance with each of the four core protections determines eligibility for its continued participation in the Formula Grants programs. For example, failure to achieve or maintain compliance, despite good faith efforts, reduces the Formula Grant to the state by 20 percent for each core requirement not met. In addition, the noncompliant state must agree to expend 50 percent of the state's allocation for that year to achieve compliance with the core requirement(s) with which it is not in compliance.

\*These definitions are not intended to denote language of the current state law, but are given to assist in possible categories of classification.

## 5006    ACRONYMS

ACA - American Correctional Association
ADA - Americans with Disabilities Act
AJA - American Jail Association
ANSI - American National Standards Institute
CJCA - Council of Juvenile Correctional Administrators
DHEC - South Carolina Department of Health and Environmental Control
IBC - International Building Code
IEBC - International Existing Building Code
IFC - International Fire Code
IMC - International Mechanical Code
IPC - International Plumbing Code
JJDP Act - Juvenile Justice and Delinquency Prevention Act
MASC - Municipal Association of South Carolina
NCCHC – National Commission for Correctional Health Care
NFPA - National Fire Protection Association
NJDA - National Juvenile Detention Association
NSA - National Sheriffs' Association
OJJDP - Office of Juvenile Justice and Delinquency Prevention
OSHA - Occupational Safety and Health Administration
PbS - Performance Based Standards
SBC - Standard Building Code
SC - South Carolina - used to denote existing edition of the Minimum Standards for
          Local Detention Facilities in South Carolina
SCAC - South Carolina Association of Counties
SCCJA - South Carolina Criminal Justice Academy
SCDC - South Carolina Department of Corrections
SCDJJ - South Carolina Department of Juvenile Justice
SCDPS - South Carolina Department of Public Safety
SCJAA - South Carolina Jail Administrators' Association
SCSA - South Carolina Sheriffs' Association
SEBC - Standard Existing Building Code
SFMRR - State Fire Marshal Rules and Regulations
SFPC - Standard Fire Prevention Code
SL - State Law
SMC - Standard Mechanical Code
SMSA - Standard Metropolitan Statistical Area

### 5010  APPLICATION OF STANDARDS

5011  TYPES OF FACILITIES

All standards and requirements herein shall apply to every local juvenile detention facility in South Carolina except where exceptions have been documented. These standards and requirements do not necessarily apply to adult detention facilities unless they have been incorporated into the respective edition(s) of Minimum Standards when appropriate.

5012  VARIANCES AND WAIVERS

a.    The Director, Jail and Prison Inspection Division, may grant specific variance from these Standards for sufficient reasons and in the public interest. Any variance granted shall be reviewed at least annually by the Director and continued only if substantial progress is being made to comply with the Standard(s).

b.    All requests for waivers shall be submitted in writing to the Director, Jail and Prison Inspection Division, with explanation of extenuating circumstances and justification included. He/she shall review all documentation available to him/her, may consult with local officials where the facility is located, and may request additional information. A written recommendation from the Director, Jail and Prison Inspection Division, shall be submitted within thirty (30) days to the Local Detention Committee of the South Carolina Association of Counties. The Committee may request additional information from any of the parties involved, and may ask them to appear in person to clarify issues and answer questions from members of the Committee. A written response shall be rendered by the Committee within sixty (60) days after receiving the referral and recommendation from the Director, Jail and Prison Inspection Division. Decisions of the Committee shall be final.

5013  EMERGENCY SUSPENSION OF STANDARDS

The Facility Administrator may temporarily suspend, for a period not to exceed three (3) days, any standard herein in the event of an emergency which threatens the safety of the local detention facility, any of its juveniles or staff, or the public.

Such suspension shall be reported to the Jail and Prison Inspection Division immediately, or no later than the next business day, by telephone, and then in writing via fax; through e-mail; or by letter as soon as practical, outlining the nature of the emergency; expected end of the emergency; and steps taken to reduce or eliminate it. In no event shall such a suspension continue more than three (3) days without the approval of the Director, Jail and Prison Inspection Division, for a time specified by him/her.

5014  INSPECTIONS

Inspecting authorities employed by the Department of Corrections and Department of Public Safety are charged with the duty of inspecting all local detention facilities within the State of South Carolina where juveniles are or may be held. Inspecting authorities may enter any local detention facility in this State at any time without prior notice; shall

be admitted without unnecessary delay; and may confer privately with any employee or juvenile after coordination with the Facility Manager or the senior official on duty. Visits will deal with inspections and related matters but will not involve investigations of criminal activities. As a professional courtesy, inspecting authorities will attempt to meet with the Facility Manager or senior official on duty at the time of the visit. Inspecting authorities may make additional visits to provide technical assistance when requested.

In accordance with South Carolina Code of Laws, Section 24-9-20, staff from the Jail and Prison Inspection Division of the Department of Corrections will conduct an annual inspection of each local detention facility. The inspecting authorities will conduct an exit interview with the Facility Manager or designee. A written report will be provided within sixty (60) days of the inspection.

## 5100    ADMINISTRATION/MANAGEMENT

Once a year, the Facility Administrator should arrange for a visit of the facility by the governing body, circuit court judges, magistrates, and other interested parties, to examine the facility's condition, the treatment of juveniles, and the programs available for juveniles.

### 5130    MANUAL OF POLICIES AND PROCEDURES

Each facility shall have a written manual of all policies and procedures for the operation of the facility that will be reviewed annually and updated as needed.

These policies and procedures will be made readily available to all personnel. The following standards require written policies and procedures:

| | | | |
|---|---|---|---|
| 5140 | Emergency Pre-Planning | 5430 | Juvenile Governance |
| 5220 | Training Records | 5440 | Classification Plan |
| 5230 | Employee Regulations | 5450 | Classification Categories |
| 5260 | Admissions | 5480 | Communicable Diseases |
| 5270 | Admission Procedures | 5490 | Mentally Disordered Juveniles |
| 5280 | Booking and Record Information | 5495 | Administrative Separation |
| 5290 | Retention of Juvenile Property | 5530 | Rules and Disciplinary Penalties |
| 5310 | Death of a Juvenile | 5535 | Plan for Juvenile Discipline |
| 5320 | Recording and Reporting of Attempted Suicide | 5610 | Juvenile Programs and Activities |
| | | 5620 | Visitation |
| 5330 | Log Reports | 5630 | Correspondence |
| 5350 | Discharge, Transfer, or Release of a Juvenile | 5640 | Telephone |
| | | 5650 | Access to Legal Counsel and Courts |
| 5360 | Weapons Control | 5660 | Grievance Procedure |
| 5370 | Less Lethal Weapons | 5732 | Pharmacy Standards |
| 5374 | Use of Physical Force | 5740 | Emergencies |
| 5375 | Use of Restraints | 5750 | Sick Call |
| 5380 | Key Control | 5870 | General Sanitation and Maintenance Requirements |
| 5390 | Tool Control | | |
| 5410 | Juvenile Movement | | |

5140  EMERGENCY PRE-PLANNING

Each facility shall have current written procedures to be followed in emergency situations. These plans shall include procedures for the following emergency situations:

| | |
|---|---|
| fire | disturbances |
| escape | suicides and attempted suicides |
| taking of hostages | power failures |
| group arrests | natural disasters |
| bomb threats | homeland security issues |

Discussion: The facility should detail in writing specific procedures which can be implemented quickly when an emergency occurs. The procedures should contain provisions for sounding an appropriate alarm, alerting officials, mobilizing needed resources, and ending the alert. For example, a fire suppression plan would be coordinated with, and recognized by, the local fire department and would include a fire prevention plan in the policies and procedures manual; regular facility inspection by staff; fire prevention inspections by the fire department having jurisdiction; an evacuation plan; and a plan for the emergency housing of juveniles in case of a fire or other incident.

5150  JUVENILE POPULATION REPORT

Each facility shall have a system for physically counting juveniles. Each facility shall conduct a head-count at least once per shift. Additionally, an official headcount shall be taken at midnight everyday.

5160  PERSONNEL

5170  NUMBER OF PERSONNEL

(a) The Facility Administrator shall designate a Facility Manager who is qualified by training and experience to supervise staff and juveniles.

(b) Each facility shall have sufficient personnel to provide twenty-four (24) hour supervision and processing of juveniles, to arrange full coverage of all identified security posts, and to accomplish essential support functions.

(c) If one (1) or more female juvenile(s) is/are in custody, there shall be at least one (1) female security officer on duty, who shall be immediately available and accessible to female juveniles.

(d) A staffing analysis (using NIC Staffing Analysis Workbook or other industry recognized plan) shall be conducted to determine facility staffing needs. The staffing analysis shall be reviewed annually and updated as needed.

(e) Each facility shall have a designated training coordinator.

5180  JAIL MANAGEMENT TRAINING

All managerial personnel, including the facility manager and supervisory personnel of a

local juvenile detention facility, shall successfully complete at least forty (40) hours of relevant training to include the jail management training program, in addition to orientation training as prescribed and/or approved by the South Carolina Criminal Justice Academy. Additionally, at least forty (40) hours of relevant training will be completed each year thereafter. Such management training shall include but not be limited to:

(a) Fiscal, general, and personnel management;
(b) Administrative and logistical support management;
(c) Correctional program development;
(d) Jail planning;
(e) Labor law and legal problems in jail administration;
(f) Staff/management and community relations;
(g) Community resources for juvenile detention alternatives;
(h) Suicide prevention; and
(i) Juvenile justice system

Such management training shall be satisfactorily completed by all managerial personnel as soon as practical but, in any event, within not more than one (1) year after the date of assignment to supervisory duties. Anyone who has completed jail management training prior to current assignment within the last three (3) years and/or has three (3) years of corrections management or supervisory experience may be exempted from this requirement upon a review of credentials by the Criminal Justice Academy.

5190   PRE-SERVICE TRAINING

All non-security personnel (to include: administrative, support, and contract) and volunteers will be required to complete an orientation program which has been approved by the Facility Manager.

All security staff assigned to a local juvenile detention facility must complete the forty (40) hour juvenile specifics training course prior to assignment.

Such training shall include but not be limited to:

(a) Juvenile rights;
(b) Officer leadership
(c) Interpersonal sensitivity;
(d) Safety and security;
(e) Adolescent development;
(f) Behavioral management;
(g) Behavioral observation and recording;
(h) Basic health care and communicable disease issues;
(i) Dynamics of managing mentally disordered youth;
(j) Suicide prevention issues;
(k) Conflict resolutions; and
(l) Effective communication.

An accredited CPR and first aid training course shall be successfully completed.

5200   OPERATIONS TRAINING

Jail operations training shall be satisfactorily completed by all security personnel and supervisory personnel as soon as practical but, in any event, within not more than one (1) year after the date of assignment to security duties.

The Facility Manager or designee shall coordinate with the Criminal Justice Academy within the first six (6) months of each employee's hire date to schedule jail operations training.

5210   IN-SERVICE TRAINING

All non-security personnel shall be required to complete in-service training which has been approved by the Facility Manager.

Class 2-LCO officers shall meet the adult Minimum Standards training requirements. In addition, officers must successfully complete the Juvenile Specifics training course every three (3) years.

Officers shall be recertified in CPR and first aid training as required.

Discussion:
The purpose of the in-service training is to keep the employees up to date on procedures and incidents and methods of handling them. This requirement may be met by sessions scheduled on a weekly or monthly basis.

5220   TRAINING RECORDS

Each facility shall maintain records on types and hours of training completed by each security officer. This training shall be reported to the South Carolina Criminal Justice Academy in a form acceptable to the Academy.

Each facility shall maintain records on types and hours of training completed by non-security personnel and volunteers. These records shall be reviewed at least quarterly by the training coordinator, and they shall be available for examination by inspectors on-site.

5230   EMPLOYEE REGULATIONS

A written code of ethics prohibits staff, contractors, and volunteers from using their official positions to secure privileges for themselves or others and from engaging in activities that constitute a conflict of interest. This code is available to all employees.

5240   ORGANIZATIONAL CHART

Each facility shall have an organizational chart which reflects the line of authority and responsibility within the facility.

### 5260  ADMISSIONS

Each facility shall have written procedures for admitting juveniles. No neglected, dependent, abused, or alien child shall be detained or confined in any local detention facility if he/she is taken into custody based solely on matters related to his/her alleged condition as a neglected, dependent, abused, or alien minor. No juvenile who is alleged to be a status offender shall be detained or confined in any local detention facility unless he/she is committed for violation of a valid court order.

(a)     Every attempt shall be made to contact the parent or legal guardian of each juvenile as soon as possible upon his/her admission to the facility provided that this has not already been done by another agency. These attempts may be by telephone call and/or personal visit.

(b)     When a juvenile is not released to a parent, guardian, or custodian, the Family Court shall be notified upon admission; or, if admission occurs after business hours, the Family Court shall be notified at the beginning of the next business day.

(c)     If a juvenile is not released to the custody of his or her parents, or to another responsible adult, upon arrival at the facility, the Department of Juvenile Justice shall be contacted immediately.

(d)     Unless otherwise ordered by the court, a juvenile shall be released to the custody of his/her parents, guardian, custodian, DJJ, or others as designated by the court.

(e)     A juvenile who has been taken into custody shall not be detained or placed in secure confinement for more than six (6) hours in any facility which has not been approved as a juvenile holdover facility or a juvenile detention center.

(f)     A juvenile who is to be detained or placed in secure confinement for more than six (6) hours must be given a detention hearing within forty-eight (48) hours from the time of being taken into custody, excluding weekends and holidays.

(g)     After the initial forty-eight (48) hour detention, a juvenile shall not be held longer than seven (7) days without a court-ordered extension. Additional extensions, not to exceed seven (7) days each, may be made only by subsequent orders of the court. Such orders shall be in writing.

### 5270  ADMISSION PROCEDURES

Each facility shall have written procedures for admitting new juveniles which include:

(a)     Verification of arrest or commitment papers;
(b)     Proper search of each juvenile and his/her possessions;
(c)     Inventorying, packing, and storing of clothing and personal possessions;
(d)     Medical, dental, and mental health screenings; (See 5730)
(e)     At least two completed telephone calls by each juvenile;
(f)     Shower and hair care, if necessary;
(g)     Issue of clean clothing;

(h) Photographing and, if applicable, fingerprinting*;
(i) Interview for obtaining identifying data and recording personal data and information to be used for mail and visiting lists;
(j) Screening interview;
(k) Providing orientation and issuing written orientation materials to the juvenile and procedures for mail and visiting;
(l) Issue of personal hygiene items and bedding;
(m) Classification;
(n) Assignment of a registered number;
(o) Assignment to a housing unit; and
(p) Obtaining victim information as required by South Carolina Code of Laws, Section 16-3-1530.

*Juveniles shall be photographed or fingerprinted only in accordance with South Carolina Code of Laws, Section 20-7-8515 (F), (G), and (H).

5271   GUIDELINES FOR DETENTION DOCUMENTS

(a) Juvenile arrestees and juveniles who have been taken into custody should never be accepted without a charging document. Verbal holds shall not substitute for commitment documentation.

(b) An arrest or booking report shall contain a charge and include the name and agency of the arresting officer.

(c) Juveniles detained at the facility shall be legally held on the authority of a court order.

5280   BOOKING AND RECORD INFORMATION

(a) A record for each juvenile detainee shall be established at admission, or as soon as possible after admission, and shall be maintained throughout the period of confinement. Such record(s) shall include:

*(1) Picture;
(2) Booking number;
(3) Date and time of arrest;
(4) Name and aliases of person;
(5) Last known address;
(6) Date and time of commitment and authority thereof;
(7) Name and title of officers presenting and receiving detainee;
(8) Specific charges;
(9) Court and sentence (if adjudicated juvenile);
(10) Sex;
(11) Age and date of birth;
(12) Race;
(13) Marital status;
(14) Name and address of next of kin;
(15) Health status;
(16) Record of cash and property;

(17) Record of misconduct and discipline administered;
(18) Name, address, relationship, and phone number of parent(s), legal guardian(s), and person(s) with whom a juvenile resides at time of admission and/or other methods of contact;
*(19) Medical records;
(20) Bond information; and
(21) Social security number if available.

\*Medical records shall be secured and shall be available to staff members only when such access is required in the performance of duties. Juveniles shall be photographed and fingerprinted only in accordance with South Carolina Code of Laws, Section 20-7-8515 (F), (G), and (H).

(b) Each facility shall have written policies and procedures for safeguarding juvenile records from improper and unauthorized disclosure. A separate jail book or police blotter shall comply with the following:

(1) Juvenile records shall be clearly marked "Confidential";
(2) Juvenile records shall be kept secured and separate from adult records; and
(3) Records of juveniles shall not be opened to the public for inspection, and shall be opened to inspections only by such government agencies as are legally authorized.

## 5290    RETENTION OF JUVENILE PROPERTY

Facility policy shall require that, whenever cash or personal property is taken from a juvenile, the following actions shall be taken:

(a) A listing, including description, of each item shall be made and signed by both the officer and the juvenile. A copy of this list shall be made available to the juvenile as a receipt. If a juvenile refuses to sign, the reasons for his/her refusal should be noted on the list and witnessed by a second employee.

(b) The property taken shall be kept under lock and key.

(c) When the property is returned to a juvenile, he/she shall be directed to sign a statement saying that the property has been returned to him/her. If he/she refuses to sign, a second witness is needed.

(d) A facility should not release a juvenile's property to any third party without the permission of the juvenile's legal guardian or by court order.

(e) Facility policy shall govern the possession of items of clothing or jewelry.

## 5300    ADMISSION OF INJURED, ILL, OR INTOXICATED JUVENILES

Any juvenile who appears to be either severely injured or acutely ill, or who is in a stupor or a coma, even through the apparent cause may be intoxication, shall be examined by a physician prior to acceptance or admission to rule out the possibility of brain injury or organic disease as a cause of the apparent disability. If a juvenile is referred to a

community hospital or other medical facility and is returned, his/her admission to the facility shall be predicated upon written medical clearance.

Further, if after an examination and treatment as appropriate, and upon advice and concurrence of the examining physician, the juvenile is kept at the facility, he/she shall be maintained by security staff under the level of observation determined necessary by the physician until such time that he/she shall have completely recovered from the stupor or coma. If, after a reasonable period of time, he/she has not completely recovered, the juvenile shall be transferred to a medical facility for further examination and treatment.

## 5310   DEATH OF A JUVENILE

The death of a juvenile must be reported in writing to the Jail and Prison Inspection Division within seventy-two (72) hours of the occurrence, and must be reported by telephone on the day that it occurs. The facility administrator shall request an autopsy by the County Coroner or his/her designee to ascertain the cause of death.

## 5320   RECORDING AND REPORTING OF ATTEMPTED SUICIDE

A report of each attempted suicide shall be included in the records of the attempting juvenile and of the facility. Each attempted suicide shall be reported immediately to the responsible medical authority or a health or mental health authority. Each attempted suicide shall be reported in writing to the Jail and Prison Inspection Division within five (5) days.

## 5330   LOG REPORTS

Each incident which impairs or endangers the life or physical welfare of an employee, a juvenile, and/or a visitor shall be recorded and retained. Each incident involving death, fire, escape or other extraordinary outcome shall be reported by telephone to the Jail and Prison Inspection Division on the day that it occurs; or, when it occurs after business hours, it shall be reported on the next business day. Each such incident shall also be reported to the Jail and Inspection Division in writing within seventy-two (72) hours of the occurrence.

In addition, each incident which impairs or endangers the life or physical welfare of a juvenile shall be reported to the local office of the Department of Juvenile Justice by the next business day after the event occurred. The "local office" is defined as the DJJ office in either the juvenile's county of residence or the county where the juvenile was charged. The Department of Juvenile Justice may also obtain written information from the facility regarding such incidents.

## 5340   ORIENTATION

An orientation program by the facility's staff shall be conducted for new juveniles. The orientation shall include but not be limited to:

(a)    Information pertaining to facility procedures such as those concerning wake-up time, meals, mail, visiting, telephone, work, and medical care;

(b)    Rules of conduct;

(c) Disciplinary procedures;
(d) Contraband; and
(e) Information regarding available programs.

Reasonable accommodations shall be made for non-English speaking juveniles, illiterate juveniles, and juveniles with disabilities.

5350 DISCHARGE, TRANSFER, OR RELEASE OF A JUVENILE

Positive identification of each juvenile shall always be made by the releasing officer before discharge, transfer, or release is effected. An NCIC check shall be conducted prior to the release of a juvenile. Upon determination and verification that a release has been properly authorized, clearance procedures should be carried out expeditiously in order to avoid unnecessary delay. Whenever a discharge, transfer, or release is effected, a record shall be made of the date, time, and authority.

The discharge process should also address the following issues:

(a) A signed property form verifying the return of all property, including valuables and money; (If the juvenile refuses to sign the property form, another employee should sign as witness that the juvenile refused.)

(b) A signed form verifying that all approved medication has been given to the juvenile;

(c) A signed form verifying that all facility owned property has been turned in by the juvenile;

(d) Verification of identity and completion of a NCIC check, fingerprint card, and current photo on file, if applicable;

(e) Verification that there are no existing holds, detainers, and/or notifies; and

(f) Confirmation of victim notification as outlined in South Carolina Code of Laws, Section §16-3-1530.

**5355   SECURITY**

5360 WEAPONS CONTROL

(a) Except in emergency situations, no employee, law enforcement personnel, or other official shall be permitted to carry lethal weapons within the security portion of a facility.

(b) Each facility shall have written policies and procedures governing the use of lethal weapons. A written report must be filed each time that lethal force is used.

5370 LESS LETHAL WEAPONS

(a) Facility personnel authorized to use less lethal weapons, including but not limited to: tear gas; mace (chemical agents); tasers; stun belts; and stun shields, shall be trained and certified in their use.

(b) Less lethal weapons shall be inventoried, inspected, and, if applicable, weighed every month to determine their condition and expiration dates.

(c)     Each facility shall have written policies and procedures governing the use of less lethal weapons. A written report must be filed each time that less lethal force is used.

(d)     Appropriate medical care shall be provided and documented following each use of force incident.

Discussion:
Special attention should be given to the potential danger of the spreading of chemical agents through the air ventilation system. Juveniles must be removed if the area becomes contaminated.

## 5374   USE OF PHYSICAL FORCE

Facilities shall have written policies, procedures, and practices restricting the use of physical force to instances of justifiable self defense, protection of others, protection of property, disruption of operations, and prevention of escapes, and then only as a last resort and in accordance with appropriate statutory authority. In no event is physical force justifiable as punishment. A written report shall be prepared following each use of force and shall be submitted to administrative staff for review.

## 5375   USE OF RESTRAINTS

Each facility shall have written policies and procedures which provide that instruments of restraint shall not be used except:

(a)     As a security precaution during a transfer or temporary emergency;
(b)     On medical grounds at the direction of the physician or responsible medical authority; and
(c)     By order of the facility manager or designee to prevent a juvenile from self injury, injury to others, or property damage. However, restraints shall never be used as punishment.

## 5380   KEY CONTROL

The facility shall have a written policy and procedure governing the following:

(a)     Facility and vehicle keys shall be inventoried and stored in a secure area when not in use.

(b)     There shall be one (1) full set of well-identified facility keys, other than those in use, secured in a place accessible only to authorized personnel for use in the event of an emergency.

(c)     No juveniles shall be permitted access to, nor allowed to handle, facility or vehicle keys.

(d)     An inventory and log of all keys shall be made at the beginning of each shift.

(e)     Keys necessary for unlocking doors installed in a means of egress shall be

individually identifiable by both touch and sight, as mandated by Standard 408.7.4. of the International Fire Code.

5390   TOOL CONTROL

There shall be a written tool control plan including the standard use of inventory shadow boards, etchings, or color coding of facility tools to ensure that such tools are not used to breach the security of the facility. This plan shall include tools used in the kitchen and medical units. Tools brought into the facility for maintenance or repairs shall be accounted for at all times.

5400   FACILITY SECURITY

(a)   All juveniles leaving the confines of the facility for any reason should be searched prior to leaving and shall be searched prior to re-entering the facility.

(b)   All security locks and doors shall be regularly inspected to ensure proper working order.

(c)   All cellblock doors and all corridor doors shall be kept locked except when necessary to permit entry or exit.

(d)   Unoccupied cells, detention rooms, and storage rooms shall be searched and kept locked.

(e)   All facilities shall have two-way intercom systems for emergency communications. This shall not substitute for custodial personnel, as required in Standard 5170.

(f)   All incidents that result in serious physical harm to or threaten the life of any juvenile in the facility shall be reported promptly to the facility manager.

(g)   Vehicles in the facility's parking lot should be kept locked at all times.

5410   JUVENILE MOVEMENT

(a)   Each facility shall have written policies and procedures for handling juvenile movement which include classification by custody level, consideration of medical and mental health, and employee escort protocol.

(b)   Juveniles shall not be transported in the same vehicle with adult inmates.

(c)   Female juveniles shall not be transported in the same vehicle with male juveniles unless there is secure separation between the females and males and there is clear visual observation and supervision by a security officer.

5430   JUVENILE GOVERNANCE

Written policy and procedure shall provide that no juvenile or adult inmate nor group of juveniles or adult inmates is given control or authority over any juveniles nor given

access to records, legal documents, or confidential information pertinent to any juveniles.

**5440   CLASSIFICATION PLAN**

Each facility shall develop and implement a written classification plan to properly assign juveniles to classification categories for placement in housing and other detention specific functional situations based upon consideration of sex; age; criminal sophistication; seriousness of alleged crime; assaultive/non-assaultive behavior; medical rules; and other applicable criteria.

5450   CLASSIFICATION CATEGORIES

(a)    The facility provides for the separate management of the following categories of juveniles:

    (1)    female and male juveniles;

    (2)    juveniles with special problems (alcoholics, narcotics addicts, mentally disturbed persons, physically handicapped persons, persons with communicable diseases);

    (3)    juveniles requiring disciplinary detention;

    (4)    juveniles requiring administrative separation; and

    (5)    other categories that may pose a security problem which include but are not limited to: high profile cases; sexual deviants; sex offenders; and predators.

(b)    The admission of all juveniles to separation units shall be documented in a permanent log, specifying the name; number; location; date admitted; reason for admission; tentative release date; and special circumstances and needs of each juvenile.

5460   CLASSIFICATION REVIEW

The juvenile classification plan specifies criteria and procedures for determining and changing the status of a juvenile. The plan includes an appeals process for classification decisions.

**5470   SEPARATION**

5480   COMMUNICABLE DISEASES

Each facility shall have written policies and procedures providing for the separation of all juveniles with communicable diseases.

Discussion:

To determine if such separation shall be made, in absence of medically trained personnel at the time of admission, an inquiry shall be made of the juvenile to establish whether he/she has or has had tuberculosis or whether he/she presently has hepatitis, a sexually transmitted disease, or other special medical problems. (See Medical Services 5700 through 5750.)

5490   MENTALLY DISORDERED JUVENILES

Each facility shall have written policies and procedures providing for the appropriate housing of all mentally disordered juveniles as determined by the classification plan.

5495   ADMINISTRATIVE SEPARATION

Each facility shall develop and implement written policies and procedures for the administrative separation of juveniles who are determined to be prone to escape or to assault staff and other juveniles, or whose presence in the general population poses a serious threat to the orderly operation or security of the facility. Such policies and procedures shall include:

(a)   Documentation of reasons for placement and retention in administrative separation;

(b)   Self placement (protective custody): juvenile signs agreement requesting to be placed in, or removed from, protective custody, (should be afforded the same privileges as general population); and

(c)   Periodic review and documentation, at least every seven (7) days, of each juvenile in administrative separation.

5500   FEMALES

(a)   Female juveniles shall be confined in an area separated from normal auditory and visual contact with male juveniles.

(b)   Female juveniles shall be afforded the same rights and privileges as male juveniles.

**5520   DISCIPLINE**

5530   RULES AND DISCIPLINARY PENALTIES

Each facility shall have established written rules and specific penalties for major and minor violations to guide juvenile conduct. Such rules shall be stated simply and posted conspicuously in housing units and the booking area, or issued to each juvenile upon admission. Reasonable accommodations shall be made for non-English speaking juveniles, illiterate juveniles, and juveniles with disabilities.

5535   PLAN FOR JUVENILE DISCIPLINE

Each facility shall develop and implement a formal written procedure for imposing punishment for violation of rules, which includes:

(a)   Summary punishment for minor violations;

(b)   Procedures for major violations, which include:

(1)   Written notice (at least twenty-four (24) hours prior to hearing) to the juvenile(s) of the charge(s) against him/her;

     (2)     An opportunity for the juvenile(s) to prepare a defense to the charge(s) against him/her;

     (3)     A hearing before an impartial panel or officer;

     (4)     An opportunity for the juvenile to present information and to request witnesses in his/her own behalf;

     (5)     A decision based upon the charge(s) and information produced at the hearing;

     (6)     Preparation and retention of a summary of the proceedings; and

     (7)     A review of the decision of the hearing officer or panel by the Facility Manager;

   (c)     Assurance that no juvenile shall sit in judgment of, or have supervisory authority over, other juveniles.

Discussion:

The determination of whether a violation of facility rules and regulations is major or minor is determined not in the substantive violation but in the potential punishment. Any violation that results in a forfeiture of good time or in punitive segregation is major and requires the attendant due process protection. Those violations resulting in suspension of privileges, extra duties, etc., may be classed as minor, requiring only notice of charges, opportunity to respond, and disposition reduced to writing.

## 5540   FORMS OF AND LIMITS ON DISCIPLINARY ACTION

   (a)     Summary punishment shall not exceed a reprimand, extra work detail, or the loss of privileges, including disciplinary separation of no more than two (2) consecutive days.

   (b)     Room restriction for minor misbehavior serves only a "cooling off" purpose and is short in time duration, with the time period (15 to 60 minutes) specified at the time of assignment. During room restriction, staff contact is made with the juvenile at least every 15 minutes, or more frequently depending on his/her emotional state. The juvenile assists in determining the end of the restriction period.

   (c)     Juveniles placed in disciplinary separation shall maintain their basic rights.

   (d)     No juvenile shall be deprived of the implements necessary to maintain an acceptable level of personal hygiene.

   (e)     The use of restrictive diets as a form of punishment is prohibited. (The use of Nutriloaf is not considered to be a restrictive diet.)

   (f)     Strip cells shall not be used as a form of punishment.

   (g)     Medication or the withholding of medication and/or treatment shall not be used for the purpose of discipline.

   (h)     No juvenile shall be subjected to discipline or treatments which are dehumanizing, including but not limited to disrespect, profanity, or taunting.

(i) Juveniles shall not be deprived of sleep as a form of disciplinary action.

(j) Serious violations of rules, e.g., assaults, sexual assaults, malicious damage to property, and escapes, shall be referred to the solicitor for prosecution. Reported offenses must be investigated and documented.

(k) Juveniles shall be entitled to correspondence, visitation, and telephone privileges in accordance with the rules and regulations established by each facility. Restrictions on these privileges should not be imposed unless such privileges have been suspended and/or restricted based on legitimate government interests related to the safe and secure operation of the facility; to prevent continued criminal activities; or other similar concerns.

(l) No juvenile shall inflict punishment of any type on another juvenile.

## 5545 PHYSICAL PLANT

5550 INITIAL PLANNING

(a) When the construction of a new facility, or the extensive remodeling of, or addition to, an existing facility is considered, the governing body shall file a letter of intent with the Jail and Prison Inspection Division within ten (10) working days of the resolution or formal action to proceed.

The Jail and Prison Inspection Division will respond within ten (10) working days upon receipt of the letter and offer to assist agencies with the technical expertise necessary for the effective and economical construction of detention facilities.

(b) Prior to the design phase, a program statement shall be filed with the Jail and Prison Inspection Division which includes the following:

(1) Projected capacity of facility;
(2) Types of juveniles to be housed;
(3) Juvenile movement;
(4) Food preparation and serving;
(5) Staffing;
(6) Bookings/releases;
(7) Visiting and attorneys' interviews;
(8) Laundry operations;
(9) Juvenile separation;
(10) Future needs and possible expansion; and
(11) Activities such as recreation and rehabilitation programs

(c) A copy of the preliminary design documents and working drawings shall be submitted to the Jail and Prison Inspection Division for pre-construction review to evaluate compliance with these standards prior to releasing for bid. The Division shall respond in writing within thirty (30) working days to advise whether materials reviewed were in compliance with relevant standards, and to remind all

parties concerned of their responsibility to adhere to applicable laws, standards, codes, and regulations in the design and construction of the project.

(d) The Jail and Prison Inspection Division shall provide consultation service to the city or county, as may be requested.

## 5560   RATED CAPACITY

The Director of the Jail and Prison Inspection Division shall ascertain the maximum number of juveniles, of whatever classifications, based upon square footage and other relevant requirements, which can properly be housed in each facility and in the various living areas within each facility. After determining the rated capacity, the Director shall notify, in writing, the Facility Manager, the Facility Administrator, and the governing body which has responsibility for the facility. These numbers shall be reviewed during each annual inspection.

## 5570   FACILITIES PRIOR TO JULY 1980

Unless otherwise noted, this standard applies to all facilities which were operational or for which plans were submitted and approved prior to July 1980. Each such facility shall comply with the following requirements for living units:

(a) The number of juveniles occupying a cell, room, or dorm shall not exceed the rated capacity of the cell, room, or dorm when based upon the "average daily population" for the previous three (3) months.

(b) All cells or rooms with a minimum of seventy (70) square feet and less than one hundred (100) square feet shall have a rated capacity of one (1) juvenile.

(c) All cells or rooms of one hundred square feet or greater may be considered multiple occupancy cells or room, with rated capacity based upon a minimum of fifty (50) square feet per juvenile.

(d) Any cell, room, or area designated for separation shall be single occupancy, with a rated capacity of one (1) juvenile.

(e) Any existing facility with less than seventy (70) square feet per cell or room shall not confine a juvenile to his/her cell or room more than twelve (12) hours per day excluding counts. (An exception to this requirement is that juveniles temporarily assigned to separation may be confined more than twelve (12) hours.)

(f) Any cell, room, or area to which juveniles are confined (locked in) shall have one (1) operable water closet for every ten (10) juveniles in male facilities and one (1) for every eight (8) juveniles in female facilities, and shall have a minimum ratio of one (1) operable lavatory with running water for every twelve (12) juveniles, that are accessible twenty-four (24) hours a day. (Urinals may be substituted one-for-one for water closets in male areas; however, two thirds of fixtures shall be water closets.)

(g) Each facility shall provide, in addition to the bed, a desk or approved writing

surface; hooks or storage space; and a chair or stool for each juvenile.

(h)     Artificial lighting shall be provided of at least twenty (20) foot-candles at desk level and in the personal grooming area; and natural light shall be available from an opening or window that has a view to the outside, or from a source within twenty (20) feet of the room. Other lighting requirements for the facility should be determined by tasks to be performed. Night light should provide good visibility for supervision, but should not hinder restful sleep.

(i)     Forced air circulation of at least ten (10) cubic feet per minute turnover of fresh or purified air shall be provided for each juvenile. Heating, ventilation, and acoustical systems will be provided to ensure healthful and comfortable living and working conditions for juveniles and staff. Ventilation will be available in the event of a power failure.

(j)     Juveniles have access to operable showers with temperature-controlled hot and cold running water at a minimum ratio of one (1) shower for every eight (8) juveniles. Water for showers is thermostatically controlled to temperatures ranging from 100 to 120 degrees Fahrenheit to ensure the safety of juveniles and to promote hygienic practices.

(k)     Where programs are offered, sufficient area for them shall meet the need and provide space for the following:

        (1) Religious services;
        (2) Counseling;
        (3) Interviews;
        (4) Classroom;
        (5) Library; and
        (6) Recreation.

(l)     Each facility shall have adequate space for the secure storage of juvenile personal clothing, personal property, and institutional clothing and bedding.

(m)     Each facility shall have an emergency lighting system in case of power failure.

(n)     Each facility shall have adequate storage area(s) for cleaning utensils and supplies.

(o)     Each facility shall have an automatic fire alarm system in accordance with Fire Codes (Reference NFPA 72-e-1974).

Discussion: Where the climate warrants, individual rooms that cannot be adequately ventilated by other means should be air conditioned. When ventilation systems fail, there should be backup power sources or alternative means of ventilation.

5590   FACILITIES FROM JULY 1980 THROUGH JUNE 2007

        Unless otherwise noted, this standard applies to all facilities which became operational or for which plans were submitted and approved after June 1980, and prior to July 2007.

(a)     All cells, rooms, or dormitories shall have access to natural light and have, at a minimum, fifty (50) square feet of unencumbered floor space per juvenile if single occupancy. For multiple occupancy cells, rooms, or dormitories there shall a minimum of thirty five (35) square feet of unencumbered floor space per juvenile.

(b)     All housing units and activities areas shall have, at a minimum:

    (1)     Artificial lighting shall be provided of at least twenty (20) foot-candles at desk level and in the personal grooming area; and natural light shall be available from an opening or window that has a view to the outside, or from a source within twenty (20) feet of the room. Other lighting requirements for the facility should be determined by tasks to be performed. (Night light should provide good visibility for supervision, but should not hinder restful sleep.);

    (2)     Natural light;

    (3)     Forced air circulation of at least ten (10) cubic feet per minute of fresh or purified air per juvenile;

    (4)     Any cell, room, or area to which juveniles are confined (locked in) shall have one (1) operable water closet for every ten (10) juveniles in male facilities and one (1) for every eight (8) juveniles in female facilities, and shall have a minimum ratio of one (1) operable lavatory with running water for every (12) juveniles that are accessible twenty-four (24) hours a day. (Urinals may be substituted one-for-one for water closets in male areas; however, two thirds of fixtures shall be water closets.);

    (5)     Bed; desk, table, or shelf; storage space or hooks; and adequate accessible seating; and

    (6)     Juveniles have access to operable showers with temperature-controlled hot and cold running water at a minimum ratio of one (1) shower for every eight (8) juveniles. Water for showers is thermostatically controlled to temperatures ranging from 100 to 120 degrees Fahrenheit to ensure the safety of juveniles and to promote hygienic practices.

(c)     Each facility shall be designed and constructed so that juveniles can be separated and housed according to the facility's classification plan.

(d)     Each facility shall have a dayroom for each cellblock or cluster of rooms. Dayrooms shall have a minimum of thirty-five (35) square feet of floor space per juvenile and be separate and distinct from the sleeping area, but be immediately adjacent to and accessible from it.

(e)     Each facility shall have at least one (1) special-purpose cell or room that is designed to prevent injury to a juvenile who is under the influence of alcohol or narcotics, or for juveniles who are uncontrollably violent or self-destructive. This room shall be subject to direct observation from a twenty-four (24) hour staff position.

(f)     Each facility shall provide an intake and release area outside juvenile living areas, with the following components:

<ol>
<li>(1) Weapons locker, located outside security area, equipped with individual compartments and lock and key;</li>
<li>(2) Temporary holding cell(s) or room(s) with fixed benches to seat all juveniles at rated capacity (twenty (20) square feet per juvenile), have operable water closets, lavatories, and drinking fountain available;</li>
<li>(3) Booking area;</li>
<li>(4) Medical examination room;</li>
<li>(5) Shower facilities;</li>
<li>(6) Secure vault or room for storage of juveniles' personal property;</li>
<li>(7) Telephone facilities; and</li>
<li>(8) Interview room.</li>
</ol>

(g) Each facility shall have sufficient storage room space and inventory for clothing, bedding, and facility supplies.

Discussion:
General guidelines which may be useful for planning are: two (2) cubic feet per juvenile for personal clothing; one (1) cubic foot per juvenile for personal property; two (2) cubic feet per juvenile for institutional clothing and bedding; and 5.25 cubic feet per mattress, for twenty-five (25%) percent of rated capacity. This storage room should be well ventilated.

(h) Each facility shall have an automatic fire-alarm system in accordance with Fire Codes (Reference NFPA 72-e-1974).

(i) Any safety vestibule or sally port shall be of sufficient size to permit passage of a loaded ambulance. cot between interlocking doors.

(j) Each facility shall have an emergency lighting system in case of power failure.

(k) Space for visiting should be planned so that it is separate from the juvenile housing area and communal activity space.

5595 FACILITIES CONSTRUCTED FROM JULY 2007, TO THE PRESENT

Unless otherwise noted, this standard applies to all facilities which became operational or for which plans were submitted and approved from July 2007, to the present.

5596 STAFF/JUVENILE INTERACTION

Physical plant design facilitates continuous contact and interaction between staff and juveniles.

Discussion:
Separation of supervising staff from juveniles reduces interpersonal relationships and staff awareness of conditions in the housing units. Staff effectiveness is limited if the only staff available are isolated in control centers as observers or technicians in charge of electrical management systems.

5597   FACILTY LOCATION

If the facility is on the grounds of any other type of detention or correctional facility, it is a separated, self-contained unit.

5598   JUVENILE HOUSING

(a)   All cells, rooms, or dormitories shall have access to natural light and have, at a minimum, fifty (50) square feet of unencumbered floor space per juvenile if single occupancy. For multiple occupancy cells, rooms, or dormitories there shall a minimum of thirty-five (35) square feet of unencumbered floor space per juvenile.

Discussion:
At least one dimension of the unencumbered space is no less than seven (7) feet. Unencumbered space is determined by multiplying the length and width of the room and subtracting from this figure the total number of square feet not occupied by bed(s), plumbing fixtures, desk(s), locker(s), and other fixed equipment.

(b)   All housing units and activities areas shall have, at a minimum:

(1)   Artificial lighting shall be provided of at least twenty (20) foot-candles at desk level and in the personal grooming area, and natural light shall be available from an opening or window that has a view to the outside, or from a source within twenty (20) feet of the room. Other lighting requirements for the facility should be determined by tasks to be performed. Night light should provide good visibility for supervision, but should not hinder restful sleep;

(2)   Natural light;

(3)   Forced air circulation of at least ten (10) cubic feet per minute of fresh or purified air per juvenile;

(4)   Any cell, room, or area to which juveniles are confined (locked in) shall have one (1) operable water closet for every twelve (12) juveniles in male facilities and one (1) for every eight (8) juveniles in female facilities, and shall have a minimum ratio of one (1) operable lavatory with running water for every (12) occupants that are accessible twenty-four (24) hours a day. (Urinals may be substituted one-for-one for water closets in male areas; however, two thirds of fixtures shall be water closets.) All housing units with five (5) or more juveniles shall have a minimum of two (2) water closets;

(5)   Bed; desk, table, or shelf; storage space or hooks; and adequate accessible seating; and

(6)   Juveniles have access to operable showers with temperature-controlled hot and cold running water at a minimum ratio of one (1) shower for every eight (8) juveniles. Water for showers is thermostatically controlled to temperatures ranging from 100 to 120 degrees Fahrenheit to ensure the safety of juveniles and promote hygienic practices.

(c)   Each facility shall be designed and constructed so that juveniles can be separated and housed according to the facility's classification plan.

(d)     Each facility shall have a dayroom for each cellblock or cluster of rooms. Dayrooms shall have a minimum of thirty-five (35) square feet of floor space per juvenile and be separate and distinct from the sleeping area, but be immediately adjacent to and accessible from it.

(e)     Each facility shall have at least one (1) special-purpose cell or room that is designed to prevent injury to a juvenile who is under the influence of alcohol or narcotics, or for a juvenile who is uncontrollably violent or self-destructive. This room shall be subject to direct observation from a twenty-four (24) hour staff position.

(f)     Each facility shall provide an intake and release area outside juvenile living areas, with the following components:

    (1)     Weapons locker, located outside security area, equipped with individual compartments and lock and key;
    (2)     Temporary holding cell(s) or room(s) with fixed benches to seat all. Juveniles at rated capacity (twenty (20) square feet per juvenile), have operable water closets, lavatories, and drinking fountain available;
    (3)     Booking area;
    (4)     Medical examination room;
    (5)     Shower facilities;
    (6)     Secure vault or room for storage of juveniles' personal property;
    (7)     Telephone facilities; and
    (8)     Interview room.

(g)     Each facility shall have sufficient storage room space and inventory for clothing, bedding, and facility supplies.

    Discussion:
    General guidelines which may be useful for planning are: two (2) cubic feet per juvenile for personal clothing; one (1) cubic foot per juvenile for personal property; two (2) cubic feet per juvenile for institutional clothing and bedding; and 5.25 cubic feet per mattress, for twenty-five (25%) percent of rated capacity. This storage room should be well ventilated.

(h)     Each facility shall have an automatic fire-alarm system in accordance with Fire Codes (Reference NFPA 72-e-1974).

(i)     Any safety vestibule or sally port shall be of sufficient size to permit passage of a loaded ambulance. cot between interlocking doors.

(j)     Each facility shall have an emergency lighting system in case of power failure.

(k)     Space for visiting should be planned so that it is separate from the juvenile housing area and communal activity space.

(l)     Indoor and outdoor space for the juveniles to exercise is provided.   Indoor exercise may be conducted in the dayroom or in the multi-purpose room.   Outdoor

areas shall be at least fifty (50) feet by thirty (30) feet, except that in facilities such as those which are designed for direct supervision, when outside exercise space is provided for individual housing units, minimum space requirements are as follows:

(1) General Population Units:
Outdoor exercise areas shall provide at least fifteen (15) square feet per juvenile for the maximum number of juveniles who are expected to use the area at one time, but not less than 750 square feet of unencumbered space, with none of the dimensions less than fifteen (15) feet.

(2) Segregation/ Maximum Security Units
Outdoor exercise areas shall provide at least fifteen (15) square feet per juvenile for the maximum number of juveniles who are expected to use the area at one time, but not less than 200 square feet of unencumbered space.

## 5610  JUVENILE PROGRAMS AND ACTIVITIES

(a) Each facility shall provide an array of programs that includes social services, religious services, library services, counseling, and educational courses as mandated by South Carolina Code of Laws, Section 20-7-6845.

(b) Juveniles should not be required to work except to do personal housekeeping.

(c) Each facility shall allow juveniles access to recreational opportunities and equipment, including outdoor exercise when the climate permits.

(d) A canteen/commissary may be operated in the juvenile facility.

## 5620  VISITATION

Each facility shall develop and implement a juvenile visiting plan which shall include the following:

(a) Parents, guardians, or custodians, as well as teachers, and tutors of juveniles, shall be allowed to visit at any appropriate time as designated by the facility. Restrictions on visitation should not be imposed unless such privileges have been suspended and/or restricted based on legitimate government interests related to the safe and secure operation of the facility; to prevent continued criminal activities; or other similar concerns.

(b) Visitors shall be treated with courtesy. An explanation shall be given of visitors' rights and restrictions; and procedures visitors must follow to file complaints should either be posted conspicuously or provided in written handouts.

(c) Special visiting hours and arrangements shall be made available for visitors who have transportation problems, who have handicaps, or who are working on regular visiting days.

(d) Appointments for visits at any time may be required.

(e) All policies and procedures related to visitor searches should be reviewed by competent legal authority.

(f) Persons providing juvenile services and assistance, such as ministers, attorneys or officers of the court, among others, will be allowed to visit during normal hours of operations.

(g) Nothing contained herein shall prevent the Facility Manager from refusing to permit a visit based on circumstances related to legitimate concerns that would interfere with the orderly operation of the facility and/or pose a threat to security. Refusals shall not be arbitrary; and all refusals, along with the reasons for denial, shall be documented and kept on file.

(h) Video visitation may be used as a substitute for, and/or to supplement, direct physical parental, legal, and/or ministerial visitation.

## 5630 CORRESPONDENCE

Each facility shall develop and implement a written plan for the handling of juvenile mail. Such a plan shall include the following provisions:

(a) Juvenile mail shall not be read except where there is reasonable suspicion that a particular item of correspondence threatens the safety or security of the institution, threatens the safety of any person, or is being used for furtherance of illegal activities. All official mail shall be opened in the presence of the juvenile to whom it is addressed.

Official mail is defined as mail from officials or organizations including, but not limited to: courts, counsel, officials of the confining authority, government officials, administrators of grievance systems, Jail and Prison Inspection Division, Department of Juvenile Justice, Department of Corrections, Department of Public Safety, and members of the Parole Boards.

(b) Juveniles shall be permitted to send sealed letters to a specified class of persons and organizations as defined in (a), above.

(c) The facility shall not limit mail to or from a juvenile except when there is clear and convincing evidence to justify such limitation.

(d) If a juvenile is indigent, he/she shall be provided sufficient postage, envelopes, and writing materials to write two (2) personal letters per week if he/she wishes to do so. Like provisions apply should an indigent juvenile wish to communicate with his/her lawyer(s) and court officials.

(e) Outgoing mail shall be collected and incoming mail shall be delivered without unnecessary delay.

5640    TELEPHONE

Each facility shall develop and implement a written plan for the use of the telephone. Juveniles may be required to pay for telephone calls. If telephone calls are to be monitored and/or recorded, notice shall be provided.

Restrictions on making telephone calls should not be imposed unless such privileges have been suspended and/or restricted based on legitimate government interests related to the safe and secure operation of the facility; to prevent continued criminal activities; or for other similar concerns.

A newly admitted juvenile shall be permitted to complete at least two (2) telephone calls during the admission process. Additional telephone calls maybe made at the discretion of the Facility Manger.

Telephone terminal devices for the deaf, interpreters, and other reasonable accommodations shall be provided to juveniles with hearing or other special needs.

5650    ACCESS TO LEGAL COUNSEL AND COURTS

Each facility shall establish policies and procedures to ensure the right of juveniles to have access to legal counsel and courts and assist juveniles in making confidential contact with attorneys and their authorized representatives. Such contact includes but is not limited to telephone communications, uncensored correspondence, and visits.

Discussion:
While it should not be considered the responsibility of the facility to pay for a juvenile's legal counsel, the facility must provide the assistance necessary for the juvenile to have effective access to counsel.

5660    GRIEVANCE PROCEDURE

There shall be a written grievance procedure made available to all juveniles.

Discussion:
A grievance procedure is an administrative means of expressing and resolving juveniles' problems.    The facility's grievance mechanism should include provisions for the following:

(a)    Written responses to all grievances, including the reasons for the decision;
(b)    Responses within prescribed, reasonable time limit, with special provisions for responding to emergencies;
(c)    Advisory review of grievances;
(d)    Participation by staff in the design and operation of the grievance procedure;
(e)    Access by all juveniles, with guarantees against reprisal;
(f)    Applicability over a broad range of issues; and
(g)    Means for resolving questions of jurisdiction.

While the procedure need not be as detailed as outlined in the discussion above, some mechanism should exist for resolving juvenile grievances.

### 5700   MEDICAL SERVICES

5710   RESPONSIBLE PHYSICIAN

Each facility shall have a written agreement or arrangement with a licensed or certified physician or medical authority for the review and approval of the facility's medical services.

Discussion:
The medical authority may be the county or a public health department, a physician group, a hospital, a clinic, a health care vendor, or the county medical society.

5720   MEDICAL PROCEDURES

Each facility shall develop and implement written standard operating procedures, which are approved by the responsible physician or medical authority, for the following:

(a)   Receiving screening; (See 5700)
(c)   Non-emergency medical services;
(d)   Emergency medical and dental services;
(e)   Deciding the emergency nature of illness or injury;
(f)   First aid;
(g)   Convalescent care;
(h)   Delousing;
(i)   Detoxification;
(j)   Pharmaceuticals;
(k)   Screening, referral, and care of mentally ill and of mentally retarded juveniles;
(l)   Notification of next of kin or legal guardian in case of serious illness, injury, attempted suicide, or death;
(m)   Prompt notification of parents or guardian and DJJ when a juvenile requires medical treatment of a non-routine nature;
(n)   Prohibition against conducting medical or pharmaceutical testing for experimental or research purposes; and
(o)   Suicide prevention.

5730   SCREENING

Each facility shall perform medical, dental, and mental health screening of all juveniles, excluding intrasystem transfers, immediately upon admission to the facility, with the findings recorded on a form approved by the responsible physician or medical authority. In every case such screening shall occur before the juvenile is placed in the general population or housing area and shall include inquiry into:

(a)   Current illnesses and health problems, including those specific to women, and including sexually transmitted diseases and other infectious diseases, if appropriate;
(b)   Medications taken and special health requirements;
(c)   Screening of other health problems designated by the responsible physician;
(d)   Behavioral observation, including state of consciousness and mental status, appearance, conduct, tremor, and sweating;

(e)     Notation of body deformities, trauma markings, scars, birthmarks, tattoos, bruises, lesions, ease of movement, jaundice, and other physical characteristics of medical interest;

(f)     Condition of skin and body, including rashes and infestations, and needle marks or other indications of drug abuse;

(g)     Disposition/referral of juveniles to qualified medical personnel on an emergency basis;

(h)     Past or present treatment, hospitalization or likelihood of mental disturbance or suicide attempt by juvenile;

(i)     Dental problems;

(j)     Use of alcohol and other drugs, which includes types of drugs used, mode of use, amounts used, frequency of use, date or time of last use, and a history of problems that may have occurred after ceasing use (e.g., convulsions); and

(k)     Medical disposition regarding housing of juveniles:

(1)     general population;

(2)     general population with appropriate referral to health care service; or

(3)     referral to appropriate health care service for emergency treatment.

5731   HEALTH APPRAISAL

The health appraisal data collection shall be completed within seven (7) days after admission and shall include:

(a)     Review of earlier receiving screening;

(b)     Completion of medical, dental, and psychiatric history;

(c)     Taking of height, weight, pulse, blood pressure, and temperature;

(d)     Other examinations deemed appropriate by the responsible physician or his/her designee; and

(e)     Screening for communicable disease and, if medically indicated, testing for communicable disease.

5732   PHARMACY STANDARDS

All medications at each facility shall be safely and properly accounted for and managed according to Department of Health and Environmental Control Pharmacy Standards.

5740   EMERGENCIES

Each facility shall provide twenty-four (24) hour emergency medical and dental care availability, as outlined in a written plan which includes arrangements for:

(a)     Emergency evacuation of juveniles from the facility;

(b)     Use of an emergency medical vehicle;

(c)     Use of one (1) or more designated hospital emergency rooms or other appropriate health facilities; and

(d)     Emergency on-call physician and dentist services when the emergency health facility is not located in a nearby community.

A juvenile detainee has the right to refuse medical, psychological, or psychiatric treatment. However, if a juvenile or his/her parents or guardians refuse treatment that is

deemed necessary, those special needs should be presented to the Family Court for resolution.

Discussion:
Refusal of such routine treatment should be documented.

5750 SICK CALL

The facility shall have written policies which ensure adequate medical attention for those juveniles requesting it.

Discussion:
Sick call is the procedure through which each sick juvenile reports his/her illness and receives non-emergency medical services by a physician or a medically trained person working under the physician's standing orders.

5760 **JUVENILE CLOTHING AND PERSONAL HYGIENE**

5765 CLOTHING ISSUE

Any juvenile detained longer than six (6) hours in a facility shall be issued a uniform and footwear.

Clean juveniles' personal clothing (if available) may be substituted for institutional clothing at the discretion of the facility administrator. Juvenile holdover facilities are encouraged to issue clothing and/or to launder personal clothing regardless of the brevity of the juvenile's detention. When a juvenile is detained longer than six (6) hours this provision is mandatory.

5770 PERSONAL CARE ITEMS

Each juvenile detained longer than six (6) hours shall be provided the following items, as appropriate:

(a) toothbrush;
(b) toothpaste or tooth powder;
(c) soap;
(d) shaving implements (upon request);
(e) comb (upon request); and
(f) feminine hygiene items (if female).

Juveniles may be required to purchase replacement personal care items. However, basic hygiene items shall be provided to indigent juveniles by the facility.

5775 SHOWERING

(a) Juveniles will be given the opportunity to shower daily.

(b) Shower activity, to include refusal, must be monitored and annotated in both the Housing Unit log and annotated in the notes file.

5780  HAIR CARE SERVICES

The facility shall make hair care services available to juveniles.

There shall be no restrictions on the rights of juveniles to determine the length and style of hair except in individual cases where such restrictions are necessary for reasons of health and safety.

5785  BEDDING AND LINEN ISSUE

Each juvenile who is detained overnight shall be provided with the following standard issue:

(a)  One clean, serviceable, fire-retardant mattress;
(b)  Clean sheets and/or clean mattress cover;
(c)  Sufficient clean blankets to provide comfort under existing temperature conditions; and
(d)  One clean towel.

5787  LAUNDERING OF BEDDING AND LINENS

An adequate supply of bedding and linens shall be maintained so that the following laundry or cleaning frequencies may be adhered to:

(a)  Issued linens shall be changed and washed at least once a week;
(b)  Mattresses shall be disinfected or sanitized monthly and before re-issue;
(c)  Blankets shall be laundered, or otherwise sterilized, monthly and before re-issue; and
(d)  A clean towel shall be issued at least twice weekly.

**5790  FOOD**

5800  FREQUENCY OF SERVICE

Each facility shall provide three (3) nutritional meals at regular meal times during each twenty-four (24) hour period, with no more than fourteen (14) hours between the evening meal and breakfast.

A snack for juveniles should be provided between the evening meal and lights out.

5830  DIETARY ALLOWANCES

(a)  The food must be of sufficient nutritional value and quantity to satisfy, within reason, the juveniles' needs.

(b)  Reasonable arrangements shall be made to provide special diets prescribed by authorized medical personnel and when juveniles' religious beliefs require their adherence to dietary restrictions.

(c)  There is documentation that the facility's system of dietary allowance is reviewed

at least annually by a dietician to ensure compliance with nationally recommended food allowances.

Discussion:
A facility that follows this system of dietary allowances, as adjusted for age, sex, and activity, ensures the provision of a nutritionally adequate diet. The Recommended Dietary Allowances stated by the National Academy of Sciences should be used as a guide to basic nutritional needs.

5840    MENUS AND FOOD PREPARATION

Menus shall be planned in advance and approved by the facility administrator and/or designee. Meals prepared and served at the facility shall always be under the supervision of an employee or contract service provider. If meals are purchased from the local economy, an employee should be responsible for their distribution.

5850    SANITATION AND FOOD STORAGE

Sanitation, food handling, and food storage shall comply with standards set forth by the South Carolina Department of Health and Environmental Control.

5860    KITCHEN STAFF

Food service workers shall comply with applicable standards set forth by the South Carolina Department of Health and Environmental Control.

**5870    GENERAL SANITATION AND MAINTENANCE REQUIREMENTS**

5875    HOUSKEEPING REQUIREMENTS

Each facility shall develop and implement a written plan for the maintenance of an acceptable level of cleanliness and sanitation throughout the facility. Such plan shall include the following:

(a)    The sweeping and mopping of floors, removal of trash, and dusting, each day;
(b)    The cleaning of toilets, shower facilities, and janitor's closets each day;
(c)    A thorough cleaning of living units, each week;
(d)    The thorough cleaning of mops and other sanitation tools after each use, and their storage in a well-ventilated place;
(e)    Suitable containers easily cleaned and with tight fitting lids, shall be provided for the storage of solid waste material to control unpleasant odors, vermin, and insects. If plastic containers are used, they must be tested and approved against toxic reaction by a national testing laboratory;
(f)    Trash and garbage shall be removed at least daily and disposed of in a sanitary manner; and
(g)    Grease shall be disposed of in compliance with DHEC Regulations.

5890   VERMIN, INSECTS, AND PESTS

(a)   Each facility shall have a regularly scheduled program of pest and vermin control and extermination.

(b)   Effective measures shall be taken to keep flies, rodents, and other vermin out of the confinement facility and to prevent their breeding or continued presence on the premises. The facility shall be kept neat, clean, and free of litter. All openings to the outer air shall be effectively protected against the entrance of insects and rodents by self-closing doors, closed windows, 16 mesh or finer screening, and/or other effective means.

5900   DRINKING FOUNTAINS

Drinking cups (individual) or drinking fountains shall be provided. If drinking fountains are provided, they shall be made so that there is a mouth guard and that there is a free vertically angled flow of water. The use of the common drinking cup is prohibited.

| | |
|---|---|
| **From:** | Annie E. Andrews <AAndrews@charlestoncounty.org> |
| **Sent:** | Friday, June 19, 2020 1:11 PM |
| **To:** | Patrick Wooten |
| **Subject:** | FW: Reported problems with the Juvenile Detention Center |

| | |
|---|---|
| **Importance:** | High |

◄**External Email**► - From: AAndrews@charlestoncounty.org

---

**From:** Ashley Pennington <APennington@charlestoncounty.org>
**Sent:** Thursday, December 12, 2019 1:15 PM
**To:** Willis Beatty <wbeatty@charlestoncounty.org>
**Cc:** Annie E. Andrews <AAndrews@charlestoncounty.org>; Maryellen Rankin <MRankin@charlestoncounty.org>; J Tim. Taylor <JTTaylor@charlestoncounty.org>; Holly J. Bendure <HBendure@charlestoncounty.org>; Caroline M. Bickley (cbickley@homesc.com) <cbickley@homesc.com>
**Subject:** Reported problems with the Juvenile Detention Center
**Importance:** High

Dear Chief,
The Berkeley County Public Defender is concerned about the following issues with her clients:

- **Juvenile's Being Placed on "Lock Down"** - ██████████████████████ - now 13, but 12 at the time) - Detained from October 17, 2019 - October 31, 2019. I visited him on October 23, 2019 and he was on "lock down" for 48 Hours. I asked the guards on duty why and nobody knew. I asked ██████ and he indicated it was for "playing in the showers."

- **Juvenile's Not Being Pulled for School (and don't know why)** - ████████████████ (Detained 10/3/19 - 11/20/19) - He indicated he wasn't getting pulled for school many days and didn't know why. / ████████ ████████████ and ████████████████ also indicated to me they weren't being pulled for school at all. They both have been in and out of Headquarters many times.

- **Juvenile's Continuing to Have No Access to Outside (in particular those who end up at the facility for extended periods):** Across the board for the last year, I have not had a Juvenile client from Berkeley County indicate that they had any access to the outdoors. ████████████ (13) was unfortunately detained from August 8, 2019 to November 21, 2019 (yesterday). His charge is set for trial and no Judge would release him until yesterday. During all of that time, he never went outside. Another client, ████████████████████ - now 17), was on Headquarters Road long term to get an adult charge remanded back to family court. He confirmed that he never went outside. ████████████████████ was detained from August 8, 2019 - November 14, 2019 and never went outside.

- **Putting 3 Juvenile's in One Cell** - ████████████ family was upset by this because there was a period of time he was sleeping on the floor on a mat with 3 juvenile's in a cell. The family felt this was inappropriate. ██ ████████ and myself received e-mails regarding this. I visited ████████████ on September 13, 2019 and he was no longer sleeping on the floor because the facility was less crowded.

- **Ongoing Issues with Flooding and Mold**

I am told the same things by Charleston Public  Defenders. Please look into these problems. Thanks!
Ashley


D. Ashley Pennington
Ninth Circuit Public Defender
101 Meeting Street, 5th Floor
Charleston, SC  29401-2214

(843) 958-1850
(843) 958-1870(direct)
(843) 478-1230(mobile)
(843) 958-5149(facsimile)

apennington@charlestoncounty.org

www.lowcountrydefenders.org

Confidential Notice:  This electronic mail transmission and any and all accompanying documents and information contain data and matters belonging to the sender which may be confidential and legally privileged.  This information is intended ONLY for the use of the individual entity to whom it is addressed.  If you are not the intended recipient, any disclosure, copying, distribution or action of any sort taken in reliance on the contents of the information contained in this transmission or any attachments is strictly prohibited and objected to. If you have received this transmission in error, please immediately notify us by telephone at (843) 958-1870 and also delete the message.  Thank you.