IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Protection and Advocacy for People with Disabilities, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>James Alton Cannon, Jr., in his official capacity as Charleston County Sheriff, Mitch Lucas, in his official capacity as Assistant Charleston County Sheriff, Willis Beatty, in his official capacity as Chief Deputy of Charleston County Sheriff's Office, and Charleston County School District,<br><br>    Defendants. | Civil Action No. 2:20-cv-02738-DCN<br><br><br><br>**CONSENT DECREE** |

On July 25, 2020, Disability Rights SC (then "Protection and Advocacy for People with Disabilities") filed a civil rights action alleging unconstitutional conditions, policies and practices then existing at the Charleston County Juvenile Detention Center (CCJDC) that endangered detained youth ("Youth"), many of whom were alleged to have disabilities. Named Defendants were James Alton Cannon, Jr. in his official capacity as Charleston County Sheriff, Mitch Lucas in his official capacity as Assistant Charleston County Sheriff, Willis Beatty in his official capacity as Chief Deputy of the Charleston County Sheriff's Office, and Charleston County School District (CCSD). The parties acknowledge that there have been two elections and that the parties in the caption are no longer elected or employed by the Charleston County Sheriff's Office.

This Consent Decree has been inherited by Sheriff Carl Ritchie, who was elected and took office on January 7th, 2025. As of the date of the signatures on this Consent Decree, Sheriff Carl Ritchie has evaluated and acknowledged it in the interest of resolving this litigation.

1

During this litigation, employees of the Center for Children's Law and Policy (CCLP) visited the Sheriff Al Cannon Detention Center where youth were being temporarily housed while the current facility was under construction. The CCLP team reviewed records, interviewed Staff, and interviewed Youth, then compiled a detailed assessment with their findings and recommendations dated March 2022. On May 25, 2022, the new Charleston County Juvenile Detention Center opened, and Youth were transferred to the facility from their temporary housing within the Sheriff Al Cannon Detention Center. A single employee of CCLP visited the new facility on February 8, 2023, further interviewed Youth and Staff, then updated their evaluation of policies, procedures, and practices. The CCLP provided a supplemental report which reaffirmed its observations and recommendations from the original report and provided additional recommendations on April 28, 2023. The recommendations of the CCLP reports, in part, form the basis of this Consent Decree, though the parties understand that the recommendations of the CCLP are not mandatory standards to which the facility must comply under the laws of South Carolina.

While neither admitting nor denying any allegations of fact or legal liability, the parties agree to the entry of this Consent Decree resolving Plaintiff's claims. Therefore, based upon the stipulation and agreement of all parties to this action, by and through their respective counsel, and based upon all matters of record in this case, it is hereby **DECREED that**:

1.      The Court has jurisdiction over this matter.

2.      The named Plaintiff in this action is Protection and Advocacy for People with Disabilities, Inc.

3.      The named Defendants in this action are James Alton Cannon, Jr., in his official capacity as Charleston County Sheriff, Mitch Lucas, in his official capacity as Assistant Charleston

County Sheriff, Willis Beatty, in his official capacity as Chief Deputy of Charleston County Sheriff's Office, and Charleston County School District.

4.     The Mediator will continue to be Magistrate Judge Mary Gordon Baker. Should Magistrate Judge Baker be unable to continue in this capacity, the parties will seek to agree on a new Mediator, who must be approved by the Court.

5.     For the purposes of this Consent Decree, the following Terms and Definitions apply:

## TERMS AND DEFINITIONS

1.     "BIP" (Behavior Intervention Plan) is a written improvement plan created for a student with an individual education plan (IEP) by the student's IEP team typically based on the outcome of the functional behavior assessment (FBA).

2.     "FBA" (Functional Behavioral Assessment) is a process for gathering information about behaviors of concern, whether the behaviors are academic, social, or emotional.

3.     "Healthcare Provider" is the entity contracted by CCJDC to provide medical services as authorized under the laws of the State of South Carolina, including its physicians, physicians' assistants, nurse practitioners, registered nurses and licensed practical nurses.

4.     "IEP" (Individualized Education Plan) is a written document that describes the educational program designed to meet a child's individual needs, pursuant to the requirements and procedures of the federal Individuals with Disabilities Education Act. Every child who receives special education must have an IEP.

5.     "Mental Health Treatment Plan" is a multidisciplinary process that identifies in patients' medical chart their diagnoses and measurable goals and interventions unique to each patient. Participants in developing such a plan should include psychiatrists, nurse practitioners,

mental health clinicians, nurses, custody staff, and patients. Parents or guardians should be invited to participate where appropriate.

6.     "Multidisciplinary Treatment Team" means a group of representatives from CCJDC's mental health, medical, and security departments who review the placement of Youth in room confinement and ensure that the placement complies with policies, the Youth receive access to appropriate services, and the facility has a plan to return the Youth to the general population or to an appropriate placement.

7.     "NCCHC" is the National Commission on Correctional Health Care, which provides prison health standards for the CCJDC.

8.     "Positive Behavioral Interventions and Supports" is a framework for supporting practices to promote a safe school setting by supporting social, learning, behavioral, and emotional needs of all students both with and without individualized education programs (IEPs).

9.     "PREA" refers to the Prison Rape Elimination Act.

10.     "Quality Assurance System" is a process management activity that focuses on ensuring that processes contain as few defects as possible.

11.     "QMHP" is a Qualified Mental Health Professional, including psychiatrists, psychologists, psychiatric nurse practitioners, psychiatric physicians assistants, psychiatric nurses and mental health counselors licensed by the State of South Carolina and contracted or employed by CCJDC to provide mental health care services, which may include QMHPs furnished by the South Carolina Office of Mental Health (defined below) or otherwise. Licensed clinical social workers are included under this definition.

12.     "Restraint" or "physical restraint" means the use of mechanical restraints (e.g., handcuffs, belly chains, leg shackles) to restrict or limit a Youth's freedom of movement. The term

"restraint" does not include the routine use of mechanical restraints for transport or movement to appointments, court, and other out of facility locations.

13.     "Room Confinement" means the placement of a Youth alone in a cell/room where the Youth is unable to leave, with release dependent on the Youth's change in behavior as evaluated by staff during regular interactions and excluding sleeping hours.

14.     "SOMH" refers to the South Carolina Department of Behavioral Health and Developmental Disabilities Office of Mental Health. Wherever the term QMHP is used, CCJDC may use services provided through the OMH as long as those services include a QMHP.

15.     "Staff" means all individuals employed by the Charleston County Sheriff at the CCJDC. It does not include healthcare providers, QMHPs, CCSD employees or volunteers.

16.     "Train" means to instruct in skills to a level that the trainee has demonstrated proficiency by testing to implement those skills as and when called for. "Trained" means proficient in the skills.

17.     "U Violations" are violations of CCJDC written rules of which the Youth have been advised and do not involve violence or property damage.

18.     "Use of force" means the application of physical measures to compel compliance by an unwilling Youth, including a physical restraint.

19.     "Youth" means one or more individuals between the ages of 13 and 17, detained at, or otherwise housed, in the custody of, or confined at CCJDC. Youth only include those who are alleged to have committed criminal offenses, including violent criminal offenses.

## SECTION I: SUBJECT MATTER EXPERT / MONITOR

1.     Prior to signing this Decree, the Defendants located and contracted with Charles Kehoe, a Professional Monitor, to provide select technical assistance to help CCJDC comply with its obligations under this Decree, prepare an assessment of CCJDC's compliance with this Decree, and provide any recommendations to facilitate compliance. Plaintiff consents to Defendants' selection of Charles Kehoe as the Professional Monitor.

2.     The Parties will cooperate fully with the Professional Monitor.

3.     The Monitor will begin their duties as soon as possible upon approval. In the event the Monitor resigns, Defendants and Plaintiffs will work cooperatively to locate and retain a new Monitor.

4.     The Monitor will have full access to persons, employees, facilities, buildings, programs, services, documents, data, surveillance videos, records, materials, and things that, in the Monitor's judgment, are necessary to provide technical assistance and assess CCJDC's progress and implementation efforts with this Decree. The Monitor will provide reasonable notice of any visit or inspection. Advance notice will not be required if the Monitor has a reasonable belief that a Youth faces a risk of serious and immediate harm.

5.     In completing their responsibilities, the Monitor may: (a) request permission to hire Staff as necessary and within the limits of the budget approved, (b) request written reports and data from CCJDC, (c) communicate ex parte with CCJDC Staff, the Sheriff or his staff, or the Courts, as the Monitor deems necessary for providing technical assistance, and (d) communicate ex parte with counsel for either Party from time to time.

6.     The Monitor shall not duplicate the technical assistance provided by the consultants they retain pursuant to this Decree. However, the Monitor may hire any Staff or consultant after

consulting with counsel for the parties, should the Monitor determine that additional technical assistance is necessary for CCJDC to comply with this Decree.

7.      CCJDC will provide the Monitor with a reasonable budget to allow the Monitor to assess compliance and provide technical assistance as described in this Decree. Annually, the Monitor will prepare and submit a detailed budget to CCJDC for its approval. The Monitor shall explain, in writing, the need for any increase to the budget in subsequent years. Any such increase shall be reasonable and proportionate to the described need. The hourly rate of the Monitor shall not change during the first two years of this Agreement.

8.      The cost of the Monitor, including the cost of any approved Staff or consultants to the Expert, will be borne by CCJDC, but the Monitor and his or her Staff or consultants are not agents of CCJDC. All reasonable expenses incurred by the Monitor or any of his or her Staff in the course of the performance of the duties of the Monitor will be reimbursed by CCJDC consistent with the budget based on itemized billing and approval as previously addressed.

9.      The Monitor will not enter into any additional contract with the Plaintiff or CCJDC while serving as the Monitor without providing notification and receiving the consent of both parties.

10.     Initially, six (6) months after the date on which this Decree is executed ("Effective Date"), and thereafter, every twelve (12) months, beginning one year (1) year after the Effective Date and continuing until this Decree terminates by separate Order of this Court, the Monitor will draft and submit to the Court and the Parties a comprehensive report on CCJDC's compliance. The report will rate CCJDC's progress, indicating where CCJDC has achieved substantial or partial compliance, and where CCJDC is in noncompliance with the terms of this Decree. The report will also include recommendations, if any, to facilitate or sustain compliance.

11.     The Monitor will submit the draft report to counsel for the Parties, who will have three (3) weeks to provide comments on each draft Compliance Report, with a copy to the adverse party, before it is finalized. The Monitor will consider these comments and provide a final Compliance Report.  The Court will only receive the final Compliance Report for each reporting period.

12.     If the Monitor resigns from his or her position as Monitor, he or she may not enter any contract with CCJDC or the Plaintiff on a matter related to this Decree without the written consent of the other Party while this Decree remains in effect.


## SECTION II: CLASSIFICATION AND INTAKE

1.     CCJDC will support JDAI efforts in Charleston County, including working with judges, probation officers, prosecutors, defense attorneys, youth advocacy groups, and law enforcement, who may develop and implement standards that limit secure detention to those Youth who represent significant danger to the community. The CCJDC agrees to work with such groups but shall not be responsible for coordinating them or directing them in any way. Plaintiff acknowledges that CCJDC does not have any independent control over limiting secure detention and does not expect or ask that CCJDC be involved in determining which Youth remain incarcerated.

2.     CCJDC's total population and the population per unit will not exceed maximum rated capacity.

3.     CCJDC Youth rooms will not be occupied by more Youth than the rated capacity allows.

4.      If CCJDC's population approaches or reaches its rated capacity, CCJDC will immediately notify the Chief Administrative Family Court Judge, Circuit Solicitor, and Circuit Public Defender of Charleston, Berkeley, and Dorchester Counties.

5.      As part of the classification process, within 72 hours, CCJDC will compile the following information and use it as part of the developed formal classification process to identify the appropriate housing placement for each youth.

      a.      Age;

      b.      Gender;

      c.      History of violent behavior;

      d.      Level of emotional and cognitive development to the extent that such can be determined from interviewing them or from records in the facility's possession;

      e.      Current charges and offense history;

      f.      Physical size and stature;

      g.      Status as limited English proficient and the availability of interpretation services;

      h.      Presence of intellectual or developmental disabilities to the extent that such can be determined from interviewing them or from records in the facility's possession;

      i.      Physical disabilities;

      j.      Presence of mental health needs or history of trauma to the extent that such can be determined from interviewing them or from records in the facility's possession;

k.      The Youth's perception of his or her vulnerability;

l.      Suicide risk and suicidality;

m.      Prior sexual victimization or abusiveness to the extent that such can be determined from interviewing them or from records in the facility's possession [See also JDAI standard II(A)(5)(f)];

n.      Any gender nonconforming appearance or manner or identification as transgender, or intersex; and

o.      Any other specific information about individual Youth that may indicate heightened needs for supervision, additional safety precautions, or separation from certain other Youth (mere affiliation with a gang without more specific information does not qualify unless there are members of known competing or opposing gangs in the facility at the same time).

6.      CCJDC will gather information used for classification through conversations with Youth during the intake process and medical and mental health screenings; during classification assessments; and by reviewing the Youth's charges, prior bookings (if any), National Crime Information Center data (if available), facility behavioral records and other relevant documentation from the Youth's files as available.

7.      As part of the booking process, CCJDC Staff or QMHPs will question Youth in accordance with PREA §115.341 requirements.

8.      When a Youth has sensitive information (such as prior sexual victimization or abusiveness) to disclose, the Youth should be questioned by QMHPs or healthcare providers, if available, to ascertain the information. If in CCJDC's judgment, there is a sense of urgency to obtain such sensitive information, the questioning of the Youth will not be delayed in order to

bring in a QMHP or Healthcare Provider if doing so would require more than two hours.  If the matter is not urgent, an appointment should be made with the Youth and a QMHP or Healthcare Provider as soon as practicable.

9.      CCJDC will make all classification and housing decisions on a case-by-case basis.

10.    CCJDC will not exclude Youth with temporary or permanent mobility impairments from the general population for that reason except by order from a physician

11.    CCJDC will develop and implement policies, procedures and actual practices to ensure that Youth with disabilities receive appropriate accommodations in accordance with the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitative Act of 1973 and any applicable state laws.

12.    In deciding whether to assign a transgender or intersex Youth to a facility or unit for males or females and in making housing and other programming decisions, CCJDC Staff will consider, on a case-by-case basis, whether the placement will ensure the Youth's health and safety, whether the placement will present management or security problems, the Youth's perception of where he or she will be most secure,  any recommendations from the Youth's health care provider and applicable law. Staff will document the reasons for such decisions, and the facility administrator or designee will review each decision. Such decisions will be reassessed at least every 60 days to review Youth's safety and physical and emotional well-being.

13.    A Youth's assertion that they identify as straight, lesbian, gay, bisexual, transgender, intersex or a Youth's gender non-conformity may only be considered as one of multiple factors in considering whether a Youth is or is likely to be sexually abusive or likely to be the victim of sexual abuse.

<u>SECTION III: HEALTH AND MENTAL HEALTH CARE</u>

**A.     MEDICAL SCREENING**

1.     As part of the booking process Youth will receive a medical screening from a Healthcare Provider. Healthcare Providers will conduct the screening in a confidential setting. Only female healthcare providers will conduct the screening for girls.

2.     CCJDC's medical screening will include questions about:

a.     Current medical, dental, and mental health problems or complaints.

b.     Recent injuries or physical trauma.

c.     Current medications needed for ongoing conditions and other special health needs.

d.     Allergies to medicines, foods, insects, and other aspects of the environment, as well as any special health (e.g., dietary needs) restrictions.

e.     Current infectious and communicable diseases, including symptom screening for tuberculosis and other communicable illnesses.

f.     Recent engagement in illegal use of drugs or alcohol, drug or alcohol withdrawal symptoms, and any recent hiding of drugs in the Youth's body.

g.     Current gynecological problems and pregnancies.

h.     Names and contact information for physicians and clinics treating Youth in the community.

i.     The name and contact information of an adult family member or guardian who can provide information about a Youth's health and mental health history, Medicaid and health insurance information, and consent to medical treatment for the Youth, if necessary.

3.      CCJDC's medical screening will include observations of:

     a.     State of consciousness, sweating, or difficulty breathing.

     b.     Signs of recent physical trauma, injuries, or other physical problems.

     c.     Signs of alcohol or drug intoxication or withdrawal.

     d.     Mood, general appearance, awareness of surroundings, difficulties communicating, and other signs of mental health problems or suicide risk, including emotional distress, signs of post-traumatic stress, evidence of self-injury (e.g., cutting), crying, or rocking.

     e.     Physical disabilities, including vision, hearing, or mobility limitations.

     f.     Signs of intellectual, developmental, or learning disabilities.

     g.     Condition of skin, including evidence of trauma, bruises, lesions, jaundice, rash, infestation (e.g., lice, scabies) and needle marks or other indications of drug use.

4.      As part of the medical screen, Healthcare Providers will ask Youth if they have ever had a traumatic brain injury.  If a Youth answers yes and provides information about such injury, Healthcare Provider will document the same. Then, if necessary for diagnostic or treatment purposes, will arrange for appropriate services for Youth with traumatic brain injury.

5.      CCJDC will ensure Youth who are limited English proficient receive screenings by Healthcare Providers and Staff with the assistance of interpretation or translation services through Language Line. CCJDC also will ensure that Youth who are deaf or hard of hearing will be provided a sign language interpreter or interpretation services through Language Line if the Youth uses American Sign Language, to ensure they can be adequately screened.

6.      After medical screenings described above, CCJDC Staff or Healthcare Provider will promptly refer the following Youth for needed services.

7.      Youth who are unconscious, semiconscious, bleeding, mentally unstable, intoxicated, or withdrawing from drugs or alcohol, actively suicidal or self-injurious, report having recently swallowed or ingested illegal drugs, or otherwise in need of urgent care will be refused for booking, and the arresting officer will transport the Youth to a local hospital for evaluation, treatment and clearance for admissions to the CCJDC.

8.      Youth who are identified as having medical needs beyond the ability of the medical staff to assess and treat appropriately on site will be referred for and receive an expedited medical follow-up within 24 hours or sooner if medically necessary.

9.      Youth who have dental pain or other acute dental conditions that may have an adverse effect on the Youth's health will be immediately referred to a dentist who represents they are able to provide prompt dental care.[1] It is acknowledged that the CCJDC does not have control over the dentist or dental provider's schedule.

10.     CCJDC will ensure Youth who acknowledge they are on prescription medications have access to their medications after such prescriptions are confirmed with the either the prescribing provider or filling pharmacy, unless a Healthcare Provider determines that continuing the medication is clinically inappropriate after evaluation of the Youth or consultation with the Youth's treating Healthcare Provider and Youth about the reasons that he or she believes that the medication may be inappropriate. If a Youth's treating Healthcare Provider cannot be located, CCJDC will make best efforts to consult with the Youth's parents if medical staff intends to change

---

[1]If a youth has an acute issue that requires immediate treatment, such individual will not be accepted for booking. The arresting officer is required to take such individuals to a hospital for assessment, treatment and a determination that they are cleared for admission to the facility.

or discontinue the use of a prescription medication. Medication continuity decisions are made through a same-day evaluation by a Healthcare Provider or QMHP licensed to prescribe medications, or sooner if medically necessary.

11.     CCJDC will contract with a Healthcare Provider to provide services to CCJDC Youth. The Healthcare Provider will ensure only such personnel as are authorized by state law and who have been properly trained will be allowed to administer medications.

12.     CCJDC will ensure Youth have immediate access to necessary medications such as asthma inhalers and epinephrine autoinjectors, if medically ordered.

13.     CCJDC will require that Healthcare Providers maintain an adequate supply of easily accessible emergency medications (e.g., auto-epinephrine injectors).

14.     Healthcare Providers and QMHPs will document:

      a.     Disposition of the Youth, such as referral to emergency medical or mental health services, or referral to non-emergency health or mental health services.

      b.     The date and time screenings are completed and the name and title of the person(s) completing the screening.

      c.     Any information provided to facility Staff on the Youth's medical or mental health needs intended to inform housing, programming, or supervision decisions.

15.     The facility will develop and implement written policies, procedures, and actual practices, in conjunction with the Healthcare Provider and QMHP as applicable, to ensure sufficient supervision of Youth identified with potential medical problems (e.g., diabetes, asthma) until such Youth receive full health assessments which occur within seven (7) days. For Youth

who are released after receiving this health assessment and who return within a ninety (90) day period, a new assessment will not be separately conducted, unless the facility is informed of a material change in a Youth's health condition that has occurred since the Youth's immediate prior release.

16.     If Staff identify a serious need for medical or mental health care that a Youth refuses to acknowledge, Staff may submit a request for a referral for the Youth for evaluation by Healthcare Provider or QMHP before the end of their shift. Youth are also able to submit a sick call request without notifying unit staff.

## B.     MENTAL HEALTH SCREENING, ASSESSMENT, AND MENTAL HEALTH TREATMENT PLANNING

1.     A QMHP will conduct an assessment as soon as reasonably feasible after a Youth's detention, but no later than 72 hours of a Youth's detention.

2.     Youth who are identified upon initial screening or at a later date as having experienced prior sexual victimization or who previously perpetrated sexual abuse will be offered a meeting with a QMHP.

3.     Youth identified as needing further evaluation for suicidality[2] will be monitored as set forth below in Section IV.

4.     Subject to review by the Monitor and disclosure to counsel for Plaintiffs, the CCJDC mental health provider shall identify a protocol for appropriate monitoring and evaluation of Youth at risk of suicidality.

5.     The assessment will include making the following determinations based on information reasonably available:

---

[2]"Suicidality" refers to Youth at risk of suicide, usually indicated by suicidal ideation or intent, especially as evident in the presence of a well-elaborated suicidal plan.

a.    Whether the Youth experienced a medical or mental health emergency, or suicide attempt during any prior period of confinement.

b.    Whether the Youth has ever attempted or considered suicide.

c.    Whether the Youth is or has been treated for mental health or emotional problems previously.

d.    Whether the Youth feels like there is nothing to look forward to in the immediate future.

e.    Whether the Youth's physical appearance suggests a risk of suicide, such as evidence of self-injury, crying, or rocking.

f.    Whether the Youth has recently experienced a significant loss (relationship, death of family member/close friend, job, etc.).

g.    Whether the Youth has a family member or close friend who has ever attempted or completed suicide.

h.    Whether the Youth expresses that he or she is thinking of hurting or killing himself or herself.

6.    OMH will develop a standardized mental health treatment protocol for Youth who remain in the facility for more than 30 days from the date of booking or who otherwise are in acute need of mental health intervention.

7.    CCJDC will develop training for Staff on the provision of appropriate interventions for Youth having mental health needs and based upon length of stay.

## C.    MENTAL HEALTH POLICY, SERVICES

1.    CCJDC will ensure a QMHP offers services for Youth with significant existing mental health needs as well as for mental health needs that arise after admission. Services will be provided as medically necessary, will meet the community level of care, and will be tailored to be

appropriate for the length of time the Youth is expected to stay in the facility, acknowledging that Staff has no control over and often no knowledge of the Youth's length of stay. CCJDC may provide these mental health services through SCDMH or a private contractor.

2.     CCJDC will provide access to ongoing mental health services in accordance with a treatment plan determined by the medical and mental health needs of the Youth.  The treatment plan will be prepared at the direction of a QMHP with input from CCJDC staff with knowledge of the Youth's needs and the factors identified below  and should include the following:

     a.    Identification of the mental health needs to be addressed.

     b.    Any medication or medical course of action to be pursued by healthcare and/or mental health providers.

     c.    Planned activities by medical or mental health providers to monitor the efficacy of any medication or the possibility of side effects using standardized measures or checklists.

     d.    A description of any behavioral management plan or strategies to be undertaken and the specific goals of the intervention(s).

     e.    A description of any individual and group counseling and psychotherapy to be provided by medical or mental health providers.

     f.    A determination of whether the type or level of services can be provided in the detention center and, if services cannot be provided, a plan for securing such services or requesting a transfer of the Youth to a different setting.

     g.    A plan for monitoring the course of services, including consultation with the Youth's family members about the Youth's progress if reasonable to do so.

h.    Any necessary modifications to the standard use of force, restraint, and room confinement procedures (e.g., a Youth who has been sexually abused or experienced other trauma may need to be restrained differently than other Youth).

i.    A schedule for the periodic review and, if necessary, modification of the Youth's treatment plan.

3.    If a Youth experiences a mental health emergency, CCJDC will make appropriate arrangements for the delivery of emergency mental health services by a QMHP, or by way of other immediately available services.

4.    CCJDC will provide sufficient service hours of QMHPs to timely meet the needs of Youth in the facility, including scheduled on-site services.

5.    CCJDC will ensure QMHPs have training on and are knowledgeable about the assessment of mental health disorders, trauma, and suicidality among adolescents and age-appropriate interventions.

6.    CCJDC will ensure QMHPs work with direct care Staff and other non-clinical Staff in the facility, providing guidance, insight, and direction on managing the needs and understanding the behavior ,of Youth with disabilities, post-traumatic stress, mental illness, or behavioral health disorders, on a need-to-know basis consistent with the requirements of patient-provider confidentiality.

7.    Therapeutic services will be provided primarily in-person and can be supplemented Telehealth services where necessary after a therapeutic relationship has been established with the Youth and the QMHP.

8.    Psychiatrists or psychiatric physician's assistants will evaluate Youth who are prescribed psychotropic medications shortly after admission, after any change in psychotropic medications and at least every 30 days. Psychiatrists and/or psychiatric physician's assistants will advise other Healthcare Providers and CCJDC Staff, as appropriate consistent with the requirements of patient-provider confidentiality.

9.    CCJDC in collaboration with OMH and the on-site QMHP, will establish mental health policies to align and cross-reference other related policies to create consistency for administrators and Staff.

10.    All new and modified policies related to mental health services shall be reviewed by the Monitor and after approval, be provided to plaintiffs' counsel 30 days prior to Defendant's scheduled final adoption of a new or modified policy.

11.    CCJDC, in conjunction with OMH and the on-site QMHP will develop any necessary additional policies and procedures to govern the provision of a comprehensive behavioral health program for Youth, including mental health appraisals and the development of a meaningful mental health treatment plan where applicable within seven (7) days of appraisal completion. This may require revision of related policies to ensure that terminology aligns with newly developed mental health services policies. The on-site QMHP will clarify the provision of psychiatric care in both CCJDC and other related health care provider policies and ensure that Staff understand these requirements.

12.    CCJDC will collect disaggregated juvenile-specific data on mental health diagnoses, treatment plans, services provided, QMHPs who ordered services, and QMHPs involved in providing services. The quality assurance process for mental health services will include identification of key areas outlined in policy. In addition, if or when the facility develops

new policies and practices to expand the array of mental health services, a mechanism to evaluate the implementation of these changes will be added to the Quality Assurance process.

**D.     MENTAL HEALTH STAFFING**

     1.     CCJDC  has and will maintain a contract for the provision of mental health services through its Healthcare Provider in conjunction with OMH that is designed to meet the needs of the Youth in the facility. The contract will include:

         a.     A child and adolescent trained or experienced psychiatrist or psychiatric Physician's Assistant available on site for at least 10 hours per week.

         b.     Child and adolescent QMHPs consistent with applicable NCCHC staffing standards

     2.     CCJDC will facilitate periodic multidisciplinary treatment team meetings as needed, but on no less than a monthly basis, that is Youth-specific and targets the unique mental health needs of the Youth population. This will include Youth on suicide status, Youth who present with vulnerabilities related to the Prison Rape Elimination Act (PREA), Youth with significant medical needs or with significant behavioral concerns. As a result of the meeting, the healthcare provider, QMHP, and Staff will work collaboratively to develop appropriate individualized behavior management plans for Youth as provided herein.

             **SECTION IV: SUICIDE PREVENTION AND INTERVENTION**

     1.     CCJDC may continue the use of the Ferguson Smock, but smocks and blankets will not be used as a substitute for appropriate monitoring.  The determination of whether a smock or blanket should be used may be made only by a QMHP or, if they are not available and cannot be reached after reasonable effort, a Healthcare Provider. When a question of using a smock or blanket arises in an emergency, Staff should make reasonable attempts to contact the appropriate

2:20-cv-02738-DCN     Date Filed 12/10/25     Entry Number 59     Page 22 of 48

QMHP via radio or in person before placing the Youth in the smock or blanket. When due to a QMHP's unavailability, a Healthcare Provider makes a decision to place a Youth in a smock or blanket, the QMHP on-call will review the decision as soon as reasonably practicable and determine whether the use of the smock or blanket should continue or be discontinued.

2.      For Youth being monitored for active suicidality, a Staff Member will be assigned to constantly supervise the Youth in the medical unit. Youth monitored at staggered intervals, not to exceed fifteen (15) minutes, will be observed in the medical unit. CCJDC, in collaboration with a QMHP, will create a protocol to appropriately monitor Youth who are on various levels of suicide status to ensure they are physically safe. The QMHPs will work directly with Youth to develop short and long-term treatment strategies for Youth on suicide status.

3.      A QMHP will provide Youth at risk of suicide or self-harm individual mental health services designed to assist them in developing appropriate strategies to reduce the risk of self-harm to the extent the Youth is willing and able to participate.

## SECTION V: EDUCATION

A.      EDUCATION

1.      CCJDC in cooperation with CCSD will ensure Youth are afforded the opportunity to attend school at the earliest practical time but no later than three school days after admission to CCJDC.

2.      CCSD will assign a school guidance counselor to manage transfer of all student records, transcripts, education intake evaluation, and coordination of special/educational services and 504 plans.

3.      CCSD will request a Youth's educational records from his or her prior school, when applicable, including Individual Education Program (IEP) and 504 plans, within 24 hours or the

next business day after, the Youth's first court appearance following admission to CCJDC, whichever is later.

4.     Within five days of a Youth's attendance at the school program following admission to CCJDC, CCSD staff will determine whether a comprehensive assessment of a Youth's general educational functioning is necessary to facilitate placement in an appropriate program. The assessment may include data from multiple sources, including standardized tests, informal measures, observations, student self-reports, parent reports, progress monitoring data, and educational records from the Youth's prior school. For Youth eligible for services under the IDEA or Section 504, any such assessment shall be conducted in accordance with the applicable statutory and regulatory requirements.

5.     CCJDC's school program will comply with state and local education laws governing the minimum number of minutes in a school day and ensures that each student is offered the required number of minutes of educational instruction. Detention Staff ensure that procedures to move Youth to and from their educational program do not interfere with the minimum number of minutes in a school day.

6.     CCJDC's school program will operate on the same calendar as the Charleston County School District schools, including summer sessions. The facility will attempt to provide additional elective and special activities for programming during breaks and school holidays. Youth eligible for services under the IDEA will continue to be eligible for extended school year education services as determined by their IEP teams.

7.     CCSD, with cooperation from CCJDC, will hold classes in dedicated classrooms with appropriate spacing and furniture to allow for flexible arrangements to support varying modes of instruction and student work.

8.      CCSD, in cooperation with CCJDC, will have an adequate number of school staff members available to meet Youth's educational needs. Teacher-student ratios will comply with state law and regulations. CCSD will timely replace teachers who retire or transfer. Instructional staff provided by CCSD will be qualified and hold appropriate credentials, including any specialized credentials necessary for providing special education programming or instruction for limited English proficient (LEP) Youth.

9.      CCJDC will coordinate with CCSD to develop a plan to assure timely and complete staffing of CCSD classes and educational services.

10.     CCDJC will work with CCSD to provide ongoing training and coaching to educators and detention Staff to support education quality.

## B.     SPECIAL EDUCATION AND YOUTH WITH SPECIAL NEEDS

1.      CCSD will assign a  staff member to manage scheduling of IEP meetings, FBAs, and BIPs.

2.      CCJDC will provide video conferencing technology to enable attendance by stakeholders (e.g., CCSD teachers, parents, Youth) at IEP, FBA, and BIP meetings.

3.      CCJDC will provide a special education or resource area for individualized, direct, or one-on-one instruction as indicated in student's IEPs if requested by CCSD.

4.      CCJDC will request assignment of CCSD individuals, as needed, to provide behavioral, psychological, speech and other support services prescribed in student's IEPs.

5.      CCSD will establish regular communication between CCSD teachers and detention Staff to review BIPs and other support and services outlined in student's IEPs.

## SECTION VI: PROGRAMMING

**A.      GENERAL PROGRAMMING**

1.      CCJDC will ensure Youth are permitted to come out of their rooms except during sleeping hours and for brief periods of transition, such as shift changes, unless there are issues with "keep separates" such that they cannot both be out at the same time or for the safety and security of the facility. For the majority of time that Youth are out of their rooms, Youth will be offered recreational, cultural, or educational activities. Staff will provide Youth with some unstructured free time as well.

2.      CCJDC will offer structured programming, for a period of time between the end of the school day  and when youth go to bed and on weekends. Programming will include an appropriate mix of recreational, self-improvement and leisure activities. The programming will be designed to support positive behavior, engage youth in constructive activity and address general health and mental health needs, but is somewhat dependent on volunteers from the community to provide programming. Youth will also be provided some unstructured time.

3.      CCJDC shall develop and provide opportunities for exercise which includes at least one hour of large muscle exercise at least several times a week, including weekends, and daily if possible based on staffing.  Outdoor recreation will be provided, staffing and weather permitting.

4.      CCJDC will provide equivalent gender-responsive programming for female and male Youth at CCJDC to the extent reasonably feasible dependent on opportunities and providers available. CCJDC will not limit access to recreation and vocational opportunities on the basis of gender. "Equivalent" does not mean that programming for males and females is identical, but that male and female Youth have reasonable opportunities for similar activities and an opportunity to participate in programs, physical activities, and recreational opportunities of comparable quality.

5.      CCJDC has an agreement with the Charleston County Library who provides books for the CCJDC library. Youth may make requests for specific books or types of books they would like to have available (e.g., current events, history, mysteries, athletics). The Library will follow the CCSD policies on acceptable reading materials (outside of the educational program). If a book is permitted into the facility by CCSD and the Charleston County Library it may be specifically reviewed and declined by the Captain or Major.  If declined, a written reasoning shall be prepared setting forth the name and rank of the staff member who reviewed it and the basis upon which the decision to decline was made.  CCJDC will have a library that contains reading materials that are geared to the diverse reading levels, interests, gender, sexual orientation, socio-economic, cultural, racial, and ethnic backgrounds, experiences, and primary languages of confined Youth based on availability from the Charleston County Library.

6.      CCJDC will allow Youth to keep reading materials in their rooms. CCJDC will allow Youth to access the library at least once per week.

7.      CCJDC will create opportunities for Youth to gather for religious services and plan non-religious activities for those who do not want to participate in religious services. This will be dependent on religious services providers volunteering their time to provide such services. CCJDC will provide access to clergy from different faiths, as possible based on the population in the CCJDC, the desire to attend such services by the Youth and the availability of such providers in the community.

**B.      PROGRAMMING FOR YOUTH WITH SPECIAL NEEDS**

1.      CCJDC will maintain its written policies, procedures and actual practices that prohibit discrimination based on disability in the provision of programs and services.

2.     CCJDC will ensure Youth with disabilities have an equal opportunity to participate in or benefit from all aspect of the facility's programs, activities, and services consistent with applicable disability rights laws and regulations.

3.     CCJDC will provide written materials in formats or through methods that ensure effective communication with Youth with disabilities, including Youth who have intellectual or developmental disabilities, limited reading skills, or who are blind or have low vision.

4.     CCJDC will designate a person with the necessary knowledge and experience to ensure that the legally required accommodations are made for Youth with disabilities.

5.     CCJDC will review and modify policies and practices regarding special needs Youth to ensure effective communication with Youth with disabilities, including Youth who have intellectual or developmental disabilities and Youth who are hearing-impaired or blind.

6.     Youth with physical disabilities will have the opportunity to participate in recreational activities. CCJDC will make modifications to recreational activities or provide aids to allow Youth with disabilities to participate in activities alongside Youth without disabilities, except in the rare circumstance when doing so would fundamentally alter the nature of the program. When it is not possible for Youth with physical disabilities to participate in regularly scheduled recreation activities, the Staff will provide alternative recreational opportunities that are equal in the potential challenge and benefit for the Youth with the disability as those offered to Youth without disabilities.

7.     CCJDC will make appropriate auxiliary aids and services available for Youth who are deaf or hard of hearing in all areas of programming and services, including intake, medical and mental health services, educational and recreational programming, and discipline. CCJDC will give  consideration to the Youth's request for particular types of auxiliary aids or services.

8.      CCJDC will primarily utilize UbiDuo or a local law enforcement officer to provide sign language interpretation for Youth whose primary means of communicating is sign language.

9.      Televisions or other audio-visual equipment for recreational or other purposes will have the built-in capability to display captions, or Staff make closed captioning decoders available to Youth who are deaf or hard of hearing.

10.     CCJDC will create a language access policy that outlines who will be responsible for identifying the needs of limited English proficient Youth and determining how to meet those needs. The language access policy will prohibit using other Youth as interpreters. Language Line will be the primary tool for limited English proficient Youth.

## SECTION VII: BEHAVIORAL MANAGEMENT

1.      CCJDC will develop a Behavior Management System (BMS) that focuses on certain, immediate, proportionate, fair, and individually tailored incentives for positive behavior and repercussions for negative behavior, generally geared at U violations, but also applicable to more physically violent behavior and/or behavior that damages physical property.

2.      CCJDC will revise its handbook for Youth to describe the BMS in a visually accessible and developmentally appropriate format.

3.      CCJDC will incorporate positive recognition, verbal and otherwise, as a regular part of the BMS. The BMS will include a list of possible incentives on materials posted in the living units which are readily visible to Staff.

4.      CCJDC will establish positive BMS tools to encourage compliance with facility rules by providing positive incentives, including both short and long-term incentives. CCJDC will consistently implement the BMS tools.

5.      CCJDC will provide staff with de-escalation strategies and a graduated array of responses and sanctions, other than to use force or room confinement, to employ as part of the BMS. This system will also include consequences for negative behaviors.

6.      CCJDC will train Staff on how to implement the BMS, as well as the established reasons to adopt the BMS.

7.      CCSD will support Positive Behavioral Interventions and Supports in the facility school program. The school program will be consistent with a facility-wide BMS and focus on enabling Youth to achieve preferred activities in response to positive behaviors.

8.      This is not intended to prevent Staff from exercising appropriate, discipline consistent with this Consent Order, as needed, to address violations of rules.

9.      CCJDC will develop standard procedures for tracking and reporting of Youth conduct.  This will include incident reports that document in detail the actions  of Youth and Staff before, during, and after incident.

## SECTION VIII: TRAINING AND SUPERVISION OF EMPLOYEES

### A.      QUALIFICATIONS AND STAFFING

1.      The Monitor will review the CCJDC staffing plan to determine whether it is adequate to achieve its operational responsibilities, including those to which it commits in this Consent Order.  CCJDC will review the plan at least annually. The staffing plan will include a replacement factor that accurately accounts for Staff training, foreseeable vacancies, Staff vacation, family and medical leave and other absences. The plan will provide sufficient Staff to avoid involuntary double-shifts and mandated overtime as possible. As the facility routinely relies upon mandated overtime, administrators will continue to work to hire additional staff to help alleviate such requirements. to address the problem. (See additional detail on PREA compliance

at 28 CFR §§ 115.313(a)). Direct care Staff will be stationed inside living units where they can directly see, hear, and speak with Youth. Units with individually housed Youth will also be monitored through the Control room where officers have view of the unit through both windows and video monitors.

2.    CCJDC will have adequate Staff to provide required direct supervision of Youth during times when some Staff are in other areas of the facility, such as the visitation area.

**B.    TRAINING**

1.    CCJDC will implement "Trauma Informed Training" for Staff in the first 12 months of this Consent Decree.

2.    As training is generally provided by the South Carolina Criminal Justice Academy (SCCJA), CCJDC will request the SCCJA to develop and implement effective training curricula.

3.    CCJDC will work with the SCCJA to implement a suicide prevention training that includes information about risks that are specific to detained adolescents. Training materials will reflect best practices in juvenile detention settings.


**SECTION IX: QUALITY ASSURANCE**

1.    CCJDC will  engage in a quality assurance program for conducting a reasonable review of various aspects of facility operations

2.    CCJDC will implement a Quality Assurance system, to track measures such as the duration, manner, timeliness, and effectiveness of mental health services to the extent possible.

3.    At least two weeks before the adoption of any such policy, CCJDC will provide Plaintiff the Quality Assurance system policy for its review and comment.

4.    CCJDC will schedule weekly meetings between detention administrators and Staff to support and exchange information and reinforce appropriate facility culture Administrators will

also track and review discipline, assault, use of force and room confinement information based on date, time, Staff, Youth, gender, age, and race.

.

## SECTION X: CROSS GENDER PRIVACY

1.      Officers of the opposite sex of the Youth, shall not be on the unit of open bay units during times when Youth are expected to be changing clothing (i.e. morning after wake up and before school; nighttime when preparing for bed).  Anytime a Youth needs to change clothes, they are instructed to use the bathroom  for privacy.


## SECTION XI: YOUTH WITH PHYSICAL HANDICAPS

1.      CCJDC will have sleeping rooms  for Youth with limited mobility. Such rooms will contain the following features:

      a.      Doorways that are wide enough to permit entry by Youth in a wheelchair.

      b.      Floor space that permits movement about the sleeping room and access to each of the room's features.

      c.      A desk with space for use by a Youth in a wheelchair

      d.      Grab bars that are designed with adequate gripping surfaces while ensuring that nothing can be tied onto them.


## SECTION XII: RESTRAINTS AND USE OF FORCE

1.      CCJDC will prohibit the use of a Restraint Chair for Youth  except under the following circumstances:

      a.      for medical reasons as determined by a Healthcare Provider or QMHP;

b.      to prevent ongoing or immediate attempts at self-mutilation or self-harm or for a Youth who is actively causing physical injury to others;

c.      for Youth who refuse a strip search especially if staff finds contraband or suspects that contraband is hidden on the Youth's person.

d.      For Youth who are physically combative with staff.

2.      Youth will be released from the Emergency Restraint chair when a Healthcare Provider or QMHP determines that it is no longer necessary to prevent such activities.

3.      The CCJDC will continue the following policies which it represents are currently in place:

a.      The chair is never to be used for punishment or to address behavior that is not present and ongoing.

b.      Youth should never be confined in the chair without being directly and personally  visually monitored in person by a member of the Staff.

c.      If the Youth appears to be in physical distress, he or she shall be released immediately from the chair by any QMHP or Staff.

d.      If the Youth shows no ability to gain personal control after a prolonged period, but no more than thirty minutes, the Healthcare Provider or QMHP will confer with a QMHP or Healthcare Provider to determine whether a transfer of the Youth to a hospital is medically necessary.

e.      The Restraint Chair will remain in the medical unit and any Youth who is placed in the chair will be held in the medical unit until released from the chair.

4.     CCJDC will use, and to the extent necessary develop, approved written policies, procedures, and actual practices to prohibit:

a.     use of any kind of restraint device other than handcuffs or belly belts/chains and leg shackles during transportation.

b.     use of chemical or medical restraints unless determined necessary by a physician and in a hospital setting.

c.     hitting Youth with a closed fist, throwing Youth into a wall or the floor, kicking or striking Youth, pulling a Youth's hair, or using chokeholds or blows to the head on Youth.

d.     use of four- or five-point restraints or straightjackets, outside of the restraint chair as addressed in paragraph XII.1.

e.     hogtying Youth or placing Youth in restraints in other uncomfortable positions.

f.     restraint of Youth to fixed objects, including beds or walls.

g.     restraint of Youth in a prone position (beyond a temporary position for purposes of handcuffing) and putting pressure on the Youth's back or restraining Youth in a position that may restrict their airway.

h.     use of physical force or mechanical restraints for punishment, discipline, or retaliation.

5.     CCJDC will take reasonable steps to minimize and to the extent feasible, avoid or eliminate the following uses of force:

a.     The use of weapons such as tasers, which may only be carried by supervisory staff under current policies;

      b.      The use of chemical agents, i.e. OC Spray.

      c.      The use of pressure point control techniques at the facility.

6.      This consent decree expressly does not address the abilities of the (ERT) to respond to any law enforcement emergency that may occur inside the facility or involving any Youth inside or outside the facility, while on the property.

7.      CCJDC will not use belly belts/chains except as necessary (to be determined on a case by case basis) for transportation to court, the hospital, or another correctional facility.

8.      CCJDC Staff will ensure that all Youth subjected to use of force or restraint incident see a Healthcare Provider within one hour of the use of physical force or restraint, unless the restraint takes place outside the facility (i.e. court). Then the Youth will be seen upon return to the facility.

9.      CCJDC Staff will make reasonable attempts to notify the Youth's parents or guardians (or guardian ad litem) using their last known contact information and the Youth's attorney of all uses of force that require medical treatment by the end of the next business day following the event involving the Youth. In the case of Youth with disabilities or a documented serious mental illness diagnosis, as determined by OMH, the facility will provide written notice to Disability Rights South Carolina within 24 hours of any use of force requiring medical treatment.

10.      CCJDC will document all Use-of-Force incidents, including:

      a.    Name of Youth.

      b.    Date and time force was used on Youth.

      c.    The person giving prior authorization for the Use of Force, if any.

      d.    A description of the circumstances leading up to the Use of Force.

      e.    The Staff involved in the incident.

       f.    Any Youth or Staff witnesses.

       g.    If alternative actions or de-escalation techniques were attempted and found unsuccessful, identify the same.

       h.    The type of physical force or restraints used and a description of how they were applied.

       i.    Referrals or contacts with Healthcare Provider and QMHPs, including the date and time such persons were contacted.

11.    On site QMHPs for CCJDC will review incidents, discipline, and room confinement of more than four hours for Youth under their care to evaluate the effectiveness and appropriateness of behavioral management techniques and Staff's response to Youth behavior. QMHP's will offer feedback on needed adjustments to care plans for Youth and offer feedback for Staff on how to manage the behaviors of Youth.

## SECTION XIII: ROOM CONFINEMENT

1.    CCJDC will utilize their written policies, procedures, and practices which include the following:

       a.    Staff only use room confinement as a temporary response to behavior that threatens immediate harm to the Youth or others. Staff may use room confinement when a Youth is engaging in property destruction that threatens immediate harm to the Youth or others.

       b.    Staff shall never use room confinement for administrative convenience (except for shift change or temporary documented emergency measures),

retaliation, staffing shortages, or reasons other than a temporary response to behavior that threatens immediate harm to a Youth or others.

c.    Prior to using room confinement, Staff will make reasonable efforts to use less restrictive techniques, including talking with Youth to de-escalate the situation and bringing in Staff, QMHPs, or other Youth to talk with the Youth. Prior to using room confinement or immediately after placing a Youth in room confinement, Staff will explain to the Youth the reasons for the room confinement, the fact that the length of confinement can be extended for serious misconduct, and  the fact that he or she will be released upon regaining self-control.

d.    Staff will secure the approval of a unit supervisor if the length of time in room confinement exceeds what was originally given, provided the reason and the additional length of time is documented in the Youth's file

e.    A clear description of how and when to involve Healthcare Providers and/or QMHPs.

f.    A clear description of the expectations for in-person visits of Youth in room confinement by Healthcare Providers and/or QMHPs, supervisors, and administrators.

g.    Staff will develop a plan that will allow Youth to leave room confinement and return to programming when they have met the previously set forth requirements for release from room confinement.

       h.     CCJDC will provide the Monitor and Plaintiffs with the policies, procedures, and plans identified in this section at least two weeks before their adoption for review and comment.

2.     CCJDC will not use placement in room confinement as a sanction for a single "U" violation or other minor misbehavior, though it may be used for habitual "U" violations or continual minor rule violations that are not being corrected with other means.

3.     CCJDC will use the BMS to address rules violations.

4.     If Youth require room confinement for a limited period of time, that confinement will be in a lockdown room in the living unit.

5.     Youth in room confinement will have reasonable access to water, toilet facilities and hygiene supplies.

6.     CCJDC will not place Youth in room confinement for a set time longer than four (4) hours. After four hours, if a youth is not prepared to return to the general population, a QMHP will be consulted about the youth, and the QMHP must agree to the reasonableness of extending the room confinement. Otherwise, Staff will permit the Youth to return to the general population.

7.     If at any time during room confinement, a Healthcare Provider or QMHP believes the level of crisis service needed is not available in the current environment, CCJDC will transport or request EMS to transport the Youth to a location where those services can be obtained (e.g., medical unit of the facility, hospital).

8.     QMHPs will review room confinement longer than four hours and documentation of the use of room confinement for a Youth that occurs more than 4 times in a thirty day period and report such reviews to the Monitor and the CCJDC facility director. The Monitor will provide such reports to counsel for the Parties.

9.      CCJDC will create an incident report regarding all incidents in which a Youth is placed in room confinement, including:

      a.      Name of the Youth.

      b.      Name of the Youth.

      c.      The date and time of placement in room confinement.

      d.      Date and time the Youth was placed in room confinement.

      e.      The Staff making the decision to use room confinement.

      f.      Documentation of required checks of Youth at regular but staggered intervals, including the Youth's behavior and temperament at each interval.

      g.      Date and time the Youth was released from room confinement.

      h.      Description of the circumstances leading to the use of room confinement.

      i.      The alternative actions attempted and found unsuccessful, or reason alternatives were not possible.

      j.      Referrals and contacts with qualified healthcare  provider and QMHPs, including the date, time and person contacted if the same were determined to be necessary.

10.     The Facility administrator or his or her designee will review the use of room confinement one or more times per week to ensure that Staff only use it as a temporary response to behavior that threatens immediate harm to the Youth or others. The facility administrator or his or her designee will maintain a file in his or her office (or on a facility computer) for at least one year after the incident, of reports on all incidents in  which Youth are placed in room confinement for more than 4 hours or for more than four periods of confinement during any 30-day period.

11.    Staff will not use room confinement as a substitute for individualized programming. Individualized programming includes one or more of the following:

      a.    Development of an individualized plan to improve the Youth's behavior, created in consultation with the Youth, security staff, social worker, mental health Staff and the Youth's family members.

      b.    Attempts to identify the causes and purposes of the negative behaviors, to the extent possible as well as concrete goals that the Youth understands and that he or she can work toward to be removed from special programming.

      c.    In-person supervision by and interaction with Staff members, subject to Staff availability.

      d.    In-person provision of educational services.

      e.    Involvement of the Youth in other aspects of the facility's programming unless such involvement threatens the safety of Youth or Staff or the security of the facility.

      f.    Daily review with the Youth of his or her progress toward the goals outlined in his or her plan.

12.    CCJDC facility administrators and QMHPs will have a mechanism for identifying Youth who receive more than four periods of room confinement within 30 days and work to develop strategies to try to reduce the use of room confinement for those Youth.

## SECTION XIV: DUE PROCESS IN DISCIPLINE

1.    If the violation is a criminal offense, outside law enforcement may be brought in. Otherwise, the Disciplinary Board will hear and consider rules violations that qualify for a hearing.

2.    Facility discipline will be separate from any criminal investigation that may result in additional criminal charges. Such criminal investigation will be undertaken by the Sheriff's Office and/or SLED.

3.    Youth who are in room confinement lasting more than six hours resulting from a single event or who are given more than four room confinements of greater than four hours in a 30-day period, shall be seen by mental health and shall receive a disciplinary hearing prior to any additional room confinement.

4.    Youth charged with a major rule violation who have been diagnosed by a QMHP with a serious mental illness as determined by OMH will be interviewed by a QMHP to determine the extent to which the rules violation was related to the Youth's mental illness and, if it were, to make recommendations to the Disciplinary Board concerning appropriate actions in the best interests of the Youth. If the disciplinary panel determines that because of their mental illness, the Youth should not be held responsible for the rules violation, the Youth will not be punished for the offense and such reasoning will be fully documented. Youth who commit major rule violations and have a diagnosed serious mental illness so severe that they should not be disciplined for their offenses, will be transferred out of the facility to either an OMH facility, MUSC, or another appropriate mental health care facility or, only if necessary, a DJJ facility.

## SECTION XV: GRIEVANCES

1.    Youth will have access to a grievance system that does not require them to report to any specific officer. Generally, this will be a kiosk system or through the use of a tablet. Grievances will be responded to by staff within the time periods set forth in policy.

2.     Charleston County Sheriff's Office Professional Standards Division will conduct a regular bi-monthly review of grievances to identify areas of concern in facility operations, Staff who are commonly cited in grievances, particular issues in specific units, and the amount of time between filing a grievance and getting a response and will be responsible for addressing any such issues with the facility director and/or other command staff members.  Grievance reports will be provided on a monthly basis to the Monitor, who will include a review of such grievances in his reporting to counsel for the parties.

## SECTION XVI: ENFORCEMENT AND TERMINATION

1.     The Parties agree simultaneously to file this Decree as an exhibit to a joint motion to dismiss Plaintiff's Complaint, pursuant to Fed. R. Civ. P. 41(a)(2), subject to reinstatement upon Plaintiff's motion for the purpose of resolving a claim that CCJDC or CCSD materially breached any provision of this Decree. The motion to dismiss the Complaint shall request that the Court retain jurisdiction to resolve any dispute under this Decree.

2.     After attempting to resolve any dispute regarding an alleged breach of this Consent Decree or otherwise through discussions with the Monitor, meetings with the parties and/or mediation, Plaintiff may move to restore the Complaint to the active docket of the Court for purposes of resolution of a claim of breach. If the Action is reinstated within 2 years of the date of dismissal, CCJDC expressly agrees not to count the time during which this Decree is in place, or use the terms or existence of this Decree, to plead, argue or otherwise raise any defenses under theories of claim preclusion, issue preclusion, statute of limitations, estoppel, laches, or similar defenses.

3.      Before moving to restore the Complaint to the active docket, Plaintiff will provide CCJDC, CCSD, and the Monitor notice of any asserted breach in writing and shall engage in good faith discussions with the Parties and the Mediator to resolve the dispute. For conditions or practices that are alleged to pose an immediate and serious threat to the life, health, or safety of Youth, CCJDC will have seven (7) days from the date of notice to respond to the allegation. For all other conditions or practices, CCJDC will have sixty (60) days from the date of notice to respond. The notice, with a request for confirmation of receipt, will be sent by email to the Parties or their successors and their attorney of record as well as the Monitor.

4.      In the event Plaintiff reinstates the Action and the Court finds a material breach of this Decree, Plaintiff may seek the following: (1) an order mandating specific performance of any term or provision in this Decree; or (2) any additional relief that may be authorized by law.

5.      Except where otherwise agreed to under a specific provision of this Decree, CCJDC will implement all provisions of this Decree within three (3) years of the effective date.

6.      This Decree shall terminate in three (3) years if the Monitor determines that CCJDC has attained substantial compliance with all provisions. "Substantial compliance" means the Monitor has concluded that CCJDC has achieved and has sustained for at least 12 consecutive months compliance with the requirements of the Decree. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance.

7.      The Parties are ordered to work collaboratively to achieve the purpose of this Decree. In the event of any dispute over the language, requirements, or construction of this Decree, the Parties shall meet and confer to achieve a mutually agreeable resolution.

Any modification of this Decree must be approved by Order of Court.

## <u>SECTION XVII: GENERAL PROVISIONS</u>

1.      This Decree is binding on all successor Sheriffs and Jail Directors of the Charleston County Sheriff's Office and on CCSD to implement the terms of this Decree. To the extent that any paragraph in this Decree becomes inconsistent with  federal law due to a change in the law, the parties or the Monitor will notify each other of the discovery.  If, based on such discovery, a party intends to notify the Court of such reported change, the party will give the other party 15-days notice of its intent to file such disclosure.

2.      Failure by any Party to comply with this Decree or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver, including of its right to enforce other deadlines and provisions of this Decree.

3.      The Parties represent and acknowledge this Decree is the result of extensive, thorough, and good faith negotiations. The Parties further represent and acknowledge that the terms of this Decree have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of the allegations set forth in Plaintiff's Complaint.

4.      The Parties will promptly notify each other of any court or administrative challenge to this Decree or any portion thereof.

5.      The Parties represent that, as of the effective date of this Decree, litigation is not "reasonably foreseeable" concerning the matters described in this Decree. To the extent that any Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in this Decree, the Party is no longer required to maintain such a litigation hold. Nothing in this paragraph relieves any Party of any other

obligations imposed by this Decree, including the document creation and retention requirements described herein.

6.     CCJDC will maintain sufficient records and data to document that the requirements of this Decree are being properly implemented and will make such records available to the Monitor and Plaintiff for inspection and copying on a reasonable basis. Such action is not intended, and will not be construed, as a waiver, in litigation with third parties of any applicable statutory or common law privilege associated with such information. Other than to carry out the express functions as set forth herein, the Plaintiff and the Monitor will hold information designated as confidential in strict confidence, except as provided by law.

7.     This decree shall not be relied upon or admitted as evidence in any third party litigation involving the CCJDC, other than by Plaintiff in this action for the purpose of enforcing this Agreement.

8.     The performance of this Decree will begin immediately upon the effective date.

9.     Plaintiff has alleged causes of action alleging violations of the Eighth and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983. Attorneys' fees are available to the prevailing party in a § 1983 action pursuant to 42 U.S.C. § 1988(b) and (c). Plaintiff has also alleged violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182 *et seq.* Under the ADA, the Court may allow the prevailing party reasonable attorneys' fees, including expenses and costs. 42 U.S.C.A. § 12205. Plaintiffs have also alleged causes of action under the Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq.* Attorneys' fees are available for a prevailing plaintiff under the IDEA. 20 U.S.C. § 1415. Plaintiff asserts that it is the prevailing party under each of these federal statutes and therefore is entitled to receive reimbursement for reasonable attorneys' fees, as well as costs and expenses. Defendants

reserve the right to challenge the petition both legally and factually. Plaintiffs are to submit appropriate petitions and briefing pursuant to the Federal Rules of Civil Procedure. The parties agree to try to mediate the fee issue prior to any hearings being set.

10.     Jurisdiction is retained to enter any further orders that are necessary and proper, including, without limitation, all post-judgment orders that may be necessary to enforce the terms and conditions of this Consent Decree.

**AND IT IS SO ORDERED.**

_____
David C. Norton
United States District Judge

December 10, 2025
Charleston, South Carolina

WE CONSENT: (*signature blocks on following pages*)

**NELSON MULLINS RILEY & SCARBOROUGH LLP**


By: _S/ Robert H. Brunson_

Robert H. Brunson
Federal Bar No. 4971
E-Mail: robert.brunson@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC  29401-2239
(843) 853-5200


**BURNETTE SHUTT MCDANIEL**


By: _S/ Stuart Andrews_

Stuart Andrews
Federal Bar No. 1099
E-Mail: Sandrews@burnetteshutt.law
912 Lady Street / 2nd Floor
PO Box 1929 Columbia, SC 29202
(803) 850-0912

     -and-

**ANNIE ANDREWS  LLC**


By: _S/ Annie Elizabeth Andrews_

Annie Elizabeth Andrews
Federal Bar No. 13134
E-Mail: Annie@andrewslawfirm.com
1501 Belle Isle Avenue, Suite 110
Mount Pleasant, SC 29464
(843) 888-1515

_Attorneys for Plaintiff_

**SENN LEGAL, LLC**

By:____S/ *Robin L. Jackson*_____

Robin L. Jackson
Federal Bar No. 7465
3 Wesley Drive (29407)
P.O. Box 12279
Charleston, SC 29422
Phone: 843-556-4045
Robin@sennlegal.com

*Attorney for Charleston County Sheriff Defendants*

**HALLIGAN MAHONEY WILLIAMS SMITH FAWLEY & REAGLE, PA**

By:____S/*John M. Reagle*_____

John M. Reagle
Federal Bar No. 7723
Dwayne T. Mazyck
Federal Bar No. 9026
PO Box 11367
1301 Gervais Street, Suite 1400
Columbia, SC 29211-1367
Phone: 803-254-4035 / Fax: 803-771-4422
jreagle@hmwlegal.com
dmazyck@hmwlegal.com

*Attorneys for Charleston County School District*

TABLE OF CONTENTS

|  | TERMS AND DEFINITIONS | 3 |
|---|---|---|
| I. | SUBJECT MATTER EXPERT/MONITOR | 6 |
| II. | CLASSIFICATION AND INTAKE | 8 |
| III. | HEALTH AND MENTAL HEALTH | 12 |
| III.A. | Medical Screening | 12 |
| III.B. | Mental Health Screening, Assessment And Mental Health Treatment Planning | 16 |
| III.C. | Mental Health Policy, Services | 17 |
| III.D. | Mental Health Staffing | 21 |
| IV. | SUICIDE PREVENTION AND INTERVENTION | 21 |
| V. | EDUCATION | 22 |
| V.A. | Education | 22 |
| V.B. | Special Education and Youth with Special Needs | 24 |
| VI. | PROGRAMMING | 25 |
| VI.A. | General Programming | 25 |
| VI.B. | Programming for Youth with Special Needs | 26 |
| VII. | BEHAVIORAL MANAGEMENT | 28 |
| VIII. | TRAINING AND SUPERVISION OF EMPLOYEES | 29 |
| VIII.A. | Qualifications and Staffing | 29 |
| VIII.B. | Training | 30 |
| IX. | QUALITY ASSURANCE | 30 |
| X. | CROSS GENDER PRIVACY | 31 |
| XI. | YOUTH WITH PHYSICAL HANDICAPS | 31 |
| XII. | RESTRAINTS AND USE OF FORCE | 31 |
| XIII. | ROOM CONFINEMENT | 35 |
| XIV. | DUE PROCESS IN DISCIPLINE | 39 |
| XV. | GRIEVANCES | 40 |
| XVI. | ENFORCEMENT AND TERMINATION | 41 |
| XVII. | GENERAL PROVISIONS | 43 |
|  | Table of Contents | 48 |