**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Protection and Advocacy for People with Disabilities, Inc., | ) | Civil Action No. 2:20-cv-02738-DCN |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S MOTION FOR** |
| vs. | ) | **ATTORNEYS' FEES, COSTS, AND** |
| | ) | **EXPENSES** |
| James Alton Cannon, Jr., in his official | ) | |
| capacity as Charleston County Sheriff, | ) | |
| Mitch Lucas, in his official capacity as | ) | |
| Assistant Charleston County Sheriff, Willis | ) | |
| Beatty, in his official capacity as Chief | ) | |
| Deputy of Charleston County Sheriff's | ) | |
| Office, and Charleston County School | ) | |
| District, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, Local Civil Rule 54.02, and 42 U.S.C. §§ 1988(b)–(c), and 12205, Plaintiff Protection and Advocacy for People with Disabilities, Inc. (now, "Disability Rights SC") ("Plaintiff"), as the prevailing party in this case, hereby moves for an award of attorneys' fees and costs incurred through December 10, 2025 (the date of the Consent Decree), in the total amount of $928,918.53.[1]

## STATEMENT OF FACTS

Plaintiff initiated this civil rights action five years ago to redress the dangerous, inhumane, and unconstitutional conditions, polices, and practices that existed for the youth detained at the Charleston County Juvenile Detention Center (the "CCJDC"), including youth with disabilities (the "Youth"). (ECF 1). In its July 25, 2020 complaint ("Complaint"), Plaintiff

---

[1] Pursuant to Local Civil Rule 7.04, a full explanation of the motion is provided herein, and, accordingly, a separate supporting memorandum would serve no useful purpose.

sought declaratory and injunctive relief against Defendants on the grounds that Defendants deprived the Youth of the rights secured to them by the Eighth and Fourteenth Amendments of the United States Constitution, as enforced by 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182 *et seq.*, the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*, the Individuals with Disabilities Education Act ("IDEA"), Title 20 United States Code §§ 1401 *et seq.*, and other relevant provisions of federal and state law. (ECF 1).

Since then, Plaintiff's counsel have—*pro bono*—fought tirelessly to obtain a Consent Order that achieves all material goals of the litigation by requiring that Defendants bring the living conditions of these pre-trial detained juveniles into compliance with constitutional and statutory minimums. Plaintiff's counsel take great pride in their ability to achieve the fantastic results they did in this case.

While this case has only fifty-nine prior docket entries, that metric alone does not remotely reflect this case's factual and legal complexity, the magnitude of its public importance, or the true volume of work required along the way. A large portion of the work on this case occurred before Plaintiff ever filed its Complaint. Filing a lawsuit on behalf of detained Youth against County officials for widespread unconstitutional practices and systemic statutory non-compliance required Plaintiff's counsel to prepare a meticulous and exhaustive complaint and thorough pre-suit factual record. *See* Fed. R. Civ. P. 11(b)(3) (requiring factual contentions in pleadings to have evidentiary support). To develop such a record, counsel located and interviewed over forty-five Youth and their parents, among other investigative measures, to evaluate the validity of Plaintiff's claims. *See* Affidavit of Robert H. Brunson ¶ 30, attached hereto as **Exhibit A**. This due diligence process required Plaintiff's counsel to gather information

from the Youth and their families and required Plaintiff to enter into limited engagement agreements with many of them and document their consent to provide information. *Id.* at 28.

Preparing the Complaint was itself a substantial undertaking, as was drafting Plaintiff's Motion for Preliminary Injunction filed the same day, which was equally detailed and factually supported. (ECF 1–2). Plaintiff's efforts via these initial pleadings almost immediately gave rise to real positive change for the Youth then detained at the CCJDC. Just weeks after Plaintiff initiated this action and moved for a preliminary injunction, the then-Sheriff moved the Youth detained at the CCJDC into a separate floor of the Sheriff Al Cannon Detention Center, representing an early win for Plaintiff and the Youth. Brunson Aff. ¶ 33.

The first several months of this litigation required an immense effort on a quick timeline. After engaging in initial discovery pursuant to Local Rule 26.01 and motions practice surrounding Plaintiff's Motion for Preliminary Injunction and Defendants' two motions to dismiss, (ECF 2, 3, 12, 15, 17, 18, 19, 20, 21, 22, 24, 25, 26, 27, 28, 30), the parties agreed to conduct informal discovery in an effort to expedite resolution of the case. Brunson Aff. ¶ 34. This discovery process required Plaintiff's counsel to locate, organize, and produce copies of the executed representation agreements and a list of the names of all the Youth, parents, and guardians interviewed during pre-suit diligence. *Id.* at 35.

Counsel also had to locate, review, and produce a significant volume of documentary evidence, including a comprehensive set of incident reports from the CCJDC's Behavioral Management Unit ("BMU") and nearly 1 terabyte (TB) of surveillance and body camera footage from the CCJDC. *Id.* at ¶ 35. This video evidence was essential to verify and supplement information obtained from witnesses about the conditions of the CCJDC both at the closed facility and in the adult detention center where the Youth had been relocated as a result of the

lawsuit. *Id.* Obtaining, storing, and reviewing this surveillance video was a major undertaking that presented formidable practical and technological challenges. *Id.* Due to the enhanced security features and specialized software that housed this footage, isolating and reviewing it required counsel to obtain specialized laptops from the CCJDC, purchase hard drives to house the footage, and participate in training to learn how to review the footage. *Id.* Further, the footage review itself was necessarily time-intensive, as reviewing hundreds of hours of video is not a task that can be shortened significantly. *Id.*

After this initial period of informal discovery, the parties and their counsel have spent most of the last five years (spanning the terms of three different elected Sheriffs) negotiating a consent decree under the supervision of United States Magistrate Judge Mary Gordon Baker, who has served as the Court-appointed mediator. *Id.* at ¶ 37. This ongoing mediation effort first began on May 3, 2021 and included commission of an independent, outside assessment of the conditions at the CCJDC both before and after the ground-up construction of an entirely new building. *Id.* at ¶¶ 37-38. The mediation process finally concluded on December 10, 2025 when the Court entered the Consent Decree, granting substantially all of the relief sought in the Complaint. (ECF 59).

The Consent Decree represents an enormous success for Plaintiff and the Youth it has zealously protected. The Consent Decree mandates sweeping and permanent reforms to the CCJDC's living conditions; medical and mental health care; education and special education services; uses of force, solitary confinement, and restraints; grievance procedures; staff training; and disability accommodations, among others. Now, for example, under the Consent Decree:

- The CCJDC will not exceed its maximum rated capacity, ensuring rooms are not overcrowded;

- The CCJDC is required to provide medical screenings for Youth promptly after being taken into custody, ensuring confidentiality and appropriate medical attention;

- Youth with disabilities will receive appropriate accommodations in accordance with the ADA and other relevant laws;

- The CCJDC will ensure Youth have access to ongoing mental health services tailored to their needs;

- The CCJDC will provide structured programming to the Youth, including recreational, self-improvement, and leisure activities, to support positive behavior and address health and mental health needs;

- The CCJDC will develop a Behavior Management System focusing on positive incentives, reducing inhumane uses of force, restraints, and excessive room confinement;

- The CCJDC, in cooperation with the Charleston County School District ("CCSD"), will ensure Youth can attend school within three days of admission and that Youth receive the required number of instructional minutes;

- A Qualified Mental Health Professional will conduct assessments and offer services for Youth with significant mental health needs;

- The CCJDC will implement protocols for monitoring youth at risk of suicide, ensuring constant supervision and appropriate intervention strategies; and

- A Professional Monitor, Charles Kehoe, will assist the CCJDC in complying with the decree, assess compliance, and provide recommendations.

(ECF 59).

None of this relief would have resulted without the diligence of Plaintiff and its attorneys. To prevail in this litigation, Plaintiff's counsel had to: interview dozens of Youth and their parents; participate in a significant informal discovery process; file numerous motions, responses, and replies in this Court, including those needed to respond to Defendants' motions to dismiss; file periodic joint status reports in this Court; consult with numerous experts; and coordinate two formal assessments of the conditions at the CCJDC facility by The Center for Children's Law and Policy ("CCLP"), whose reports and recommendations served as the basis

for the Consent Decree, which took four years to negotiate and required Plaintiff's counsel to construct a detailed new architecture of practices and policies for the facility.

The result of all this is a Consent Decree that remedies the unconstitutional conditions, practices, and policies at the CCJDC and dramatically improves the treatment and wellbeing of all existing and future Youth detained at the CCJDC, ultimately benefitting our community as a whole.

## **ARGUMENT**

Plaintiff brought this action for declaratory and injunctive relief under the ADA and 42 U.S.C. § 1983, which collectively allow the Court, in its discretion, to award to the "prevailing party" reasonable attorneys' fees, including litigation expenses and court costs. 42 U.S.C. §§ 1988(b)-(c); 42 U.S.C. § 12205. "The analytical considerations for awarding attorneys' fees under . . . the ADA are essentially the same as the analysis under Section 1988." *Alexander S. By & Through Bowers v. Boyd*, 929 F. Supp. 925, 930 (D.S.C. 1995), *aff'd sub nom. Burnside v. Boyd*, 89 F.3d 827 (4th Cir. 1996). The Supreme Court has held that fees to prevailing civil rights plaintiffs should be awarded as a matter of course, except where unusual special circumstances—not present here—dictate otherwise. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). That Court also warned that "[a] request for attorney's fees should not result in a second major litigation." *Id.* at 437.

After the Court determines the movant is a "prevailing party" and therefore eligible to recover attorneys' fees and costs, it calculates those fees in three steps:

> First, it must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. Second, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Third, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

6

*Hudson v. Pittsylvania Cty., Va.*, 774 F.3d 231, 237 (4th Cir. 2014) (internal quotation marks and citations omitted).

## I.     Plaintiff is a "Prevailing Party."

First, Plaintiff is eligible to recover its attorneys' fees, litigation expenses, and costs because it is a "prevailing party" under 42 U.S.C. §§ 1988(b)–(c) and 12205. To qualify as a "prevailing party," a plaintiff need not prevail on every claim or issue raised, but only "on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley*, 461 U.S. at 433. A civil rights plaintiff prevails "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992). Consent decrees satisfy this test. *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Hum. Res.*, 532 U.S. 598, 604 (2001). As long as the consent decree provides the plaintiff with some of the relief sought in the complaint, the plaintiff is considered to have "prevailed." *Cities4Life, Inc. v. City of Charlotte*, 52 F.4th 576, 580 (4th Cir. 2022).

There is no question Plaintiff is a "prevailing party" in this case. *See* Declaration of Mark Soler ¶ 28, attached hereto as **Exhibit B**. The lengthy Consent Decree (ECF 59) requires Defendants to make comprehensive systemic improvements to the CCJDC's facility, practices, and polices, and grants substantively all of the relief sought in the Complaint (ECF 1), thereby protecting countless current and future pre-conviction juvenile detainees from the CCJDC's unconstitutional conditions. Soler Decl. ¶¶ 32–34. Plaintiff is, therefore, eligible for an award of attorneys' fees, litigation expenses, and costs under 42 U.S.C. §§ 1988 and 12205.

The only remaining issue is whether the attorneys' fees, expenses, and costs Plaintiff incurred are reasonable. *Blanchard v. Bergeron*, 489 U.S. 87, 89 n.1 (1989) ("[T]he prevailing

party 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'").

## II.    Determining Plaintiff's "lodestar figure."

To calculate a proper fee award, the court "must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate*." Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 244 (4th Cir. 2009) (citation omitted). The lodestar method, when properly employed, yields a fee that is presumptively reasonable. *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010); *Alexander S.*, 929 F. Supp. at 932.

The court must make its determination by considering the twelve factors set forth in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978), which include: (1) time and labor expended; (2) novelty and difficulty of the issues raised; (3) the skill required to perform the legal services; (4) the attorney's opportunity costs in undertaking the representation; (5) the customary fee for similar work; (6) the attorney's expectations at the outset of the litigation; (7) time limitations imposed by the client or circumstances; (8) amount in controversy and results obtained; (9) the expertise, reputation and ability of counsel; (10) the nature and length of the professional relationship between attorney and client; (11) the undesirability of the case within the legal community; and (12) fee awards in similar cases. *See* Local Civ. R. 54.02(A). However, the court is "not required to strictly apply the factors in every case since all of the factors are not always applicable." *McClaran v. Carolina Ale House Operating Co., LLC*, C/A No. 3:14-cv-03884-MBS, 2015 WL 5037836, at *3 (D.S.C. Aug. 26, 2015) (citing *EEOC v. Serv. News, Co.*, 898 F.2d 958, 965 (4th Cir. 1990)).

Ultimately, "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010) (citation omitted). Fees should be high enough to encourage attorneys to take

cases without awarding windfalls. *See Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1359 (4th Cir. 1995).

Here, as evidenced by the Affidavits of Robert H. Brunson and Annie Andrews and the Declaration of Stuart M. Andrews, and accompanying timesheets attached thereto, Plaintiff's counsel (including attorneys paralegals, law clerks, and other technical and support staff) have spent a total of 3,120.8 hours through December 10, 2025 (the "True Lodestar Time") litigating this case, resulting in a true lodestar figure of $1,369,897.50 (the "True Lodestar Figure"). Brunson Aff. ¶ 17; Declaration of Stuart Andrews ¶ 22, attached hereto as **Exhibit C**; Affidavit of Annie Andrews ¶ 6, attached hereto as **Exhibit D**. As explained in more detail below, however, Plaintiff's counsel have, in good faith and fairness to Defendants, applied extensive billing judgment to substantially reduce the amount of fees sought to $901,411.40 ("Final Lodestar Figure"). Brunson Aff. ¶ 23-24 (seeking $817,096.40 in fees); S. Andrews Decl. ¶ 22 (seeking $84,315 in fees). *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission."). Counsel have voluntarily reduced their fees in the following ways.

First, counsel do not seek to recoup the *de minimis* fees of the ten Nelson Mullins timekeepers who each billed less than $10,000 to this case, representing an upfront discretionary cut of 58 hours and a total of $17,075.50 in fees: Neeru Gupta (Partner; 21.4 hours; $9,748.50), Megan Lemon (Law Clerk; 22.2 hours; $3,330.00), Melanie Creech (Intranet and Research Specialist; 7.9 hours; $1,659.00), Olesya V. Bracey (Partner; 1.5 hours; $862.50), Sherry H. Culves (Partner; 1 hour; $445.00), Tammie M. Pope (Senior Paralegal; 1 hour; $250.00), Calvin

McKenzie (Research Specialist; 1.1 hours; $249.00), Robert S. Powers (Senior Litigation Technologist; 0.8 hours; $164.00), Sarah N. Hardware (Research Specialist; 0.9 hours; $222.00), Lisa Boney (Paralegal; 0.2 hours; $75.00), and Colin D. Duncan (Discovery Collections Specialist; 0.3 hours; $70.50).[2] *See* Brunson Aff. ¶ 18. Plaintiff's counsel, therefore, seek only to recover the fees of seven remaining attorneys and support personnel: Robert H. Brunson (Partner, Lead Counsel), Stuart M. Andrews (Partner), Andrew M. Connor (Partner), Shane P. Martin (Partner), Patrick C. Wooten (Partner), John P. Bozeman (Associate), and Lauren Lynch (Senior Paralegal).[3] *See* Brunson Aff. ¶ 19.

Second, Plaintiff's counsel do not seek to recover any of Annie Andrews' time on this case as a result of her personal choice not to seek or accept compensation for her work. Annie conservatively estimates she spent a total of 162.3 hours on this case. *See* A. Andrews Aff. ¶ 6. Annie would normally have charged a rate of $400 for this time. *Id.* at ¶ 3. Therefore, this write-off of all of Annie's fee represents an additional reduction of $64,920. *Id.* at ¶ 7.

Third, counsel have meticulously scrutinized each time entry and deleted or reduced time that the Court could, under existing precedent, deem excessive, redundant, or otherwise unnecessary. *See Hensley*, 461 U.S. at 433; Brunson Aff. ¶ 21. Specifically, these reductions include time billed for: (i) tasks that were unnecessary or excessive; (ii) routine internal meetings except for the time of Robert Brunson and Stuart Andrews; (iii) attendance at mediation meetings, site visits, and negotiations by any Nelson Mullins timekeeper other than Robert Brunson; (iv) in general, more than one attorney to draft documents or conduct research on a

---

[2] These amounts were calculated by multiplying each individual's time by their firm-assigned standard hourly rate, called the "R1" rate.

[3] Paralegal and law clerk fees are recoverable as a part of the "reasonable attorney's fee" allowed under § 1988. *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 285 (1989).

single issue; (v) clerical tasks, and (vi) vague time entries. Brunson Aff. ¶ 21. In total, counsel have cut 445.9 hours from the remaining seven timekeepers' time, reducing the time sought to 2,454.3 total hours (the "Final Lodestar Time"). Brunson Aff. ¶ 23 (seeking 2,301 hours); S. Andrews Decl. ¶ 22 (seeking 153.3 hours).

Fourth, Nelson Mullins elected to use only its 2020 rates discounted by approximately 15% and has not applied the normal periodic rate increases it normally does for paid work. Brunson Aff. ¶ 43. For example, counsel seek to recover all of Robert Brunson's time (after the discretionary time reduction mentioned above) only at his firm-assigned standard 2020 rate of $640 discounted by approximately 15% to $550, even though his standard rate increased substantially (by 48%) over the course of this litigation to a 2025 rate of $950.[4] *Id.* at ¶ 46. Applied across all seven timekeepers, this rate freeze plus 15% discount brings the Final Lodestar Figure down to $901,411.40, as shown in the table below.

**FINAL LODESTAR FIGURE**

| Name | Title | Rate | Hours | Final Individual Lodestar |
|------|-------|------|-------|---------------------------|
| Robert H. Brunson | Partner | $550 | 772.9 | $425,095 |
| Stuart Andrews | Partner | $550 | 153.3 | $84,315 |
| Shane P. Martin | Partner | $375.00 | 22.4 | $8,400 |
| Patrick C. Wooten | Partner | $370.00 | 94.7 | $35,039 |
| Andrew M. Connor | Partner | $340.00 | 248.7 | $84,558 |
| John P. Bozeman | Associate | $400.00[5] | 93.6 | $37,440 |

---

[4] Robert's standard rate was: $640 in 2020 and 2021; $705 in 2022; $750 in 2023; $825 in 2024; and $950 in 2025. *Id.* at ¶ 46.

[5] Because John Bozeman began his employment at Nelson Mullins in 2024, he does not have an established firm 2020 rate. Therefore, counsel have applied his lowest R1 rate since he started at the firm—$475, discounted by slightly over 15% to $400.

| Lauren M. Lynch | Senior Paralegal | $212.00 | 1068.7 | $226,564.40 |
| | | **TOTAL:** | **2,454.3** | **$901,411.40** |

The Final Lodestar Figure of $901,411.40 is $468,486.10 (34.2%) less than the True Lodestar Figure of $1,369,897.50. Plaintiff's counsel submit these substantial self-imposed fee discounts demonstrate counsel's good faith effort to avoid protracted litigation over this issue and strongly support the reasonableness of its requested fee. Brunson Aff. ¶ 22; *See Summers v. Adams*, No. CA3:08-2265-CMC, 2010 WL 2179571, at *3 (D.S.C. May 26, 2010) (concluding plaintiffs were entitled to full amount of requested fees for litigation of case's merits, reasoning in part: "The court also considered Plaintiffs' decision not to seek recovery of fees for Attorneys Katskee, Luchenitser, Leong, Rice, Klazen, and Cain and self-imposed ten-percent reduction of the remaining fees as an additional indication of the reasonableness of the recovery sought."). Nevertheless, counsel now address the twelve *Barber* factors.

### A.     Time and labor expended

Counsel seek to recover for 2,454.3 hours spent by seven timekeepers on this case, including this Motion.[6] As discussed, this figure is 666.5 hours less than the actual number of hours spent on this case—the True Lodestar Time of 3,120.8 hours—representing a 21.4%-time discount.

"The trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities." *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974); *see e.g.*, *Riverside v. Rivera*, 477 U.S. 561, 573 n.6 (1986) (affirming a generous award of time because the trial judge is in the best position to

---

[6] "Fees for the preparation of a motion for attorneys' fees are properly compensable in a § 1988 fee award." *Summers*, 2010 WL 2179571, at *3 (awarding fees for 77.76 hours of work on plaintiffs' motion for attorneys' fees); *Trimper v. City of Norfolk*, 58 F.3d 68, 77 (4th Cir. 1995) ("[I]t is well settled that the time spent defending entitlement to attorney's fees is properly compensable under § 1988. . . .").

determine what is reasonable in a particular case); *Daly v. Hill*, 790 F.2d 1071, 1079 (4th Cir. 1986) (quoting *Ballard v. Schweiker*, 724 F.2d 1094, 1098 (4th Cir. 1984) ("It is important that the district court remain primarily responsible for resolving fee disputes, because it is in the better position to evaluate the quality and value of the attorney's efforts.")).

To obtain the excellent result they did in this case, Plaintiff's counsel had to conduct an extraordinary amount of pre-suit diligence not typical of most ADA or § 1983 cases by locating and interviewing Youth and/or their families to obtain first-hand accounts of conditions inside the CCJDC facility to evaluate whether valid claims of constitutional violations existed. Brunson Aff. ¶¶ 27-28. Locating and interviewing these Youth (most of whom lacked a means of transportation) took place during the height of the COVID-19 pandemic while counsel and staff were working from home. *Id.* at ¶ 29. Plaintiff's counsel, therefore, retained a private detective to find and obtain the necessary releases and engagement agreements from these Youth and their families. Plaintiff's counsel—primarily, Robert Brunson (but with only one attorney at any given interview), Senior Paralegal Lauren Lynch, and expert consultant John Rhoads[7]—interviewed at least forty-five current and former Youth and/or their parent(s) to gather enough detailed factual support for Plaintiff's allegations against Defendants. *Id.* at ¶¶ 28-30. Senior Paralegal Lauren Lynch then had to summarize the interviews and circulate them for review by the attorneys working on preparing the initial pleadings. *Id.* at ¶ 30. Lauren also maintained a spreadsheet to track information about each person interviewed; negotiated engagement agreements to provide limited representation to many of the Youth; and fielded many calls from these Youth and their families regarding the litigation status over the course of the case. *Id.* Thus, while Plaintiff's

---

[7] Locating, interviewing and retaining an expert witness who would be able to provide testimony to the court in support of the motion for preliminary injunction was also a substantial task, which included conducting interviews with numerous potential experts in various fields, including youth facility operations, mental health, medical health, and education.

counsel represented only one party to the litigation, that party in effect represented the interests of many Youth whose input required extensive time and effort by Ms. Lynch.

Before filing the lawsuit, Plaintiff's counsel also had to undertake significant legal research and analysis to evaluate whether to bring a lawsuit on behalf of a class, individual plaintiffs, or an organization with associational standing. *Id.* at ¶ 27. After being retained by Plaintiff, counsel had to research the complex constitutional claims that would form the basis of the Complaint. *Id.* When considering the extensive factual and legal research that was required to comply with Rule 11, FRCP, and the drafting that followed, the work to prepare the Complaint was substantial. And after determining that many Youth were suffering irreparable harm, Plaintiff's counsel also researched, drafted, and filed with the Complaint a Motion for Preliminary Injunction. (ECF 2); Brunson Aff. ¶ 31. This motion was supported by two lengthy supporting expert affidavits which were drafted through careful communication between Plaintiff's counsel and the retained experts. (ECF 2); Brunson Aff. ¶ 31.

Next, because Defendants removed all of the affected Youth from the existing CCJDC facility immediately upon the filing of this lawsuit, Plaintiff's counsel had to consider how this move would affect the litigation. Brunson Aff. ¶ 33. Defendants then filed two motions to dismiss under Rules 12(b)(1) and 12(b)(6), which collectively argued for dismissal for lack of standing, failure to exhaust administrative remedies, and failure to state a claim. (ECF 18–19). This required Plaintiff's counsel to research, draft and file two separate Responses in Opposition. (ECF 21–22); Brunson Aff. ¶ 25.

This initial flurry of motions practice eventually yielded to a more cooperative relationship between the parties and resulted in Plaintiff's withdrawal of its Motion for Preliminary Injunction on October 9, 2020, the Court's denying Defendants' motions to dismiss

without prejudice on September 27, 2021, and the beginning of what would become a years-long mediation process facilitated by Magistrate Judge Mary Gordon Baker, which ultimately began on May 3, 2021. (ECF 32, 42); Brunson Aff. ¶ 37. Under normal circumstances, mediation would likely have yielded a quick and efficient conclusion to this case—especially when the parties first agreed to mediate within one year after the lawsuit was filed and when Defendants had essentially conceded the validity of Plaintiff's claims by moving the Youth out of the CCJDC facility. However, because the then-incumbent Sheriff Al Cannon lost the November 2020 election to Kristin Graziano, many months passed before the parties had their first meeting with the mediator. *Id.* at ¶ 37.

In an effort to expedite the litigation, Plaintiff's counsel also successfully negotiated an agreement with Defendants to engage in an informal exchange of evidence in lieu of formal discovery. *Id.* at ¶ 34. This required Plaintiff's counsel to locate, review, and produce a significant volume of documentary evidence, including copies of the executed representation agreements with Youth who engaged Nelson Mullins, along with a list of the names of all Youth, parents, and guardians interviewed during pre-suit diligence. *Id.* at ¶ 35.

This informal exchange also included nearly 1 terabyte of surveillance and body camera footage. *Id.* Reviewing the surveillance and body camera video turned out to be a gargantuan undertaking. *Id.* Plaintiff's counsel had to locate the hundreds of surveillance cameras in both facilities (the old building and the Al Cannon Detention Center where the Youth were moved in September 2020). *Id.* After this was accomplished, Plaintiff's counsel located the ten most relevant cameras at each facility and requested footage from those cameras. Due to the many layers of security and specialized systems needed to actually review the footage, Plaintiff's counsel ultimately had to obtain laptops with the jail's specialty software and purchase multiple

hard drives to load the footage. *Id.* Ms. Lynch also went through specialized training to learn how to review the footage and spent many hours actually reviewing it. *Id.* She also recruited several other non-timekeeping staff members to review some footage. *Id.*

Because Plaintiff sought permanent injunctive relief on a comprehensive range of issues and because of the two changes in Sheriff administrations during the negotiations, reaching a resolution in this case was no small task. To achieve the favorable outcome of the Consent Decree in this litigation, counsel had to carefully study the CCJDC's facility, practices, policies, and omissions, and compare those to the constitutional minimums so that the harms suffered by its Youth detainees could be adequately remedied on a permanent basis. This required counsel to coordinate with multiple experts and the CCLP, which conducted two thorough assessments of the CCJDC. *Id.* ¶ 38. It also required two site visits—one at the old facility and one after the new building was constructed. *Id.* at ¶ 36, 38. The CCLP drafted two reports identifying issues and making recommendations, which became the foundation of the Consent Decree. *Id.* at ¶ 38. As is evident from the Consent Decree's length, scope, and detail, drafting and negotiating the Consent Decree required a very significant expense of time and labor by Plaintiff's counsel.

Further, the distribution of hours among timekeepers heavily supports the reasonableness of counsel's requested fee because nearly half (43.5%) of the time sought in this case is that of Ms. Lynch, a paralegal who billed a true total of 1,166.8 hours (reduced to 1,068.7 hours) at a discounted rate of only $212. Staffing Ms. Lynch on a near majority of the work on this case thus significantly reduced the overall cost of this case and furthered the policies underlying the civil rights statutes. *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 288 (1989) ("By encouraging the use of lower cost paralegals rather than attorneys wherever possible, permitting market-rate billing of

paralegal hours 'encourages cost-effective delivery of legal services and, by reducing the spiraling cost of civil rights litigation, furthers the policies underlying civil rights statutes.'").

There is precedent from this District approving hours far greater than counsel's here. In *Alexander S. By and Through Bowers v. Boyd*, Nelson Mullins, along with the law firm Fairey, Parise & Mills, P.A. and the Plaintiff in this very case (formerly called "South Carolina Protection and Advocacy System for the Handicapped, Inc.") represented *pro bono* a class of incarcerated juveniles in their class action lawsuit against the Director of the South Carolina Department of Juvenile Justice ("DJJ") asserting claims under the IDEA, Rehabilitation Act, ADA, and § 1983 and challenging the constitutionality of certain policies, practices, and conditions at the DJJ's four juvenile correctional facilities. 929 F. Supp. at 928.

After a bifurcated non-jury trial, United States District Court Judge Joseph F. Anderson, Jr. found for the plaintiffs on some but not all claims and ordered the defendants to submit a plan designed to remedy the constitutional and statutory violations. *Id.* at 930. Having prevailed, the plaintiffs moved for an award of attorneys' fees and costs under 42 U.S.C. § 1988. After cutting time for various reasons not present here,[8] Judge Anderson approved nearly *10,000* hours of work by plaintiffs' lawyers, paralegals, law clerks, and project assistants, including nearly 8,000 hours for Nelson Mullins personnel alone. *Id.* at 938–43.

The similarities to the present case are many. *Anderson S.* involved Nelson Mullins representing the plaintiffs *pro bono* in a lawsuit against government officials concerning almost identical subject matter and legal issues. Though there has been no trial, this case has nonetheless required an immense time commitment by Plaintiff's attorneys and other support personnel.

---

[8] The Court eliminated some duplicative and secretarial work, time spent on a blatantly erroneous motion for preliminary injunction, time related to the introduction of staged photographs, and time spent on redundant testimony. *Id.* at 941-43.

Counsel, therefore, submit that 2,454.3 hours is perfectly reasonable in light of this litigation's five-year history, scale, complexity, the injunctive nature of the relief sought, and the distribution of work among timekeepers.

**B. Novelty and difficulty of the issues raised**

Even where the legal issues raised are not particularly novel, courts weigh this factor in favor of the lodestar figure where, as here, the case presents a significant degree of overall difficulty. *See, e.g.*, *Buie v. Charter Commc'ns*, No. 6:17-CV-03007-DCC, 2021 WL 4226166, at *2 (D.S.C. June 9, 2021) (finding this factor weighed in favor of counsel's fees even though the "issues raised in this case are not particularly novel and the law is well established"). The issues here were factually complex and difficult to pursue. Before filing suit, counsel had to carefully consider the issue of Plaintiff's associational standing, a notoriously amorphous doctrine. *See*, *e.g.*, 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531 (3d ed. 2025) (noting "the difficulties that inevitably beset every attempt to articulate and apply any clear principles of standing"). Defendants later argued Plaintiff lacked standing and failed to exhaust its administrative remedies under the IDEA in their motions to dismiss (ECF 18–19), requiring Plaintiff's counsel to draft thorough arguments in their two responses in opposition, one of which was twenty-nine pages and required another seventy-five pages of supporting declarations and exhibits. (ECF 21–22). Plaintiff also sought the "extraordinary remedy" of a preliminary injunction, which required counsel to address, among others, the merits of Plaintiff's constitutional and statutory claims. (ECF 2); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

In addition, designing the comprehensive suite of policies and practices the Defendants must now implement was an enormous project requiring counsel to locate and interview experts in the fields of education, health care, mental health, solitary confinement, use of excessive

force, facility operations, and juvenile detention facility standards. Brunson Aff. ¶ 39. Counsel consulted at least ten different experts and the CCLP on an ongoing basis. *Id.* Counsel also engaged in protracted and detailed negotiations with Defendants over the Consent Decree. *Id.* at ¶ 39. Counsel had to conduct numerous meetings with the CCLP to coordinate the assessments, review and analyze the assessments, visit the new facility after it was constructed, and draft the Consent Decree itself. While much of the Consent Decree was drawn from the CCLP's recommendations, other parts required additional research into applicable standards and best practices. *Id.* at ¶ 39. The Consent Decree spans forty-five pages and requires Defendants' compliance with a patchwork of state and federal laws, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, the Rehabilitation Act, the IDEA, the Prison Rape Elimination Act ("PREA"), 42 U.S.C. §§ 15601 *et seq.*, S.C. Code Ann. § 63-19-360, governing the detention of juveniles, and S.C. Code Ann. Regs. §§ 43-232 & 234, setting minimum educational standards. (ECF 59).

Importantly, this case has seen three different Charleston County Sheriffs. Soler Decl. ¶ 25. Initially, when the Complaint was filed, long-standing Sheriff Al Cannon, was in office. Brunson Aff. ¶ 40. Sheriff Cannon lost his re-election bid in November 2020 and Kristin Graziano became Sheriff. *Id.* Then, well into the negotiations, in November 2024, Sheriff Graziano lost her re-election bid to current Sheriff Carl Ritchie. *Id.* Again, counsel had to adjust negotiations to address the revised approach taken by Sheriff Ritchie. *Id.*; Soler Decl. ¶ 25.

### C. Skill required to perform the legal work

This factor is highly correlated with the prior factor, and courts in this District have treated them as one. *See, e.g., Alexander S.*, 929 F. Supp. at 936 ("The third . . . factor requires the court to consider the skill required to properly perform the legal services rendered. In determining this, the court must determine whether the case presented plaintiffs' counsel with

novel or complicated issues."). As already noted, this case involved both legal and practical difficulties. Taking on government officials in a public matter of such scale and impact demanded the veteran representation Plaintiff enjoyed in this case. Further, counsel had to navigate media coverage and manage public relations issues.[9] For example, Charleston's *The Post & Courier* newspaper published at least six articles on this case, several of which asked for counsel's comment. *See* Post & Courier Articles, attached hereto as **Exhibit E**. Plaintiff's counsel, therefore, respectfully submit this matter presented unique challenges for which many would not be equipped and that this factor supports the reasonableness of the requested fees.

### D.    Attorney's opportunity costs in undertaking the representation

While they seek to recover fees only for 2,454.3 hours, in reality, Plaintiff's counsel have spent 3,120.8 hours litigating this case. Such a time commitment represents an enormous opportunity cost for any law firm, as participation in this litigation has denied Plaintiff's counsel the opportunity to accept fee-producing cases. *See DeWitt v. Darlington Cnty., S.C.*, No. 4:11-CV-00740-RBH, 2013 WL 6408371, at *10 (D.S.C. Dec. 6, 2013) (finding that 187 attorney hours devoted to a case "represents a significant opportunity cost . . . in terms of other cases that could have been handled during the same period"). The True Lodestar Figure of $1,369,897.50 represents the revenue counsel could have generated from paying clients if not for this case. It is also important to recognize that, because this is a *pro bono* case,[10] Plaintiff's counsel advanced

---

[9] Plaintiff has removed from the fee petition most charges relating to management of press inquires and interviews. In addition, this case also caught the attention of the United States Department of Justice, which filed a Statement of Interest pursuant to 28 U.S.C. § 517 on September 14, 2020 "to assist the Court in its analysis of the Defendants' alleged punitive isolation practices." (ECF 30).

[10] Counsel's *pro bono* representation of Plaintiff neither disentitles it from an award of attorneys' fees nor warrants a discount of those fees. *Alexander S.*, 929 F. Supp. at 935 ("It is thus clear, under well-established law, that Nelson Mullins is entitled to be compensated for its reasonable attorneys' fees under Section 1988, even though it participated in this case on a *pro bono* basis.

all the costs of this litigation, totaling $38,434.85. *See id.* (finding fact that plaintiff's counsel advanced all litigation costs supported court approval of counsel's requested attorneys' fees). Therefore, counsel have not only forgone roughly $1,369,897.50 in revenue, their outlay of costs has put them $38,434.85 in the negative.

This is also not a case in which Plaintiff's counsel will enjoy a share of a damages award. Plaintiff did not seek damages, and counsel did not represent Plaintiff on a contingency fee basis. Therefore, this factor weighs heavily in favor of counsel's fees.

### E.     Customary fee for similar work

"The hourly rate included in an attorney's fee must also be reasonable." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994) (citing *Hensley*, 461 U.S. at 433). This requirement is met by compensating attorneys at the "prevailing market rates in the relevant community," which is a fact-intensive determination "best guided by what attorneys earn from paying clients for similar services in similar circumstances." *Id.* "While evidence of fees paid to attorneys of comparable skill in similar circumstances is relevant, so too is the rate actually charged by the petitioning attorneys when it is shown that they have collected those rates in the past." *Id.* (citing *Gusman v. Unisys Corp.*, 986 F.2d 1146 (7th Cir. 1993)).

Here, and as mentioned above, Plaintiff's counsel seek to use only their 2020 rates discounted by 15% and to forego the natural rate increases that have taken place over the five years since this litigation commenced. Nelson Mullins routinely collects these—and significantly higher—rates for its paid client work. *See* Brunson Aff. ¶ 45. In 2025, the median rate charged for equity partners in the litigation practice group at Nelson Mullins' Charleston office is $815.

---

In determining the amount of the fee, the court will not discount the fee because of the goodwill derived by Nelson Mullins from its *pro bono* work.").

*Id.* That same figure is $688 for non-equity partners, $600 for senior associates, $550 for associates, and $360 for litigation paralegals. *Id.*

Further, as Armand Derfner, Mark Soler, and James B. Moore, III testify, in their extensive experience as civil rights lawyers, these rates and total fees are reasonable for this type of matter in South Carolina. *See* Declaration of Armand Derfner ¶¶ 8–13, attached hereto as **Exhibit F** (stating, among others, that a rate of $550 for Robert Brunson and Stuart Andrews "is an extremely modest rate for their services and is below the rate generally prevailing in this district for lawyers of their ability and seniority"); Soler Decl. ¶ 29 (stating that the fees and costs sought in this case are reasonable and "comparable to other civil rights conditions of confinement cases that I have litigated and to other cases that I know about from my research and contact with other civil rights attorneys"); Affidavit of James Moore ¶¶ 7–8, attached hereto as **Exhibit G** (stating that the prevailing hourly rates for attorneys with similar experience, expertise, and demonstrated success to that of Robert Brunson and Stuart Andrews "range from $500 to $800 per hour" in South Carolina and that "rates of $300 to $400 per hour for associate attorneys or attorneys with fewer years of practice fall squarely within accepted market parameters for such demanding work"); *see also Black v. Mantei & Associates, Ltd.*, No. CV 3:23-04149-MGL, 2024 WL 1681314, at *3 (D.S.C. Apr. 18, 2024) (finding partner rates of $700 and $600 were "within the prevailing market rates in the Columbia legal community"), *aff'd*, 145 F.4th 528 (4th Cir. 2025); *Sauders v. S.C. Pub. Serv. Auth.*, No. 2:93-3077, 2011 WL 1236163 (D.S.C. Mar. 30, 2011) (approving rates up to $600); *Veasey v. Abbott*, No. 2:13-CV-193, 2020 WL 9888360, at *29 (S.D. Tex. May 27, 2020) (approving rates up to $600, including a rate of $585 for Mr. Derfner), *aff'd*, 13 F.4th 362 (5th Cir. 2021); *Pub. Int. L. Found., Inc. v. Knapp*, No. 3:24-cv-1276-JFA (D.S.C. Jan. 7, 2025) (approving rate of $550 for four lawyers),

attached hereto in **Exhibit H**; *Nutramax Labs., Inc. v. Manna Pro Prods., LLC*, No. 0:16-cv-01255-JMC (D.S.C. Dec. 21, 2017) (approving attorney rates up to $535 for contempt proceeding in trademark case), attached hereto in **Exhibit H**; *Doe v. Kidd*, 656 F. App'x 643, 658 (4th Cir. 2016) (approving $480 and $425 for lead counsel); *Gifford v. Horry Cnty. Police Dep't*, No. 4:16-CV-03136-MGL, 2023 WL 2696575 (D.S.C. Mar. 29, 2023) (approving rates up to $450); *Lux v. Judd*, 868 F. Supp. 2d 519, 531 (E.D. Va. 2012) (approving $575 for lead counsel in federal election case); *Buie*, 2021 WL 4226166, at *3 (approving $400/hour for lead counsel); *Southeast Booksellers Ass'n v. McMaster*, C.A. No. 2:02-3747-23 (D.S.C. Sept. 8, 2005) (finding rates of $500, $430, $420 and $400 to be reasonable for attorneys with extensive experience in litigation involving constitutional issues), attached hereto in **Exhibit H**.

### F.     Attorney's expectations at the outset of this litigation

This factor typically entails consideration of "[t]he fee quoted to the client or the percentage of the recovery agreed to." *Buie*, 2021 WL 4226166, at *3 (quoting *Johnson v. Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974)). The risk of receiving little or no recovery is a major factor in awarding attorneys' fees.[11] *Savani v. URS Prof'l Solutions LLC*, 2014 WL 172503, *5 (D.S.C. Jan. 15 2014). When counsel works "for years with no payment, undertaking the risk of walking away with no fee at all," such "'burdens are relevant circumstances' that support the requested award." *Id.* (citing *Torrisi v. Tuscon Elec. Power Co.*, 83 F.3d 1370, 1377 (9th Cir. 1993)).

Here, counsel have represented Plaintiff at no charge throughout the entirety of this litigation. While counsel are delighted to represent Plaintiff *pro bono* and accepted the possibility

---

[11] While Plaintiff does not seek an enhancement of its fee, it could on this basis. The risk of non-recovery of attorneys' fees is so significant, the Supreme Court held it "is a proper basis on which a district court may award an upward adjustment to an otherwise compensatory fee." *Blum v. Stenson*, 465 U.S. 886, 902 (1984). Here, Plaintiff does not even ask for a fully compensatory fee, which would be $1,369,897.50, and instead seeks only $901,411.40.

of receiving no compensation for their services, they evaluated the availability of prevailing party fees at the outset of this case and, accordingly, have always anticipated recovering most or all of their fees and costs. Brunson Aff. ¶ 12. Therefore, this factor weighs heavily in Plaintiff's favor.

### G. Time limitations imposed by the client or circumstances

"Priority work that delays the lawyer's other legal work is entitled to some premium. This factor is particularly important when a new counsel is called in to prosecute the appeal or handle other matters at a late stage in the proceedings." *Johnson*, 488 F.2d at 718. This case required devotion of time and resources by counsel over the course of five years. At the outset of this litigation, counsel simultaneously filed its Complaint and Motion for Preliminary Injunction, requiring counsel to work quickly. *See Hebb v. City of Asheville, North Carolina*, No. 1:22-CV-00222-MR-WCM, 2025 WL 256999, at *5 (W.D.N.C. Jan. 21, 2025) (finding fact that plaintiffs sought preliminary injunction weighed modestly in favor of the requested award). Further, as counsel learned more and more about the abominable conditions that so many Youth were experiencing at the CCJDC on a daily basis, this matter took on greater urgency. The need to achieve major changes as quickly as possible because of this irreparable harm gave this matter the highest priority. Therefore, this factor weighs in favor of counsel's fee. *See, e.g.*, *W.S. v. Daniels*, No. 8:16-CV-01032-DCC, 2022 WL 18232287, at *6 (D.S.C. Dec. 13, 2022) (finding this factor weighed slightly in favor of fee award where the case "required devotion of time and resources by counsel over a relatively long period of time"), *aff'd*, No. 23-1033, 2025 WL 2255013 (4th Cir. Aug. 7, 2025).

### H. Amount in controversy and results obtained

In the Fourth Circuit, "the most critical factor in calculating a reasonable fee award is the degree of success." *Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998). Even where the

plaintiff does not recover the maximum amount, courts still weigh this factor in favor of the reasonableness of the requested fees. *See, e.g.*, *Buie*, 2021 WL 4226166, at *3.

Even though Plaintiff did not seek any damages in this case and, instead, sought declaratory and injunctive relief, its counsel obtained significant results by successfully negotiating to obtain substantively all of the relief that was sought in the Complaint. As it did in *Alexander S.*, Nelson Mullins here "identified several constitutional and statutory deficiencies in a major [County facility]," and "succeeded in bringing about changes in the conditions of confinement and in the programs, practices and procedures of" the CCDJC, a facility that houses, rehabilitates, and educates youth detained before conviction. 929 F. Supp. 925, 938 (D.S.C. 1995).

When this case was filed, the CCJDC facility was an old, moldy, uninhabitable building that was nowhere close to meeting modern standards of decency. The Youth—most of whom had a history of mental illness—were regularly confined to their rooms for twenty-two hours of every day. They were not receiving adequate medical or mental health care, had little to no programming, were not receiving the legal minimum of educational services, and were living in fear of being confined to a restraint chair, a "wet cell," solitary confinement, and various forms of excessive force. As a result of counsel's efforts, within two months of filing this lawsuit, the Sheriff moved the Youth from the old building into vastly improved conditions of the adult Al Cannon Detention Center. Brunson Aff. ¶ 33. This was something the Sheriff presumably could have done at any time before this case was filed, but he did not take this important step until counsel brought this lawsuit.

As a direct result of this litigation, Youth detained at the CCJDC are now housed in a newly constructed detention facility and will be protected by enforceable limits on the use of

force and isolation, guaranteed timely access to medical and mental health care, assured the opportunity to attend school and receive special education services, provided with safe living conditions and meaningful programming, and afforded dignity and equal treatment under disability and civil rights laws. (ECF 59). And most importantly, these conditions are mandatory, permanent, enforced by the Monitor, and not susceptible to change at the whim of a new Sheriff. As Mark Soler, a national leader in this practice area, attests, the Consent Decree achieved in this case "will become a model for attorneys and other advocates for children and youth around the country." Soler Decl. ¶ 33. Therefore, this crucial factor weighs heavily in favor of counsel's fee.

## I.     Expertise, reputation, and ability of counsel

As set out in the various affidavits filed herewith, Plaintiff's lawyers in this case are veteran litigators with deep knowledge of constitutional and civil rights laws. Lead counsel, Robert Brunson, is an Equity Partner at Nelson Mullins with over thirty-seven years of experience litigating many different types of cases typically involving very large stakes. Brunson Aff. ¶ 4. These cases have included class actions, products liability, commercial litigation and probate litigation. *Id.* Robert is a 1988 graduate of the University of South Carolina School of Law, former Editor in Chief of the *South Carolina Law Review*, and former law clerk to United States District Court Judge Karen L. Henderson. *Id.* at ¶ 3. Over his nearly four decades of practice, Robert has represented corporate, institutional, governmental, and individual clients in a wide range of litigation matters, including the defense of colleges and universities in tuition refund class actions, high wealth family trust and estate disputes, environmental and consumer class actions, business/commercial conflicts, and supply chain and consumer litigation. *Id.* at ¶ 4. Robert has also led complex litigation against governmental entities in the past with great success. *Id.* at ¶ 5. In 2013, after seven years of litigation, Robert tried a case for six weeks in the United States Court of Federal Claims against NASA, ultimately five years later obtaining a

Plaintiff's verdict and a $15 million recovery on behalf of his commercial clients. *Id.* In 2021, Robert obtained a settlement against the U.S. Department of Labor in a complex case in the Court of Federal Claims for $1 million. *Id.* Robert has taught trial advocacy at both of South Carolina's law schools, is a frequent speaker on legal education topics, a founding member of the James Petigru Inn of Court in Charleston, and a member of both the South Carolina and Georgia Bars. *Id.* at ¶¶ 1, 8-9. Robert is also routinely named in peer-reviewed industry rankings such as Best Lawyers and was twice named to the South Carolina Supreme Court Pro Bono Honor Roll. *Id.* at ¶ 7. In 2023, primarily as a result of his leadership in this litigation, Robert was honored by Nelson Mullins as the Claude M. Scarborough Pro Bono Lawyer of the Year. *Id.*

Stuart Andrews is a veteran civil rights advocate with forty-seven years of experience focused on litigation, regulatory advocacy, and legislative reform for institutionalized and low-income individuals. S. Andrews Decl. at ¶¶ 2–4. His work has included extensive challenges to unconstitutional conditions of confinement in both youth and adult correctional facilities. *Id.* at ¶¶ 6, 13. For example, Stuart served from 2002 to 2018 as co-lead counsel in a class action on behalf of individuals with serious mental illness in the custody of the South Carolina Department of Corrections, which resulted in a bench trial finding of constitutional violations and an eventual settlement mandating systemic reforms to mental health care and the use of solitary confinement. *Id.* at ¶ 13. In addition to his litigation work, Mr. Andrews has led and served on numerous civil rights and public interest organizations, testified before the United States Senate regarding the treatment of individuals with mental illness in confinement, and received multiple awards recognizing his contributions to civil rights and access to justice. *Id.* at ¶¶ 14–16.

Andrew Connor is a graduate of Vanderbilt Law School, past President of the Charleston County Bar Association, and the founder of Connor Law, PC. Brunson Aff. ¶ 49. Before starting

his own firm, Andrew was a Partner at Nelson Mullins, where he defended large corporations in complex litigation matters, including class actions, consumer claims, and construction defect litigation.[12] *Id.*

Patrick Wooten is a graduate of Duke Law School, former law clerk to United States District Court Judge Richard M. Gergel, current Shareholder at Duffy & Young, LLC, and former Partner at Nelson Mullins.[13] *Id.* at ¶ 48. A former law clerk to United Stated District Court Judge Richerd Gergel, Patrick has over fifteen years of broad civil litigation experience in state and federal courts. *Id.* Patrick has represented corporate, institutional, and individual clients in a wide range of matters, including complex commercial litigation, business litigation, appellate litigation, class action litigation, real estate litigation, False Claims Act litigation, probate litigation, and trust and fiduciary litigation. *Id.*

Shane Martin is a graduate of the University of Miami School of Law and Partner at Nelson Mullins' Miami, Florida office. *Id.* at ¶ 47. Shane advises and represents individual and business clients in complex commercial litigation matters. *Id.* His wide-ranging practice includes prosecution and defense of disputes involving non-compete and other employment agreements, director and officer liability, construction defects, fraud and deceptive and unfair trade practices, professional malpractice, products liability, and toxic torts. *Id.*

John Bozeman is a fifth-year litigation associate at Nelson Mullins whose experience spans commercial and probate litigation, employment law, and appellate practice. *Id.* at ¶ 50. He previously served as a law clerk to the Honorable George C. James, Jr. on the Supreme Court of

---

[12] Andrew did not continue to represent Plaintiff after his departure from Nelson Mullins. Brunson Aff. ¶ 49. The Court granted Andrew's motion to withdraw as counsel on January 12, 2022. (ECF 46).

[13] Patrick's representation of Plaintiff ceased on March 17, 2021 after Patrick left Nelson Mullins and the Court granted his motion to withdraw as counsel. (ECF 39).

South Carolina. *Id.* Before his clerkship, he practiced at the international law firm, K&L Gates LLP, where he primarily defended employment discrimination lawsuits in federal court. *Id.* John is a *cum laude* graduate of the University of South Carolina School of Law, where he ranked in the top 10% of his class, was named to the Order of the Coif, earned five CALI awards, and served as a legal writing tutor and Senior Articles Editor of the *South Carolina Law Review*. *Id.* John was also recently named to the Best Lawyers: Ones to Watch list. *Id.*

Lauren Lynch is a Senior Paralegal at Nelson Mullins. She graduated from The University of West Georgia in 1986 with a BBA in Accounting and earned her Paralegal Certificate from Trident Technical College in 2001. *Id.* at ¶ 51. Lauren has worked at Nelson Mullins for twenty-six years as a paralegal almost exclusively in the field of commercial litigation. *Id.*

### J.    Undesirability of the case within the legal community

"[C]ivil rights cases are unquestionably much more difficult and less desirable to the plaintiffs' bar than personal injury, product liability, and class action litigation as evidenced by advertising dollars." *Buie*, 2021 WL 4226166, at *3; *see Hebb*, 2025 WL 256999, at *5 ("Complex § 1983 actions are admittedly difficult to litigate."). The complexity of this case was compounded by the factual and legal issues presented. Neither Plaintiff nor the Youth it represents could have afforded legal representation in this matter on an hourly basis. Additionally, this case had no chance for an award of monetary damages, further disincentivizing attorneys from pursuing it, and leaving *pro bono* representation as the only plausible arrangement. *Hebb*, 2025 WL 256999, at *5. Accordingly, this case presents the exact issue that motivated Congress to enact civil rights laws in the first place. *See City of Riverside v. Rivera*, 477 U.S. 561, 576 (1986) ("Congress enacted [Section] 1988 specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with

effective access to the judicial process."). This factor, therefore, weighs heavily in favor of the reasonableness of a substantial fee. *Hebb*, 2025 WL 256999, at *5.

### K. Nature and length of the relationship between attorney and client

Courts are directed to consider this factor on the basis that "[a] lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *Johnson*, 488 F.2d at 719. Here, counsel has represented Plaintiff on a *pro bono* basis over the course of many years, but Plaintiff, a non-profit organization, has never retained Nelson Mullins for any paid work and is unlikely to do so. Brunson Aff. ¶ 10.

### L. Fee award in similar cases

Other fee awards by this Court and others in ADA and § 1983 cases furnish a basis for the fees sought here. Because there is so much legal and factual overlap with the present case, the case *Alexander S. By & Through Bowers v. Boyd* is particularly instructive. 929 F. Supp. 925 (D.S.C. 1995). There, thirty years ago, Judge Anderson awarded $1,066,599.32 in attorneys' fees and $118,509.59 in costs to the prevailing plaintiffs, represented in part by Nelson Mullins *pro bono*. Adjusted for inflation, those awards roughly equal $2,255,413.15 and $250,598.40 in September 2025 dollars, respectively.[14] *See, e.g.*, *Gifford v. Horry Cnty. Police Dep't*, No. 4:16-CV-03136-MGL, 2023 WL 2696575, at *10 (D.S.C. Mar. 29, 2023) (comparing fee awards in other cases by adjusting for inflation), *aff'd*, No. 23-1471, 2024 WL 5166611 (4th Cir. Dec. 19, 2024), *cert. denied sub nom. Rhodes v. Gifford*, No. 24-1081, 2025 WL 1549793 (U.S. June 2, 2025). Other cases from this District have also yielded substantial fee awards:

- *Sauders v. S.C. Pub. Serv. Auth.*, No. C.A. 2:03-0934-23, 2011 WL 1236163 (D.S.C. Mar. 30, 2011) (applying multiplier of 1.25x to reasonable lodestar fee of $6,858,460 to award $8,573,075 in attorneys' fees and $1,710,219.60 in costs for a total of $10,283,294.60);

---

[14] *See* https://www.bls.gov/data/inflation_calculator.htm.

- *Liberty Mut. Ins. Co. v. Emp. Res. Mgmt., Inc.*, 176 F. Supp. 2d 510, 540 (D.S.C. 2001) (applying the *Barber* factors to award $885,133.70 in attorneys' fees under the South Carolina Unfair Trade Practices Act);

- *Gifford v. Horry Cnty. Police Dep't*, No. 4:16-CV-03136-MGL, 2023 WL 2696575 (D.S.C. Mar. 29, 2023) (awarding $878,467.80 in fees in § 1983 case, minus billing for more than two attorneys at a deposition, with rates up to $450);

- *Moultrie v. Charleston County Council*, No. 2:01-0562-23 (D.S.C. Aug. 8 2005) ($712,027.71 in fees and costs in voting case), attached hereto in **Exhibit H**;

- *Doe v. Kidd*, 656 F. App'x 643, 647 (4th Cir. 2016) (directing entry of $669,077.20 fee award for 1,714.73 hours of work in § 1983 case brought by disabled individual against state agencies);

- *Southeast Booksellers Ass'n v. McMaster*, No. 2:02-cv-03747-PMD (D.S.C. Sept. 8, 2005) (awarding over $405,000 in attorneys' fees in a free speech case, at rates of $400 per hour for South Carolina counsel and higher rates for out-of-state counsel);

- *Morris v. Bland*, No. 5:12-CV-3177-RMG, 2015 WL 12910631, at *6 (D.S.C. Jan. 15, 2015) (awarding $354,293 in attorneys' fees for 1,170.33 hours).

Counsel, therefore, submit that precedent amply supports the reasonableness of the fees here.

III.    **Step Two: The Court should award the Final Lodestar Figure.**

At the second step, the court subtracts fees for any hours spent on unsuccessful, unrelated claims. *Buie v. Charter Commc'ns*, No. 6:17-CV-03007-DCC, 2021 WL 4226166, at *2 (D.S.C. June 9, 2021). However, when all claims "involve a common core of facts ... much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Brodziak v. Runyon*, 145 F.3d 194, 197 (4th Cir. 1998) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)). In such a case, the court should decline to subtract hours at the second step and should turn instead to the third step. *Buie*, 2021 WL 4226166, at *2.

31

Here, because Plaintiff did not fail to succeed on any of its claims, which all involve a common core of integrated facts, the Court should not reduce the fee award on this basis and should proceed to the next analytical step. *Id.*

### IV.    Step Three: Plaintiff's degree of success.

Finally, at the third step, the court must consider the "degree of success enjoyed by the plaintiff." *Hudson*, 774 F.3d at 237. There is no "precise rule or formula" for determining a plaintiff's degree of success. *Jones v. Southpeak Interactive Corp.*, 777 F.3d 658, 676 (4th Cir. 2015) (quoting *Hensley*, 461 U.S. at 436). The court "must compare the amount of the damages sought to the amount awarded." *Mercer v. Duke Univ.*, 401 F.3d 199, 204 (4th Cir. 2005) (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). Nevertheless, courts do not "reflexively reduce fee awards whenever damages fail to meet a plaintiff's expectations in proportion to the damages' shortfall." *Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 190 (4th Cir. 2007) (citations omitted). Where an attorney has obtained "excellent results," his fee should not be reduced "simply because the plaintiff failed to prevail on every contention." *Hensley*, 461 U.S. at 435. If, however, the plaintiff "has achieved only partial or limited success," a reduction of the fee award may be appropriate. *Id.* at 36.

As already discussed, Plaintiff enjoyed truly remarkable success in this case. The Consent Decree mandates unqualified, comprehensive reform to the CCJDC, impacting the lives of countless current and future Youth. Therefore, the Court should award Plaintiff attorneys' fees in the full amount of its Final Lodestar Figure—$901,411.40.

### V.    Plaintiff's Costs and Expenses

Prevailing plaintiffs in ADA and § 1983 actions are also entitled to recover the costs and litigation expenses reasonably incurred in litigating their claims. *See* 42 U.S.C. § 12205 (allowing the prevailing party in an ADA action to recover reasonable "litigation expenses, and

costs"); 42 U.S.C. § 1988(b)–(c) (allowing prevailing parties in a § 1983 action to recover expert

fees as part of the attorney's fee); *see Trimper v. City of Norfolk*, 58 F.3d 68, 75 (4th Cir. 1995)

("[Section] 1988 contemplates reimbursement not only for attorney's fees but also litigation

expenses such as secretarial costs, copying, telephone costs and necessary travel."); *Spell v.*

*McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988) ("A prevailing plaintiff in a civil rights action is

entitled, under § 1988, to recover those reasonable out-of-pocket expenses incurred by the

attorney which are normally charged to a fee-paying client, in the course of providing legal

services."). The scope of expenditures covered is intentionally broad. In the Fourth Circuit,

expenses, in addition to taxable costs, are recoverable under any of the civil rights statutes. *Daly*,

790 F.2d at 1084 (citation omitted). This includes, for example, meals, lodging, air travel, and

mileage. *E.g.*, *Wyatt v. Owens*, 7:14-cv-492, 2018 U.S. Dist. LEXIS 235871, at *50-51 (W.D.

Va. Jan. 23, 2018).

   The true total amount of litigation expenses and costs in this matter is $38,434.85.

Brunson Aff. ¶ 52. However, counsel have elected not to seek recovery of any "soft" costs like

postage and legal research and, rather, only seek to recover hard, out-of-pocket expenses like

fees for expert consultants and an electronic discovery vendor. *Id.* Thus, after this discretionary

write-off of soft costs, counsel seek only to recover $27,507.13 in litigation expenses and costs.

*Id.* This figure is more than reasonable for a case of this magnitude, complexity, and duration,

which required counsel to perform intricate legal research and retain multiple experts whose

specialized knowledge and opinions served as the foundation for the practices and policies now

mandated by the Consent Decree. *See, e.g.*, *Alexander S.*, 929 F. Supp. at 943 n.15 (awarding

$118,509.50 in costs and expenses); *Savani v. URS Pro. Sols. LLC*, No. 1:06-CV-02805-JMC,

2014 WL 172503, at *9 (D.S.C. Jan. 15, 2014) (awarding $43,944.40 in costs and expenses);

*Summers v. Adams*, No. CA3:08-2265-CMC, 2010 WL 2179571, at *6 (D.S.C. May 26, 2010) (allowing prevailing party to recover costs for: filing fees, postage, copying, telephone expenses, necessary travel, transcriptions, and electronic legal research (Westlaw) under § 1988).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant this Motion and award it $901,411.40 in attorneys' fees and $27,507.13 in costs, for a total recovery of $928,918.53.

Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: *Robert H. Brunson*
Robert H. Brunson (Federal Bar No. 4971)
E-Mail: robert.brunson@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC  29401-2239
(843) 853-5200

**BURNETTE SHUTT MCDANIEL**
Stuart Andrews (Federal Bar No. 1099)
E-Mail: Sandrews@burnetteshutt.law
912 Lady Street / 2nd Floor
PO Box 1929
Columbia, SC 29202
(803) 850-0912

**ANNIE ANDREWS LLC**

Annie Elizabeth Andrews (Federal Bar No. 13134)
E-Mail: Annie@annieandrews.law
1501 Belle Isle Ave., Suite 110
Mount Pleasant, SC 29464
(843) 888-1515

*Attorneys for Plaintiff*