# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| Protection and Advocacy for People with Disabilities, Inc. | Civil Action No. 2:20-cv-02738-DN |
| Plaintiffs, | |
| vs. | **DECLARATION OF MARK SOLER** |
| James Alton Cannon, Jr., in his official capacity as Charleston County Sheriff, et al., | |
| Defendants | |

I, Mark Soler, hereby declare under penalty of perjury, pursuant to 28 U.S.C. Section 1746(2), that I am over the age of eighteen (18) years; that the following statements are true and correct to the best of my knowledge, information, and belief; and that the opinions expressed herein are in good faith and are honestly held by me. I submit this Declaration in support of Plaintiff's Motion for Attorneys' Fees and Costs.

**BACKGROUND AND EXPERIENCE**

1. From 2006 until I retired from practice in 2022, I was the founder and Executive Director of the Center for Children's Law and Policy (CCLP), a nonprofit public interest law and policy organization located in Washington, DC. CCLP worked throughout the country to reform juvenile justice and related systems that affect troubled and at-risk children, and to protect the rights of children in such systems, through research, writing, public education, media advocacy, training, technical assistance, administrative and legislative advocacy, and litigation. CCLP ceased operations in 2024.

2. Prior to working at CCLP, from 1978 until February, 2006, I was the Senior Staff Attorney, then Executive Director (1980-1994), then President of the Youth Law Center, a national public interest law firm. At the Youth Law Center, my colleagues and I worked in more than 40 states on juvenile justice, child welfare, health, mental health, and education issues.

3. Before joining the Youth Law Center, I was in private practice in the San Francisco Bay area from 1974 to 1978.

4. I graduated from Yale University in 1968. In 1973 I graduated from Yale Law School, where I was an editor of the Yale Law Journal. Following law school, I clerked for one year with the Hon. M. Joseph Blumenfeld, who was then the Chief Judge of the United States District Court for the District of Connecticut.

5. I have worked to reform juvenile justice systems across the country for the past forty-five years. During that time, I have litigated federal civil rights class action cases involving conditions of confinement for juveniles in adult jails, juvenile detention facilities, state institutions, and private facilities in sixteen states. I was lead counsel in cases in California, Utah, New Mexico, Colorado, South Dakota, Ohio, Kentucky, Maine, and the District of Columbia. I was co-counsel in cases in Washington, Oregon, Alabama, Florida, North Carolina, Arizona, and Idaho. Representative opinions are *Doe v. Burwell*, 537 F.Supp. 186 (S.D. Ohio 1982) and *Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982).

6. I have been admitted to practice before the United States Supreme Court; United States Courts of Appeals for the Fourth, Sixth, Ninth, Tenth, Eleventh, and District of Columbia Circuits; and the United States District Court for the Northern and Eastern Districts of California. On particular cases, I was admitted to practice *pro hac vice* before federal courts in the Districts of Utah, Colorado, Arizona, Idaho, New Mexico, District of Columbia, Southern District of

Ohio, Eastern District of California, Eastern District of Washington, Western District of Kentucky, and Northern District of Alabama, as well as state courts throughout California.

7. I have been involved in major juvenile justice reform efforts across the country. I have worked on planning and implementing the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative (JDAI) since it began in 1992. JDAI is a national reform effort to promote policies, practices, and programs to reduce the unnecessary and inappropriate use of secure detention for juveniles charged with delinquency offenses without jeopardizing public safety; ensure safe and humane conditions for youth who are held in secure confinement; reduce racial and ethnic bias in the juvenile justice system; and save taxpayers' dollars. JDAI has operated in over 200 sites in 39 states and the District of Columbia. Over the years, the Casey Foundation has invested more than $100 million in JDAI.

8. I was one of the leaders in the John D. and Catherine T. MacArthur Foundation's Models for Change Juvenile Justice Reform Initiative (2004-2017). Models for Change supported state and local public officials, legal advocates, researchers, educators, community leaders, and family members who are working to ensure that young people who make mistakes are held accountable and treated fairly throughout the juvenile justice process. Models for Change provided research-based tools and techniques to make juvenile justice more fair, effective, rational and developmentally-appropriate. Models for Change operated in sixteen states. During the period of the initiative, the MacArthur Foundation invested approximately $165 million in Models for Change. Models for Change had a special focus on improving mental health care for youth in the juvenile justice system, improving access to counsel and quality of representation for indigent juveniles, and reducing racial and ethnic disparities in the juvenile justice system.

3

9. As Executive Director of CCLP, I oversaw and was directly involved in all of the Models for Change work on reducing racial and ethnic disparities. That work included site-based work in 17 counties and parishes in eight states, as well as coordination of the Disproportionate Minority Contact (DMC) Action Network. Also as part of Models for Change, I worked for two years with local and state officials and all of the juvenile detention facility superintendents in Louisiana to develop the first-ever mandatory state standards for conditions, policies, and practices in juvenile detention facilities. The Louisiana standards, which are now embodied in state regulations, are largely based on the JDAI juvenile detention facility standards.

10. I have written more than 40 articles and book chapters on civil rights issues and the rights of children in the juvenile justice system. My resume is attached.

11. I have taught courses on juvenile justice and complex federal litigation at Boston University School of Law (Juvenile Law, Complex Federal Litigation), Boston College Law School (Juvenile Justice), the Washington College of Law at American University (Juvenile Justice), and the University of Nebraska Law School (Juvenile Justice). During the 1980s I taught a course on First Amendment Law that was required for all Journalism and Broadcasting majors at San Francisco State University.

12. I have received several awards for my work on behalf of children and youth, including a 1982 Swedish Bicentennial Scholarship from the Swedish government to study the juvenile justice system in Sweden; the 1987 American Psychological Association Award for Distinguished Contributions to Child Advocacy; the 1990 American Bar Association Livingston Hall Award for "outstanding legal advocacy on behalf of troubled children, youth, and families"; the 1991 Western Society of Criminology Award "for significant improvement of the quality of justice"; the 1996 James J. Gould Juvenile Detention and Correctional Services Award from the

Alliance for Juvenile Justice, which was composed of the American Correctional Association, Council of Juvenile Justice Administrators, Juvenile Justice Trainers Association, National Association of Juvenile Correctional Agencies, and the National Juvenile Detention Association; the 2000 "Justice for Children" award from the federal Office of Juvenile Justice and Delinquency Prevention, an agency of the U.S. Department of Justice; and the 2013 John D. and Catherine T. MacArthur Foundation Models for Change "Champions of Change" Award (to the Center for Children's Law and Policy).

13. In 1990 I was recognized as a juvenile law expert by the United States District Court in *Hendrickson v. Branstad*, 740 F.Supp. 636, 644 (N.D. Iowa 1990). In that case, plaintiffs sued over abusive and unconstitutional conditions in a state juvenile facility. Through settlement, the plaintiffs achieved very significant reforms in facility policies and practices. I submitted a declaration in support of the plaintiffs' Motion for Attorneys' Fees and Costs and the Court explicitly relied on my declaration in calculating fees. *Id*. at 644. When the defendants appealed the award of fees, the Court of Appeals for the Eighth Circuit affirmed the District Court's award of fees while holding that an "enhancement" of the lodestar amount was not appropriate. *Hendrickson v. Bronstad*, 934 F.2d 158, 163 (8th Cir. 1991)

**PURPOSE OF THIS DECLARATION**

14. The purpose of this Declaration is to provide the Court with information regarding the complexity of the pre-litigation, litigation, and settlement process; the reasonableness of the fees and costs sought by plaintiff in this case; and the significance of the plaintiff's victory in this case.

15. In order to prepare this Declaration, I reviewed the Complaint in this case, the Consent Decree, the plaintiff's draft Motion for Attorneys' Fees and Costs and related

documents, the plaintiff's attorneys' billing and cost records, and the JDAI assessment of the conditions of confinement for youth in the wing of the Charleston County Jail used at the time to house young people and the new juvenile detention facility (then under construction).

## COMPLEXITY OF INVESTIGATING, LITIGATING, AND SETTLING JUVENILE FACILITY CONDITIONS CASES

16. I have litigated and settled individual and class action conditions of confinement cases in juvenile detention facilities, state juvenile correctional institutions, private juvenile corrections facilities, and adult county jails. Litigating and settling such cases in juvenile facilities is difficult, time-consuming, and complex in ways that are different from other litigation.

17. The first problems occur during the investigation stage. Typically, the attorneys hear anecdotal reports of deficiencies or abuses in a facility. The reports may come from public defenders, parents, social workers, medical or mental health professionals, or staff who work in the facility (who believe that something is wrong but don't know what to do about it). I have received many such calls during my career. They usually begin, "I'm concerned about a situation in the juvenile facility. Can you help me?"

18. The attorneys must then determine how to find out more about the facility. A juvenile detention or correctional facility is a closed institution covered by a cloak of confidentiality. The agency operating the facility does not disclose the names or any other information about youth who are incarcerated, nor could they under Juvenile Court confidentiality provisions. The attorneys usually must find other ways to get information. This is often a painstaking process of following up leads from the original report of abuse until the attorneys can make connections with others who have knowledge of the facility.

6

19. Another complicating factor is that most youth are in a detention facility for a very short period. At the CCJDC, for example, the average length of stay for half of the youth detained was three days. Attorneys want to interview youth who are currently in the facility, so that they get timely and accurate information. But the short length of stay makes it difficult to do. As a practical matter, it is very difficult for attorneys to identify youth, contact their parents to discuss the situation, and arrange to interview the youth in such short periods of time.

20. Even when attorneys are able to identify youth and meet with them, youth are often reluctant to talk about policies, practices, and conditions in the facility. This is especially true for youth who are inside the facility. Many youth have a fear of retribution from staff if they talk to attorneys from the outside. I have been in many facilities where that fear was well-founded. Even after youth are released, they are often concerned about getting involved in an effort to confront the facility: they may be concerned about consequences if they are detained in the future, or the impact on their probation, or about consequences for friends who are still in the facility and who may be questioned by facility staff.

21. Another difficulty in the investigation is obtaining relevant documents, including videos of incidents involving use of force. The cloak of confidentiality prohibits disclosure of documents or other materials that allow identification of individual youth. If an attorney actually represents a youth, the attorney can usually obtain some documents relevant to the youth, but not all. For example, videos of use of force usually show other youth and multiple staff. For that reason, such videos are usually not released to outsiders absent a court order or agreement between the parties. Similarly, such materials are generally not disclosed through public documents or Freedom of Information Act requests.

22. Once the litigation begins, there are additional problems. Documentary evidence in the form of videos of use of force and "special incident" reports is often the heart of the case. Reviewing videos is a very time-consuming process. I have reviewed hundreds of videos of use of force and thousands of special incident reports. Usually, the special incident report narrative starts with the misbehavior by the youth and the forcible response by staff. However, the critical information is often what happened *before* the misbehavior. Had the staff and youth interacted earlier in the day? Was there tension between them? Was there a minor incident that escalated into full confrontation and use of force? Were other staff nearby before the confrontation occurred? Were there any others who could have intervened to prevent the confrontation, such as mental health professionals or senior unit staff? Were other youth involved? When did they get involved? Because special incident reports usually do not provide this information, the videos of the incident become crucial. They must be reviewed carefully and often repeatedly. Reviewers must observe things like tone of voice, body language, physical environment, interaction between staff and youth, and between staff directly involved and other staff. They must also look for things that often do not happen, such as whether the staff person tried to de-escalate the situation and whether a mental health professional was called to intervene.

23. As the litigation continues, it is often challenging for attorneys to keep track of the youth they have interviewed. The litigation in this case has lasted for more than five years. During that time, youth who were teenagers in 2020 are now young adults in their early 20s. They may have moved, gone to college or vocational school, or entered the military. It requires a major effort by attorneys to keep track of such youth, if that is even possible.

24. Another complication is that, once the litigation begins, defendant agencies often release from custody youth who have talked with or are being represented by counsel.

Defendants then file a motion to dismiss for mootness regarding those youth and lack of standing by other youth. When plaintiff's attorneys are careful, e.g., by filing a motion for class certification with the complaint or by representing an associational plaintiff, such motions are usually time-consuming but unsuccessful.

25. Settling a case over conditions of juvenile confinement is also challenging. One issue is that the leader of the agency operating the facility often changes over time. In this case, there have been three Sheriffs during the course of the litigation. Sometimes these changes signal new attitudes toward the litigation or even reversal of prior approaches. In any event, when the agency leadership changes, the attorneys must often work with a new cast of characters.

26. Another problem with settling a conditions of juvenile confinement case is that, within the agency or within the jurisdiction, there may be sharply differing opinions on how to treat young people accused of crimes. Those who take a hard stance – "If you do the crime, you do the time" – may resist reforms as coddling of criminals. Those who focus on treatment and rehabilitation may be appalled by abusive policies and practices. Often these conflicting approaches exist within the agency itself, and they certainly exist in the general population. These differences can make it challenging for the attorneys on both sides to negotiate a settlement.

27. Another issue complicating settlement negotiations is economic. Implementing reforms usually requires expenditures by the agency or the jurisdiction. Additional facility staff, mental health professionals, and teachers; new training for all staff; and changes to the physical environment all cost money. When plaintiffs prevail, they are also entitled to attorneys' fees and costs. Plaintiffs' attorneys must not only work with the attorneys for the defendants, but must also address the financial concerns of city councils, county commissions, and state officials.

## REASONABLENESS OF FEES AND COSTS REQUESTED IN THIS CASE

28. There is no question that the Plaintiff in this case is the prevailing party. Through the Consent Decree, the Plaintiff achieved virtually all of its goals in the litigation as well as additional reforms that were identified during the litigation and assessment process. Therefore, the Plaintiff is entitled to reasonable fees and costs.

29. After reviewing the hourly billing logs and expenses claimed, it is my opinion that the attorneys' fees and costs requested by Plaintiff are reasonable. The fees and costs are comparable to other civil rights conditions of confinement cases that I have litigated and to other cases that I know about from my research and contact with other civil rights attorneys.

30. It is impressive that the Plaintiff has discounted fees and costs in several ways: by not seeking to recoup *de minimis* fees of the Nelson Mullins timekeepers, by not seeking to recover for any of Annie Andrews' time on this case, by deleting time that could be considered redundant or otherwise unnecessary (e.g., internal meetings, two partners at mediation meetings), and by counsel using their 2020 rates discounted by approximately 15%. For example, for Robert Brunson, the discounted rate for this case is only 58% of his current hourly rate.

31. It is also impressive that the parties agreed to conducting the JDAI Standards assessment and to use the report as the basis for the Consent Decree. The Sheriff's Department is to be highly commended for avoiding the expense of extensive discovery and trial, and for agreeing to use the most comprehensive set of standards for juvenile detention facilities that exists in the field.

**SIGNIFICANCE OF RESULTS ACHIEVED**

32. The results achieved in this case are phenomenal. The Plaintiff achieved reform on every major issue in the Complaint. By securing the Consent Decree, the Plaintiff has assured, by court order, that decades of abuse and neglect of youth in detention in Charleston County will end. Hundreds of children in Charleston County, perhaps thousands, will benefit directly from the provisions of the Consent Decree.

33. The Consent Decree incorporates JDAI Standards and the recommendations of the assessment at a level of detail that I have not seen in other consent decrees involving juvenile conditions of confinement. Many of the JDAI Standards are incorporated verbatim in the Decree. As a result, the Consent Decree will become a model for attorneys and other advocates for children and youth around the country. I will send it to my former colleagues in the field and to newsletters and clearinghouses that provide resources to child advocates and civil rights attorneys, for further dissemination. The Consent Decree will have impact far beyond Charleston County and the State of South Carolina.

34. In addition, the process in this litigation – avoiding protracted litigation in favor of utilizing an independent assessment to provide the basis of a Consent Decree – will be influential to litigants all over the country. Plaintiff's attorneys have provided a model for resolving important issues of youth health and safety without resorting to the much more expensive artillery so often wielded in major litigation.

**PLAINTIFF'S ATTORNEYS BROUGHT THE JDAI STANDARDS TO THE CCJDC**

35. This lawsuit was filed on July 25, 2020. After extended discussions between Plaintiff's attorneys and attorneys for the Sheriff, the Center for Children's Law and Policy was asked to conduct an assessment of the conditions of confinement for youth in detention. On

November 2-3, 2021, I was part of the assessment team that conducted an on-site visit. The team consisted of myself, several staff from CCLP, and subject matter experts in education and mental health. Prior to the visit, the team reviewed policies and practices and operational documents such as incident reports at the Jail and the juvenile detention facility.

36. By agreement between the Plaintiff's attorneys and the Sheriff's Department, the team used the Standards for Juvenile Detention Facility Assessments (JDAI Standards) published by the Annie E. Casey Foundation. The JDAI Standards were developed by attorneys at the Youth Law Center and the Center for Children's Law and Policy and more than three dozen subject matter experts. The standards were developed following an extensive review of applicable federal statutes such as the Individuals with Disabilities Education Act; federal and state court decisions; settlement agreements in conditions of confinement lawsuit brought by the U.S. Department of Justice and public interest law offices; professional standards, including those of the American Correctional Association and the National Commission on Correctional Healthcare. The Standards are very comprehensive and cover eight major areas of operations in juvenile facilities, including classification, medical and mental health services, access to counsel and family, programming (including education), staff training, physical environment, use of room confinement and restraints, facility discipline for misconduct, and grievances. The Standards have been used for juvenile detention facility assessments in jurisdictions all over the country.

37. The Plaintiff's attorneys in this case brought the JDAI Standards to the Charleston County Juvenile Detention Center (CCJDC). After they heard reports of abuse in the facility, they researched the Standards and talked to people who were familiar with them, including me. They used the Standards to organize their investigation into the facility, their interviews with

youth who had been incarcerated, the documents they requested from the Sheriff's Department, and their legal research. Early on, they advocated with the defendants to have an independent assessment of the facility conducted using the JDAI Standards rather than going through an extended discovery process. They continued this advocacy until the Sheriff's Department formally agreed to the JDAI assessment in late 2021. Following the assessment, they advocated with the defendants to use the report as the basis for a consent decree to resolve the issues in the case. They continued their advocacy until the parties were able to reach final agreement on all issues and this Court entered its Consent Decree. Without the JDAI Standards assessment, it would have been very difficult to litigate this case and cure the deficiencies in the facility, and it would likely have been impossible to achieve the enormous reforms in the Consent Decree. Without the plaintiff's attorneys' efforts in this case, there would have been no JDAI Standards assessment.

38. I compared the claims in the Complaint with the findings in the JDAI Standards assessment. The comparison demonstrates the difficulty of reforming the policies and practices at the facility. In the Complaint, filed July 25, 2020, the plaintiffs cited overcrowding (Para. 59-63), lack of a classification system for protecting vulnerable youth from older and stronger youth (Para. 68-71), inadequate medical care (Para. 72-76), inadequate mental health care (Para. 77-80), inadequate access for youth with mobility disabilities (Para. 81-83), inadequate programming including indoor and outdoor recreation (Para. 64-67), inadequate training of staff (Para. 94), dangerous physical environment (Para. 20-29), excessive use of force and restraints (Para. 47-58), excessive use of room confinement (Para. 30-46), and denial of due process in discipline proceedings (Para. 97).

39. In the JDAI Standards assessment, conducted more than fifteen months later, the team found many of the same issues: overcrowding and severe understaffing and, as a consequence, excessive involuntary (and unwanted) overtime for staff who were available; absence of a classification system; inadequate mental health services; lack of an effective behavior management system; insufficient programming, including recreation; inadequate education and special education services; inadequate staff training, particularly with regard to supervising youth with trauma histories and mental health needs; poor staff morale; drab and dreary physical environment; a dangerous dependence on room confinement, often due to staff shortages, including solitary for youth who engaged in minor misconduct; and abusive use of restraints.

40. For each of these issues, the report provided specific recommendations for resolving the issue and meeting the highest standards of care. The JDAI Standards assessment report provided a template for the settlement of this case. Many of the recommendations in the report are incorporated verbatim in the Consent Decree.

41. The JDAI Standards are a tool for reform. They are not self-implementing. They require advocates to understand them, promote them for adoption in a facility, and follow through during implementation. The role of Plaintiff's attorneys in promoting the Standards to the Sheriff's Department in this litigation was central to the success of the effort.

Mark Soler

January 9, 2026

Date

# EXHIBIT 1

## RESUME OF MARK SOLER

Address:     3920 Livingston Street, NW
             Washington, DC 20015

             Phone: (202) 285-7568 (cell)

             E-mail: markisoler@gmail.com

### Undergraduate education

Yale University: B.A. in Psychology (magna cum laude) June, 1968

### Legal education

Yale Law School: J.D. June, 1973

        Editor, Yale Law Journal
        Law Student's Civil Rights Research Council Internship

        Connecticut Student Practice Certification Program

### Bar membership and admissions to practice

Member, State Bar of California

Admitted to practice before the United States Supreme Court; United States Courts of Appeals for the Fourth, Sixth, Ninth, Tenth, Eleventh, and District of Columbia Circuits; and the United States District Court for the Northern and Eastern Districts of California. On particular cases, practiced before federal courts in the Districts of Utah, Colorado, Arizona, Idaho, New Mexico, District of Columbia, Southern District of Ohio, Eastern District of California, Eastern District of Washington, Western District of Kentucky, and Northern District of Alabama, as well as state courts throughout California.

**Work experience**

April  2006 – April 2022

> Executive Director
> Center for Children's Law and Policy
> 1701 K St., NW, Suite 1100
> Washington, DC 20006

The Center for Children's Law and Policy (CCLP) is a public interest law and policy organization focused on reform of juvenile justice and other systems that affect troubled and at-risk children, and protection of the rights of children in such systems.  The Center's work covers a range of activities including research, writing, public education, media advocacy, training, technical assistance, administrative and legislative advocacy, and litigation.  I oversaw all operations of the organization, supervised all staff, and worked on major projects.

CCLP works in three areas of juvenile justice reform: (1) preventing unnecessary entry of youth into the juvenile justice system, and especially unnecessary detention and incarceration; (2) ensuring safe and humane conditions of confinement for those youth who are incarcerated; and (3) reducing and eliminating racial and ethnic disparities in the juvenile justice system.  In the first area, CCLP is a partner in the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative (JDAI).  CCLP staff serve as Technical Assistance Team Leaders (TATLs) in Baltimore, MD, and Shelby County (Memphis), TN, and in multiple counties in Pennsylvania, Kentucky, Arkansas, Virginia, Alabama, and New Hampshire.  CCLP staff also co-authored JDAI's comprehensive set of standards for assessing conditions and practices in juvenile detention facilities.  In the second area, CCLP staff conducts thorough assessments of juvenile facilities for judges and agency administrators to alert them to potential dangers and problems.  Staff also trains teams in JDAI sites to conduct their own assessments of local facilities.  In the third area, CCLP coordinated the work to reduce racial and ethnic disparities and the Disproportionate Minority Contact (DMC) Action Network as part of the John D. and Catherine T. MacArthur Foundation's Models for Change juvenile justice reform initiative, working in 17 counties and parishes in eight states.  CCLP has done similar work in four cities in Connecticut and counties in Colorado and Florida. I was directly involved in projects in all areas of CCLP's work.

June 1994 – April 2006

> President
> Youth Law Center
> 1010 Vermont Avenue, N.W., Suite 310
> Washington, D.C. 20005

> (August, 1980 - June, 1994 - Executive Director, San Francisco Office)
> (November, 1978 - August, 1980 - Senior Staff Attorney, San Francisco Office)

The Youth Law Center is a public interest law office organized as a nonprofit corporation to provide advice and assistance in matters relating to the legal rights of children. Since 1978, Center staff attorneys have worked with public officials, community groups, attorneys, and other children's advocates in more than 40 states around the country. Center staff have also brought civil rights law

reform litigation in federal and state courts in 15 states to protect the rights of children in the juvenile justice system-particularly those confined in adult jails, detention centers, and similar correctional facilities—and the rights of children in foster care. Center staff also work in the areas of health care, education, mental health, and rights of the disabled.

The Center promotes the development of preventive, family-focused, comprehensive, community-based services to meet the multiple needs of children and families. The Center also aims to insure accountability of public and private agencies by emphasizing cost-effective services and measurable outcomes. The Center is funded primarily through foundation grants, the State Bar Trust Fund, and contributions from law firms, corporations, and individuals.

As Executive Director, I supervised all activities of the Center's eight staff attorneys, health policy analyst, development director, and support staff; coordinated Center activities with those of other national and local organizations interested in children's rights; conducted litigation as lead counsel or co-counsel in particular lawsuits; participated in trainings and technical assistance projects; supervised all fundraising activities; and reported regularly to, and worked with, the Center's Board of Directors.

As President, I was responsible for developing Youth Law Center collaborations with other national organizations working for children and youth, monitoring federal legislation and the activities of federal agencies, expanding advocacy activities on the East Coast, and conducting fundraising activities on the East Coast.

January, 1995 – May, 2004
2012 – 2014

     Adjunct Professor

     Washington College of Law
     American University
     4801 Massachusetts Avenue, N.W.
     Washington, DC 20016-8084 (202)
     274-4000

     1995 – 2004: Course on "Juvenile Law: Advocacy for Children," covering child development, statutory and constitutional rights of children in state custody, advocacy strategies (media, legislative, administrative, litigation), foster care and the child welfare system, the juvenile justice system, race and gender issues, and new efforts such as integrated services and use of multiple strategies.

     2012 – 2014:  Seminar on "Selected Topics in Juvenile Justice," covering history and mission of the juvenile court, rights of young people in the juvenile justice system, adolescent development, responsibilities of counsel, school-to-prison pipeline, youth of color in the juvenile justice system, girls, alternatives to incarceration and evidence-based practices, conditions of confinement, LGBTQI issues, Prison Rape Elimination Act, the right to treatment, transfer to adult court, and the juvenile death penalty and juvenile life without parole

September, 1996 - May, 1997

     Visiting Professor
     Boston College Law School
     885 Centre Street
     Newton, MA 02159
     (202) 552-4382

     Co-taught course on "Juvenile Justice" with Professor Francine Sherman. Course covered child development, civil rights of youth in the juvenile justice system, conditions of confinement, race and gender issues, and juvenile justice issues in Massachusetts.

July, 1988-August, 1988

     Visiting Professor
     University of Nebraska
     College of Law
     Lincoln, NE 68583-0902
     (402)472-2161

     Taught course in the Law/Psychology Program on "Interdisciplinary Perspectives on Children in Society." Course covered legal, health, and public policy perspectives on abortion, the "Baby Doe" controversy, maternal and child health, foster care, adolescent psychosocial

development, adolescent sexuality and "risk-taking" behavior, children at special risk (gay children, runaways), and benefits and disadvantages of litigation and other advocacy strategies for children.

January, 1985-May, 1985

> Associate Professor
> Boston University School of Law
> 765 Commonwealth Avenue
> Boston, MA 02215
> (617) 353-3112

Taught a survey course on "Juvenile Law," covering the juvenile court, juvenile justice system, foster care, and termination of parental rights, and a seminar on "Complex Litigation," including jurisdictional requirements, causes of action, class actions, discovery, pretrial motions, use of experts and special masters, settlements, trial work, attorney's fees, and enforcement of court orders.

September, 1976 – May, 1986

> Instructor
> Journalism Department
> San Francisco State University
> 1600 Holloway Avenue San
> Francisco, CA 94132
> (415)469-1689

Course on "Mass Communication Law," required of journalism majors but open to all undergraduates. Course covered basic First Amendment concepts, prior restraints on publication, free press/fair trial, libel and slander, invasion of privacy, grand juries and reporters' "privilege," and obscenity.

June, 1976-June, 1978

> Treuhaft and Walker
> Oakland, CA 94612

General practice involving criminal and civil litigation, including appellate work. Particular focus on civil rights cases, including police brutality, First Amendment issues, and constitutional challenges to state and federal drug laws.

September, 1974 - June, 1976

> Community Law Office
> San Francisco, CA 94110

General practice involving criminal and civil litigation. The office was a neighborhood-based community law office located in the Mission District.  The office primarily served low-

income people of the Mission community. I also spent an afternoon each week at the Native American Health Center in the Mission providing free legal counseling for people using the Health Center.

September, 1973 - August, 1974

      Law Clerk for
      Honorable M. Joseph Blumenfeld
      Chief Judge, United States District Court
      District of Connecticut
      Hartford, Connecticut

September, 1972 - June, 1973

Law Clerk for attorney John R. Williams, New Haven, Connecticut, working on criminal cases, including trial work and preparation and conducting of evidentiary hearings in state and federal courts.

June, 1972-August, 1972

Law Student's Civil Rights Research Counsel summer intern at the Community Law Office, San Francisco, California.

September, 1971 - June, 1972

Law Clerk for Elliott S. Milstein, Senior Attorney, New Haven Legal Assistance Association, New Haven, Connecticut, working on criminal cases.

September, 1971 - June, 1972

Teaching assistant for Professor Jonathan Casper, Department of Political Science, Yale University. During the Fall term, I taught two sections of Political Science 46a, "Politics and the Legal System"; during the Spring term, two sections of Political Science 46b, "Civil Rights and Civil Liberties."

June, 1971 -August, 1971

VISTA summer legal intern at Denver Legal Aid, Denver, Colorado. Worked on civil cases in a neighborhood law office, Title VII litigation, and criminal cases.

November, 1969 - September, 1970 (full-time);
September, 1970 - June, 1971 (part-time)

Administrative Assistant to Frederick W. Danforth, Jr., Executive Director, New Haven Legal Assistance Association, working on program development and management, research and writing, preparation of grants, and public relations.

January, 1969 - June, 1969

High school teacher, Bridgeport, Connecticut

September, 1968 - January, 1969

Elementary school teacher, Washington, D.C.

**Representative Litigation**

Doe v Burwell. 537 F. Supp. 186 (S.D.Ohio 1982) (sexual assault on 15-year-old girl in county jail)

Milonas v Williams. 691 F.2d 931 (10th Cir. 1982), cert, denied 460 U.S. 1069 (1983) (unlawful conditions of confinement in juvenile facility)

**Representative Publications**

Note, "The Legal Services Corporation: Curtailing Political Interference," 81 Yale Law Journal 231(1971)

Soler, "Legal Assistance Is Dying in New Haven," 3 Yale Review of Law and Social Action 9 (1972)

Soler, "Of Cannabis and the Courts: A Critical Examination of Constitutional Challenges to Statutory Marijuana Prohibitions," 6 Connecticut Law Review 601 (1974)

Soler, "'A Woman's Place ...': Combating Sex-Based Prejudices in Jury Trials Through Voir Dire," 15 Santa Clara Lawyer 535 (1975)

Soler, "Voir Dire: The Art of Seating Jurors Who Are Free of Sex Prejudice," Student Lawyer. Vol. 4, No. 8 (April, 1976)

Soler, Dale, and Flake, "Stubborn and Rebellious Children: Liability of Public Officials for

Detention of Children in Jails," 1980 <u>Brigham Young University Law Review</u> 1 (1980)

National Juvenile Law Center and Youth Law Center, <u>Introduction to Litigative Advocacy</u> (1980) (sections on litigation devices and tactics)

National Juvenile Law Center and Youth Law Center, <u>Juvenile Justice: Guidelines for Police</u> (1980)

Soler, Costello, and O'Hearn, "Legal Rights of Children in the United States of America," <u>Law and the Status of the Child</u> (A. Pappas ed., United Nations Institute for Training and Research 1983) (also published in 13 <u>Columbia Human Rights Law Review</u> 675 (1981))

Soler,  "Our Delinquency on Juvenile Justice," <u>Los Angeles Times</u> (Op-Ed Page, January 20, 1984)

Soler, "The Court Path to Reform," <u>Foundation News</u> (July/August 1986) (book review)

Shauffer and Soler, "Jail Reform in California," 5 <u>ABA Juvenile & Child Welfare Law Reporter</u> 112 (October 1986)

Soler and Smith, "Federal Actions on Behalf of Children," <u>Managing Risks While Protecting Children</u> (National Association of Counsel for Children and American Association for Protecting Children 1986)

Soler, "Federal Law Relevant to Protecting Children from Harm in Out-of-Home Care," <u>Legal Advocacy for Children and Youth: Reforms, Trends, and Contemporary Issues</u> (American Bar Association 1986)

Soler, "Litigating on Behalf of Children in Institutions," 2 <u>Criminal Defense Techniques</u> § 42 A (1986)

Soler, "Juvenile Justice," <u>The American Annual 1987: Yearbook of the Encyclopedia Americana</u> 318(1987)

Soler, "Litigating on Behalf of Children in Institutions," <u>Representing the Child Client</u> (Matthew Bender 1987)

Soler, "Legal Rights of Children in Institutions," <u>Representing the Child Client</u> (Matthew Bender 1987)

Soler, "Horrors and Healers: New Directions for Child Advocacy," 11 <u>American Psychological Association Division of Child, Youth, and Family Services Newsletter</u> 6 (Winter 1988)

Soler, "Litigation on Behalf of Children in Adult Jails," 34 <u>Crime & Delinquency</u> 190 (April 1988)

**7**

Soler, "Effective Legal Advocacy for Children," 8 San Francisco Barrister Law Journal 3 (1989)

Soler and Warboys, "Services for Violent and Severely Disturbed Children: The Willie M. Litigation," Stepping Stones: Successful Advocacy for Children" (Foundation for Child Development 1990)

Soler and Shauffer, "Fighting Fragmentation: Coordination of Services for Children and Families," 69 Nebraska Law Review 278 (1990), reprinted in Law and Psychology: The Broadening of the Discipline (J. Ogloff, ed.) (California Academic Press 1992), and 25 Education and Urban Society 129 (J. Koppich and M. Kirst, eds.) (February 1993) (special issue on "Integrating Services for Children: Prospects and Pitfalls")

Soler and Jameson, "Liability of Medical Professionals for Failure to Train Institutional Staff," The Forgotten Child in Health Care: Children in the Juvenile Justice System (Johns Hopkins University 1991)

Soler, "Interagency Services for Children and Families: Questions, Answers, and More Questions" (EdSource, November 1991)

Soler, "Interagency Services in Juvenile Justice Systems," Juvenile Justice and Public Policy (I. Schwartz, ed.) (Lexington Press 1992)

Soler, "Report on a Work in Progress: Confidentiality Regulations as Barriers to Interagency Collaborations," in 5th Annual Research Conference Proceedings - A System of Care for Children's Mental Health: Expanding the Research Base (Florida Mental Health Institute, DATE???)

Soler, Shotton, and Bell, Glass Walls: Confidentiality Provisions and Interagency Collaborations (Youth Law Center 1993)

Soler, "Re-Imagining the Juvenile Court," Child, Parent, & State: Law & Policy Reader (Temple University Press 1994)

Puritz, Burrell, Schwartz, Soler, and Warboys, A Call for Justice: An Assessment of Access to Counsel and Quality of Representation in Delinquency Proceedings (American Bar Association 1995)

Puritz, Burrell, Soler, and Schwartz, "Due Process Advocacy Project: Seeking better representation for young offenders," 10 Criminal Justice 14 (Winter 1996)

Soler, "Prosecuting Children as Adults: Con," The Dallas Morning News 1J (April 5,1998)

Soler, "Save Our Children," The Bell 1 (National Mental Health Association April 1998)

Soler, "Examining 'Justice' in the Juvenile System," <u>Building Violence: How America's Rush to Incarcerate Creates More Violence</u> (J. May, ed.) (1999)

Soler, Shoenberg, and Schindler, "Juvenile Justice: Lessons for a New Era," 41 <u>Georgetown Journal on Poverty Law & Policy</u> (2009)

Soler, "Missed Opportunity: Waiver, Race, Data, and Policy Reform," 71 <u>Louisiana Law Review</u> 17 (2010)

Soler, Cocozza, and Henry, "Providing and Receiving Technical Assistance: Lessons from Models for Change" (Center for Children's Law and Policy and National Center for Mental Health and Juvenile Justice 2013).

Soler, "Reducing Racial and Ethnic Disparities in the Juvenile Justice System," Trends in State Courts 2014 (National Center for State Courts 2014)

Center for Children's Law and Policy, <u>Racial and Ethnic Disparities Reduction Practice Manual</u> (Chapters 1 and 2) (2015), available at:  http://www.cclp.org/redpracticemanual/.

Lutz, Soler, and Kittredge, <u>Not in Isolation: How to Reduce Room Confinement White Increasing Safety in Youth Facilities</u> (Washington, DC: Center for Children's Law and Policy and the Justice Policy Institute, May 2019)

Macaluso and Soler, "Refining *Parens Patriae* to Address Structural Racism in the Juvenile Justice System," <u>Juvenile Justice Update</u>, Vol. 26, No. 4 (Winter 2021).

Soler, "Legal Briefs," <u>KPFA Folio</u>. KPFA was a listener-supported radio station in Berkeley, California, part of the Pacifica network. <u>KPFA Folio</u> was the monthly magazine carrying the schedule of station broadcasts and columns on issues of public interest. "Legal Briefs" was a column I wrote on legal topics of current interest.

October, 1979          "Filthy Words" (<u>Pacific Foundation v FCC</u>)

November, 1979         "Marijuana Laws: (Prosecution of Court of Appeals Justice Paul Halvonik)

December, 1979          "Atomic Secrets" (Government request for injunction against <u>The Progressive</u> for article in "The H-Bomb Secret")

March, 1980            "The Brethren" (Book on the Supreme Court by Scott Armstrong and Bob Woodward)

April, 1980            "Children's Rights" (<u>Parham v J.R.1</u>

August, 1980           "Actor's Equity" ("Rights" of performers to particular roles)

November, 1980         "The New Censorship" (Censorship of Ms. magazine by fundamentalist

religious groups)

| | |
|---|---|
| February, 1981 | "The Rights of Mental Patients" (Halderman v Pennhurst State School & Hospital) |
| May, 1981 | "Evolution vs Creationism" (Litigation against California Dept. of Education over teaching of theory of evolution) |
| July, 1981 | "Legal Cutbacks" (Efforts by the Reagan Administration to eliminate the Legal Services Corporation) |
| November, 1981 | "The Family Protection Act" |
| January, 1982 | "Children, Sex, and the Media" (Globe Newspaper Company v Superior Court and New York v Ferber) |
| April, 1982 of | "Zoning Out the Retarded" (City of Torrance v Transitional Living Centers Los Angeles. Inc.) |
| November, 1982 | "Tragedy in Boise" (Murder of 17-year-old boy in county jail) |
| April, 1983 | "The Betamax Case" (Universal City Studios v Sony Corporation of America) |
| July, 1983 | "The Race & Taxes at Bob Jones University" (Bob Jones University v United States') |
| October, 1983 | "A Little White Lie" (Christine Craft's sex-discrimination lawsuit against Metromedia, Inc.) |
| February, 1984 | "Child Abuse" (Incarceration of child for refusing to testify against allegedly abusive stepfather) |
| October, 1984 | "Pacifica's Editorials" (FCC v League of Women Voters of California) |
| December, 1984 | "The Radical Supreme Court" (U.S. Supreme Court's 1984 Term) |
| August, 1985 | "The Right to Petition" (McDonald v Smith) |
| November, 1985 | "Schoolchildren with AIDS" (New York State Association for Retarded Children v Carey) |

December, 1985     "Fact vs Fiction" (<u>Bindrim v Mitchell</u>)

February, 1986     "'Accuracy' in Academia"

March, 1986     "Holding Officials Accountable" (<u>Daniels v Williams</u> and <u>Davidson v Cannon</u>)

April, 1986     "Feminist Pornography Law" (<u>American Booksellers Ass'n v Hudnut</u>)

June, 1986     "Selecting Fair Juries" (<u>Batson v Kentucky</u> and <u>Lockhart v McCree</u>)

October, 1986     "Choosing Judges" (Antonin Scalia and Rose Bird)

July, 1986     "Government Interference" (U.S. Dept. of Justice)

December, 1986     "Sodomy Laws" (<u>Bowers v Hardwick</u>, <u>Post v Oklahoma</u>)

January, 1987     "Protecting the Press" (<u>McCoy v Hearst Corporation</u>)

February, 1987     "Japanese Internment Case" (<u>Yasui v United States</u>)

April, 1987     "AIDS Discrimination" (<u>School Board of Nassau County. Florida v Arline</u>)

October, 1987     "The Gay Olympic Games" (<u>"San Francisco Arts and Athletics. Inc. v United States Olympic Committee</u>)

February, 1988     "Falwell v <u>Hustler</u>" (<u>Falwell v Hustler Magazine</u>)

June, 1988     "Reassessing <u>Runyan</u>" (<u>Patterson v. McLean Credit Union</u>)

**Congressional testimony**

Juvenile Justice Subcommittee of the Senate Judiciary Committee, Children in Adult Jails (February 24,1983)

Constitution Subcommittee of the Senate Judiciary Committee, Juvenile Justice and Delinquency Prevention Act (June 14, 1984)

House Select Committee on Children, Youth, and Families, Children in Out-of-Home Care (September 25,1986)

Congressional Black Caucus, Braintrust on Youth Violence (May 14,1996)

Senate Judiciary Committee, Prison Litigation Reform Act (September 25,1996)

Youth Violence Subcommittee of the Senate Judiciary Committee, Violent Juvenile and Repeat
        Offender Act of 1997 (May 6, 1997)

**Professional Honors**

**1982 Swedish Bicentennial Scholarship**

The Swedish Bicentennial Fund was established by an Act of the Swedish Parliament in 1976 as a tribute to the United States Bicentennial. Each year, the fund provides financial support for visits to Sweden by ten Americans working in the fields of politics, public administration, working life, the human environment, mass media, business and industry, education, and research. The purpose of the visits is to provide opportunity for study for persons who are in a position to influence public opinion and contribute to the development of American society in areas of current concern.

As preparation for my trip to Sweden, I read all materials available in English on the Swedish juvenile justice and child welfare systems. During August and September, 1982, I spent two weeks in Sweden, meeting with police officers, prosecutors, child care administrators, social workers and staff of residential placements, criminologists, educators, and administrators of correctional institutions. I also inspected juvenile detention rooms in local jails, and visited a residential placement community on a collective farm and two "reformatory schools" for adjudicated delinquents. When I returned to the United States, I prepared a report to the Swedish Institute on the Swedish and American juvenile justice systems.

**1987 American Psychological Association Award for Distinguished Contributions to Child Advocacy**

The award is given each year to a non-psychologist who has made notable efforts on behalf of children, particularly in using psychological concepts and principles to protect children from harm. At the award ceremony ori "August 29, 1987, I presented a paper entitled "Horrors and Healers: New Directions for Child Advocacy."

**1990 American Bar Association Livingston Hall Award**

The award is given each year "for outstanding legal advocacy on behalf of troubled children, youth, and families."

**1991 Western Society of Criminology Morrison-Gitchoff Award**

The award is given each year to a person who is not a criminologist "for significant improvement of the quality of justice."

**1996 James E. Gould Juvenile Detention and Correctional Services Award**

The award is given by the Alliance for Juvenile Justice, which is composed of the American Correctional Association, Council for Juvenile Correctional Administrators, Juvenile Justice Trainers Association, National Association of Juvenile Correctional Agencies, and the National Juvenile Detention Association.

**2000 Office of Juvenile Justice and Delinquency Prevention "Justice for Children" Award**

The award was given for "achievements [which] have made the future safer and brighter for children and families in America's communities."

**2013 John D. and Catherine T. MacArthur Foundation Models for Change "Champion for Change" Award (to Center for Children's Law and Policy)**

The award was given for outstanding contributions to the Foundation's Models for Change juvenile justice reform initiative.