# EXHIBIT H

**Nutramax Laboratories, Inc., and
Nutramax Laboratories Veterinary
Sciences, Inc., Plaintiffs,**

**v.**

**Manna Pro Products, LLC, Nutri-Vet
Wellness, LLC, and 21st Century Animal
HealthCare, LLC, Defendants.**

**Civil Action No. 0:16-cv-01255-JMC**

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

**December 21, 2017**

<u>**ORDER AND OPINION**</u>

Plaintiffs Nutramax Laboratories, Inc., and Nutramax Laboratories Veterinary Services, Inc., (together, "Nutramax" or "Plaintiffs") filed this action against Defendants Manna Pro Products, LLC, Nutri-Vet Wellness, LLC, and 21st Century Animal HealthCare, LLC ("21st Century") (collectively "Defendants") "alleging that Defendants' 'Petnology Essentials' product line of health supplements for pets infringed on Nutramax's trademark by employing copycat packaging and using improper comparisons to Nutramax's Cosequin product line and that these actions violated South Carolina law on unfair competition." (ECF No. 44 (referencing ECF No. 8).)

This matter is before the court on Plaintiffs' Second Renewed Petition for Attorneys' Fees seeking "$55,506 to reimburse [Nutramax for] its reasonable, out-of-pocket attorneys' fees incurred" in connection with the Contempt Proceeding[1] brought against 21st Century. (ECF No. 66 at 1.) 21st Century objects to the Petition "because Plaintiffs have, yet again, failed to sufficiently support this amount as being 'reasonable' in view of the framework for determining

Page 2

reasonable attorneys' fees and when considering the facts before the Court." (ECF No. 67 at 1.) For the reasons set forth below, the court **GRANTS** Nutramax's Second Renewed Petition for Attorneys' Fees.

## I. RELEVANT BACKGROUND OF THIS MOTION

In Orders entered on April 17, 2017 (the "April Order") and August 14, 2017 (the "August Order"), the court denied without prejudice Nutramax's two prior Petitions for Attorneys' Fees (ECF Nos. 50 & 60).[2] (See ECF No. 59 at 8; ECF No. 65 at 27.) In both Orders, the court found that Nutramax had failed to submit satisfactory specific evidence demonstrating the prevailing market rate in South Carolina for litigating civil contempt or similar proceedings. (Id.) On September 29, 2017, Nutramax filed the instant Second Renewed Petition for Attorneys' Fees, its third attempt at such relief. 21st Century filed Objections to the Second Renewed Petition for Fees on October 13, 2017, to which Nutramax filed a Reply in Support of Fees on October 20, 2017. (ECF Nos. 67 & 68.)

## II. JURISDICTION

This court initially had jurisdiction over Nutramax's claims via 28 U.S.C. § 1331, as the claims arose under the Trademark and Copyright Laws of the United States. The court appropriately heard Nutramax's state law claims based on supplemental jurisdiction since they were "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a). In the parties' Settlement Order, the court "retain[ed] jurisdiction with respect to the implementation and enforcement of the terms of th[e] Stipulation and the Parties to th[e] Stipulation submit[ted] to the jurisdiction of the Court for

Page 3

those purposes." (ECF No. 32 at 7 ¶ 11.)



## III. LEGAL STANDARD

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370 (1966) (citing United States v. United Mine Workers, 330 U.S. 258, 330—332 (1947)). "The appropriate remedy for civil contempt is within the court's broad discretion." In re Gen. Motors Corp., 61 F.3d 256, 259 (4th Cir. 1995) (citing McComb v. Jacksonville Paper Co., 336 U.S. 187, 193-94 (1949)). "Remedies include ordering the contemnor to reimburse the complainant for losses sustained and for reasonable attorney's fees." Id. (citing United States v. Trudell, 563 F.2d 889, 891 (8th Cir. 1977)).

## IV. ANALYSIS

### A. The Parties' Arguments

In connection with its Contempt Proceeding against 21st Century, Nutramax seeks reimbursement for attorneys' fees in the amount of $55,506.00 incurred as follows:

| Attorney Name | Hours Billed | Hourly Rate | Total |
|---|---|---|---|
| Morgan Nickerson | 55.3 | $515.00 | $28,479.50 |
| Jeffrey Patterson | 24.9 | $535.00 | $13,321.50 |
| Chris Jaros | 2.2 | $475.00 | $1,045.00 |
| M. Stanley | 11.5 | $425.00 | $4,887.50 |
| E. Gianetta | 16.3 | $425.00 | $6,927.50 |
| K. Taylor | 1.1 | $275.00 | $302.50 |
| Richard Farrier | 0.7 | $775.00 | $542.50 |
| **Total** | **112.00** | | **$55,506.00** |

(ECF No. 50 at 6.) In support of its Second Renewed Motion for Attorneys' Fees, Nutramax submitted the following: (1) the Affidavit of Thad H. Westbrook (ECF No. 66-1), a Partner at Nelson Mullins Riley & Scarborough, LLP's Columbia, South Carolina Office; the Affidavit of Morgan T. Nickerson (ECF No. 66-2 at 1-5), counsel of record in this case; and invoices from

Page 4

K&L Gates LLP (id. at 7-22), Nutramax's lawyers.

In response to the court's observations in its April and August Orders, Nutramax submitted Westbrook's opinion as a South Carolina lawyer "familiar with the prevailing market rate for civil litigators practicing in South Carolina." (Id. at 2 ¶ 4.) As a basis for his opinion, Westbrook relied on his seventeen years of legal practice in South Carolina in the areas of "business litigation, complex commercial litigation, consumer finance litigation, and class action defense." (Id. ¶¶ 1 & 2.) Westbrook generally opined that "there are no lawyers who specialize in civil contempt proceedings." (Id. at 3 ¶ 6.) Westbrook further opined that the lawyers who worked on the Contempt Proceeding are entitled to the following hourly rates:

| Attorney | Hourly Rate |
|---|---|
| Morgan Nickerson | $475.00[3] |
| Jeffrey Patterson | $535.00 |
| Chris Jaros | $475.00 |
| M. Stanley | $425.00 |
| E. Gianetta | $425.00 |
| K. Taylor | $275.00 |
| Richard Farrier | $475.00 |

(Id. at 3 ¶ 7-4 ¶ 11.) Westbrook stated that "these hourly rates are in line with the prevailing rates in Columbia, South Carolina for litigating a contempt proceeding or similar by lawyers of reasonably comparable skill, experience, and national reputation." (Id. at 3 ¶ 8.) As a result of the foregoing, Nutramax reiterates its request for an order directing 21st Century to pay

Page 5

$55,506.00 to compensate its reasonable, out-of-pocket attorneys' fees incurred in connection with the Contempt Proceeding.[4] (ECF No. 66 at 10.)

21st Century objects to Nutramax's Second Renewed Petition on the basis that $55,506.00 is an unreasonable amount of fees because it is "nearly three times the net profits at issue" of



$11,130.14. (ECF No. 67 at 2.) Moreover, 21st Century asserts that the proposed rates for Nutramax's counsel are unreasonable for civil contempt litigation and the hours expended were excessive. (Id. at 4 & 6.) In this regard, based on its analysis of the lodestar figure (id. at 4-9), 21st Century argues that the fee amount sought by Nutramax should be reduced by the court. Accordingly, 21st Century requests that the court award Nutramax reasonable attorneys' fees in "an amount far less than the $55,506 that Plaintiffs seek for a third time." (Id. at 10.)

B. The Court's Review

"In calculating an award of attorney's fees, a court must first determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 243 (4th Cir. 2009) (citing Grissom v. The Mills Corp., 549 F.3d 313, 310 (4th Cir. 2008)). In determining what constitutes a reasonable number of hours and rate, the court in its discretion considers the following twelve Barber factors:

Page 6

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12)

attorneys' fees awards in similar cases.

Id. at 243-44 (citing Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 n.28 (4th Cir. 1978)).[5] "After determining the lodestar figure, the 'court then should subtract fees for hours spent on unsuccessful claims unrelated to successful ones.'" Robinson, 560 F.3d at 244 (quoting Grissom, 549 F.3d at 321). "Finally, '[o]nce the court has subtracted the fees incurred for unsuccessful, unrelated claims, it then awards some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.'" Id. (quoting Grissom, 549 F.3d at 321) (internal quotation marks and citation omitted).

*1. Reasonable Hourly Rate*

"The first step in setting a reasonable fee is determining the appropriate hourly rate." Alexander S. By and Through Bowers v. Boyd, 929 F. Supp. 925, 935 (D.S.C. 1995) (citing Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 1990)). Fee applicants bear the burden of establishing that the rates they request are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). "In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." Plyler, 902 F.2d at 277

Page 7

(citations and internal quotation marks omitted). "The relevant market for determining the prevailing rate is ordinarily the community in which the court where the action is prosecuted sits." Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 175 (4th Cir. 1994) (citing Nat'l Wildlife Fed'n v. Hanson, 859 F.2d 313, 317 (4th Cir. 1988)).

Upon review, the court observes that relevant to determining the reasonable hourly rate are



Barber factors three, four, five, eight, nine, ten, eleven, and twelve. The parties discuss the Barber factors in their submissions and expressly dispute the weight accorded to the evidence submitted by Nutramax in support of its Petition. (See ECF No. 66 at 8-9; ECF No. 67 at 4-9.) In addition to the fact that the fees sought ($55,506.00) are almost five times the amount recovered ($11,130.14), the court is not persuaded regarding the necessity of Nickerson's expertise in intellectual property and trademark because there are invoices showing other attorneys allegedly without such expertise performing duties similar to Nickerson.[6] Therefore, after considering the parties' arguments regarding the Barber factors in conjunction with statements provided by attorney Westbrook in his Affidavit, the court is satisfied that Nutramax presented sufficient specific evidence of the prevailing market rate in South Carolina for purposes related to the instant Second Renewed Petition for Attorneys' Fees. Accordingly, <mark>the court approves as reasonable the following hourly rates for Nutramax's attorneys</mark>:

| Attorney | Hourly Rate |
| --- | --- |
| Morgan Nickerson | $475.00 |
| Jeffrey Patterson | $535.00 |
| Chris Jaros | $475.00 |
| M. Stanley | $425.00 |
| E. Gianetta | $425.00 |
| K. Taylor | $275.00 |
| Richard Farrier | $475.00 |

Page 8

### 2. Hours Reasonably Expended

"The court may not simply accept as reasonable the number of hours reported by counsel." Alexander S., 929 F. Supp. at 938 (citing Espinoza v. Hillwood Square Mut. Ass'n, 532 F. Supp. 440, 446 (E.D. Va. 1982)). "The fee applicant has the burden of proving hours spent and how those hours were allotted to specific tasks, and the Court must ensure that the time is reasonable and that the work billed by different attorneys is not duplicative." NGM Ins. Co. v. Carolina's Power

Wash & Painting, LLC, C/A No. 2:08-3378-DCN, 2010 WL 3258134, at *4 (D.S.C. July 6, 2010). Duplication must be excluded from any fee award:

> Counsel for the prevailing party shall make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority."

Hensley v. Eckerhart, 461 U.S. 424, 434 (1983) (citation omitted). "A party is certainly free to hire and pay as many lawyers as it wishes, but cannot expect to shift the cost of any redundancies to its opponent." Pollard v. City of Portland, No. CV-01-114-ST, 2001 WL 34042624, at *5 (D. Or. Aug. 7, 2001). "Instead it can only shift the reasonable attorney fee expended." Id. "A fee that is 'not excessive' may still be unreasonable." Id. As with the reasonable hourly rate, the court is instructed to use the Barber factors referenced above in determining the reasonableness of the number of hours expended by counsel. Rum Creek Coal Sales, 31 F.3d at 175 (citing Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974)).

The parties dispute whether Nutramax's attorneys reasonably expended one hundred twelve hours on the Contempt Proceeding. The court reviewed the invoices submitted by Nutramax and concludes that they are specific enough to allow for appropriate judicial review. Upon consideration of the first and second Barber factors, the court concludes that some of the

Page 9



hours Nutramax seeks attorneys' fees for are excessive and/or duplicative. For example, the court finds excessive and/or duplicative the amount of hours spent on drafting, editing and revising the Motion for Contempt.[7] The Motion for Contempt was a form motion of two pages and did not contain any substantive argument.[8] (See ECF No. 34.) Additionally, there is not any evidence before the court as to why it was reasonable for two attorneys to prepare for, travel and attend oral argument on the Motion for Contempt.[9] (See ECF No. 66-2 at 15-16.) Finally, the court believes that a reduction is warranted for the occasions in which the time taken to revise a document was significantly longer than it took to draft the document. (See ECF No. 66-2 at 21.) Accordingly, the court finds that the following hourly totals are reasonable for Nutramax's attorneys:

| Attorney | Hours Reasonably Expended |
|---|---|
| Morgan Nickerson | 51.7 |
| Jeffrey Patterson | 10.6 |
| Chris Jaros | 0.9 |
| M. Stanley | 5.1 |
| E. Gianetta | 13.3 |
| K. Taylor | 1.1 |
| Richard Farrier | 0.7 |

*3. Lodestar Rate Calculation*

Based on the number of reasonable hours noted above and the approved reasonable rate for each attorney of record, the court determines that the lodestar figure is as follows:

Page 10

| Attorney Name | Adjusted Hours | Hourly Rate | Total |
|---|---|---|---|
| Morgan Nickerson | 51.7 | $475.00 | $24,557.50 |
| Jeffrey Patterson | 10.6 | $535.00 | $5,671.00 |
| Chris Jaros | 0.9 | $475.00 | $427.50 |
| M. Stanley | 5.1 | $425.00 | $2,167.50 |
| E. Gianetta | 13.3 | $425.00 | $5,652.50 |
| K. Taylor | 1.1 | $275.00 | $302.50 |
| Richard Farrier | 0.7 | $475.00 | $332.50 |
| **Total** | **83.40** | | **$39,111.00** |

The court declines to either increase or reduce the aforementioned lodestar amount and finds that an award of attorneys' fees in the amount of $39,111.00 is appropriate.

## V. CONCLUSION

Upon careful consideration of the entire record and for the reasons stated above, the court hereby **GRANTS** the Second Renewed Petition for Attorneys' Fees (ECF No. 66) of Plaintiffs Nutramax Laboratories, Inc., and Nutramax Laboratories Veterinary Services, Inc. The court awards Plaintiffs fees in the amount of $39,111.00.

**IT IS SO ORDERED.**

/s/
United States District Judge

December            21,            2017
Columbia, South Carolina

--------

Footnotes:

1. "'Contempt Proceeding' [] refer[s] to the period of time between August 19, 2016, when Nutramax first became aware that 21st Century was in violation of the Settlement Order, and January 11, 2017, the date of filing of Nutramax's original Fee Petition." (ECF No. 66 at 3 n. 3.)

2. The court provided an accurate and thorough recitation of the complicated factual and procedural background of this matter in the April Order (ECF No. 59 at 1-4) and the August Order (ECF No. 65 at 1-6). None of the parties objected to this background information. Accordingly, the court incorporates the factual and procedural background provided in these Orders by reference, but will not repeat that information herein.



3. Regarding Nickerson, Nutramax asserts that Nickerson, a trademark litigation specialist, is entitled to a rate of $515.00 per hour. Nutramax asserts that the work done on the Contempt Proceeding did require the expertise of an intellectual property/trademark lawyer. (ECF No. 66 at 4.) Nutramax further asserts that "it is undisputed that the contempt proceedings 'used the Lanham Act as a guide to structure civil contempt sanctions'" and, therefore, "it is appropriate for Nutramax to recover fees for trademark litigation specialization, which commands a higher rate due to the specialized nature of the work." (Id. at 5.) Westbrook recommended a rate of $475.00 per hour for Nickerson, which rate did not consider his intellectual property specialization. (ECF No. 66-1 at 4 ¶ 11.) Westbrook observed that "Nickerson is able to command a higher rate than an attorney without this specialization." (Id.) However, Westbrook did not state that the higher rate sought by Nutramax is applicable in this matter.

4. The amount requested by Nutramax is dependent on whether the court agrees with its position that trademark law principles "played an essential role in the adjudication of the contempt proceeding." (ECF No. 66 at 4) If the court does not agree that trademark law principles played an essential role in the adjudication of the contempt proceeding, Nutramax requests attorneys' fees in the amount of $53,126.00.

5. While the court must consider all twelve of the factors, the court is not required to rigidly apply these factors, as not all may affect the fee in a given case. EEOC v. Serv. News Co., 898 F.2d 958, 965 (4th Cir. 1990).

6. The fact of the matter is that other attorneys without Nickerson's alleged expertise performed the same billable work.

7. The court also notes that several attorneys attempted to bill for time spent drafting a motion to compel. (See ECF No. 66-2 at 7 & 18.) A motion to compel was not ever filed on the electronic docket. In this regard, the court is not aware of any motion to compel that was relevant to the Contempt Proceeding.

8. If the hours designated for drafting the Motion for Contempt (see ECF No. 66-2 at 7-8) were spent on the Memorandum in Law in Support of Motion for Contempt and Enforcement of Court Order (ECF No. 34-1), counsel should have designated the hours as such.

9. "[G]ood 'billing judgment' requires attorneys not to bill for more than two attorneys to review pleadings or to attend oral argument." Nat'l Warranty Ins. Co. v. Greenfield, No. CV-97-1654-ST, 2001 WL 34045734, at *5 (D. Or. Feb. 8, 2001).

--------



IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Public Interest Legal Foundation, Inc., | C/A No. 3:24-cv-1276-JFA |
| Plaintiff, | |
| vs. | **ORDER** |
| Howard M. Knapp, in his official capacity as the Executive Director of the South Carolina State Election Commission, | |
| Defendant. | |

This matter is currently before the Court on Public Interest Legal Foundation's ("PILF") motion for attorneys' fees, costs, and expenses. (ECF No. 41). This motion has been fully briefed and is therefore ripe for review. For the reasons discussed below, the motion is granted in part and denied in part.

**I.    FACTUAL AND PROCEDURAL HISTORY**

This declaratory judgment action concerns the issue of whether the South Carolina State Election Commission ("SEC") must turn over a copy of the Statewide Voter Registration List to PILF pursuant to the National Voter Registration Act ("NVRA"). Because the parties agreed to the salient facts in this case (ECF No. 27), counsel declined a formal scheduling order or discovery practice. Following an expedited briefing schedule (ECF No. 25) and oral argument, the Court ultimately granted PILF's motion for summary judgment and held that the South Carolina Statewide Voter Registration List is a record subject to inspection pursuant to the NVRA, and that the NVRA preempts any South

1

Carolina law limiting access to the Statewide Voter Registration List to South Carolina registered voters. (ECF No. 38). The SEC's cross-motion for summary judgment was consequently denied. The entirety of this litigation lasted approximately six months. As a prevailing party, PILF requested attorneys' fees and costs pursuant to 52 U.S.C. § 20510(c). (ECF No. 41).

Thereafter, the SEC moved to alter or amend the order granting PILF summary judgment and contemporaneously filed a motion to stay the judgment pending the outcome of a possible appeal. Since then, the motion to alter or amend has been denied and the motion to stay has been granted. In addition to its original request for fees (ECF No. 41), PILF has submitted a supplemental request for fees incurred in responding to the post-judgment motions. (ECF No. 50). PILF seeks attorney's fees, costs, and expenses in the total amount of $173,452.62.

## II.    LEGAL STANDARD

The NVRA contains the following provision: "In a civil action under this section, the court may allow the prevailing party (other than the United States) reasonable attorney fees, including litigation expenses, and costs." 52 U.S.C.A. § 20510(c). "The party requesting a fee bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Project Vote/Voting for Am., Inc. v. Long*, 887 F. Supp. 2d 704, 709 (E.D. Va. 2012).[1]

---

[1] The SEC initially argues that PILF should not be afforded any attorneys' fees because it "is unaware of any binding precedent in this district finding that the NVRA is in fact a civil rights statute" and therefore "this Court has the authority and in fact should deny PILF's attorneys' fees

2

The proper calculation of a reasonable attorneys' fee award involves a three-step figure. First, the court must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. To ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).[2] Next, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

*Doe v. Kidd*, 656 F. App'x 643, 651–52 (4th Cir. 2016)(cleaned up).

## III. DISCUSSION

Initially, the SEC requests this court hold any determination of attorneys' fees in abeyance pending its motion to reconsider or alternatively "establish a comprehensive briefing schedule to fully flesh out the issues." (ECF No. 42). Given that the court has ruled on the SEC's motion to reconsider, the request to stay is now moot. Additionally, the court is mindful that a request for attorneys' fees should not result in a second major litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)("A request for attorney's fees should not result in a second major litigation."). Accordingly, the court declines to issue a months-

---

request in total." (ECF No. 42, p. 4). However, this argument is inapplicable as the NVRA contains its own fee shifting provision.

[2] The *Johnson* factors include "(1) The time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *Doe v. Kidd*, 656 F. App'x 643, 652 n.1 (4th Cir. 2016).

long briefing schedule[3] simply to "flesh out" PILF's fee request. PILF has provided sufficient documentation to allow this court to evaluate its request and calculate a reasonable amount of fees. Thus, any request to delay adjudication of this matter is respectfully denied.

The SEC also offers other reasons as to why PILF's fee request should be denied outright. For instance, the SEC avers it is required to enforce state statutes until those statutes are declared unconstitutional and, at the time the request for the Voter List was made, no such declaration had been issued. Moreover, the state statute in question was passed in 1967, 26 years before passage of the NVRA, and there had been no finding that it had been preempted by federal law. Thus, the SEC contends it had no discretion but to enforce the statute as written.

Despite these contentions, PILF is correct in asserting that these reasons do not count as special exceptions as to the award of attorneys' fees or otherwise qualify as some good faith exception. The Fourth Circuit has found that "a defendant's good faith is not a special circumstance that would render an award of fees unjust." *Bills v. Hodges*, 628 F.2d 844, 847 (4th Cir. 1980); *see also Lefemine v. Wideman,* 758 F.3d 551, 557 (4th Cir. 2014) ("Yet we, and our sister circuits, have repeatedly rejected good faith as a special circumstance justifying the denial of Section 1988 attorneys' fees."). Thus, the SEC's attempts to fully avoid the award of attorneys' fees is unavailing. *Brandon v. Guilford Cnty. Bd. of Elections*, 921 F.3d 194, 198 (4th Cir. 2019)("While both statutes include in the

---

[3] The SEC's proposed briefing schedule would add an additional four months before the issues would become ripe for adjudication. (ECF No. 42, p. 3).

authorization for fees the permissive may allow, the Supreme Court has held that a prevailing party should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.")(cleaned up).

Because PILF was granted summary judgment on the issues presented, it is considered a prevailing party entitled to reasonable attorneys' fees and costs. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)("[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.")(citations omitted).

The decision to award attorneys' fees, and the extent of those fees, "rests, of course, within the sound discretion of the trial judge." *Guidry v. Clare,* 442 F. Supp. 2d 282, 294 (E.D. Va. 2006) (Ellis, J.) (internal quotation omitted). In determining a reasonable attorneys' fee, the proper first step is to calculate the lodestar amount, which results from multiplying "the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564 (1986) (quoting *Blum v. Stenson,* 465 U.S. 886, 888 (1984)). When making this calculation, the court must exclude any hours that are "excessive, redundant, or otherwise unnecessary," as such hours are not reasonably expended on the litigation. *Hensley,* 461 U.S. at 434. This process requires the use of the same "billing judgment" that guides a lawyer in private practice in billing his client. *Id.*

a. <u>Reasonable Rate</u>

A reasonable hourly rate should be in accord with rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n.11. "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line" with the rates charged by those lawyers. *Id.* "The court may rely on its own knowledge of the market." *Gonzalez v. Caron*, 2011 U.S. Dist. LEXIS 99465 at *6 (D. Md. Sep. 2, 2011, Civil Action No. CBD-10-2188) (citing *CoStar Group, Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788 (D. Md. 2000)).

PILF has requested an hourly rate of $550 for attorneys Maureen Riordan, J. Christian Adams, Noel Johnson, and Joseph Nixon and $400 for Local Counsel Richard Bolen. PILF further requested an hourly rate of $200 for Samuel Swanson and Marshall Makk, who had completed their Juris Doctor but had yet to receive the results of their bar exams at the time the work was performed. PILF supported these requests with affidavits from other practicing attorneys familiar with the rates charged by South Carolina attorneys and those undertaking NVRA litigation. The SEC offered no substantive rebuttal to these hourly rates.[4]

Based on the submitted affidavits, as well as this court's knowledge of the prevailing rates in this district, the court finds the requested hourly rates reasonable. A review of the relevant *Johnson* factors bolsters this conclusion. Litigation involving the NVRA requires

---

[4] Although the SEC takes issue with the claimed hourly rates, they offer no evidence or suggestion as to what they believe the reasonable hourly rate should be.

specialized knowledge from experienced practitioners. Although PILF has initiated several lawsuits raising similar challenges pursuant to the NVRA across the country, a challenge to South Carolina's specific statutes will necessarily involve novel questions. The supporting affidavits provided by PILF show these fees to be in line with similarly situated practitioners. Additionally, PILF's counsel were able to obtain the desired result in a relatively short amount of time. Accordingly, the hourly rates requested above are approved as a sensible request.

    b.  <u>Reasonable Hours</u>

Although the hourly rates proposed by PILF are reasonable, the total amount of hours sought to be reimbursed is excessive. A close look at the billing records offered by PILF shows unwarranted billing and duplication of efforts.

For instance, PILF brought not one, but four separate attorneys to oral argument in addition to the required local counsel. "[The Fourth Circuit has] been sensitive to the need to avoid use of multiple counsel for task where such use is not justified by the contributions of each attorney." *Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 180 (4th Cir. 1994). As such, the court will "award fees for the time of one attorney when an issue does not require the attention of multiple lawyers." *Cox v. Reliance Std. Life Ins. Co*., 179 F. Supp. 2d 630, 636 (E.D. Va. 2001). Despite the presence of five attorneys of record at the oral argument, only one attorney, Adams, addressed the court. The court acknowledges the mandatory presence of local counsel given the pro hac admission of the remaining attorneys. However, requesting attorneys' fees for three other attorneys who offered little,

if any, advocacy during oral argument is excessive.[5] These attorneys billed numerous hours for their travel to Columbia for the hearing in addition to their presence at the hearing. Specifically, Adams billed two hours for traveling to the hearing and one hour for attending the hearing. Nixon spent 10.2 hours on "travel to and from Columbia, SC for summary judgment hearing (8.0) help prepare Christian for oral argument (2.2)" but reduced this billing entry to two hours with no explanation. (ECF No. 41-2, p. 4). Riordan billed four hours for "travel to South Carolina for Argument on Monday 9/16." (ECF No. 41-2, p. 5). Johnson billed 1.5 hours to "attend SJ motion hearing" and 3.5 hours for "travel back to IND (SJ hearing)." (ECF No. 41-2, p. 6). Of the above hours, those billed by Nixon, Riordan, and Johnson—11 in total—are excessive and will not be compensated.

Additionally, the billing records show inconsistencies in time attributed to attending the oral argument. For instance, local counsel billed 3.2 hours for "hearing at law school & debrief." (ECF No. 41-7, p. 4). Conversely, the attorney who argued the motion for summary judgment, Adams, billed one hour for "court hearing on summary judgment in case." (ECF No. 41-2, p. 3). Attorney Johnson billed 1.5 hours to "attend SJ motion hearing." The hearing on the motion for summary judgment lasted no more than an hour. Billing for anything more, especially from multiple attorneys, is excessive. Accordingly,

---

[5] *See Project Vote/Voting for Am., Inc. v. Long*, 887 F. Supp. 2d 704, 714 (E.D. Va. 2012)("The court agrees with Defendants' contention that billing for attendance by three attorneys, including two similarly experienced associates, and the accompanying travel required from counsel's Washington, D.C. office, is duplicative and does not represent the type of 'billing judgment' of private practice. The court expects that the presence of two attorneys would have been more than sufficient to handle oral argument.") (internal citation omitted).

Local Counsel's time will be reduced to one hour and Johnson's time has been accounted for in the previous paragraph.

Furthermore, the attorneys that billed for travel did so at their full hourly rate of $550. (*See* ECF No. 41-2). The court is hard-pressed to find travel time for any attorney compensable at a rate of $550 an hour as reasonable. *See Project Vote/Voting for Am., Inc. v. Long*, 887 F. Supp. 2d 704, 716 (E.D. Va. 2012)("The court agrees with Defendants that counsel should not recover their full market rate for travel from their offices in Washington, D.C., to Norfolk and Richmond, and that failure to reduce this time indicates a lack of billing judgment."). In addition to the travel time referenced above in relation to oral argument, Adams billed five hours, at his full rate of $550, for traveling to South Carolina for a scheduling status conference early in this litigation. Given the presence of local counsel, it is doubtful Adams' physical presence was necessary for such a routine preliminary matter. Nevertheless, the court will award Adams his 5 hours, but at a reduced rate of $275.

In addition to hourly billing, of the $5,322.62 requested for expenses, $4,822.62 of that was incurred on travel, food, and lodging for five separate individuals in attending oral argument. (ECF No. 41-3). Again, only one of these attorneys participated in the oral argument. Thus, the $4,822.62 requested for travel, food, and lodging from PILF's various attorneys will not be awarded.[6]

---

[6] The entries related to travel from Adams do not provide sufficient detail to allow the court to discern which expenses relate to Adams' travel for oral argument. (ECF No. 41-3). Otherwise, the court would award those fees. The remainder of the fees, claimed by various other attorneys in

Additionally, some of the billing records provide little to no detail and therefore do not allow the court to evaluate their reasonableness. For instance, Samuel Swanson billed three hours (at a rate of $200 an hour) for "moot". (ECF No. 41-2, p. 6). Vague entries offer little insight into the work performed or the reasonableness of the corresponding fee. Needless to say, these three hours will not be awarded.

Moreover, the court finds some of the time expended on certain tasks excessive. The most salient example is the time PILF utilized in preparing for the hearing on summary judgment after all substantive briefing had been submitted. (*See generally* ECF No. 41-2). For instance, Adams billed over 42 hours (at a rate of $550 per hour) in preparing for oral argument on summary judgment which itself lasted one hour. Nixon billed for over 12 hours (at a rate of $550 per hour) of preparation time for an oral argument he did not participate in. Riordan billed for nearly 20 hours (at a rate of $550 per hour) of time spent in preparing for the same oral argument although she did not present at oral argument. Johnson similarly billed over five hours (at a rate of $550 hours) in preparing for the summary judgment hearing. The court does not seek to minimize the effort and time needed to prepare for a hearing which will be dispositive of the case. Preparing an effective oral argument is no easy feat. However, when asking a Governmental agency to foot the bill for attorneys' fees, charging $43,450 for 79 hours in preparation for one attorney to argue for less than an hour appears excessive. *See Project Vote/Voting for Am., Inc. v. Long*, 887 F. Supp. 2d 704, 715 (E.D. Va. 2012)("However, the court agrees that the extent of

---

traveling to oral argument, will not be awarded for the reasons stated above—namely the excessive nature of sending five attorneys to an argument only one participated in.

preparation of Ms. Ripa, 'who did not conduct oral argument,' exceeds reasonableness and ordinary billing discretion."). For context, approximately 25% of PILF's total fee request comes from the time billed by numerous attorneys in preparing for oral argument. When exercising proper "billing judgment," no reasonable attorney would charge such excess to a client. Moreover, experienced and learned counsel such as Adams, who has handled several matters raising substantially similar issues, should have no problem in readying himself for oral argument in a handful of hours. Given the unreasonable nature of this request, the court will reduce PILF's total request by 70 hours to account for excess time billed in preparation for one attorney to argue for less than an hour.[7]

Other examples of excessiveness permeate PILF's fee request. In their original fee request, Riordan billed over $9,790 in her initial work preparing the instant fee petition. (ECF No. 41-2, p. 5). Within PILF's supplemental request, Riordan billed yet another $15,785 when working on the fee petition and associated reply brief. A request of $25,575 from one attorney in preparing a petition for $173,452 in total for fees and costs cannot be deemed reasonable. Nearly 15% of the total reimbursement sought is for Riordan's work in preparing a request for fees. Combined with the $5,000 billed by other attorneys, PILF's counsel billed a total of $30,565 in relation to its fee request—nearly 18% of the total. (*See generally* ECF Nos. 41-2 & 50-2). It is true that attorneys may be able to recover for the

---

[7] The court would note that counsel in this action were asked to present oral argument at the Joseph F. Rice School of Law in front of current law students. The court is appreciative of counsel's efforts to diligently prepare and effectively deliver their arguments for observation in an educational setting. Regardless, the amount of time spent in preparation for this argument cannot be deemed reasonable.

time reasonably expended in preparing a fee request. *Daly v. Hill*, 790 F.2d 1071, 1080 (4th Cir. 1986). However, a fee petition should not be used as a device to manufacture $30,565 in additional fees collectible from opposing counsel. *See Daly v. Hill*, 790 F.2d 1071, 1084 n.18 (4th Cir. 1986)("An expense award, like an attorney's fee, must adequately compensate counsel without resulting in a windfall. Prevailing attorneys must exercise billing judgment, for expenses not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.")(cleaned up). No reasonable attorney would ask a client to pay $30,500 in preparing a billing statement. Thus, the court declines to award PILF any of the time spent solely in preparation for its fee request. This conclusion is bolstered by the fact that many of the entries related to the fee petition include purely administrative tasks. For instance, attorney Riordan billed 2.5 hours (at $550 an hour) for "preparation of receipts, including conversion to PDF. Continued Editing of Affidavit." (ECF No. 50-2, p. 1). Additionally, Kaylan Phillips billed half an hour (at $550 an hour) to "format spreadsheet of billing entries, verify calculations." *Id.* The court finds it unreasonable to charge $550 an hour for the performance of such administrative functions.

In addition to their original fee request, PILF submitted a supplemental request seeking reimbursement for an additional 51.4 hours for time spent preparing the fee petition and the supplement, responding to Defendant's Motion for Reconsideration, and responding to Defendant's Motion to Stay Judgment. The total value of this work is $27,405. When combined, the substantive briefing of these filings totals less than 50 pages exclusive of exhibits and attachments. Although the court does not seek to diminish the quality of work product or discount the effort required to produce quality briefing, PILF's

supplemental request for $27,405 emphasizes the excessive nature of their fee requests.[8] However, the reductions already issued above—specifically those related to the fee petition—work to bring PILF's request into a reasonable range and no further reductions are necessary.

In an attempt to appear reasonable, PILF emphasizes its efforts to reduce its request by showing that it has already cut over $20,000 in billings that "were deemed excessive, duplicative, redundant, inefficient, not directly related to the case, not sufficiently detailed, or which in the exercise of reasonable billing judgment, the Foundation has agreed not to seek recovery for one reason or another." (ECF No. 41-1, p. 8). However, PILF's acknowledgment that it has indeed spent dozens of hours on tasks that were excessive, duplicative, redundant, inefficient, or not directly related to the case does little to assuage the court as to the overall reasonableness of PILF's fee request.

In sum, PILF originally requested $140,725 in attorneys' fees and $5,322.62 in costs and expenses. (ECF No. 41). They requested another $27,405 in attorneys' fees within their supplemental request. In total, PILF is requesting attorneys' fees, costs, and expenses in the amount of $173,452.62. The court finds this total unreasonable. This entire civil action

---

[8] *See Doe v. Kidd*, 656 F. App'x 643, 656 (4th Cir. 2016) ("In determining the appropriate number of hours to be included in a lodestar calculation, the district court should exclude hours that are excessive, redundant, or otherwise unnecessary. Here, the district court determined that Harrison's hours should be reduced by twenty-five percent for excessiveness because her time includes numerous entries for copying, organizing files, and other clerical/paralegal tasks, and "the court was required to hold a hearing and issue an order instructing lead counsel as to inappropriate questions that could not be propounded during depositions. Similarly, the court concluded that Law's hours were excessive because she included an exorbitant amount of time reviewing the file and performing clerical tasks. We find no abuse of discretion in these findings and will not accept the parties' invitation to reweigh the evidence. We therefore affirm the court's twenty-five percent reduction.") (cleaned up).

lasted six months from complaint until the entry of a final judgment. The parties appeared in court for a brief scheduling conference and later for oral argument which lasted less than an hour. PILF submitted less than 50 pages of briefing to support its dispositive motion. Moreover, PILF, having filed numerous other lawsuits raising substantially similar issues, noted that much of the work for this action had been modified from their series of prior efforts. Out of that, PILF now requests $173,452.62. Although PILF is indeed entitled to fees and costs, the sum requested is untenable.

Consequently, the court will reduce PILF's request by the amounts set forth above to determine the proper lodestar figure. Therefore, PILF's fee request is reduced by $82,792.62.[9] The resulting lodestar figure is thus $90,660.

The remaining factors to be considered do not alter this amount. After calculating the lodestar figure, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff. *Doe v. Kidd*, 656 F. App'x 643, 651–52 (4th Cir. 2016).

Here, PILF was successful in each claim pursued. Specifically, PILF sought and received a declaration averring that the South Carolina statute at issue was preempted by the NVRA and could not be used to prevent PILF from obtaining the requested documents.

---

[9] This sum includes the 11 hours associated with numerous attorneys attending the oral argument ($6,050); 2.2 hour reduction in local counsel's billing for attending oral argument ($880); reduction in rate for 5 hours Adams billed for travel time ($1,375); $4,822.62 in fees associated with travel to oral argument; 3 hours Swanson billed for "moot" ($600); 70 hour reduction in time billed for preparation for oral argument ($38,500); and the $30,565 billed for preparing the attorneys' fee request.

PILF thus fully succeeded in each of the claims it presented. Accordingly, the proper lodestar figure need not be reduced any further.

## IV.    CONCLUSION

For the reasons stated above, PILF's requests for fees (ECF Nos. 41 & 50) are granted in part and denied in part. PILF is awarded fees and costs totaling $90,660.

IT IS SO ORDERED.

*Joseph F. Anderson, Jr.*

January 7, 2025                            Joseph F. Anderson, Jr.
Columbia, South Carolina              United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| Southeast Booksellers Association, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 2:02-3747-23 |
| v. | ) ) | **ORDER** |
| Henry D. McMaster, Attorney General of South Carolina, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on Plaintiffs' petition for attorney's fees pursuant to 42 U.S.C. § 1988. Defendants Henry McMaster, Attorney General, and Solicitors (hereinafter "Defendants") filed a memorandum in opposition to Plaintiffs' petition, claiming that no award of attorney's fees and costs should be made. In the alternative, if any award is made, Defendants ask the court to make such award against the state of South Carolina as an entity rather than against the Attorney General and the solicitors and/or to substantially reduce the award below the amount requested by Plaintiffs. For the reasons set forth below, the court grants Plaintiffs' petition for attorney's fees, but only in the amount of **$405,485.61**.

## BACKGROUND

In this case, Plaintiffs[1] initially brought a pre-enforcement constitutional challenge to

_____

[1]  With the exception of Families Against Internet Censorship ("FAIC"), which is an organization representing families with Internet access and at least one child, Plaintiffs are organizations that represent artists, writers, booksellers, and publishers who use the Internet to engage in expression, including graphic arts, literature, and health-related information. Most of these organizations maintain websites that contain resources on obstetrics, gynecology, and sexual health; visual art and poetry; and other speech which could be considered "harmful to minors" in some communities under the Act, despite the fact that their speech is constitutionally protected as

permanently enjoin the operation of S.C. Code § 16-15-385, which provides criminal sanctions for "disseminating harmful material to minors" as applied to "digital electronic files" that are sent or received via the Internet under S.C. Code Ann. § 16-15-375 (2).  *See* S.C. Code Ann. § 16-15-375; S.C. Code Ann. § 16-15-385 (collectively hereinafter "the Act").  The Act defines "harmful to minors" as follows:

> "Harmful to minors" means that quality of any material or performance that depicts sexually explicit nudity or sexual activity and that, taken as a whole, has the following characteristics:
>
> > (a) the average adult person applying contemporary community standards would find that the material or performance has a predominant tendency to appeal to a prurient interest of minors in sex; and
> >
> > (b) the average adult person applying contemporary community standards would find that the depiction of sexually explicit nudity or sexual activity in the material or performance is patently offensive to prevailing standards in the adult community concerning what is suitable for minors; and
> >
> > (c) to a reasonable person, the material or performance taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

S.C. Code Ann. § 16-15-375.  A violation of § 16-15-375 is a felony, punishable by up to five years in prison, a fine of $5,000, or both.  *See* S.C. Code Ann. § 16-15-385.

The controversy in this case centered primarily around an amendment to the Act, signed by former Governor Jim Hodges on July 20, 2001, which added the definition of "material" as follows: "'Material' means pictures, drawings, video recordings, films, *digital electronic files, or other visual depictions or representations* but not material consisting entirely of written words."  S.C. Code §

---

to adults.

2

16-15-375(2) (emphasis added).  Pursuant to this amendment, the Act proscribes the dissemination to minors of obscene "digital electronic files."  Plaintiffs initially challenged this proscription as violative of the First Amendment and the Commerce Clause because it prohibits adults, and even older minors, from viewing and sending constitutionally-protected images over the Internet and has the effect of prohibiting constitutionally-protected communications nationwide. (Compl. ¶ ¶ 1; 78-81; 84-86.)

## PROCEDURAL HISTORY

In this case, both parties filed cross motions for summary judgment.  This court held those cross-motions in abeyance pending the United States Supreme Court's decision in *Ashcroft v. ACLU*, 542 U.S. 656 (2004), due to the similarities between the relevant provisions of the Child Online Protection Act ("COPA"), which were under review in *Ashcroft*, and those at issue in the present action.[2]  Following the Supreme Court's decision in *Ashcroft* on June 29, 2004, this court issued its ruling denying summary judgment to both sides in the present case on July 6, 2004.

In the July 6, 2004 ruling, the court denied Defendants' motion for summary judgment because Defendants simply reasserted arguments previously addressed and rejected at the motion to dismiss stage.  With respect to Plaintiffs' motion, the court concluded that summary judgment was inappropriate under the reasoning in *Ashcroft*.  Specifically, the court denied summary judgment

---

[2]  In *Ashcroft*, the Supreme Court held that Internet content providers and civil liberties groups were entitled to a preliminary injunction against enforcement of COPA because the plaintiffs were likely to prevail on their claim that COPA violated the First Amendment by unduly burdening adults' access to protected speech.  542 U.S. at 703.  Notably, however, the Court stopped short of declaring COPA unconstitutional.  *Id.* at 703-06.  The Court held that, instead of considering the broader question of the constitutionality of COPA, the United States Court of Appeals for the Third Circuit should have remanded the case to the district court to conduct a "full trial on the merits." *Id.* at 704.

3

pursuant to the admonition in *Ashcroft* that a full trial on the merits might be necessary before a court could rule on the constitutionality of a statute such as the one at issue in order to allow adequate development of the record with respect to the question of plausible, less restrictive alternatives. At the time of the court's July 6th Order, the record simply did not contain sufficient evidence regarding the effectiveness of less restrictive alternatives vis-a-vis the challenged statute.

On October 7, 2004, Plaintiffs filed an updated motion for summary judgment including the Supplemental Expert Declaration of Dr. Lorrie Faith Cranor ("Cranor Declaration"). On November 24, 2004, Defendants filed their updated motion for summary judgment, including a Declaration of Dr. Dan R. Olsen, Jr ("Olsen Declaration"), who, like Cranor, offered a factual account of pertinent Internet technology. Through these expert declarations, both parties attempted to answer the question of whether the restriction at issue was the least restrictive means of furthering the goals of the statute. Ultimately, the court granted Plaintiff's motion for summary judgment and permanently enjoined and prohibited Defendants from enforcing S.C. Code Ann. § 16-15-385 as applied to "digital electronic files" that are sent or received via the Internet under S.C. Code Ann. § 16-15-375(2). Defendants did not appeal the court's decision.

## ANALYSIS

In their request for attorney's fees and costs under 42 U.S.C. § 1988, Plaintiffs seek a total amount of $480,669.89, broken down as follows:

| | | |
|---|---|---|
| (1) | Derfner, Altman & Wilborn, LLC | $32,658.02 |
| (2) | Wilmer Cutler Pickering Hale and Dorr LLP | $364,668.30 |
| (3) | Sonnenschein Nath & Rosenthal LLP | $83,343.57 |
| | **TOTAL** | **$480,669.89** |

Unfortunately, however, the court finds that Plaintiffs made some mathematical miscalculations[3] in reaching their total of $480,669.89, and in reality, according to Plaintiffs' requested rates and hours, the correct figure sought should be **$490,699.89**. First, the court considers whether Plaintiffs are entitled to such an award under the standard for awarding fees under 42 U.S.C. § 1988 and then turns to the reasonableness of Plaintiffs' request.

---

[3] The miscalculations appear to be with Attorney Kenneth Bamberger and Attorney Brian Murray's requested rates. For instance, Plaintiffs assert that Mr. Bamberger spent 293.7 hours working on this case at an hourly rate of $420. However, according to the time records and the charts in Attorney Ogden's Declaration, Plaintiffs actually apply a rate of $340 for work done before 2002, $370 for work done in 2003, $400 for work done in 2004, and $420 for work done in 2005. Similarly, Attorney Brian Murray requests a rate of $370 an hour. However, in the time sheets, Plaintiffs charge a rate of $340 for work completed in 2004 and a rate of $370 for work completed in 2005. The court understands that this reflects the change in these Attorneys' rates over the years. However, hourly rates for the other attorneys at Wilmer Cutler Pickering Hale and Dorr, LLP do not vary over the years, even though Mr. Ogden's Declaration notes each attorney's historic rates. For example, Attorney Ogden charges a rate of $650 for work done in every year, from 2002-2005, even though his rate was $540 in 2002, $580 in 2003, and $625 in 2004. Similarly, Attorney Kestenbaum charges a consistent rate of $430 for work done even though her rate has increased over time, and Attorney Strayer charges a consistent rate of $310 even though his rates also have increased. Moreover, in their Fee Petition, Plaintiffs request that the court calculate fees at the attorneys' current rates because the litigation spanned a number of years. The court finds that if Plaintiffs had applied a consistent hourly rate of $420 for Attorney Bamberger and $370 for Attorney Murray, the calculation of the fee award would be $490,669.89.

5

## A.    Standard for awarding attorney's fees under 42 U.S.C. § 1988

In civil rights actions, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ." *See* 42 U.S.C. § 1988(b).  The provision allowing attorney's fees in § 1988 helps ensure "'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart,* 461 U.S. 424, 429 (1983) (quoting H.R.Rep. No. 94-1558 at 1 (1976)).  Although the decision to award a fee is discretionary, "a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'"  *Hensley*, 461 U.S. at 429 (quoting S.Rep. No. 94-1011 at 4 (1976)).  In this case, Defendants claim both that Plaintiffs are not prevailing parties and that special circumstances render an award of fees unjust.  The court addresses each of these issues in turn.

### 1.    Prevailing Party Determination

As a threshold matter, the court first must determine whether Plaintiffs are in fact prevailing parties within the meaning of 42 U.S.C. § 1988.  In their Memorandum in Opposition to Plaintiffs' Petition for Attorney's Fees, Defendants claim that no award should be made because Plaintiffs are not "prevailing parties" under § 1988.  The court disagrees with Defendants' contention that Plaintiffs merely won a "technical" victory and are not prevailing parties.

"[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim . . . a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992).  "Thus, at a minimum, to be considered a prevailing party within the meaning of § 1988, the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and

6

the defendant." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989) (citing *Hewitt v. Helms*, 482 U.S. 755, 760-61 (1987)); *see also Hewitt*, 482 U.S. at 760 (finding that the plaintiff was not a prevailing party because he did not receive a damages award, an injunction, a declaratory judgment, or a consent decree or settlement).

In the present case, the court granted Plaintiffs' motion for summary judgement and permanently enjoined and prohibited Defendants from enforcing S.C. Code Ann. § 16-15-385 as applied to "digital electronic files" that are sent or received via the Internet under S.C. Code Ann. § 16-15-375(2). Defendants claim that because they had neither enforced nor threatened to enforce the statute, Plaintiffs have not prevailed in any legal victory, and the court's declaratory relief and injunction is but a "technical" victory. The court disagrees entirely and finds that there is no question that Plaintiffs are prevailing parties.

Clearly, Plaintiffs can point to a resolution of the dispute which altered the relationship between the parties. Plaintiffs received all of the relief they sought under both their First Amendment and their Commerce Clause claims; the court granted summary judgment in Plaintiffs' favor, declared the Act unconstitutional, and permanently enjoined Defendants from enforcing the Act, a statute that they previously had the ability to enforce had they so chosen. Therefore, Plaintiffs' victory alters the relationship between the parties by modifying Defendants' behavior in a way that benefits Plaintiffs. *See, e.g., Filtration Dev. Co., LLC v. U.S.*, 63 Fed. Cl. 612 (Fed. Cl. 2005) ("The permanent injunction in this case altered the legal relationship between the parties and is sufficient to confer prevailing party status."); *Gerling Global Reinsurance Corp. of America v. Garamendi*, 400 F.3d 803, 806 (9th Cir. 2005) (finding that insurance companies prevailed in their challenge to California's Holocaust Victim Insurance Relief Act when they obtained a permanent

7

injunction against enforcement of the act), *amended on other grounds on denial of reh'g*, 410 F.3d 531 (9th Cir. 2005); *Abrahamson v. Bd. of Educ. of Wappingers Cent. Falls Sch. Dist.*, 374 F.3d 76 (2d Cir. 2004) (holding that plaintiff teachers who obtained an injunction requiring defendant school district to bring collective bargaining agreement in compliance with Age Discrimination in Employment Act were prevailing parties because the existence of the injunction and the ability to enforce it materially altered the relationship between the parties); *Lewis v. Wilson*, 253 F.3d 1077, 1082 (8th Cir. 2001) (finding that plaintiff was entitled to an injunction against a statute found facially invalid under the First Amendment, and therefore, she was a prevailing party entitled to fees under § 1988); *Rhode Island Med. Soc. v. Whitehouse*, 323 F.Supp.2d 283, 298 (D.R.I. 2004) (finding that plaintiffs constitute prevailing parties because the district court granted a permanent injunction against defendants and as a result, the state could no longer enforce the statute at issue); *Yassky v. Kings County Democratic County Comm.*, 259 F.Supp.2d 210, 217-18 (E.D.N.Y. 2003) (finding that the legal relationship between the parties was permanently altered in plaintiffs' favor only because of the issuance of a permanent injunction against defendants and the judgment in favor of plaintiffs); *West Virginia for Life, Inc. v. Smith*, 952 F.Supp. 342, 344 (S.D.W.Va. 1996) ("Here, there is no question that plaintiffs are prevailing parties. They obtained a summary judgment order granting the precise relief prayed for in their complaint – a determination that the challenged statute was unconstitutional and a permanent injunction against its enforcement."); *Dairy Maid, Inc. v. U.S.*, 837 F.Supp. 1370 (E.D.Va. 1993) (noting that the Army did not dispute that plaintiff was a prevailing party when the court entered a permanent injunction). In the present case, Plaintiffs clearly qualify for prevailing party status. Therefore, having found Plaintiffs entitled to reasonable attorney's fees as prevailing parties, the court must next determine who is liable for those fees and

8

to what extent.

### 2. Defendants' Authority to Pay Attorney's Fees

"In general, losing Title VII defendants are held presumptively liable for attorney's fees." *Mallory v. Harkness*, 923 F.Supp. 1546, 1551 (S.D. Fla. 1996)(citing *Christiansburg Garment v. EEOC*, 434 U.S. 412, 418 (1978)). However, Defendants claim that "no attorneys award may be made against the Attorney General or solicitors because state law does not appropriate funds or authorize the use of public monies for that purpose by those defendants," and therefore, if an award is made, it should be against the State of South Carolina as an entity. (Def. Memo in Opposition 15.) In Plaintiffs' Reply Brief in Support of their Petition for Attorney's Fees, Plaintiffs do not oppose excusing the county solicitor and instead making the Attorney General and the State of South Carolina jointly and severally liable for the fee award. (Pl. Reply Br. 11.) In response, Defendants filed a Supplemental Memorandum claiming that *only* the State of South Carolina as an entity, and not the Attorney General, should be liable if the court grants an award. (Def. Supp. Memo in Opposition 1-3.) Accordingly, the court must determine against whom any award of attorney's fees should be made.

"As the case law of the circuits amply demonstrates, the allocation of liability for attorneys' fees remains an area in which there is no simple formula of universal applicability." *Herbst v. Ryan*, 90 F.3d 1300, 1304 (7th Cir. 1997) (citing *Council for Periodical Distribs. Ass'sn v. Evans*, 827 F.2d 1483, 1487 (11th Cir. 1987), and *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 959 (1st Cir. 1984)). Additionally, the legislative history of § 1988 provides "that the attorney's fees . . . will be collected either directly from the official, in his official capacity, from the funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named

9

party)." *Hutto v. Finney*, 437 U.S. 67, 694 (1978) (citations omitted).

Here, Defendants cite *Herbst* in support of their claim that only the State of South Carolina should be liable for an award of attorney's fees. In *Herbst,* Plaintiffs, a group of physicians in Illinois, brought suit for declaratory and injunctive relief against the enforcement of various amendments to the Illinois abortion law against: (1) the State's Attorney of Cook County, in his official capacity and as a representative of a class of the State's Attorneys; (2) the Attorney General of Illinois in his official capacity; and (3) the Director of the Illinois Department of Public Health, in his official capacity. 90 F.3d at 1302. "The District Court noted that a state is liable for attorneys' fees under section 1988 when a state official is sued in his official capacity." *Id.* (citing *Hutto*, 437 U.S. at 693-94). Plaintiffs argued for joint and several liability, but the district court concluded that the fee award should be entered solely against the State of Illinois. The Seventh Circuit Court of Appeals affirmed the District Court's decision, noting that in requiring the State of Illinois to bear full responsibility for the fee award, "[t]he district court certainly committed no abuse of discretion in determining that the 'moving force' behind the statute at issue here was the State of Illinois . . . [and] the district court certainly in no way impaired the purposes of § 1988 or the concerns of federalism."[4] *Id.* at 1306.

_____

[4] In *Herbst*, the court stated:

> Because the officers were sued in their official capacities, the liability for attorney's fees is not their personal liability but the liability of the governmental body of which they are officers. . . . Liability can be imposed on a governmental entity, and on its officer in his official capacity, only when that governmental entity is the "moving force" behind the constitutional wrong that forms the basis of the suit. Here, the Attorney General of the State and the State Director of Public Health clearly undertook the defense of the challenged amendments on behalf of the state. The State's Attorneys also undertook the defense of the constitutionality of this *state* statute and the *state* policy that it embodied. It is clear that the State's Attorneys,

In this case, Plaintiffs request that the court award fees against the Attorney General and the state of South Carolina jointly and severally. In support of their position, Plaintiffs also cite *Herbst* and claim that there is no basis to excuse Defendant McMaster from liability for the fee award. (Pls.' Reply Br. 13.) In *Herbst*, the court noted "that a number of courts have upheld the imposition of joint and several liability for a fee award where there existed a question as to whether the fee would be collectible from one of the defendants." 90 F.3d at 1306 (citations omitted). However, Plaintiffs only cite the "uncertainty and potential practical difficulties with awarding a fee award against a non party" in support of their request for joint and several liability. (Pls' Reply Br. 14.) Interestingly, Plaintiffs also state: "Nor is there any meaningful distinction between the state Attorney General and the entity called the 'State of South Carolina.'. . . And whether the Attorney General or 'the State of South Carolina' pays the attorney's fee award, the money will ultimately come from the same place – the South Carolina State Treasury." (Pls.' Reply Brief 13.)

Accordingly, because Plaintiffs sued Defendants in their official capacities and because a state is liable for attorney's fees when a state official is sued in his official capacity, the court believes that an award of attorney's fees against the State of South Carolina as an entity is proper.

---

when bringing an action under the criminal laws of the State of Illinois, also are operating as officers of the state. In short, the undertaking was a defense of a state policy by state officers on behalf of the state. The district court certainly committed no abuse of discretion in determining that the "moving force" behind the statute at issue here was the State of Illinois.

90 F.3d at 1306 (citations omitted).

**B.**     **Reasonableness of Plaintiffs' Request**

**1.**     **Lodestar Calculation**

After determining that Plaintiffs are in fact prevailing parties entitled to a fee award against the State of South Carolina, the court must evaluate the reasonableness of Plaintiffs' fee request. In so doing, the court begins by calculating the lodestar figure. The lodestar figure is calculated by multiplying the number of reasonable hours expended times a reasonable rate. To determine the reasonable rate and reasonable number of hours to use in calculating the lodestar, a district court's analysis must strictly follow the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), as modified by *Hensley v. Eckerhart*, 461 U.S. 424 (1983). The *Johnson* factors are: (1) the time and labor required to litigate the suit; (2) the novelty and difficulty of the questions presented by the lawsuit; (3) the skill required to properly perform the legal services; (4) the attorney's opportunity costs in pursuing the litigation; (5) the customary fee for such services; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the attorney's professional relationship with the client; and (12) awards in similar cases. *See Daly v. Hill,* 790 F.2d 1071, 1075 n. 2 (4th Cir. 1986). The court will therefore consider these factors to determine the reasonable rate and the reasonable number of hours in this case. *See id.* at 1078.

**a.**     **Reasonable Rate**

The first prong of the lodestar analysis involves determining the reasonable hourly rate of compensation to apply. *See Hensley*, 461 U.S. at 433. *See Wagner v. Dillard Dep't Stores, Inc.*, 2000 WL 33321252, at *2 (M.D.N.C. 2000). Defendants argue that local rates should control, not

12

the New York and Washington, D.C. rates proposed by Plaintiffs.  In *National Wildlife Federation v. Hanson*, 859 F.2d 313 (4th Cir.1988), the Fourth Circuit observed that the community in which the court sits is the first place to look to in evaluating the prevailing market rate.  "Rates charged by attorneys in other cities, however, may be considered when 'the complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally,' and the party choosing the attorney from elsewhere acted reasonably in making the choice."  *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 179 (4th Cir. 1994) (quoting *National Wildlife,* 859 F.2d at 317).

In this case both criteria are satisfied.  The litigated issues include complicated First Amendment questions, and because Plaintiffs' counsel are specialists in these fields and regularly litigate cases involving the questions at issue, consideration of their customary rates is proper.  *See Rum Creek*, 31 F.3d at 179 (reversing the district court's downward adjustment of out-of-town counsel's rates when the issues "included questions of preemption and constitutional law" and out-of-town counsel were "concededly well-experienced in the type of matters involved.").  Accordingly, the requirements of *National Wildlife* are satisfied, and this court declines to apply local rates to non-local attorneys.

The court's inquiry does not end here.  The court must now determine whether Plaintiffs' counsels' proposed hourly rates are reasonable - that is, "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Blum v. Stenson,* 465 U.S. 886, 895 n.11 (1984).  Here, at least three of the *Johnson* factors – the customary fee; the attorney's experience, reputation, and ability; and awards in similar cases – are relevant to determining the prevailing market rate for the services rendered by all three of Plaintiffs' counsel.

Defendants argue that the hourly rates requested by Plaintiffs are too high:  From the Charleston, South Carolina firm of Derfner, Altman & Wilborn, LLC, Mr. Derfner requests a rate of $400 an hour while both Mr. Altman and Mr. Wilborn request a rate of $275 an hour.  From the Washington, D.C. office of Wilmer Cutler Pickering Hale and Dorr LLP, Mr. Ogden, partner, requests $650 an hour; Ms. Kestenbaum, counsel, requests $430 an hour; Mr. Kenneth Bamberger, counsel, requests $420 an hour; Brian Murray, associate, requests $370 an hour, Robert Strayer, associate, requests $310 an hour; and compensation for five law clerks and paralegals is requested at rates varying from $160 to $200 an hour.  From the New York City office of Sonnenschein Nath & Rosenthal LLP, Mr. Michael Bamberger requests $650 an hour.  The court addresses each firm's situation in turn.

### i.      Derfner, Altman & Wilborn LLC (Charleston, SC)

### 1.      Armand Derfner

Attorney Derfner documents that he spent 75.5 hours on this case at a rate of $400 an hour. Plaintiffs have submitted Mr. Derfner's Declaration, in which he details the extent of his expertise and experience in civil rights litigation and affirms that the rate of $400 is reasonable given his experience.  (Derfner Decl.)

Mr. Derfner has extensive experience in first amendment and constitutional litigation. Consideration of the customary fees awarded in similar litigation and the awards in other cases support a rate of $400 an hour for Mr. Derfner.  Also, Mr. Derfner has received similar fees in this district.  *See, e.g., United States v. Charleston County*, C.A. No. 2:01-00155-23 (D.S.C. Aug. 8, 2005) (awarding Mr. Derfner $400 an hour); *IUE-CWA v. EnerSys, Inc.*, C.A. No. 3:01-4766-10 (D.S.C. Aug. 10, 2004) (approving a rate of $450 an hour).  Therefore, given Mr. Derfner's

experience and similar past awards, the court believes his requested rate of $400 an hour is reasonable.

### 2. Jonathan Altman and Peter Wilborn, Jr.

Attorney Altman documents that he spent 1.4 hours on this case, and Attorney Wilborn documents that he spent 5.7 hours on this case. Both attorneys request a rate of $275. In Mr. Derfner's Declaration, he notes that both Mr. Altman and Mr. Wilborn are experienced litigators with skill comparable to lawyers in this area who charge $275 or more an hour. (Derf. Decl.) Additionally, Mr. Wilborn has been awarded a rate of $267 an hour in *Maxey v. ALCOA*, C.A. No. 1:02-CV-0280 (N.D. Oh. Sept. 25, 2003), and a rate near that in *IUE-CWA*. Therefore, given the experience and similar awards, the court believes that Mr. Altman and Mr. Wilborn's requested rate of $275 an hour is not unreasonable.

### ii. Wilmer Cutler Pickering Hale and Dorr LLP (Washington, D.C.)

### 1. David W. Ogden, Partner

First, Attorney Ogden documents that he spent 43.3 hours working on this case at a rate of $650 per hour. Plaintiffs have submitted Mr. Ogden's Declaration, in which he details the extent of his expertise and experience in First Amendment and Commerce Clause issues and affirms that the rate of $650 an hour would be reasonable given his experience. (Ogden Decl. 7-10.)

Mr. Ogden graduated *magna cum laude* from Harvard Law School in 1981, where he served as an editor of the *Harvard Law Review*. Overall, he has a highly impressive background including vast experience in First Amendment litigation. Many of the cases in which he has participated have involved constitutional challenges to federal or state legislation that purported to restrict speech, and some of which have involved statutes directed at the protection of children from obscene or harmful

material, including, for example: *ACLU v. Reno*, 217 F.3d 162 (3d Cir. 2000); *American Library Ass'n v. Reno*, 33 F.3d 78 (D.C. Cir. 1994); and *American Library Ass'n v. Barr*, 794 F.Supp. 412 (D.D.C. 1992). In addition, Mr. Ogden has co-taught a course entitled, "Constitutional Law: Theories of Free Speech," at Georgetown University Law Center.

Although the court recognizes that Mr. Ogden has vast expertise and experience, the court rejects Mr. Ogden's request for payment at $650 an hour in favor of a more reasonable figure. In his Declaration, Mr. Ogden claims that his requested hourly rate of $650 an hour is in line with those in the Washington, D.C. community. In support of this claim, Mr. Ogden attached a copy of the National Law Journal's December 6, 2004 survey of billing rates nationwide. *See Firm-By-Firm Sampling of Billing Rates Nationwide*, 12/6/04 NAT'L L.J. 20. This survey does not include a sampling of rates for Wilmer Cutler Pickering Hale and Dorr LLP, and therefore, Mr. Ogden directs the court's attention to the comparable firms of Akin, Gump, Strauss, Hauer & Feld; Covington & Burling; and Hogan & Hartson. These three firms report billing rates for partners as follows: $425-$750; $390-$690; and $230-$725, respectively. Frankly, as these rates range anywhere from $230 to $750, they do not help the court in determining a reasonable hourly fee for Mr. Ogden. Furthermore, Mr. Ogden does not support his request for $650 an hour with an affidavit or with reference to recent case law awarding either him or partners similarly situated with such a steep rate. Additionally, Plaintiffs include the Memorandum Opinion from *PSINet, Inc*. as Attachment A to their Reply Brief; in this Memorandum Opinion, the court capped counsels' rates at $300 an hour for partners and $200 an hour for associates, finding that the higher rates that counsel had requested exceeded "the outer limits of the court's 'conscience cap.'" (Attachment A to Pls.' Reply Br. 7.) Although this Opinion is dated March, 27, 2002, and almost three and one-half years have since

16

passed, the court likewise finds that Mr. Ogden's request for $650 an hour, without any support other than the National Law Journal's survey, exceeds its conscience cap. Therefore, the court limits Mr. Ogden's rate to $500 an hour, $10 more than the average of the $230 to $750 range provided in the National Law Journal survey for partners at comparable firms.

### 2.    Janis C. Kestenbaum, Counsel

Attorney Kestenbaum documents that she spent 348.9 hours on this case at a rate of $430 an hour. Mr. Ogden's Declaration details the extent of her expertise and experience in First Amendment litigation and litigation involving other constitutional issues. (Ogden Decl. 10.)

Ms. Kestenbaum graduated *magna cum laude* from Harvard Law School, where she served as an editor of the *Harvard Law Review*, in which she published three pieces on constitutional issues, including one involving the First Amendment. (Ogden Decl. 10.) As with Mr. Ogden, Ms. Kestenbaum has extensive experience with the subject matter at issue. Furthermore, from a review of the time records, it appears that Ms. Kestenbaum, along with Attorney Kenneth Bamberger, put in the brunt of the work in this case. Although Plaintiffs again do not include a supporting affidavit or a reference to case law providing for a fee of $430 an hour for Ms. Kestenbaum, after a review of the record and consideration of awards in similar litigation, the court believes that Ms. Kestenbaum's requested rate of $430 an hour is reasonable.

### 3.    Kenneth A. Bamberger, Counsel

Attorney Kenneth Bamberger documents that he spent 293.7 hours working on this case at a rate of $420 an hour. Mr. Ogden's Declaration outlines Mr. Bamberger's historical rates and details the extent of his expertise and experience. (Ogden Decl. 11.)

Like Ms. Kestenbaum, Mr. Bamberger graduated from Harvard Law School, where he served

17

as President of the *Harvard Law Review*.  (Ogden Decl. 11.)  Mr. Bamberger's practice has primarily involved constitutional and statutory litigation – including First Amendment issues raised by the regulation of telecommunications – in proceedings raised against government and private parties at the trial and appellate court levels, and in administrative proceedings.  (Ogden Decl. 11.)  As previously mentioned, a review of the record indicates that Mr. Bamberger, along with Ms. Kestenbaum, performed a great portion of the work involved in this case.  Accordingly, the court finds Mr. Bamberger's requested rate of $420 an hour reasonable in light of the circumstances.

### 4.      Brian Murray, Associate

Attorney Murray documents that he spent 44.2 hours on this case at a billing rate of $370 per hour.  Mr. Ogden's Declaration outlines Mr. Murray's background and experience.  (Ogden Decl. 11-12.)

Mr. Ogden graduated from the University of Virginia School of Law in 2000, where he was an Executive Editor of the *Virginia Law Review*.  Mr. Murray clerked both at the U.S. District Court for the District of Columbia and at the U.S. Court of Appeals for the Eleventh Circuit before joining Wilmer Cutler Pickering Hale and Dorr LLP, where he works with the firm's Communications and E-Commerce Department.  (Ogden Decl. 12.)  Again, Plaintiffs provide no support for this requested rate other than Mr. Ogden's Declaration and the National Law Journal survey.  Accordingly, and in light of a mathematical error in Mr. Ogden's Declaration that concerns Mr. Murray's hourly rate, the court finds a rate of $350 an hour to be more reasonable than the requested rate of $370 an hour.

### 5.      Robert Strayer, Associate

Attorney Strayer documents that he spent 19.9 hours on this case at a rate of $310 an hour.  Mr. Ogden's Declaration describes Mr. Strayer's background and experience in this area.  (Ogden

Decl. 12.)

Mr. Strayer graduated from Vanderbilt Law School in 2000, *Order of the Coif.* Prior to joining the firm, he clerked at the U.S. Court of Appeals for the Eleventh Circuit and also served a one-year fellowship with the State Solicitor in the Ohio Attorney General's Office, where his practice focused on federal constitutional litigation, including litigation before the U.S. Supreme Court. (Ogden Decl. 12.) Mr. Strayer was a third-year associate in 2004, and ultimately, the court finds a billing rate of $300 to be more reasonable than Mr. Strayer's requested billing rate of $310 an hour.

### 6. Law Clerks and Paralegals

Defendants advance no serious challenge to the rates assessed for law clerk and paralegal assistance given to litigation counsel.[5] Notwithstanding, the court finds the rates charged by such support staff are not unreasonable or unconscionable under the circumstances of this case.

### iii. Sonnenschein Nath & Rosenthal LLP (New York, NY)

### 1. Michael A. Bamberger, Partner

Attorney Bamberger documents that he spent 121.6 hours working on this case at a billing rate of $650 an hour. Plaintiffs have submitted Mr. Bamberger's Declaration, in which he details his extensive experience and expertise in First Amendment litigation. (Bamberger's Decl.) Additionally, Plaintiffs have submitted Mr. Bruce Rich's Declaration in support of Mr. Bamberger's request for a billing rate of $650 an hour. (Rich Decl.)

Mr. Bamberger graduated *magna cum laude* from Harvard Law School, where he was an

---

[5] As the court more fully addresses below, Defendants do challenge the number of hours assessed for law clerk and paralegal assistance in this litigation.

editor of the *Harvard Law Review*.  Mr. Bamberger has participated in over 60 First Amendment

cases, many of which have involved the regulation of access by minors to sexually explicit material,

namely *PSINet, Inc. v. Chapman*, 342 F.3d 227 (4th Cir. 2004), *reh'g. den.* 372 F.3d 671 (4 th Cir.

2004), *aff'g* 167 F.Supp.2d 878 (D. Va. 2001).  Additionally, he has represented members of the

Media Coalition for over twenty years.  (Bamberger Decl.)

In the Declaration of Bruce Rich, a member of the firm of Weil Gotshal & Manges LLP in

New York, Mr. Rich states that Mr. Bamberger is one of the leading First Amendment attorneys in

the nation.  (Rich Decl.)  Additionally, Mr. Rich states that he is familiar with the billing rates of

leading New York attorneys and that "the billing rate of $650 per hour is within the range of what

one would reasonably expect for an attorney of his stature and experience."  (Rich Decl.)  Although

the court recognizes the extent of Mr. Bamberger's expertise and experience in this field, the court

declines to accept Mr. Bamberger's requested rate of $650 an hour and instead believes that a rate

of $600 an hour is more reasonable.

### 2.    Reasonable Number of Hours

Defendants argue that the requested amount of compensation, $480,669.89, is unreasonable

because it shocks the conscience and the hours claimed by Plaintiffs are grossly excessive due to

overstaffing and unnecessary work which created duplication of effort.[6]  Additionally, Defendants

claim that the amount of time needed to present this case should have been minimized because of

previous experience and participation by some Plaintiffs in these types of cases.  In return, Plaintiffs

argue both that Defendants' actions prolonged and complicated the case and that Defendants grossly

---

[6] Using the hourly rates and the numbers of hours actually requested by Plaintiffs, the court finds that Plaintiffs actually seek a fee award of $490,669.89.

underestimate the complexity of the case and amount of work necessary to prosecute this case.

To establish the reasonable number of hours expended, Plaintiffs must submit evidence supporting the number of hours worked. *See Hensley*, 461 U.S. at 433. The number of hours should be reduced to exclude "hours that are excessive, redundant, or otherwise unnecessary" in order to reflect the number of hours that would be properly billed to the client. *Id.* at 434. Plaintiffs request compensation for 954.2 attorney hours and 114.1 law clerk and paralegal hours, for a total of 1068.3 hours.

The party seeking reimbursement of attorney's fees has the burden of presenting adequate documentation of the hours reasonably expended. *See League of United Latin Am. Citizens #4552 v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1233 (5th Cir. 1997). Accordingly, the fee applicant must document the hours expended in a manner sufficient for the court to verify that the applicant has met his burden. *See La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995) (per curiam). The court may reduce fee requests that are based on inadequate documentation. *See LULAC*, 199 F.3d at 1233; *La. Power & Light Co.*, 50 F.3d at 326. Here, the court finds that attorneys provided sufficiently detailed billing records that adequately describe the date, hours, and work performed, and as such, the court will not discount the hours for inadequate documentation.

Defendants argue that the hours Plaintiffs claim are grossly excessive due to overstaffing and unnecessary work. For example, in their Memo in Opposition to Plaintiffs' Fee Petition, Defendants note that Plaintiffs submitted time records for nine attorneys and five paralegals, and at any one time, at least six lawyers were working on the case. (Defs.' Memo in Opp. 21.) Also, three lawyers attended each hearing although only one made oral arguments, and two attended the deposition of Defendants' expert in Utah although only one asked questions of the deponent. (Defs.' Memo in

Opp. 21, 24, 26.)  The involvement of this number of attorneys necessarily involves some degree of duplication and overlap, and accordingly, the court must take this into account in determining the reasonable number of hours to compensate Plaintiffs.  *See, e.g., Alexander S. By and Through Bowers v. Boyd*, 929 F.Supp. 925, 946 (D.S.C.,1995) ("Courts will substantially reduce bills when unnecessary duplication is brought about by having an excessive number of attorneys involved in a case.  Duplicative work, such as several attorneys attending the same hearing, should generally not be part of a fee award.") (citations omitted).

Additionally, Defendants argue that the time is particularly unconscionable in light of a recent similar case, *PSINet v. Chapman*, 372 F.3d 671 (4th Cir. 2004), which involved one of the same attorneys and two of the same experts.[7]  After reviewing counsels' declarations and billing records, the court does not find that the hours requested by Plaintiffs "shock the conscience," as Defendants assert.  However, the court does find some unnecessary duplication of effort and excessive billing and therefore reduces the award accordingly.

For example, as previously mentioned, three attorneys attended the Motion to Dismiss hearing, but only one attorney argued the matter.  Anywhere from three to six attorneys worked on most documents at any given time.  In addition, three attorneys attended and prepared for oral argument for Plaintiffs on the updated Motion for Summary Judgment, although only one attorney actually argued it.  Also, Plaintiffs' records include more than 44 hours in connection with a moot

---

[7]  In *PSINet*, the district court awarded fees for more than 1,429.75 hours through the summary judgment stage and 15 additional hours spent on litigation of the fee petition itself. Plaintiffs note that they seek roughly 500 fewer attorney hours than the district court awarded in *PSINet*.  However, in addition to the 954.2 attorney hours Plaintiffs request in this case, Plaintiffs also request 114.1 hours for the work of law clerks and paralegals.

court held in advance of the argument.[8]  *See Planned Parenthood of Cent. New Jersey v. Attorney Gen. of New Jersey*, 297 F.3d 253 (3d Cir. 2003) (holding that moot court time of 25.5 hours was excessive for purposes of attorney fee award under § 1988).  In preparing the fee petition alone, Plaintiffs claim almost 70 hours.  *See Spell v. McDaniel*, 852 F.2d 762, 770 (4th Cir. 1988) (finding counsel's 64.6 hours spent preparing the fee petition "simply incredible" and noting that 19 attorney hours were sufficient to accomplish the task).  Lastly, Plaintiffs' records indicate that one paralegal spent 12.6 hours cite checking Plaintiffs' Motion for Summary Judgment, a document of less than 2 pages.  Overall, and in light of the foregoing examples, the court believes that Plaintiffs' hours are somewhat excessive due to duplication and/or waste of effort of the nine attorneys and five law clerks and paralegals.[9]  Therefore, the court believes that a 15% reduction[10] in fees and costs is

---

[8]  Plaintiffs' records from April of 2005 include the following entries in connection with moot court: (1) for Kenneth Bamberger, entries for 3.6 and 4.2 hours for a total of 7.8 hours; (2) for Janis Kestenbaum, entries for 5, 4.5, 5, and 7 hours for a total of 21.5 hours; (3) for Brian Murray, entries for 4 and 4 hours for a total of 8 hours; (4) for David Ogden, entries for 1.5 and 2 hours for a total of 3.5 hours, and; (5) for Michael Bamberger, entries for .75 and 2.6 hours.  Entries for these five attorneys in connection with the moot court total 44.15 hours.

[9]  Plaintiffs claim that Defendants' actions prolonged the litigation and complicated the case.  For example, Plaintiffs note that Defendants refused to enter into certain stipulations, and Defendants filed numerous motions that were without merit.  Although the court finds Plaintiffs' hours to be somewhat excessive and/or redundant, the court also considers the extent to which Defendants prolonged this litigation in addressing the reasonableness of the fee award.

[10]  In *Copeland v. Marshall*, the U.S. Court of Appeals for the D.C. Circuit stated:

> Once the district court determines the reasonable hourly rates to be applied, for example, it need not conduct a minute evaluation of each phase or category of counsel's work. . . . We think that the District Court Judge in this case – recognizing, as he did, that some duplication or waste of effort had occurred – did not err in simply reducing the proposed "lodestar" fee by a reasonable amount without performing an item-by-item accounting.

41 F.2d 880, 903 (D.C. Cir. 1980) (citing *Lindy Bros. Builders, Inc. of Philadelphia v. Am. Radiator*

appropriate, to be applied after application of the court-approved hourly billing rates.[11]

**Total Reasonable Attorney's Fees**

Accordingly, based on the discussion above, the court finds that Plaintiffs are entitled to attorney's fees in the amount of **$405,485.61.**

---

*& Standard Sanitary Corp.*, 540 F.2d 102, 116 (3d Cir. 1976)) (citation omitted).

[11] Using the hourly rates and the numbers of hours actually requested by Plaintiffs, the court finds that Plaintiffs actually seek a fee award of $490,669.89.00. Using the court's approved hourly rates, the new amount is calculated as follows:

Attorney Derfner: 75.5 hours at $400/hour = $30,200
Attorney Altman: 1.4 hours at $275/hour = $385
Attorney Wilborn: 5.7 hours at $275/hour = $1,567.50

Attorney Ogden: 43.3 hours at $500/hour = $21,650
Attorney Kestenbaum: 348.9 hours at $430/hour = $150,027
Attorney Bamberger: 293.7 hours at $420/hour = $123,354
Attorney Murray: 44.2 hours at $350/hour = $15,470
Attorney Strayer: 19.9 hours at $300/hour = 5,970
Attorney Bamberger: 121.6 hours at $600/hour = $72,960
Law Clerks and Paralegals: 114.1 hours at rates between $160 to $200/hour = $20,378
Costs and fees:
    (1) for Derfner, Altman & Wilborn, LLC: $505.52.
    (2) for Wilmer Cutler Pickering Hale and Dorr LLP: $30,271.30;
    (3) for Sonnenschein Nath & Rosenthal LLP: $4,303.57.

The sum of these amounts is: $477,041.89. This is $13,628 less than the actual amount sought by Plaintiffs. After calculating this amount, the court believes that a 15% reduction for excessive and duplicative work is necessary. Fifteen percent of $477,041.89 amounts to $71,556.28. Subtracting this amount from $477,041.89 leaves $405,485.61.

### CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that Plaintiffs' petition for attorney's fees and costs in the aggregate amount of **$405,485.61** is **GRANTED**.

**AND IT IS SO ORDERED.**

_____

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, SC**
**September 8, 2005**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | C.A. No. 2:01-00155-23 |
| | ) | |
| CHARLESTON COUNTY, SOUTH CAROLINA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————————————— | ) | |
| | | |
| LEE H. MOULTRIE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | C.A. No. 2:01-00562-23 |
| | ) | **ORDER** |
| CHARLESTON COUNTY COUNCIL, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————————————— | ) | |

This matter is before the court on the Moultrie Plaintiffs' Petition for Attorney's Fees and Costs pursuant to 42 U.S.C. § 1988.[1]  For the reasons set forth herein, the Moultrie Plaintiffs' petition is granted, and attorney's fees and costs are awarded in the amount of $712,027.71.

## BACKGROUND

The underlying action was brought on January 17, 2001 by the United States of America and the Moultrie Plaintiffs against Charleston County, South Carolina, the Charleston County Council, the Charleston County Election Commission, and several individual defendants ("Charleston County").  The Moultrie Plaintiffs challenged the at-large method of election for County Council

---

[1]  The Moultrie Plaintiffs are several private individual Charleston County voters.

seats under Section 2 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973, claiming that the at-large method diluted minority voting strength.[2]  Specifically, the Moultrie Plaintiffs claimed that the at-large election method (1) denied African-Americans equal access to the electoral process in contravention of the results standard of Section 2 of the Voting Rights Act (hereinafter "the results claim"), and (2) was motivated by a racially discriminatory purpose in violation of the intent standard of Section 2 of the Voting Rights Act and the 14th Amendment of the United States Constitution (hereinafter "the intent claim").

On March 6, 2003, this court found that the at-large system of elections for County Council - in light of the County's severe voting polarization, electoral structure, and size - denied African-Americans, on account of their race, equal access to the electoral and political process in contravention of Section 2 of the Voting Rights Act.  In so finding, this court upheld both the Moultrie Plaintiffs' and the United States' Section 2 results claims.  However, this court rejected the Moultrie Plaintiffs' intent claim.[3]  Charleston County and the Moultrie Plaintiffs appealed.  The

---

[2]  The Moultrie Plaintiffs brought suit under both the results and intent standards of Section 2 of the Voting Rights Act of 1965, as amended in 1982.  The results standard of Section 2 provides:

> [n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race . . . .

42 U.S.C. § 1973.  Section 2's intent standard provides:

> [a] violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the [jurisdiction] are not equally open to participation by members of a class in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.*  The United States, also a party to this lawsuit, brought suit against Charleston County under only the results standard of Section 2.  The United States is not a party to the present motion for attorney's fees.

[3]  In other words, this court denied the Moultrie Plaintiffs' Section 2 intent claim and their Fourteenth Amendment claim.  This court held that there was not enough evidence of intent to find

2

Fourth Circuit affirmed this court's finding that the County's at-large election system violated

Section 2 by diluting minority voting strength, but did not reach the Moultrie Plaintiffs' intent claim

because the court had already affirmed the rejection of the at-large method. *See United States v.*

*Charleston Co.*, 365 F.3d 341, 347 (4th Cir. 2004). Charleston County then filed a petition for a writ

of certiorari. The Supreme Court denied the petition on November 29, 2004. *See Charleston Co.*

*v. United States,* 125 S.Ct. 606 (2004). The Moultrie Plaintiffs now seek attorney's fees and costs

pursuant to 42 U.S.C. § 1988 in the amount of $723,657.71.[4]

## DISCUSSION

In civil rights actions, "the court, in its discretion, may allow the prevailing party . . . a

reasonable attorney's fee as part of the costs . . . ." *See* 42 U.S.C. § 1988(b). Section 1988's

provision of attorney's fees helps to ensure "'effective access to the judicial process' for persons

with civil rights grievances." *See Hensley v. Eckerhart,* 461 U.S. 424, 429 (1983) (quoting

H.R..Rep. No. 94-1558 at 1 (1976). Although the decision to award a fee is discretionary, "a

_____

that the at-large system was adopted with the intent to discriminate. *See United States v. Charleston Co.*, 316 F.Supp.2d 268, 304 (D.S.C. 2003). The Moultrie Plaintiffs did demonstrate, through temporal evidence, that the at-large system was a known device for diluting minority voting strength, and historically was combined with other actions to insulate white control of the electorate. *See id.* at 305. However, Charleston County also presented evidence that the legislation establishing the at-large method was actually enacted to satisfy the one-person, one-vote mandate of the Supreme Court. *See id.* at 306. In light of the lack of legislative history or other evidence of intent, this court found that the adoption of the at-large system might reasonably have been explained by either of the historical explanations. Consequently, while the court found the timing of the adoption of the system suggested discriminatory intent, the evidence was not probative enough for the court to find intentional discrimination in its adoption. *See id.*

[4] As detailed *infra*, this calculation of attorneys' fees and expenses encompasses 1,771.5 hours total for attorneys Laughlin McDonald, Armand Derfner, and Cheryl Whipper Hamilton, as well as 52.10 hours for a law clerk, in addition to expenses incurred by each attorney. (Pl. Mot. at 2).

3

prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley*, 461 U.S. at 429 (*quoting* S.Rep. No. 94-1011 at. 4 (1976)). "[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim . . . a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992). Notably, Plaintiffs do not need to succeed on all claims or issues to be considered as prevailing parties. *See Alexander S. By & Through Bowers v. Boyd*, 929 F.Supp. 925, 931 (D.S.C. 1995) (holding that plaintiffs challenging the conditions of juvenile confinement facilities were prevailing parties even though they did not succeed on all claims).

Here, the Moultrie Plaintiffs are unquestionably prevailing parties, despite their failure to succeed on their intent claim, because they prevailed on their Section 2 results challenge to Charleston County's at-large election method, resulting in its discontinuance. *See League of United Latin Am. Citizens v. N.E. Indep. School Dist.*, 903 F.Supp. 1071, 1094 (W.D. Tex. 1995) (holding that plaintiffs challenging at-large election method were prevailing parties because they succeeded on Section 2 results claim, despite their failure to succeed on Fourteenth Amendment intent challenge). As prevailing parties, the Moultrie Plaintiffs are therefore entitled to an award of attorney's fees. However, this "brings the plaintiff[s] only across the statutory threshold . . . [i]t remains for the district court to determine what fee is 'reasonable.'" *Hensley*, 461 U.S. at 433.

Here, Charleston County does not contest that the Moultrie Plaintiffs are prevailing parties with respect to the results claim, nor do they argue that special circumstances render an award of fees unjust. Instead, the dispute between the parties concerns the reasonable amount of fees to be

4

awarded to the Moultrie Plaintiffs.

### A.    Lodestar Calculation

In determining the amount of attorney's fees to award, the court begins by calculating the lodestar figure.  The lodestar figure is calculated by multiplying the number of reasonable hours expended times a reasonable rate.  To determine the reasonable rate and reasonable number of hours to use in calculating the lodestar, a district court's analysis must strictly follow the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), as modified by *Hensley v. Eckerhart*, 461 U.S. 424 (1983).  The *Johnson* factors are: (1) the time and labor required to litigate the suit; (2) the novelty and difficulty of the questions presented by the lawsuit; (3) the skill required to properly perform the legal services; (4) the attorney's opportunity costs in pursuing the litigation; (5) the customary fee for such services; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the attorney's professional relationship with the client; and (12) awards in similar cases.  *See Daly v. Hill*, 790 F.2d 1071, 1075 n. 2 (4th Cir. 1986).  The court will therefore consider these factors to determine the reasonable number of hours and the reasonable rate to be used in this case.  *See id.* at 1078.

Charleston County argues that the requested amount of compensation, $723,657.71, is unreasonable because: (1) the billing itemization is overly broad; (2) the court cannot determine whether Plaintiffs' counsel unnecessarily duplicated efforts because of the vague billing records; (3) Plaintiffs' fail to distinguish between claims in their billing; (4) the case was not undesirable; (5)

the billing improperly includes overhead expenses.[5]

### 1.  Reasonable Number of Hours

To establish the number of hours reasonably expended, Plaintiffs must submit evidence supporting the hours worked.  *See Hensley*, 461 U.S. at 433.   The number of hours should be reduced to exclude "hours that are excessive, redundant, or otherwise unnecessary" in order to reflect the number of hours that would be properly billed to the client.  *Id.* at 434.  The Moultrie Plaintiffs are requesting compensation for 1,771.5 hours of work by counsel,[6] and 52.5 hours by a law clerk, spanning the years from 2000 to 2004.   Specifically, Laughlin McDonald seeks compensation for 969.85 hours, Armand Derfner seeks compensation for 647.5 hours, and Cheryl Whipper Hamilton seeks compensation for 154.1 hours.

### a.  Unacceptably Broad Billing Records

Defendants first argue that the billing itemization is unacceptably broad.  The party seeking reimbursement of attorney's fees has the burden of presenting adequate documentation of the hours reasonably expended.  *See League of United Latin Am. Citizens # 4552 v. Roscoe Indep. Sch. Dist.,*

---

[5]  The court addresses the argument that work on the intent claim should not be compensated in its analysis of the results obtained *infra*, after calculation of the lodestar, while all other arguments are addressed within the court's lodestar analysis.

[6]  On August 3, 2005, Plaintiffs' counsel filed a "Supplement to Private Plaintiffs' 2005 Fee Petition."  In this supplement, counsel Derfner and McDonald seek compensation for an additional 50.25 hours spent briefing the fee issue.  The court declines to consider this petition, as the fee petitions have been pending for approximately five months, and counsel should have included these hours in the original briefing.  Moreover, as explained *infra* in Footnote 11, counsel had once discounted their fees, and have since withdrawn those discounts.  Given that the court has awarded fees to Mr. Derfner and Mr. McDonald based on the non-discounted petition, and compensated them at their requested hourly rates, the court believes counsel have been adequately compensated without the addition of the fifty hours contained in the recently filed supplement.

6

119 F.3d 1228, 1233 (5th Cir.1997). Accordingly, the fee applicant must document the hours expended in a manner sufficient for the court to verify that the applicant has met his burden. *See La. Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir.1995) (per curiam). The court may reduce fee requests that are based on inadequate documentation. *See LULAC,* 119 F.3d at 1233; *La. Power,* 50 F.3d at 326.

"Although mathematical precision is rarely achievable when determining a reasonable fee award, an attorney's billing records, and, accordingly, the fee petition itself should be sufficiently detailed so as to make it unnecessary to have a full scale second trial - with the result being that the attorney's fee issue would become the proverbial tail that wags the dog - simply to determine the reasonableness of the fee claim." *Am. Canoe Ass'n, Inc. v. U.S. E.P.A.*, 138 F.Supp.2d 722, 747 FN63 (E.D.Va. 2001); *see Hensley*, 461 U.S. at 437. Billing records are sufficiently detailed when the court is able to determine the amount, subject matter, and purpose of the hours expended. *Compare Brack v. Shoney's Inc.*, 2004 WL 2806495, at *4 (W.D. Tenn. 2004) (applying no reduction in fees for vagueness where billing records were sufficiently detailed so the court could determine the subject and purpose of the hours expended), *with Herring v. Thomasville Furniture Ind., Inc.*, 1999 WL 1937352, at *8, (M.D.N.C. 1999) (discounting fee 25% for lack of specificity where billing records merely recorded the total number of hours for each day as a lump sum, without providing the amount of time spent on the specific tasks described).

The court finds that Attorneys McDonald and Derfner provided sufficiently detailed billing records and, as such, will not be discounted. Both attorneys' records adequately describe the date, amount of hours, and work performed thoroughly enough for the court to readily determine the purpose of the work and its subject matter. For example, on July 17, 2001, Mr. McDonald's records

7

reveal that he prepared responses to Defendants' discovery requests for 1.2 hours, conducted the deposition of George Freeman for 4.0 hours, conferred with the Department of Justice regarding the deposition schedule for .75 hours, and traveled to Charleston for 2.0 hours. (McDonald Decl., Ex. A at 3). Similarly, Mr. Derfner's records reveal that on May 18, 2002, he reviewed Defendants' objections to the Magistrate's Report and drafted the Moultrie Plaintiffs' response to those objections for 4.5 hours. (Derfner Decl., Ex. A at 3). These entries are representative of the satisfactory level of detail which consistently permeates both attorneys' billing records.

In contrast, however, Attorney Whipper Hamilton's billing records are not sufficiently detailed. For example, in a two-month period, Ms. Whipper Hamilton simply recorded "Review Email" nine times. (Hamilton Decl., Ex. A at 2). This lack of detail is largely representative of Ms. Whipper Hamilton's records, and does not permit the court to determine the purpose of her work. The court notes, however, that her records do become more detailed toward the end of the litigation.[7] Overall, the court finds that Ms. Whipper Hamilton's records do "contain sufficient information and adequate documentation to allow for general evaluation of the claim," *Herring*, 1999 WL 1937352 at *8, so that it is possible to determine the general nature of work expended. Nevertheless, the lack of clear detail makes it more difficult for the court to determine the reasonableness of Ms. Whipper Hamilton's fee request.

Consequently, the court finds it appropriate to reduce the number of hours requested by 25% to account for the lack of specificity. "An overall reduction of 25% corrects for this lack of detail,

---

[7] For example, on March 18, 2004, Ms. Whipper Hamilton's records reveal that she reviewed the Department of Justice Response to the Motion to Stay and reviewed the Moultrie Plaintiffs' Opposition to the Motion to Stay for 1.15 hours. This entry represents a general improvement in specificity in Ms. Whipper Hamilton's later billing records.

and ensures that the amount of time is reasonable in light of the nature of the case and the time and effort required." *Id.* The Fourth Circuit has approved a percentage reduction in fees in similar situations where the overall request appears to be reasonable, but the lack of detail nevertheless makes it difficult to review most of the billing entries. *See Buffington v. Baltimore Co., Md.*, 913 F.2d 113, 126-27 (4th Cir. 1990); *Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987). The court declines to reject the fee request altogether on lack of specificity, because the overall request of 154.1 hours does not "shock the conscience" and Ms. Whipper Hamilton's records are not completely lacking in detail. *Cf. Fair Housing Council v. Landow*, 999 F.2d 92, 97 (4th Cir. 1993) (holding that district court may completely deny attorney's fees to a partially successful plaintiff who sought over $500,000 in attorney's fees without adequately detailed records).

### b.    Duplication of Effort

Relatedly, Defendants argue that the Moultrie Plaintiffs' billing records are so broad that they cannot discern whether there was impermissible duplication of effort. After reviewing counsels' declarations and billing records, the court disagrees.[8] Even if the Moultrie Plaintiffs' attorneys performed somewhat overlapping tasks, so long as their work is not needlessly duplicative, they are still entitled to a reasonable amount of fees. *See, e.g., Broome v. Biondi*, 17 F.Supp.2d 230, 235 (S.D.N.Y. 1997) ("While it is true that redundant work should not be billed, many tasks require or benefit from the attention of more than one attorney. Therefore, the presence and collaboration of multiple lawyers do not, by themselves, indicate needless duplication."). After a thorough review

---

[8] The court's earlier conclusion that the majority of the billing records are sufficiently detailed to enable a general review for reasonableness enables the court to readily review the records for unnecessary duplication, of which there is none.

9

of the billing records, the court sees no unnecessary duplicitous efforts, but rather, collaboration amongst three qualified counsel on a case of great importance and difficulty. It is common for more than one attorney to appear in a case, and fees may not be discounted solely on that basis. *See Avalon Cinema Corp. v. Thompson*, 689 F.2d 137 (8th Cir. 1982). In fact, Charleston County was represented by seven attorneys, five from the County Attorney's office and two private attorneys. "Defendants themselves had several attorneys in the courtroom during trial which supports the court's prior observation that 'attorneys seldom try cases alone; counsel for defendants certainly did not.'" *Broome*, 17 F.Supp.2d at 235.

Further, the Moultrie Plaintiffs have represented to the court that "counsel have exercised caution to avoid duplication . . . their motions and motion responses avoided duplicating or covering the same ground as [co-plaintiff] the United States . . . at trial, only lead counsel McDonald attended the entire trial . . . with other counsel being present generally for witnesses whom they were examining or cross-examining." (Pl. Mot. At 3-4). Accordingly, Charleston County's argument that the billing records are too broad to determine whether there was duplicitous effort fails, as the billing records are sufficiently detailed, and Plaintiffs' counsels did not unnecessarily duplicate their efforts.

### c.    Failure to Distinguish Between The Results Claim and The Intent Claim

In objecting to the vagueness of the billing records, Charleston County additionally argues that the itemization impermissibly fails to distinguish between hours expended on the results claim versus the intent claim. While records should be maintained in a way that allows the court to identify distinct claims, *see Hensley*, 561 U.S. at 437, it is not significant that the hourly records do not provide detail of hours expended per claim because the court holds that the Moultrie Plaintiffs' claims were related, not distinct. *See infra* at 16-24. Hence, there is no need for the court to

distinguish between the hours spent on each claim. *See Certain v. Potter*, 330 F.Supp.2d 576, 583 (M.D.N.C. 2004) (holding that it was unnecessary to impose a reduction in counsel's hours for lack of detail by claim where the court found that the claims were related and compensable).

### d.    Undesirability of the Case

Defendants also object to the tenth *Johnson* factor - the undesirability of the case. Charleston County claims that the case was desirable, as demonstrated by the fact that it was litigated by the United States. *See* Def. Mem. at 9 ("[C]ontrary to Private Plaintiffs' assertions, this case clearly was not 'undesirable.' Rather, the opposite is true - the case was litigated by the United States."). The court remains puzzled as to how the United States' involvement in the matter necessarily means the case was desirable, as the Government chooses cases to litigate based on their importance to public law or the magnitude of the alleged legal violation, not their desirability. It is well-settled that civil rights cases, particularly those that are controversial and those that are based on contingent fees, are often not desirable to attorneys. *See Rainey v. Jackson State College*, 551 F.2d 672, 677 (5th Cir. 1977) (finding that a free speech case was not desirable under *Johnson* where counsel risked public disfavor in challenging the State Board of Trustees of Institutions of Higher Learning, citizens of stature in the state).[9]

### e.    Overhead Expenses

Finally, Defendants object that the billing improperly includes overhead expenses, including postage expenses and time counsel spent preparing itemized billing statements. However,

---

[9] In fact, Section 1988 was enacted with the purpose of ensuring access to the judicial process for civil rights plaintiffs, *see Hensley,* 461 U.S. at 429, given that these cases were often undesirable because attorneys could not obtain compensation.

11

reasonable litigation expenses include such expenses as "secretarial costs, copying, telephone costs and necessary travel." *Trimper v. City of Norfolk, Va.*, 58 F.3d 68, 75 (4th Cir. 1995). Courts have awarded postage costs as part of attorney's fees and costs. *See Certain*, 330 F.Supp.2d at 591-92. Further, "[i]t is well-settled that reasonable time and expenses spent preparing a fee petition are compensable . . . because 'the fee application is a necessary part of the award of attorney's fees.'" *Am. Canoe Ass'n.,* 138 F.Supp.2d. at 746, *citing Trimper*, 58 F.3d at 77. The court holds that the Moultrie Plaintiffs are entitled to receive compensation for costs and hours that include postage and time spent preparing the billing statements.

After a thorough consideration of Defendants' arguments with respect to the reasonableness of the hours, the court believes that Laughlin McDonald is entitled to compensation for 969.85 hours, Armand Derfner for 647.5 hours, and Cheryl Whipper Hamilton for 115.58 hours.[10] It is not unreasonable that Plaintiffs' counsel spent 1,732.93 hours on this action, particularly in light of the multiple appeals pursued by Charleston County and the time and labor required to litigate the suit, pursuant to the first *Johnson* factor. In short, defendants "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by plaintiff in response." *City of Riverside v. Rivera*, 477 U.S. 561, 580 (1986).

### 2.    Reasonable Rate[11]

---

[10] This figure reflects a 25% deduction from Ms. Whipper Hamilton's requested 154.1 hours.

[11] Plaintiffs filed two interim fee petitions on March 20, 2003 and August 28, 2003. Both of those petitions contained fee calculations that included a 5% deduction for time spent on the intentional discrimination issue in the amount of $15,455. Plaintiffs explain the reduction was included in those previous petitions "in the interest of cooperation and a desire to see this case end." (Pl. Mot. at 5). The present motion does not contain such a discount, and a discount is not required since the court finds that the prevailing results claim is related to the intent claim, *infra*.

The court must next determine a reasonable hourly rate for Plaintiffs' counsel. *See Hensley*, 461 U.S. at 433. Defendants argue that the hourly rates requested by Attorneys McDonald, Derfner, and Hamilton are too high. Mr. McDonald requests a rate of $400 an hour; Mr. Derfner requests $400 an hour; Ms. Whipper Hamilton seeks $250 an hour.[12]

In determining a reasonable hourly rate for the Moultrie Plaintiffs' counsel, the court finds most relevant *Johnson* factors five, nine, and twelve: (5) the customary fee for such services; (9) the experience, reputation and ability of the attorney; and (12) awards in similar cases. *See Wagner v. Dillard Dep't Stores, Inc.*, 2000 WL 33321252, at *2 (M.D.N.C. 2000). In light of these factors, a reasonable hourly rate should be calculated according to "prevailing market rates." *Blum v. Stenson*, 465 U.S. 866, 895 (1984). The court addresses each counsel's situation in turn.

### a.    Mr. McDonald

Attorney McDonald documents that he spent 969.85 hours on this case at a rate of $400 per hour. Plaintiffs have submitted Mr. McDonald's Declaration, in which he details the extent of his expertise and experience in the area of voting rights and affirms that the rate of $400 would be reasonable given his experience. (McDonald Decl.)

Mr. McDonald is the author of numerous publications on the subject of voting rights, including a manual on voting rights litigation. (McDonald Decl. at 6). He has also been counsel in approximately 28 other voting rights cases. (*Id.* at 7-8). Mr. McDonald has further testified before Congress on voting rights matters. In light of this evidence, the court acknowledges Mr. McDonald's extensive expertise in complex voting rights litigation.

---

[12] The Moultrie Plaintiffs also seek compensation for a law clerk at a rate of $100 per hour, a rate to which the Defendants have not objected.

The Moultrie Plaintiffs argue that a survey of Mr. McDonald's home bar (Fulton County, Georgia) shows that all lawyers average approximately $300 an hour, with partners ranging up to $571 an hour, and that a rate of $400 is reasonable in comparison.  (McDonald Decl., Exhibit C).  While in *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313 (4th Cir. 1988), the Fourth Circuit observed that the community in which the court sits is the first place to look to in evaluating the prevailing market rate, "[r]ates charged by other attorneys in other cities, however, may be considered 'when the complexity and specialized nature of a case may mean that no attorney, with the required skills is available locally,' and the party choosing the attorney from somewhere else acted reasonably in making the choice."  *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 179 (4th Cir. 1994), *quoting Nat'l Wildlife*, 859 F.2d at 317.  In this case, both criteria are satisfied.  The litigated issues here were complicated voting rights and constitutional questions.  As Mr. McDonald is a specialist in this field and regularly litigates cases involving the questions at issue, his rate need not be adjusted downward.  *See Rum Creek*, 31 F.3d at 179 (reversing the district court's downward adjustment of out-of-town counsel's rates when the issues "included questions of preemption and constitutional law" and out-of-town counsel were "concededly well-experienced in the type of matters involved.").  Moreover, here Plaintiffs made a "reasonable" choice in choosing counsel since Mr. McDonald is Director of the Southern Regional Office of the American Civil Liberties Union, which accepts cases involving the constitutional and civil rights of minorities on a non-fee generating basis.  Accordingly, the requirements of *National Wildlife* are met and the court declines to reduce the rates charged.

In consideration of Mr. McDonald's extensive expertise, his affiliation with the ACLU, and the market rates in Fulton County, Georgia, the court finds that the rate of $400 an hour is

reasonable.

### b.    Mr. Derfner

Attorney Derfner documents that he spent 647.5 hours on this case at a rate of $400 per hour. Plaintiffs have submitted Mr. Derfner's Declaration, in which he details the extent of his expertise and experience in civil rights litigation and affirms that the rate of $400 would be reasonable given his experience.  (Derfner Decl.)

Mr. Derfner has been principal counsel in approximately eighteen voting rights cases. (Derfner Decl. at 2).  Mr. Derfner's experience with the Voting Rights Act also stems from Supreme Court arguments, law review articles and other publications, and congressional testimony.  *Id.* As with Mr. McDonald, Mr. Derfner has extensive expertise in complex voting rights and other civil rights litigation.

Consideration of the customary fees awarded in similar litigation and the awards in other cases further support a rate of $400 per hour for Mr. Derfner.  Mr. Derfner has received similar fees in this district.  *See, e.g. IUE -CWA v. EnerSys, Inc.,* C.A. No. 3:01-4766-10 (D.S.C. Aug. 10, 2004) (approving a rate of $450 for Mr. Derfner approximately one year ago).[13]  Given Mr. Derfner's wealth of experience and similar past awards, the court believes his requested rate of $400 per hour is reasonable.[14]

---

[13]  While Defendants argue that this case was distinguishable because it was an organized labor class action lawsuit and resulted in a large settlement, the court nonetheless finds the rate Mr. Derfner received in *IUE-CWA* relevant, as that rate was based, at least in part, on testimony from an expert witness regarding rates in this district for complex litigation.  Moreover, while the present litigation was not a class action, it was equally challenging, and involved a four-year commitment by Mr. Derfner.

[14]  With respect to both Mr. Derfner and Mr. McDonald, the court notes that the County employed a redistricting expert at the rate of $500 per hour.  *See* Pl. Suppl. Ex. 1, Docket # 201.

### c.    Ms. Whipper Hamilton

Attorney Whipper Hamilton documents that she spent 154.1 hours on this case at a rate of $250 per hour.[15]  Plaintiffs have submitted Ms. Whipper Hamilton's Declaration, where she detailed her experience as an Assistant Solicitor for the County of Charleston, South Carolina.  Ms. Whipper Hamilton presently practices general civil litigation.  She also serves as a legal advisor to the Legal Redress Committee of the North Charleston Branch of the NAACP.

Hourly rates in the range of $200 to $300 per hour have been commonly awarded in South Carolina.  *See, e.g., Boyd,* 929 F.Supp. at 943 (approving a rate of $250 per hour in 1995).  Based on Ms. Hamilton's experience, the court holds that $250 an hour is a reasonable rate for Ms. Whipper Hamilton.[16]

### B.    Analysis of Results Obtained

After calculating the lodestar figure, the court must consider whether to adjust the fee award upward or downward, particularly in light of the results obtained in litigation.  "The Court's opinion in *Hensley* indicates that this determination is of such importance that the district court should make it separate from, and subsequent to, the calculation of the lodestar figure."  *ECOS, Inc. v. Brinegar*, 671 F.Supp. 381, 399 (M.D.N.C. 1987).  Analysis of the result obtained "is particularly crucial

---

Mr. Derfner and Mr. McDonald are receiving less compensation than this, and are both unquestionably as experienced and qualified as Mr. Packman.

[15]  As noted above, Ms. Whipper Hamilton's hours have been discounted to 115.58.

[16]  The court finds that the Moultrie Plaintiffs are not bound to the rates submitted in their two previous interim applications for attorney's fees.  Nearly two years, and two appeals, have passed since those previous petitions were filed, and it is appropriate that counsel be awarded current fees.  *See Daly v. Hill*, 790 F.2d 1071 (4th Cir. 1986).  The court believes that the requested rates of $400, $400 and $250 respectively are reasonable, as discussed above.

16

where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Hensley*, 461 U.S. at 435.

Because the Moultrie Plaintiffs intent claim was rejected, the court must utilize a two-part inquiry to determine whether the fee award should be reduced accordingly. First, the court must determine if the unsuccessful claim is related to the prevailing claim. If, as here, a plaintiff prevails on some claims but not others, related claims may be compensated, but unrelated claims may not. *Id*. Second, if the claims are related the court must measure the degree of success achieved by the plaintiff in awarding compensation for attorney's fees. *Id*. If a plaintiff "has obtained excellent results, his attorney should recover a fully compensatory fee," but if a plaintiff has achieved only partial or limited success, full compensation may be excessive and the award should be reduced accordingly. *See id*. Charleston County's final argument in support of a reduction of fees is that work spent on the intent claim should be excluded from the lodestar calculation because the intent claim was unsuccessful.[17]

### 1.    Relationship Between the Claims[18]

---

[17] Defendants challenge the degree of success obtained by the Moultrie Plaintiffs as part of their challenge to the reasonableness of the fee request. The court addresses this issue after calculation of the product of reasonable hours times a reasonable rate, and will adjust that product, if appropriate, as directed by the *Hensley* court. *See Hensley*, 461 U.S. at 434. While other courts have considered the degree of success in the initial calculation of the lodestar figure, the court believes that the truest application of *Hensley* requires a separate analysis of the distinctiveness of the claims <u>after</u> the calculation of the lodestar figure. *See id*.

[18] Plaintiffs argue that they presented only one claim for relief, which was then supported by alternate legal theories:

> The ground was that the method discriminated against African-American voters in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and there were two legal theories for this: one theory was that the at-large method had a discriminatory result, while the other theory was that it had a discriminatory intent. Both theories supported the same relief . . . .

(Pl. Mot. at 4-5; Pl. Mem. at 14-16). The court is not persuaded by this argument and finds that the

Pursuant to *Hensley*, the court must first identify the relationship between the successful and unsuccessful claims, or in other words, determine whether the Moultrie Plaintiffs' intent claim is related to their successful results claim.[19]  The relationship between the claims determines whether attorney's fees may be awarded.  If the claims are unrelated, the plaintiff should not be compensated for time attorneys spent pursuing the unsuccessful claim.  *See Certain*, 330 F.Supp.2d at 583, *citing Hensley*, 461 U.S. at 435).  However, when the claims are related, a plaintiff who has won substantial relief should not be awarded diminished attorney's fees simply because the district court

---

Moultrie Plaintiffs presented two *claims* against Charleston County, a results claim and an intent claim.  The Moultrie Plaintiffs were successful on only one of those claims, necessitating the *Hensley* analysis.  Regardless, the distinction between claim and theory is not dispositive, because the court finds that the results and intent claims were related for the reasons enumerated herein.

Similarly, the court declines to invoke the doctrine of judicial estoppel as urged by Charleston County.  (Def. Mem. at 5-7).  Judicial estoppel "is an equitable doctrine invoked by a court at its discretion."  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  Defendants seek to invoke this doctrine to prevent the Moultrie Plaintiffs from arguing that they pursued two legal theories, not claims in the underlying action.  The three essential elements of judicial estoppel are clearly not present here.  *See id.* at 750-51.  First, the Moultrie Plaintiffs' argument that they presented two legal theories is not clearly inconsistent with an earlier position, because there was no representation of a legal position to this court.  The statements cited by Defendants are broad, offhand remarks that simply reference the Moultrie Plaintiffs' case, *e.g.* counsel's reference to the intentional discrimination issue as separate from the United States' case.  (Def. Mem. at 5-6).  Secondly, the alleged inconsistent position was never accepted by this court.  Thirdly, and most importantly, the Moultrie Plaintiffs did not intentionally mislead this court to gain unfair advantage.  In holding that judicial estoppel should not be invoked, the court is mindful that "[b]ecause of the harsh results attendant with precluding a party from asserting a position that would normally be available to the party, judicial estoppel must be applied with caution."  *See Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996).

[19]  Plaintiffs appear to argue that *Hensley* does not control here because their intentional discrimination claim was not reached by the Fourth Circuit and is therefore "undecided" and not rejected.  (Pl. Mot. at 5).  However, the Moultrie Plaintiffs rely extensively on the *Hensley* analysis throughout their memoranda.  (Pl. Mem. at 15-20, Pl. Reply at 2-8).  This court was the highest authority to speak to the intent claim, and rejected that claim.  *See Charleston Co.*, 316 F.Supp.2d at 304.  That ruling was undisturbed by the Fourth Circuit.  Therefore, *Hensley* applies.

did not adopt each contention raised.  *Hensley*, 461 U.S. at 440.

Courts have taken an approach "that is more in tune with the realities of litigation . . . '[f]or tactical reasons and out of caution[,] lawyers often try to state their client's claim in a number of different ways . . . he is not to be penalized just because some, or even all but one, are rejected, provided that the one or ones that succeed give him all that he reasonably could have asked for.'" *Tauber v. City of Chicago*, 33 F.Supp.2d 699, (N.D.Ill. 1999), *quoting Lenard v. Argento*, 808 F.2d 1242, 1245 (7th Cir. 1987).  Under this approach, related claims are based on "a common core of facts or . . . related legal theories, [where] [m]uch of counsel's time [is] devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Hensley*, 461 U.S. at 435.  In contrast, unrelated claims are "distinctly different claims for relief that are based on different facts and legal theories . . . [where] counsel's work on one claim will be unrelated to his work on another claim [and] [a]ccordingly, work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.'" *Hensley*, 461 U.S. at 435 (quoting *Davis v. Co. of Los Angeles*, 1974 WL 180, *3 (C.D.Cal. 1974)).

Here, the court finds that the two claims presented by the Moultrie Plaintiffs are related because both claims sought the same relief.  The Moultrie Plaintiffs, through their results and intent claims, pursued a single remedy, a court order enjoining Charleston County's at-large election method. (Pl. Mot. at 4-5).  Consequently, those claims are related for purposes of an attorney's fee award.  *See Emery v. Hunt*, 272 F.3d 1042 (8th Cir. 2001) (holding that the unsuccessful Section 2 federal law claims were related to the successful state law claims because, in addition to the claims sharing a common core of operative facts, both claims, on different grounds, sought to abolish a multi-member voting district).

19

More importantly, the court finds that the Moultrie Plaintiffs claims are related because they share a common core of facts in the history of the at-large voting method and past racial discrimination in Charleston County.[20]  *Compare City Consumer Services, Inc. v. Horne*, 631 F.Supp. 1050, 1052 (D.Utah 1986) (finding claims related where all claims arose out of the same transactions, counsel devoted time generally to the litigation as a whole, and the evidence to prove different claims was not distinct, despite each claim having been brought under different statutes and different legal theories), *with West Virginia Univ. Hospitals, Inc. v. Casey,* 898 F.2d 357, 362 (3rd. Cir. 1990) (finding that a successful challenge to a hospital Medicaid reimbursement system was not related to an unsuccessful challenge to the administrative appeals system because the second claim dealt with a totally different subject and had a different factual matrix, the two programs were governed by different statutes, and the two issues involved different legal theories and analysis).

---

[20] Plaintiffs' Memorandum describes in greater detail the degree of interrelatedness in the common core of facts supporting both claims, and highlights the significance of the history of the at-large system and of past discrimination in Charleston County.  Specifically, the Moultrie Plaintiffs provided evidence to this court concerning the opposition of white political leaders to desegregation and attempted black enfranchisement, the exclusion of blacks from the local decision-making process, and polarized voting in the County.

In finding that the County's at-large election method violated Section 2 of the Voting Rights Act of 1965, this court gave great weight to such historical evidence of discrimination.  "The essence of a Section 2 results-claim is that an 'electoral law, practice, or structure interacts with social *and historical conditions* to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives.'"  *Charleston Co.*, 316 F.Supp.2d at 275, *quoting Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (emphasis added).  Emphasizing the historical evidence provided by Plaintiffs, this court held that "African Americans in Charleston County, on account of their race, have inherited a depressed socioeconomic posture which hinders political participation and exacerbates the effect of already severely polarized voting."  *Id.* at 304.

The same historical background and history that supported the results claim was also relevant to the claim of intentional discrimination.  *See Village of Arlington Heights v. Metropolitan Housing Develop. Corp.*, 429 U.S. 252, 264-68 (1977); *Rogers v. Lodge*, 458 U.S. 613, 623-27 (1982).  Furthermore, Charleston County's own expert witness, Dr. Moore, presented a report that extensively outlined the history of discrimination in South Carolina.  Given this, it would be difficult to conclude that the claims were truly distinct.

Because the result and intent claims share a common core of facts, counsels' work on both claims was interconnected, and work on the unsuccessful intent claim was expended in pursuit of the ultimate result achieved. *Compare Board of Educ. of Frederick Co. v. I.L. ex rel.,* 358 F.Supp.2d 462,466 (D.Md. 2005) (holding that, despite the different relief sought by each claim, they were nevertheless related because both claims had a common core of facts, related legal theories, and counsel's preparation would have been the same even if those claims had not been brought), *with Certain*, 330 F.Supp.2d at 585 (reducing the fee award for counsel's time spent solely on unsuccessful constructive-discharge and state-law claims that were unrelated to the successful hostile work environment and retaliation claims and that work did not aid the litigation as a whole).

Defendants argue that the Moultrie Plaintiffs' intentional discrimination claim may be severed from their successful results claim.  (Def. Mem. at 2).  Contrary to Defendants' argument, this case is not controlled by *Figueroa-Torres v. Toledo-Davilla*, 232 F.3d 270 (1st. Cir. 2000).  In *Figueroa-Torres*, the First Circuit held that the plaintiffs' unsuccessful claim of supervisory liability for alleged mistreatment of a deceased prisoner was unrelated to their successful claim of individual liability against the arresting officers, because discovery on the unsuccessful claim would have included a much wider and more diverse set of facts than discovery relating to individual liability, and the facts proving liability on each legal theory would have been wholly different.  *See id.* at 278-79.  *Figueroa-Torres* is not analogous to this lawsuit because the Moultrie Plaintiffs (1) conducted the same discovery to support both claims, (2) utilized common facts to support both claims, and (3) brought both claims against the same parties, unlike the plaintiffs in *Figueroa-Torres* who brought one claim against the arresting officers and another against their supervisors.  Unlike here, *Figueroa-Torres* involved distinct claims that could have been brought in separate lawsuits.  The

Moultrie Plaintiffs brought related claims supported by a common core of facts against Charleston County.  Accordingly, the results claim and the intent claim are not severable.[21]

The Moultrie Plaintiffs "would have presented substantially the same evidence even if they had not raised a purpose claim [and] . . . virtually everything in the discussion of the purpose claim was relevant to the Section 2 results claim."  (Pl. Brief in Supp. at 18-19).  Since the court finds that the two claims are interrelated, it would be unreasonable to ask Plaintiffs' attorneys to divide the hours they spent on each claim.  *See Broome*, 17 F. Supp.2d at 234 (finding that the plaintiffs' unsuccessful claims for intentional infliction of emotional distress rested squarely on the same facts as their successful claim of discrimination in housing and that the factual commonalities underlying the claims rendered time spent on both virtually indivisible); *Cf. Abshire v. Walls*, 830 F.2d 1277, 1282-83 (4th Cir. 1987) (holding that division of hours between interrelated claims was impossible because the facts behind the successful strip search claim were inextricably intertwined with the facts behind the unsuccessful false arrest, false imprisonment and malicious prosecution claims so

---

[21] Likewise, the court is not persuaded by *Lenard v. Argento*, 808 F.2d 1242, (7th Cir. 1987), another case upon which Defendants rely.  In *Lenard*, the plaintiff prevailed on his civil rights claim that officers had conspired to violate his equal protection rights during an arrest.  The 7th Circuit held that Lenard's unsuccessful claim alleging that he was beaten during his arrest was related to the equal protection claim, and therefore compensable, because both claims originated out of the same incident, his arrest.  However, the court found that Lenard's other claims of malicious prosecution and conspiracy to prosecute maliciously, were not related because those claims were conceptually different from the arrest claims and were only connected sequentially.  In other words, although the prosecutorial claims would not have arisen if Lenard had not been arrested, they were connected to the arrest claims only in that they occurred in a sequence of events but still had distinct factual bases.  In contrast, here, the claims involve the same system and are not related by sequence, but by historical fact.

Similarly, the court is not persuaded by Charleston County's reliance on *Goodwin v. Metts*, 973 F.2d 378, 383 (4th Cir. 1992).  *Goodwin* also involved claims related only by a sequence of events.

that it would be impossible to isolate counsel's inquiry into the successful claim only).[22]  Similarly, the historical evidence offered in support of the intent claim is inextricably intertwined with the successful results claim and it would be impossible to isolate counsels' inquiry into either.  Only "time spent on claims for relief that are unsuccessful and unrelated to the ultimate result achieved are not compensable." *Jackson v. Ill. Prisoner Review Board*, 856 F.2d 890, 894 (7th Cir.1988). Accordingly, the court holds that counsels' work on both claims may be compensated.

## 2.    Analysis of Results and Success

The second prong of *Hensley* directs the court to measure the overall result obtained in litigation and the degree of success achieved by the plaintiff in awarding compensation for attorney's fees.  *Hensley*, 461 U.S. at 435.  The fact that the claims are related does not mandate a full recovery.  "Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised" *Id.* at 440.  However, if "a plaintiff has achieved only partial or limited success[,]" full compensation may be excessive and the district court may either attempt to identify specific hours that should be eliminated or reduce the award to account for the limited success.  *Id.* at 435, 436-37.  Further, in calculating an award, the court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*

---

[22] The court notes that while the Fourth Circuit found a common core of facts so that it was impossible to isolate counsel's inquiry into the claims in *Abshire*, the Fourth Circuit distinguished that case from the facts in *Goodwin*, where the court found that the attorneys could have isolated their inquiry and easily presented evidence establishing each element of the successful claim without developing the facts surrounding the entire sequence of events and the unsuccessful claims.  *See Goodwin*, 973 F.2d at 382-83.

The Moultrie Plaintiffs prevailed on their Section 2 results claim, but not on their related intent claim. Regardless, the Moultrie Plaintiffs won the only relief they sought, an invalidation and injunction of the at-large voting method in Charleston County. Courts have previously reduced awards when plaintiffs have not achieved complete success in obtaining the desired remedy. *See Page v. Trustees of Sandhills Community College*, 1999 WL 1937475, *16 (M.D.N.C. 1999) (awarding 80% of fees because the plaintiff received damages from her retaliation claim but not from her discrimination claim); *Taylor v. Runyon*, 1999 WL 1940009, *10 (E.D.N.C. 1999) (applying a 5% reduction in fees because the plaintiff did not receive the compensatory and punitive damages sought). In contrast, "a plaintiff who prevail[s] on only one of several interrelated claims and w[ins] essentially complete relief should receive a fee award equal to the lodestar amount." *Johnson v. Orr*, 897 F.2d 128, 132 (3rd Cir. 1990), *citing Hensley*, 461 U.S. at 436; *see also Denton v. Boilermakers Local 29*, 673 F.Supp. 37, 54 (D.Mass 1987) (holding that the plaintiff who prevailed on a Title VII claim and not other related state claims, but who nevertheless received all of the relief he was seeking through various theories, should be treated the same as a plaintiff who prevails on all claims and receives full relief).

This judgment changed the voting system in place in Charleston County since 1969. *See Charleston Co.*, 316 F.Supp.2d at 274. The court found this system to be "a significant impediment to African-Americans' ability to gain equal access to the electoral process in Charleston County." *Charleston Co.*, 316 F.Supp.2d at 294.[23] While the intent claim was unsuccessful, the Moultrie

---

[23] The court may also consider benefit to the public at-large from the relief obtained by the Plaintiffs and "the public benefit may assume a principal significance in the court's calculus." *Popham v. City of Kennesaw*, 820 F.2d 1570, 1580 (11th Cir. 1987) (holding that a lawsuit challenging an arrest did not result in specific, identifiable benefits to non-parties, particularly since it did not challenge an institutional practice of police misconduct). The court finds it significant that the elimination of the at-large method of electing County Council representatives removed a 34-year

24

Plaintiffs did receive the full relief sought and, consequently, the court will not reduce the lodestar

determination of appropriate attorney's fees in light of the result obtained.[24]

### C.    Total Reasonable Attorney's Fees

Accordingly, based on the discussion above, the court finds that the Moultrie Plaintiffs are

entitled to attorney's fees in the amount of $675,835.[25]  While at first glance this may appear to be

a high figure, as highlighted throughout this Order, the litigation required a great commitment of

time and effort by extremely talented lawyers, and spanned almost four years.  Moreover, the

County's own attorneys document costs of over a million dollars as of April 2003, well-before the

case was finished (and, in fact, almost a year prior to the Fourth Circuit's ruling).  (Pl. Mem., Ex 1)

(detailing the County's fees as of April 17, 2003 as $1,053,443.43).[26]  While the determination of

---

old barrier to equal access to the electoral process by African-Americans, and finds that this public
benefit further bolsters the court's conclusion that the Moultrie Plaintiffs achieved more than merely
limited success.
    Furthermore, the court notes that attorney's fees should not be reduced because the Plaintiffs
sought no monetary damages.  Civil rights litigation achieves a public benefit and seeks to vindicate
important civil rights that cannot be valued solely in monetary terms.  *See Rivera*, 477 U.S. at 574-
76 (holding that an award of attorney's fees that exceeded the monetary damages awarded in trial
was not excessive because of the public benefit in prevailing in a civil rights action against the
police department aimed at ending practice of police brutality against the Hispanic community).

[24]  The court declines to order that the parties submit to mediation on attorney's fees,
particularly in light of the past contentious litigation and in interest of an expeditious end to this
litigation.

[25]  This figure is calculated as follows:
    Attorney Laughlin McDonald: 969.85 hours at $400/hour = $387,940
    Attorney Armand Derfner: 647.5 hours at $400/hour = $259,000
    Attorney Cheryl Whipper Hamilton: 115.58 hours at $250/hour = $28,895
The sum of $387,940, $259,000, and $28,895 is $675,835.

[26]  As of May 2004, it appears that the County's attorneys' fees total over $1.8 million
dollars.  *See* Pl. Suppl. Ex. 1, Docket # 201.

the reasonableness of the Moultrie Plaintiffs' fees is by no means judged by a comparison to the County's fees, the large amount of money spent by the County simply demonstrates how much effort and expense was required to adequately prosecute or defend this matter. The court has also reviewed the Moultrie Plaintiffs' submitted costs and finds that the requested amount of $36,192.71 is likewise reasonable. Accordingly, the Moultrie Plaintiffs are entitled to $712,027.71 in fees and costs.

### CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that the Moultrie Plaintiffs' Motion for Attorneys' Fees and Costs Pursuant to 42 U.S.C. § 1988 is hereby **GRANTED** in the amount of $712,027.71.

**AND IT IS SO ORDERED.**

**s/ Patrick Michael Duffy**

**PATRICK MICHAEL DUFFY**
**UNITED STATES DISTRICT JUDGE**

**Charleston, SC**
**August 8, 2005**

26